1 ANDREW J. WAXLER, SBN 113682
  WON M. PARK, SBN 194333
2 WAXLER♦CARNER♦BRODSKY LLP
  1960 East Grand Avenue, Suite 1210
3 El Segundo, California 90245
  Telephone:  (310) 416-1300
4 Facsimile:  (310) 416-1310
  e-mail:     awaxler@wcb-law.com
5 e-mail:     wpark@wcb-law.com

6 Specially Appearing for Respondent
  BRETT L. GIBBS
7

8                UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10

11 INGENUITY 13 LLC,                  ) Case No.  2:12-CV-8333-ODW (JCx)
                                      )
12        Plaintiff,                  ) [Assigned to Judge Otis D. Wright, II ]
                                      )
13     vs.                            ) **BRETT L. GIBBS' RESPONSE TO**
                                      ) **THE COURT'S FEBRUARY 7, 2013**
14 JOHN DOE,                          ) **OSC**
                                      )
15        Defendant.                  ) [Filed Concurrently with Declaration of
   _____) Brett Gibbs In Support of Response to
16                                       February 7, 2013 OSC And Request For
                                         Judicial Notice In Support of Response]
17
                                        [Complaint Filed: August 1, 2012]
18
                                        Date:  March 11, 2013
19                                      Time:  1:30 p.m.
                                        Dept:  11
20
                                        Trial date: None set
21

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

                                  1

1

## **TABLE OF CONTENTS**

2   I.    INTRODUCTION ................................................................................ 2

3   II.   STATEMENT OF FACTS ................................................................. 3

4         A.   Brett L. Gibbs, Esq. ............................................................... 3

5         B.   The Copyright Assignment and Alan Cooper ...................... 4

6              1.   AF Holdings LLC ........................................................ 4

7              2.   Ingenuity 13, LLC ....................................................... 6

8   III.  MR. GIBBS DID NOT VIOLATE THE COURT'S OCTOBER
9         19, 2012 ORDERS ............................................................................ 8

10  IV.   A REASONABLE INVESTIGATION AND INQUIRY WAS
          CONDUCTED BEFORE ALLEGING COPYRIGHT
11        INFRINGEMENT AND ALLEGING BENJAMIN WAGAR
          AND MAYON DENTON WERE THE INFRINGERS .............................. 12

12        A.   *Ingenuity 13, LLC v. Doe*, Case No. 2:12-cv-6662-
13             ODW(JCx) .............................................................................. 12

14        B.   *Ingenuity 13, LLC v. Doe*, Case No. 2:12-cv-6668-
               ODW(JCx) .............................................................................. 16

15        C.   Ingenuity Conducted a Reasonable Inquiry Before
16             Alleging Copyright Infringement ......................................... 20

17        D.   Ingenuity Conducted a Reasonably Inquiry Before
               Naming Benjamin Wagar and Mayon Denton ..................... 22

18             1.   Mr. Gibbs Conducted a Reasonable Inquiry Before
19                  Naming Benjamin Wagar ............................................ 22

20             2.   Mr. Gibbs Conducted a Reasonable Inquiry Before
                    Naming Mayon Denton ................................................ 23

21  V.    MR. GIBBS DID NOT MISAPPROPRIATE THE NAME OF
22        ALAN COOPER AND THE LAWSUITS ARE NOT BASED
          ON AN INVALID COPYRIGHT ASSIGNMENT ..................................... 24

23  VI.   CONCLUSION ................................................................................. 27

24

25

26

27

28

1

# <u>TABLE OF AUTHORITIES</u>

2

**<u>Cases</u>**

3

*A&M Records v. Napster, Inc.,*

4

    239 F.3d 1004, 1011-14 (9th Cir.2001) .......................................................... 21

5

*Effects Associates, Inc. v. Cohen,*

6

    908 F.2d 555 (9th Cir. 1990) .................................................................. 25, 26

7

*Feist Publications, Inc. v. Rural Tel. Serv. Co.,*

8

    499 U.S. 340 (1991) ....................................................................................... 20

9

*In re Aimster Copyright Litig.,*

10

    334 F.3d 643 (7th Cir.2003) ......................................................................... 20

11

*Narrell v. Freemean,*

12

    872 f.2d 907 (9th Cir.1990) ......................................................................... 20

13

*Rice v. Fox Broad. Corp.,*

14

    330 F.3d 1170 (9th Cir.2003) ....................................................................... 20

15

**<u>Statutes</u>**

16

17 U,S.C. § 204 .............................................................................................. 25, 26

17

**<u>Rules</u>**

18

Fed. R. Civ. P. 8 ................................................................................................... 21

19

20

21

22

23

24

25

26

27

28

1

## I.    **INTRODUCTION**

2    These cases arise from the theft of Plaintiffs' copyrighted work through
3 Internet "peer to peer" file sharing sites that allow the infringers to remain faceless
4 and anonymous.  Whether ignorant or more likely scornful of the copyrights, these
5 anonymous file sharers likely discount the likelihood of being identified and
6 prosecuted for copyright infringement.  The conduct of these infringers violate the
7 exclusive rights of the owners of the copyrighted material to reproduce and
8 distribute the material.  To be clear, these individuals hiding behind the cloak of
9 secrecy created by the Internet are breaking the law.

10    Mr. Gibbs, and other attorneys, are retained by the owners of these copyrights
11 to identify and prosecute these anonymous individuals.  The facts relating to these
12 cases demonstrate that Mr. Gibbs, as counsel for the owners of the copyrights, only
13 sought to protect his clients' property interests in these copyrighted materials.  Mr.
14 Gibbs is not an owner of the copyrights, he does not, and did not, make strategic
15 decisions like whether to file actions, who to sue, and whether to make a certain
16 settlement demand or accept an offer of settlement.  (Declaration of Brett L. Gibbs,
17 Esq. ("Gibbs Decl.") ¶ 3).  All of these types of decisions were made by the clients,
18 after consulting with senior members of the law firm that employed Mr. Gibbs in an
19 "of counsel" relationship. (Gibbs Decl. ¶ 3).

20    Moreover, Mr. Gibbs has never had any financial interest in either of the two
21 underlying plaintiffs, AF Holdings, LLC or Ingenuity 13 LLC.[1]  (Gibbs Decl. ¶¶ 9
22 & 12).  Nor does Mr. Gibbs have any financial interest in any law firm that has
23 represented these clients.  (Gibbs Decl. ¶¶ 7 & 8).

24

25

26

27    [1] Livewire Holdings LLC recently purchased AF Holdings LLC.  AF Holdings LLC
thereafter became a wholly owned subsidiary of Livewire Holdings LLC.  In January of 2013, Mr.
28 Gibbs was hired as in house counsel for Livewire Holdings LLC.  Mr. Gibbs does not have a
financial or ownership interest in Livewire Holdings, LLC.  (Gibbs Decl. ¶ 9).

Mr. Gibbs takes very seriously the issues raised in this OSC.  He hopes to explain, through this brief, that he has not misled this Court.  Most importantly, Mr. Gibbs is very sorry that the Court is concerned with his conduct.  Mr. Gibbs has strived to be honest and forthright with this Court, and all courts during his legal career.  (Gibbs Decl. ¶ 4).

## II.   STATEMENT OF FACTS

### A.   Brett L. Gibbs, Esq.

Mr. Gibbs is a 2007 graduate of the University of California, Hastings College of Law.  He started practicing law in December 2007 at a small tax firm in Oakland, California, Taggart and Hawkins P.C ("Taggart and Hawkins").  (Gibbs Decl. ¶ 5).

Mr. Gibbs' relationship with Taggart and Hawkins was abruptly terminated on July 10, 2009, when he was diagnosed with inoperable/incurable Grade III/IV brain cancer.  Mr. Gibbs stopped practicing law for almost two years while focusing on his health and cancer treatments during that time.  He endured two brain surgeries, six-weeks of radiation, and 18 months of chemotherapy during that period.  (Gibbs Decl. ¶ 6).

In 2011, Mr. Gibbs wanted to ease back into the practice of law.  On March 14, 2011, he was contacted and hired by Steele Hansmeier PLLC (hereinafter "S&H").  Mr. Gibbs began litigating copyright infringement cases in California on behalf of clients of S&H in or around March 2011.  Mr. Gibbs was an independent-contract attorney for S&H and litigated cases for the firm in his capacity as "Of Counsel."  (Gibbs Decl. ¶ 7).  Mr. Gibbs has never been a partner of or had an ownership interest in S&H.  (Gibbs Decl. ¶ 7).

In or around November 2011, Mr. Gibbs was informed that S&H, and its book of business, had been sold to a Chicago firm, Prenda Law, Inc. ("Prenda"), and the principal of Prenda, Paul Duffy.  (Gibbs Decl. ¶ 8).  Mr. Gibbs was also informed that he would continue his work as "Of Counsel" and would continue in

his role as an independent contract attorney for Prenda, pursuing copyright infringement actions on behalf of the clients he had been representing while he worked for S&H. (Gibbs Decl. ¶ 8). Mr. Gibbs has never been a partner of or had an ownership interest in Prenda. (Gibbs Decl. ¶ 8).

### B.    The Copyright Assignment and Alan Cooper

#### 1.    AF Holdings LLC

AF Holdings, LLC ("AF Holdings") was, and is, a limited liability company formed under the laws of the Federation of Saint Kitts and Nevis. (Dkt. No.1 to Case No. 2:12-cv-6636-ODW(JCx); Gibbs Decl. ¶ 9, Exhibit 1 thereto – AF Holdings' Certificate of Formation). Mr. Gibbs has never had a financial or fiduciary (i.e., ownership) interest in AF Holdings. (Gibbs Decl. ¶ 9). AF Holdings was a client of S&H and then Prenda. (Gibbs Decl. ¶ 9). The face-to-face and direct interactions between S&H and later Prenda with AF Holdings were handled by the senior members of the law firms and not Mr. Gibbs. (Gibbs Decl. ¶ 9). As explained to and understood by Mr. Gibbs, AF Holdings was and is a valid company with assets including, but not limited to, the copyrights at issue in these litigations. (Gibbs Decl. ¶ 9).

Pursuant to an assignment agreement dated December 20, 2011, Heartbreaker Digital LLC ("Heartbreaker") assigned the rights to reproduce and distribute the film, "Popular Demand" to AF Holdings. The agreement for Popular Demand was executed by "Raymond Rogers, on behalf of: Assignor[,] Heartbreaker Digital LLC" and "Alan Cooper, on behalf of: Assignee[,] AF Holdings, LLC." (Dkt. No. 1, Exhibit B in Case No. 2:12-cv-06636-ODW(JXc)). Popular Demand has a valid registered copyright issued by the United States Copyright Office, registered by Heartbreaker on August 9, 2011 (Popular Demand, Copyright No. PA0001754383). (Dkt. No.1, Exhibit A in Case No. 2:12-cv-06636-ODW(JXc)).

On or around June 21, 2011, Mr. Gibbs filed his first copyright case for AF Holdings entitled, *AF Holdings LLC v. Does 1-97*, United States District Court for

the Northern District of California Case No. 4:11-cv-03067-CW ("Case No. 3067"). (Request for Judicial Notice ("RJN") No. 1 – Complaint in Case No. 3067; Gibbs Decl. ¶ 10). Mr. Gibbs had never heard of AF Holdings prior to representing it in Case No. 3067. (Gibbs Decl. ¶ 10). When filing Case No. 3067 and representing AF Holdings in other cases, Mr. Gibbs had only one clearly defined relationship with AF Holdings: he was a contracted outside attorney representing AF Holdings in California on behalf of S&H (and later Prenda) in his role as Of Counsel to those law firms. (Gibbs Decl. ¶ 10). Mr. Gibbs was informed and believed and still believes that AF Holdings is and was a company that owns the rights to copyrighted movies that were and are being uploaded and downloaded over the Internet by anonymous infringers. (Gibbs Decl. ¶ 10).

Mr. Gibbs has never met Alan Cooper, and does not know what the extent of Mr. Cooper's role is in AF Holdings aside from seeing a signature from an "Alan Cooper" on the aforementioned assignment and pleadings. (Gibbs Decl. ¶ 11). As per the aforementioned assignment agreement, AF Holdings held the valid and exclusive rights to reproduce and distribute the film. (Gibbs Decl. ¶ 11). Mr. Gibbs was not present when the assignment agreement was executed. (Gibbs Decl. ¶ 11). Mr. Gibbs has never had any direct contact with either Raymond Rogers or Alan Cooper. (Gibbs Decl. ¶ 11). Mr. Gibbs has also never executed a document as "Alan Cooper." (Gibbs Decl. ¶ 11). Mr. Gibbs did not play a role in or have knowledge of the assignment transaction at issue. (Gibbs Decl. ¶ 11). Moreover, Mr. Gibbs was given the assignment agreement by senior members of S&H and told that it was a true and correct copy of the copyright assignment and to include it as an exhibit in complaints filed on behalf of AF Holdings LLC. (Gibbs Decl. ¶ 11). Before filing any such complaints, Mr. Gibbs confirmed that AF Holdings was in fact the valid copyright holder. (Gibbs Decl. ¶ 11).

## 2.    Ingenuity 13, LLC

Ingenuity 13, LLC ("Ingenuity") was, and is, a limited liability company formed and existing under the laws of the Federation of Saint Kitts and Nevis. (Dkt. No.1, ¶ 1 – Complaint in Case No. 2:12-cv-6662-ODW(JCx); Gibbs Decl. ¶ 12). As explained to Mr. Gibbs, Ingenuity is a valid company with assets including, but not limited to, the copyrights at issues in these cases. (Gibbs Decl. ¶ 12). Mr. Gibbs has never had a financial or fiduciary interest (i.e., ownership) in Ingenuity. (Gibbs Decl. ¶ 12). Ingenuity was a client of S&H and then Prenda. (Gibbs Decl. ¶ 12). The face-to-face and direct interactions between S&H and later Prenda with Ingenuity were handled by the senior members of the law firms and not Mr. Gibbs. (Gibbs Decl. ¶ 12).

On or around October 28, 2011, Mr. Gibbs, as counsel for Ingenuity, filed his first copyright infringement case on behalf of Ingenuity entitled *In the Matter of Ingenuity 13 LLC*, United States District Court for the Eastern District of California, Case No. 2:11-mc-00084-JAM-DAD ("Case No. 84"). (RJN No. 2 – Petition to Perpetuate Testimony without exhibits in Case No. 84; Gibbs Decl. ¶ 13). Before representing Ingenuity in Case No. 84 and other copyright infringement actions, Mr. Gibbs had never heard of Ingenuity. (Gibbs Decl. ¶ 13). When filing Case No. 84 and representing Ingenuity in other cases, Mr. Gibbs had only one clearly defined relationship with Ingenuity:  he was acting as a contracted outside attorney representing Ingenuity in California in copyright infringement actions on behalf of S&H (and later Prenda) in his role as Of Counsel to those law firms. (Gibbs Decl. ¶ 13). Mr. Gibbs was informed and believes that Ingenuity is and was a company that owns the rights to copyrighted movies that were being uploaded and downloaded over the Internet by anonymous infringers. (Gibbs Decl. ¶ 13).

Case No. 84 was based on a verified petition to perpetuate testimony and, as stated therein, was intended to allow Plaintiff to identify alleged copyright infringers of Ingenuity's copyrighted works.  The petition was verified through an electronic

1  signature by "Alan Cooper".  Pursuant to Eastern District of California Local Rule

2  131(f), Mr. Gibbs confirmed that counsel for Ingenuity had a signed original

3  notarized verification for the petition.  (Gibbs Decl. ¶ 14).

4      Prior to filing *any* verified petitions on behalf of Ingenuity, it was Mr. Gibbs'

5  custom and practice to confirm that the verification of the authorized agent of the

6  client existed.  (Gibbs Decl. ¶ 15).  Mr. Gibbs confirmed that the client-executed

7  verification existed either by seeing a copy of the signed verification, or at the very

8  least, being informed by a representative of S&H or Prenda that a signed verification

9  was in the possession of S&H or Prenda.[2]

10      In Case No. 84, Ingenuity's request to perpetuate testimony was granted by

11  the Court on or around November 14, 2011 and the petition was discharged.[3]  (RJN

12  No. 4 – Order Granting Verified Petition to Perpetuate Testimony in Case No. 84).

13  Mr. Pietz first asked for a copy of Mr. Cooper's verification to the petition to

14  perpetuate testimony on or about December 2012, well after the case had been

15  discharged.  (Gibbs Decl. ¶ 16).  Given the length of time that the case has been

16  closed, Prenda (which took over for S&H mid-case), believes it no longer has a copy

17  of Mr. Cooper's verification to the petition to perpetuate testimony.  (Gibbs Decl. ¶

18  16).

19

20

21

22  ———————————

23

24  [2] In another action contested by Mr. Pietz, *Guava, LLC v. Comcast Cable Communications, LLC*, In the Circuit Court for the Twentieth Judicial Circuit, St. Clair County, Illinois Case No. 12-MR-417, Mr. Pietz made a similar claim that the verified petition was

25  improper or possibly fraudulent.  (Gibbs Decl. ¶ 17).  However, Mr. Pietz's unsupported claims were dispelled and proven incorrect by the fact that the verification to the petition had been

26  notarized.  (RJN No. 3, Petition for Discovery, In the Circuit Court for the Twentieth Judicial Circuit, St. Clair County, Illinois Case No. 12-MR-417).

27

28  [3] On March 21, 2012 the Court reversed its prior ruling granting Ingenuity's request to perpetuate testimony.  On March 23, 2012, Ingenuity filed a motion for reconsideration of the March 21, 2012 order.

### III.   MR. GIBBS DID NOT VIOLATE THE COURT'S OCTOBER 19, 2012 ORDERS

On August 1, 2012, AF Holdings filed its Complaint in the case entitled *AF Holdings, Inc. v. Doe*, United States District Court for the Central District of California Case No. 2:12-cv-6636-ODW(JCx) ("Case No. 6636") (Dkt. No. 1 to Case No. 6636).   On August 2, 2012, AF Holdings filed its Complaint in the case entitled *AF Holdings, Inc. v. Doe*, United States District Court for the Central District of California Case No. 2:12-cv-6669-ODW(JCx) ("Case No. 6669") (Dkt. No. 1 to Case No. 6669).

On or about August 24, 2012, AF Holdings filed *ex parte* applications in Case No. 6636 and Case No. 6669 for leave to take expedited discovery.   (Dkt No. 10 to Case No. 6636 and Dkt. No. 6 to Case No. 6669).   The basis of the *ex parte* applications was that while AF Holdings could identify each of the "Doe" copyright infringers by IP address, it could not do so by name until it could obtain the name and physical address of the IP subscriber by subpoenaing the Internet Service Provider ("ISP").

On August 29, 2012, the Honorable Fernando M. Olguin granted AF Holdings *ex parte* application in Case No. 6669.   (Dkt. No. 8 to Case No. 6669).   On September 4, 2012, the Honorable Frederick F. Mumm granted AF Holdings' *ex parte* application for leave to take expedited discovery in Case No. 6636.   (Dkt. No. 11 to Case No. 6636).   On August 30, 2012, AF Holdings issued a subpoena to defendant's ISP, Verizon Online LLC, in order to obtain information regarding the subscriber associated with the IP address in Case No. 6669.   (Gibbs Decl. ¶ 18).   On September 5, 2012 and September 6, 2012, AF Holdings issued a subpoena to ISP, Verizon Online LLC, in order to obtain information regarding the subscriber associated with the IP address in Case No. 6636.   (Gibbs Decl. ¶ 18).

The subpoenas to the ISPs in Case No. 6669 and 6636 were issued by a Prenda attorney from the U.S. District Court for the Northern District of Illinois.

1   (Gibbs Decl. ¶ 19).  Any responses to the subpoenas from the ISPs were mailed by

2   the ISPs to a mailbox in Chicago and not to Mr. Gibbs.  (Gibbs Decl. ¶ 19). The

3   information associated with these responses would then be made available to Mr.

4   Gibbs through a computer database after the information had been processed.

5   (Gibbs Decl. ¶ 19).

6         On October 19, 2012, the Court, issued its Order Vacating Prior Early

7   Discovery Orders and Order to Show Cause in Case No. 6636 and 6669 (the

8   "October 19, 2012 Orders").  (Dkt. No. 13 to Case no. 6636 and Dkt. No. 10 to Case

9   No. 6669).  The October 19, 2012 Orders directed AF Holdings to "cease its

10  discovery efforts relating to or based on information obtained through any

11  abovementioned Rule 45 subpoenas."  In addition, AF Holdings was to submit a

12  discovery status report detailing its discovery efforts in the case with respect to

13  "identifying or locating the Doe Defendant."  The report was to "name all persons

14  that have been identified, including subscribers, through any Rule 45 subpoenas."

15        In light of the requirement of Rule 4(m) to identify and serve the infringers

16  within 120 days of the filing of the complaints, Mr. Gibbs reasonably interpreted the

17  October 19, 2012 Orders to cease "discovery" to preclude him from pursuing formal

18  discovery related to the Rule 45 subpoenas, but did not preclude him from informal

19  investigation to identify and name the infringers.  (Gibbs Decl. ¶ 20).  In other

20  words, Mr. Gibbs believed and interpreted the October 19, 2012 Orders as only

21  precluding him from engaging in any formal discovery efforts such as pressuring the

22  ISPs to respond to the subpoenas that had been served and precluding him from

23  serving any additional subpoenas.  (Gibbs Decl. ¶ 20).

24        Indeed, following receipt of the October 19, 2012 Orders, Mr. Gibbs caused

25  the Court's October 19, 2012 Orders to be served on the registered agents for

26  service of process of Verizon Online LLC (and the other ISPs) to ensure that

27  Verizon Online LLC had notice not to respond to the subpoenas that had already

28

1 been served. (Gibbs Decl. ¶ 21). This is certainly not the action of an attorney that
2 was attempting to evade the Court's orders.

3      In preparation to draft AF Holdings' response to the Court's October 19, 2012
4 Orders, Mr. Gibbs made a reasonable investigation by accessing  the computer
5 database to determine what information, if any, had been returned in response to the
6 subpoenas. With respect to Case No. 6636 and 6669, Mr. Gibbs determined based
7 on the information in the computer database that the ISPs had not responded to the
8 subpoenas for the subscriber information. (Gibbs Decl. ¶ 22). On November 1,
9 2012, AF Holdings submitted its joint report in response to the Court's October 19,
10 2012 Orders (the "November 1, 2012 Report"). (Dkt No. 10 to Case No. 2:12-cv-
11 5709-ODW(JCx)). In Case Nos. 6636 and 6669, AF Holdings' reported that it had
12 not received any information regarding the subscribers and as AF Holdings had no
13 information regarding the subscribers, had not contacted the subscribers in any
14 manner.

15      However, in responding to the Rule 45 subpoenas, the ISPs normally mailed
16 their responses to a mailbox in Chicago and not directly to Mr. Gibbs. (Gibbs Decl.
17 ¶ 19). To Mr. Gibbs' knowledge, the responses are then picked up by Prenda and
18 the information from the responses is uploaded to a computer database accessible by
19 Mr. Gibbs. (Gibbs Decl. ¶ 19). Thus, there is a certain amount of "lag" time
20 between the information being mailed by the ISPs until Mr. Gibbs is able to view
21 the information from the responses on the computer database.

22      Thus, on or about November 7, 2012, *after* AF Holdings filed its response to
23 the Court's October 19, 2012 Order - and after serving each ISP with notice of the
24 Court's order - information in response to the subpoenas issued to Verizon Online
25 LLC in Case Nos. 6636 and 6669 was uploaded to the computer database. (Gibbs
26 Decl. ¶ 23). Accordingly, the November 1, 2012 Report which states that AF
27 Holdings had not received any information regarding the subscribers in Case Nos.
28

6636 and 6669 and the subscribers had not been contacted in any manner was accurate as of the November 1, 2012 filing date.

As AF Holdings was still faced with the 120 day Rule 4(m) deadline to serve the complaints in Case Nos. 6636 and 6669 in November 2012, Mr. Gibbs had a duty to perform further informal investigation to comply with the Rule 4 deadlines. Mr. Gibbs believed that the Court's October 19, 2012 Orders did not prevent him from attempting to identify the infringers in Case Nos. 6636 and 6669 through informal means. Thus, an informal investigation was conducted in an attempt to identify the infringers in Case Nos. 6636 and 6669. (Gibbs Decl. ¶ 24).

Indeed, on December 20, 2012, the Court issued an OSC Re: Lack of Service in Case No. 6636 directing AF Holdings to show cause why defendant had not been timely served. (Dkt. No. 14 to Case No. 6636). Moreover, on December 21, 2012, the Court issued an OSC Re: Lack of Service in Case No. 6669 directing AF Holdings to show cause why defendant had not been timely served. (Dkt. No. 17 to Case No. 6669). On December 27, 2012, AF Holdings responded to the Court's December 20, 2012 OSC Re: Lack of Services in Case No. 6636 and the Court's December 21, 2012 OSC Re: Lack of Services in Case No. 6669. (Dkt. No. 15 to Case No. 6636 and Dkt. No. 18 to Case No. 6669). AF Holdings responded in relevant part that it had identified Ignacio Ibarra in Case No. 6636 and Chaz Forsyz in Case No. 6669.

Faced with the 120 days service deadline of Rule 4(m), Mr. Gibbs reasonably interpreted the Court's October 19, 2012 Orders as precluding formal discovery related to Rule 45 subpoenas - both those that had returned (i.e. no further discovery as to those) and those that had not (i.e. the information not received from the ISPs because they had been presented with the Court's October 19 Order) - but allowing AF Holdings to continue its informal investigation to identify the infringers. Thus, Mr. Gibbs did not violate the Court's October 19, 2012 Orders.

**IV.    A REASONABLE INVESTIGATION AND INQUIRY WAS**
**CONDUCTED BEFORE ALLEGING COPYRIGHT INFRINGEMENT**
**AND ALLEGING BENJAMIN WAGAR AND MAYON DENTON**
**WERE THE INFRINGERS**

As discussed in greater detail below, a reasonable inquiry was made before Ingenuity asserted its claims for copyright infringement and named Benjamin Wagar and Mayon Denton as defendants.

First, the claim for copyright infringement was based on confirmation that the infringers had downloaded complete copies of the copyrighted film.

Moreover, Mr. Gibbs did not appreciate that the Court, through its December 20, 2012 and December 21, 2012 OSCs re:  Lack of Service, had an expectation that Ingenuity would provide a complete recitation of all specific steps taken by Mr. Gibbs to indentify the infringers.  (Gibbs Decl. ¶ 25).  Mr. Gibbs only understood the Court to be requesting Ingenuity summarize why the defendants in each case had not been served.  Accordingly, Ingenuity's December 27, 2012 responses to the OSCs was intended to provide a summary of Mr. Gibbs' efforts regarding service of the complaints and not a complete recitation of all steps taken by Mr. Gibbs' to identify the infringers.  (Gibbs Decl. ¶ 25).

**A.    *Ingenuity 13, LLC v. Doe*, Case No. 2:12-cv-6662-ODW(JCx)**

On August 2, 2012, Ingenuity filed its Complaint in the case entitled *Ingenuity 13, LLC v. Doe*, United States District Court for the Central District of California Case No. 2:12-cv-6662-ODW(JCx) ("Case No. 6662") (Dkt. No. 1 to Case No. 6662).

On or about August 24, 2012, Ingenuity filed its *ex parte* application in Case No. 6662 for leave to take expedited discovery.  (Dkt. No. 6 to Case No. 6662).  The basis of the *ex parte* application was that while Plaintiff could identify the "Doe" copyright infringer by IP address, Ingenuity could not do so by name until it could obtain the name and physical address of the IP subscriber by subpoenaing the ISP.

In support of the *ex parte* application, Ingenuity submitted the declaration of Peter Hansmeier who monitored and documented Internet based piracy of copyrighted creative content on behalf of Ingenuity.  Specifically, Mr. Hansmeier attested in relevant part:

> "After recording granular level data about every peer in the swarm, the next step is to carefully and thoroughly review the data produced by 6881's proprietary forensic software to determine what peers were actually involved in illegally reproducing and distributing Plaintiff's Video. When a verified peer was located who made Plaintiff's copyrighted Video available for distribution and reproduction via the BitTorrent protocol, I downloaded and retained both the torrent files and the actual digital reproductions being offered for distribution to verify that the digital copies being distributed in the swarm were in fact copies of the Plaintiff's copyrighted Video. Because a file could be mislabeled, corrupt or otherwise not an actual copy of Plaintiff's Video, I physically downloaded the file and compared it to an actual copy of the Video to confirm that the file was a substantially-similar reproduction of the copyrighted Video." (Dkt. No. 6 to Case No. 6662, Exhibit A – Hansmeier Declaration, ¶ 25).

***

> "In this case, I personally observed John Doe's IP address, listed in the Complaint (ECF No.1 ¶ 4), downloading and uploading the Video in a BitTorrent swarm. **Once obtaining a full version of the Video file, John Doe (then a 'seeder') shared pieces of the copyrighted Video**

13

1   **file (i.e. 'seed') with other individuals (i.e. 'peers').**[4]   (Dkt. No. 6 to

2   Case No. 6662, Exhibit A – Hansmeier Declaration, ¶ 27).

3   On August 27, 2013, the Honorable Paul L. Abrams granted Ingenuity's *ex parte*

4   application. (Dkt. 7 to Case No. 6662). On August 28, 2012, Ingenuity issued a

5   subpoena to defendant's ISP, Verizon Internet Services, in order to obtain

6   information regarding the subscriber associated with the IP address in Case No.

7   6662. (Gibbs Decl. ¶ 26).

8   The subpoena return identified David Wagar as the Internet subscriber whose

9   IP address had been observed uploading and downloading Ingenuity's movie, "Five

10   Fan Favorites." (Gibbs Decl. ¶ 26). On November 7, 2012, Mr. Gibbs sent a letter

11   to David Wagar informing him that he had been identified by Verizon, and his IP

12   address assigned to him had been observed illegally downloading and sharing

13   Ingenuity's movie. The letter further explained why the subscriber information had

14   been requested/released; explained that, in light of the infringement, a lawsuit was

15   likely to ensue against the infringer; informed him that he was "not being directly

16   accused of committing the infringement" himself; notified he "or a member of [his]

17   household" could be named in the suit; reached out to David Wagar on any

18   information he had that could allow Mr. Gibbs to identify the infringer; and

19   encouraged him to call Mr. Gibbs to "meet and confer prior to bringing any further

20   litigation." (Gibbs Decl. ¶ 27, Exhibit 2 thereto – November 7, 2012 Letter).

21   Ingenuity's counsel followed up the November 7, 2012 letter by calling David

22   Wagar on November 8, 2012 and spoke with him. (Gibbs Decl. ¶ 28). When asked

23   about the infringement, David Wagar stated that he was not the infringer. Mr.

24

25

26   [4] Mr. Gibbs is concerned that the Court believed that Ingenuity's claims for copyright
    infringement in Case No. 6662 and 6668 were only based on a "snapshot" observation of

27   copyright infringement. As discussed in greater detail below, before Case Nos. 6662 and 6668
    were transferred to Judge Wright, Ingenuity submitted the declaration of Mr. Hansmeier in support

28   of its *ex parte* applications to take expedited discovery in which Mr. Hansmeier confirmed that the
    infringers had downloaded the entire copyrighted films.

1  Wagar also informed Ingenuity's counsel that it was only he and his wife in the
2  household.    Ingenuity's counsel also inquired about the specific time period
3  surrounding the date and time of the alleged infringement--i.e. June 28, 2012 at 7:19
4  UTC - and David Wagar stated that he and his wife were the only ones at the house
5  during that time, and had been for years.  (Gibbs Decl. ¶ 28).

6       Following the November 8, 2012 telephone discussion with David Wagar,
7  Ingenuity's counsel conducted a further investigation of David Wagar.  Based on the
8  information obtained from the subpoena return from Verizon, David Wagar lived at
9  1411 Paseo Jacaranda, Santa Maria, California 93458.  Ingenuity's counsel
10  conducted a public information search of David Wagar that revealed, among other
11  things, that despite David Wagar's claim that his household only consisted of him
12  and his wife, that the house was also occupied by their son, Benjamin Wagar, who
13  according to the search had been living at 1411 Paseo Jacaranda, Santa Maria,
14  California 93458 since 1999.  (Gibbs Decl. ¶ 29).

15       Ingenuity's counsel thereafter conducted a web 2.0 search which revealed
16  that, among other interactions with the Internet, Benjamin Wagar had a Facebook
17  page whereby he showed interest in online video games which demonstrated that
18  Benjamin Wagar likely had access to an Internet connection during this time while
19  he appeared to be living at 1411 Paseo Jacaranda, Santa Maria, California 93458.
20  (Gibbs Decl. ¶ 30).

21       Moreover, in order to rule out neighbors of the 1411 Paseo Jacaranda, Santa
22  Maria, California 93458 location utilizing the internet connection, Ingenuity's
23  counsel performed a Google map search and obtained a satellite picture of the
24  corner house located at 1411 Paseo Jacaranda, Santa Maria, California 93458.   A
25  further public search revealed that the house was approximately 1,200 sq. ft. which
26  sat on a 6,534 sq. ft. lot.  Considering the position of the house on the lot, and its
27  position away from the neighboring houses, it seemed clear that, should the

28

1  household have wireless internet, it would not have been accessible by the
2  neighbors. (Gibbs Decl. ¶ 31).

3  David Wagar did not respond to the November 7, 2013 letter. Therefore, on
4  November 21, 2013, a second letter was sent to David Wagar. The November 21,
5  2013 letter recommended that David Wagar "retain an attorney;" and again
6  encouraged him, or his attorney, to contact Ingenuity's counsel to discuss the matter.
7  Again, neither David Wagar, nor anyone else from his household, responded to
8  Ingenuity's efforts. (Gibbs Decl. ¶ 32, Exhibit 3 thereto – November 21, 2013
9  Letter).

10  On December 11, 2012, Ingenuity's counsel made a further attempt to
11  telephone the Wagar household. Ingenuity's counsel was not able to reach anyone
12  in the household and left a message on the answering machine stating that it
13  intended to name Mr. Benjamin Wagar in Case No. 6662 unless someone in the
14  household could provide information that Benjamin Wagar was not the alleged
15  infringer. Although Ingeuity's counsel requested and encouraged Benjamin and/or
16  David to respond with any potential facts to the contrary, the call was never
17  returned. (Gibbs Decl. ¶ 33).

18  On December 26, 2012, Defendant filed its amended complaint naming
19  Benjamin Wagar as the defendant. (Dkt. No. 13 to Case No. 6662).

20  **B.**   ***Ingenuity 13, LLC v. Doe*, Case No. 2:12-cv-6668-ODW(JCx)**

21  On August 2, 2012, Ingenuity filed its Complaint in the case entitled
22  *Ingenuity 13, LLC v. Doe*, United States District Court for the Central District of
23  California Case No. 2:12-cv-6668-ODW(JCx) ("Case No. 6668"). (Dkt. No. 1 to
24  Case No. 6668). On or about August 24, 2012, Ingenuity filed its *ex parte*
25  application in Case No. 6668 for leave to take expedited discovery. (Dkt. No. 6 to
26  Case No. 6668). The basis of the *ex parte* application was that while Ingenuity
27  could identify the "Doe" copyright infringer by IP address, it could not do so by
28

1 name until it could obtain the name and physical address of the IP subscriber by

2 subpoenaing the ISP.

3   In support of the *ex parte* application, Ingenuity submitted the declaration of

4 Mr. Hansmeier who monitored and documented Internet-based piracy of

5 copyrighted creative content on behalf of Ingenuity. Specifically, Mr. Hansmeier

6 attested:

7   "After recording granular level data about every peer in the swarm, the

8   next step is to carefully and thoroughly review the data produced by

9   6881's proprietary forensic software to determine what peers were

10   actually involved in illegally reproducing and distributing Plaintiff's

11   Video. When a verified peer was located who made Plaintiff's

12   copyrighted Video available for distribution and reproduction via the

13   BitTorrent protocol, I downloaded and retained both the torrent files

14   and the actual digital reproductions being offered for distribution to

15   verify that the digital copies being distributed in the swarm were in fact

16   copies of the Plaintiff's copyrighted Video. Because a file could be

17   mislabeled, corrupt or otherwise not an actual copy of Plaintiff's Video,

18   I physically downloaded the file and compared it to an actual copy of

19   the Video to confirm that the file was a substantially-similar

20   reproduction of the copyrighted Video." (Dkt. No. 6 to Case No. 6668,

21   Exhibit A – Hansmeier Declaration, ¶ 25).

22         ***

23   "In this case, I personally observed John Doe's IP address, listed in the

24   Complaint (ECF No.1 ¶ 4), downloading and uploading the Video in a

25   BitTorrent swarm. **Once obtaining a full version of the Video file,**

26   **John Doe (then a 'seeder') shared pieces of the copyrighted Video**

27   **file (i.e. 'seed') with other individuals (i.e. 'peers').**" (Dkt. No. 6 to

28

1    Case No. 6668, Exhibit A – Hansmeier Declaration, ¶ 27).  (Emphasis

2    added).

3       On August 27, 2013, the Honorable Stephen J. Hillman granted Ingenuity's

4    *ex parte* application for leave to take expedited discovery in Case No. 6668.  (Dkt.

5    No. 7 to Case No. 6668).  On August 28, 2012, Ingenuity issued a subpoena to,

6    Charter Communications, in order to obtain information regarding the subscriber

7    associated with the IP address in Case No. 6668.  (Gibbs Decl. ¶ 34).

8       The subpoena return identified Marvin Denton as the Internet subscriber

9    whose IP address had been observed uploading and downloading Ingenuity's video,

10   "Five Fan Favorites."  (Gibbs Decl. ¶ 34).  On October 28, 2012, Ingenuity's

11   counsel called Marvin Denton.  However, the phone number provided by Charter in

12   its supboena return was no longer in service.  (Gibbs Decl. ¶ 34).

13      On November 8, 2012 a letter was sent to Marvin Denton.  The November 8,

14   2012 letter informed Marvin Denton of the information that had been released by his

15   ISP and why it was requested/released; explained that, in light of the infringement, a

16   lawsuit was likely to ensue against the infringer; informed him that he was "not

17   being directly accused of committing the infringement" himself; notified he "or a

18   member of [his] household" could be named in the suit; reached out to Marvin

19   Denton on any information he had that could allow Ingenuity to identify the

20   infringer; and encouraged him to call Ingenuity's attorney to "meet and confer prior

21   to bringing any further litigation."  Mr. Gibbs did not receive a response to the

22   November 8, 2012 letter.  (Gibbs Decl. ¶ 35, Exhibit 4 thereto – November 8, 2012

23   Letter).

24      Ingenuity also initiated a further investigation to identify the infringer.  The

25   return in response to the subpoena from Charter Communications stated that Marvin

26   Denton lived at 635 S. Vanderwell Avenue, West Covina, California 91790.

27   Ingenuity conducted a public information search of Marvin Denton.  The public

28   information search revealed, among other things, that there were three other

individuals who were living in the house located at 635 S. Vanderwell Avenue, West Covina, California 91790: two females (ages 65 and 33), and Mayon Denton (age 31). (Gibbs Decl. ¶ 36).

Additional research was performed as to Mayon Denton which revealed that he had been involved in, or the owner of, four different movie production companies during, or prior to, the alleged date of the infringement (i.e. July 4, 2012). Most notably, at least one of those production companies was active and operating (according to the public database search) before, during and beyond July 7, 2012 and the business was located at the same address as the residence that Charter had provided Internet access to - 635 S. Vanderwell Avenue, West Covina, California 91790. This company, Against the Grain Film, LLC, which listed Mayon Denton as a "Member", has a website--http://www.againstthegrainfilm.com/-- that has video content on the site which directly stated that Mayon Denton was the "Film Editor" of the film advertised on the site and also that the film had been "Executive Produced by" Mayon Denton. In light of the fact that activities such as film editing are now almost exclusively performed on the computer, this suggested that not only did Mayon Denton have home Internet access through his father's Charter account, but also that he had a large amount of computer expertise with regard to online films. (Gibbs Decl. ¶ 37).

According to the public look-up investigation conducted by Ingenuity, DRG Films LLC was also being operated from 635 S. Vanderwell Avenue, West Covina, California 91790 -- Mayon had also been involved with another company, Infamous Money, which had also been involved in the film production industry. (Gibbs Decl. ¶ 37).

Moreover, in order to rule out neighbors of the property located at 635 S. Vanderwell Avenue, West Covina, California 91790 utilizing the internet connection, Ingenuity utilized Google maps and obtained a satellite picture of the property. The satellite photo revealed that the property was a very large estate

1  consisting of a gate for entry and multiple separate houses/structures on the
2  property.  Further, through another publically available search, the house was
3  identified as approximately 1,304 sq. ft. sitting on a 7,620 sq. ft. lot.  Considering
4  the position of the house and the neighboring properties, including the seemingly
5  main house on the lot, it seemed clear that, should the household have wireless
6  Internet, it likely was not accessible by its neighbors.  (Gibbs Decl. ¶ 38).

7      Marvin Denton did not respond to the November 8, 2013 letter.  Therefore, on
8  November 22, 2013, a second letter was sent to Marvin Denton.  The November 22,
9  2013 letter recommended that Marvin Denton "retain an attorney;" and again
10 encouraged him, or his attorney, to contact Ingenuity's counsel to discuss this
11 matter.  Again, neither Marvin Denton, nor anyone else from his household,
12 responded to Ingenuity's attempts to contact them.  (Gibbs Decl. ¶ 39, Exhibit 5
13 thereto – November 22, 2013 Letter).

14     On January 7, 2012, Ingenuity filed its amended complaint naming Mr.
15 Denton.  (Dkt. No. 16 to Case No. 6668).

16     **C.   Ingenuity Conducted a Reasonable Inquiry Before Alleging**
17          **Copyright Infringement**

18     The facts demonstrate that Mr. Gibbs made a reasonable inquiry before
19 alleging copyright infringement.  To prevail on its copyright infringement claims,
20 Ingenuity had to demonstrate (1) ownership of a valid copyright, and (2) copying of
21 constituent elements of the copyrighted work that are original.  *Rice v. Fox Broad.*
22 *Corp.*, 330 F.3d 1170, 1174 (9th Cir.2003) *citing Feist Publications, Inc. v. Rural*
23 *Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

24     Ingenuity could establish the second element by demonstrating that:  (a) the
25 defendant had access to the allegedly infringing work; and (2) the two works (i.e.
26 the original and the reproduction) were substantially similar.  *See Narrell v.*
27 *Freemean*, 872 f.2d 907, 910 (9th Cir.1990);  *See also*, *In re Aimster Copyright*
28 *Litig.*, 334 F.3d 643, 645 (7th Cir.2003) ("If the music is copyrighted, such

swapping, involves making and transmitting a digital copy of the music, infringes copyright.  The swappers, who are ignorant or more commonly disdainful of copyright and in any event discount the likelihood of being sued or prosecuted for copyright infringement, are direct infringers.").  Moreover, use of a website to download and upload copyrighted material (i.e. music or movies) constitutes direct infringement of copyright holders' exclusive rights to reproduce the material and distribute it.  *See A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1011-14 (9th Cir.2001).

Although the respective complaints in Case No. 6662 and 6668 referred to a "snapshot observation" - the references were not intended to be a complete recitation of all of Ingenuity's pre-filing evidence of copyright infringement.  The allegations of the complaints were only intended to satisfy a plaintiff's obligation to allege the basis for jurisdiction with a short and plain statement of the claim and demand for relief.  *See* Fed. R. Civ. P. 8.  (Gibbs Decl. ¶ 40).

Here, in both Case No. 6662 and 6668, Ingenuity submitted the declaration of Mr. Hansmeier who attested that he personally observed the IP addresses listed in the respective complaints downloading and uploading the copyrighted movie in a BitTorrent swarm.  (Dkt. No. 6 to Case No. 6662, Exhibit A, ¶ 27 and Dkt. No. 6 to Case No. 6668, Exhibit A, ¶ 27).  Moreover, Mr. Hansmeier also testified that the Doe defendants obtained the full version of the video file which allowed them to share the video file with other individuals.  (*Id.*).  This was also confirmed by the monitoring reports provided by 6881 Forensics.  (Gibbs Decl. ¶ 40).  Moreover, the percentage downloads -- i.e., a full download -- allowed the infringers to view the video files.  (Gibbs Decl. ¶ 40).  Thus, Ingenuity made a reasonable inquiry and determined that the infringers had copied the "constituent elements of the copyrighted work" and the "the two works (i.e. the original and the reproduction) were substantially similar.

### D. Ingenuity Conducted a Reasonably Inquiry Before Naming Benjamin Wagar and Mayon Denton

As stated by the Court in its February 7, 2013 OSC, there is unlikely any "perfect" way to conclusively identify the infringer during the early phases of discovery for the purposes of naming the infringer in place of the Doe defendants in these types of cases.  In 2012, Mr. Gibbs filed 41 suits in the United States District Court for the Northern District of California on behalf of copyright holders alleging copyright infringement.  Of those 41 suits, 10 were dismissed because there was no viable candidate that could be identified as the infringer, 6 were dismissed because the ISP failed to respond to a subpoena and the alleged infringer was identified in 16 suits of which 11 were served with an amended complaint.  (Gibbs Decl. ¶ 41).  Here, the facts demonstrate that Mr. Gibbs conducted a reasonable inquiry before naming Benjamin Wagar and Mayon Denton in place of the Doe defendants.

### 1. Mr. Gibbs Conducted a Reasonable Inquiry Before Naming Benjamin Wagar

As an initial matter, the subpoena return in Case No. 6662 identified someone other than Benjamin Wagar as the Internet subscriber for the IP address from which the copyright infringement occurred.  If Mr. Gibbs was not going to make a reasonable inquiry to attempt to identify the actual infringer, he simply could have named the Internet subscriber as the defendant rather than conduct additional investigation to try and identify the actual infringer.

Instead of naming the Internet subscriber as the infringer, Mr. Gibbs first attempted to begin a dialogue with the Wagar household in an attempt to identify the actual infringer.  Mr. Gibbs first wrote to the Wagar household to inform them among other issues, why he was contacting them and sought any information that would allow Ingenuity to either exclude them as the infringer or identify the infringer.  This initial attempt to contact the household was followed up with telephone calls by Mr. Gibbs.

Specifically, Mr. Gibbs telephoned and spoke with David Wagar who claimed that only he and his wife were part of the household and denied being the infringer. However, a subsequent records search revealed that David Wagar may have been less than truthful when he informed Mr. Gibbs that only he and his wife were part of the household. The search revealed that their son, Benjamin Wagar, was also living at the residence since 1999 and had access to and used the Internet. Moreover, a Google Maps search also revealed that the residence was positioned in such a manner to make the possibility of a neighbor "stealing" their Internet connection unlikely. Finally, although Mr. Gibbs made additional attempts to contact the Wagars, including requests for information that could show another third-party was the infringer, the attempts to contact them were ignored.

Thus, he made a reasonable inquiry before Benjamin Wagar was named as the Doe defendant in Case No. 6662.

## 2.   Mr. Gibbs Conducted a Reasonable Inquiry Before Naming Mayon Denton

Similarly, in Case No. 6668 the subpoena return identified someone other than Mayon Denton as the Internet subscriber for the IP address from which the copyright infringement occurred. Again, if Mr. Gibbs was not going to make a reasonable inquiry to attempt to identify the actual infringer, he simply could have named the Internet subscriber as the defendant rather than conduct additional investigation to try and identify the actual infringer.

Mr. Gibbs attempted to telephone the Denton household, but was not able to reach anyone. Mr. Gibbs also conducted additional public information searches to identify the members of the household. In particular, a records search revealed Mayon Denton lived at the residence and operated multiple business from the residence related to movie production which revealed that Mayon Denton had both access to the Internet and was technologically sophisticated enough to be the infringer. Moreover, a Google Maps search also revealed that the residence was

1   positioned in such a manner to make the possibility of a neighbor "stealing" their
2   Internet connection unlikely.  Finally, although Mr. Gibbs made additional attempts
3   to contact the Dentons, including requests for information that could show another
4   third-party was the infringer, those attempts were ignored.[5]

5        Thus, the facts demonstrate that Mr. Gibbs did not blindly identify the
6   infringers as a as suggested by the Court's February 7, 2013 OSC and instead made
7   a reasonable inquiry to attempt to identify them.

8   **V.    MR. GIBBS DID NOT MISAPPROPRIATE THE NAME OF ALAN**
9        **COOPER AND THE LAWSUITS ARE NOT BASED ON AN INVALID**
10       **COPYRIGHT ASSIGNMENT**

11       Mr. Gibbs did not misappropriate the identity of Alan Cooper and the
12   litigations are not based on an invalid copyright.

13       Mr. Gibbs is not, and has never been, a principal or owner of either S&H or
14   Prenda.  He also has never had a fiduciary or ownership interest in AF Holdings or
15   Ingenuity.  Mr. Gibbs' only involvement with AF Holdings and Ingenuity was and
16   is as a contracted outside attorney representing AF Holdings in California on behalf
17   of S&H (and later Prenda) in his role as Of Counsel to S&H and Prenda.  In other
18   words, Mr. Gibbs' relationship with AF Holdings and Ingenuity is the same as other
19   straight-forward attorney-client relationships – he is an attorney representing his
20   client in litigation.

21       Moreover, like many non-senior attorneys to a law firm, Mr. Gibbs does not
22   have direct contact with his clients and receives assignments related to the litigation

23
24

_____

25   [5] Mr. Gibbs' request for information that could potentially eliminate the Wagars and
26   Dentons as the infringers is significant.  In other cases of alleged copyright infringement
     prosecuted by Mr. Gibbs, the respective complaints were dismissed without naming a defendant
27   upon the Internet subscriber contacting Mr. Gibbs in response to the inquiries and informing Mr.
     Gibbs that they were not the infringer and providing information such as an unsecured Internet
28   connection or possible unidentified third party guests to the residence.  Here, the Wagars and
     Dentons failed to provide information that would potentially eliminate members - or specifically
     Benjamin and Mayon -of their household as the infringer.  (Gibbs Decl. ¶ 42).

from the senior attorneys. Thus, Mr. Gibbs does not have direct contact with the principals of AF Holdings or Ingenuity.[6] Mr. Gibbs has never met Alan Cooper, and does not know the extent of Mr. Cooper's role is in AF Holdings aside from seeing a signature from an "Alan Cooper" on the aforementioned assignment and pleadings. Indeed, the first time Mr. Gibbs saw the name "Alan Cooper" was on the copyright assignment that was attached to the complaints in the litigations regarding the copyrights. Thus, Mr. Gibbs has not been involved in nor have any knowledge relating to the alleged misappropriation of the identity of Mr. Cooper.

In any event, as copyright law requires only that the assignment be signed by the assignor and not the assignee, the assignment from Heartbreaker to AF Holdings is valid irrespective of the potential issue raised regarding the identity of Alan Cooper. *See* 17 U.S.C. § 204; *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990); *see also* RJN No. 6, *AF Holdings v. Does* 1-96, United States District Court for the Eastern District of California Case No. 3:11-cv-03335-JSC – Order Re: Plaintiff's Renewed Request for Discovery Prior to Rule 26(f) Conference) (Northern District of California Court *specifically* finds that AF Holdings assignment was valid regardless of any alleged issues presented by the assignee).)

Pursuant to the assignment agreement dated December 20, 2011, Heartbreaker assigned the rights to reproduce and distribute the film "Popular Demand" to AF Holdings. The agreement was executed by "Raymond Rogers" on behalf of Heartbreaker and "Alan Cooper" on behalf of AF Holdings. Popular Demand has a valid registered copyright. As the Ninth Circuit asserted in *Effects Associates, Inc. v. Cohen*, "The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright

---

[6] Mr. Gibbs first became aware of a question regarding the identity of Alan Cooper when it was raised by Mr. Pietz. (Gibbs Decl. ¶ 43). Mr. Gibbs has never been accused by Alan Cooper of misappropriating is identity or forging his signature. (Gibbs Decl. ¶ 43).

1  holder to sign a piece of paper saying so.  It doesn't have to be the Magna Charta; a
2  one-line pro forma statement will do." *Id.*

3      Indeed, an issue regarding the validity of the assignment was raised in a
4  similar context and the court held that the there was a valid assignment which
5  supported Mr. Gibbs' good faith belief that the suits were based on a valid
6  assignment.  Specifically, in *AF Holdings, Inc. v. Does 1-96*, United States District
7  Court for the Northern District of California Case No. C-11-03335 JSC, an issue
8  arose regarding whether there was a valid assignment from Heartbreaker to AF
9  Holdings because while the assignment was signed by a representative of
10 Heartbreaker, it was not signed by a representative of AF Holdings.  Instead, the
11 assignment was signed by a representative of AF Films, LLC.  Relying on 17 U.S.C.
12 § 204 and *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990), the
13 Magistrate Judge determined that the inconsistency did not prevent a prima facie
14 showing of copyright ownership because the law only requires the assignment to be
15 signed by the assignor.  (RJN No. 6, *AF Holdings v. Does* 1-96, United States
16 District Court for the Eastern District of California Case No. 3:11-cv-03335-JSC –
17 Order Re: Plaintiff's Renewed Request for Discovery Prior to Rule 26(f)
18 Conference).  Thus, Mr. Gibbs had a good faith basis to believe the assignment was
19 valid.  (Gibbs Decl. ¶ 44).

20     Any attempt to undermine the validity of the assignment is outside Mr. Gibbs'
21 knowledge.  Moreover, despite any alleged issues regarding the validity of the
22 assignment, the law confirms the assignment is valid because it was executed by the
23 assignor.

24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

## VI.   **CONCLUSION**

Based on the foregoing, Mr. Gibbs respectfully requests the Court to discharge its February 7, 2013 OSC.

Dated: February 19, 2013          WAXLER♦CARNER♦BRODSKY LLP


By:   _____
ANDREW J. WAXLER
WON M. PARK
Specially Appearing for Respondent
BRETT L. GIBBS