ANDREW J. WAXLER, SBN 113682
WON M. PARK, SBN 194333
WAXLER♦CARNER♦BRODSKY LLP
1960 East Grand Avenue, Suite 1210
El Segundo, California 90245
Telephone:  (310) 416-1300
Facsimile:  (310) 416-1310
e-mail:     awaxler@wcb-law.com
e-mail:     wpark@wcb-law.com

Specially Appearing for Respondent
BRETT L. GIBBS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INGENUITY 13 LLC,<br><br>    Plaintiff,<br><br>  vs.<br><br>JOHN DOE,<br><br>    Defendant. | Case No.  2:12-CV-8333-ODW (JCx)<br><br>[Assigned to Judge Otis D. Wright, II ]<br><br>**DECLARATION OF BRETT L. GIBBS IN SUPPORT OF RESPONSE TO FEBRUARY 7, 2013 OSC**<br><br>[Filed Concurrently With Response To The Court's February 7, 2013 OSC And Request For Judicial Notice In Support Of Response]<br><br>[Complaint Filed: August 1, 2012]<br><br>Date: March 11, 2013<br>Time: 1:30 p.m.<br>Dept: 11<br><br>Trial date: None set |

**DECLARATION OF BRETT L. GIBBS**

I, Brett L. Gibbs, declare and state as follows:

1.  I am an attorney at law duly licensed to practice before all of the courts in the State of California and the United States District Court for the Central District of California.  I am "Of Counsel" to Prenda Law, Inc., counsel of record for Plaintiffs AF Holdings, LLC ("AF Holdings") and Ingenuity 13, LLC ("Ingenuity") in the actions entitled *AF Holdings, Inc. v. Doe*, United States District Court for the

1

Central District of California Case No. 2:12-cv-6636-ODW(JCx) ("Case No. 6636"), *AF Holdings, Inc. v. Doe*, United States District Court for the Central District of California Case No. 2:12-cv-6669-ODW(JCx) ("Case No. 6669"), *Ingenuity 13 LLC v. Doe*, United States District Court for the Central District of California Case No. 2:12-cv-6662-ODW(JCx) ("Case No. 6662"), *Ingenuity 13 LLC v. Doe*, United States District Court for the Central District of California Case No. 2:12-cv-6668-ODW(JCx) ("Case No. 6668") and *Ingenuity 13 LLC v. Doe*, United States District Court for the Central District of California Case No. 2:12-cv-8333-ODW(JCx) ("Case No. 8333" and collectively the "Copyright Litigations"). I have personal knowledge of the facts set forth below, and I could and would competently testify to them if called upon to do so.

    2.    I make this declaration in support of Brett L. Gibbs' Response to the Court's February 7, 2013 Order to Show Cause.

    3.    I am and have never had an ownership interest in the copyrights involved in the Copyright Litigations. As discussed in greater detail below, I did not make strategic decisions like whether to file actions, who to sue, and whether to make a certain settlement demand or accept an offer of settlement in the Copyright Litigations. These types of decisions were made by the clients, after consulting with senior members of the law firms that employed me in an "of counsel" relationship.

    4.    I am very sorry that the Court is concerned with my conduct. I have strived to be honest and forthright with this Court, and all courts during my legal career.

    5.    I am a 2007 graduate of the University of California, Hastings College of Law. I began practicing law in December 2007 at a small tax firm in Oakland, California, Taggart and Hawkins P.C. ("Taggart and Hawkins").

    6.    My employment with Taggart and Hawkins was abruptly terminated on July 10, 2009 when I was diagnosed with inoperable/incurable Grade III/IV brain cancer. I stopped practicing law for almost two years while focusing on my health

1  and cancer treatments during that time. I endured two brain surgeries, six-weeks of
2  radiation, and 18 months of chemotherapy during that period.
3      7.    In 2011, I wanted to ease back into the practice of law. On March 14,
4  2011, I was contacted and hired by Steele Hansmeier PLLC (hereinafter "S&H"). I
5  began litigating copyright infringement cases in California on behalf of clients of
6  S&H in or around March 2011. I was an independent-contract attorney for S&H
7  and litigated cases for the firm in my capacity as "Of Counsel." I have never been a
8  partner of or had an ownership interest in S&H.
9      8.    In or around November 2011, I was informed that S&H, and its book of
10 business, had been sold to a Chicago firm, Prenda Law, Inc. ("Prenda"), and the
11 principal of Prenda, Paul Duffy. I was also informed that I would be continuing my
12 work as "Of Counsel" and would continue in this role as an independent contract
13 attorney for Prenda, pursuing copyright infringement actions on behalf of the clients
14 I had been representing while I worked for S&H. I have never been a partner of or
15 had an ownership interest in Prenda.
16     9.    AF Holdings, was, and is, a limited liability company formed under the
17 laws of the Federation of Saint Kitts and Nevis. A true and correct copy of AF
18 Holdings certificate of formation is attached hereto as Exhibit 1. I have never had a
19 financial or fiduciary (i.e., ownership) interest in AF Holdings. AF Holdings was a
20 client of S&H and then Prenda. The face-to-face and direct interactions between
21 S&H and later Prenda with AF Holdings were handled by the senior members of the
22 law firms and not me. It was explained to me and I understood that, AF Holdings
23 was and is a valid company with assets including, but not limited to, the copyrights
24 at issue in these litigations. Livewire Holdings LLC recently purchased AF
25 Holdings LLC. AF Holdings LLC thereafter became a wholly owned subsidiary of
26 Livewire Holdings LLC. In January of 2013, I was hired as in house counsel for
27 Livewire Holdings LLC. I do not have a financial or ownership interest in Livewire
28 Holdings, LLC.

10. On or around June 21, 2011, I filed my first copyright case representing AF Holdings entitled, *AF Holdings LLC v. Does*, United States District Court for the Northern District of California Case No. 1-97, 4:11-cv-03067-CW ("Case No. 3067"). I had never heard of AF Holdings prior to representing it in Case No. 3067. When filing Case No. 3067 and representing AF Holdings in other cases, I had only one clearly defined relationship with AF Holdings: I was a contracted outside attorney representing AF Holdings in California on behalf of S&H (and later Prenda) in my role as Of Counsel to those law firms. I was informed and believed and still believe that AF Holdings is and was a company that owns the rights to copyrighted movies that were and are being uploaded and downloaded over the Internet by anonymous infringers.

11. I have never met Alan Cooper, and do not know what the extent of Mr. Cooper's role is in AF Holdings aside from seeing a signature from an "Alan Cooper" on the copyright assignments and pleadings. Based on the assignment agreement, AF Holdings held the valid and exclusive rights to reproduce and distribute the film Popular Demand. I was not present when the assignment agreement was executed. I also never had any direct contact with either Raymond Rogers or Alan Cooper. I have never executed a document as "Alan Cooper." I did not play a role in or have knowledge of the assignment transaction at issue. Senior members of S&H provided the assignment agreement to me and informed me that the copyright assignment was a true and correct copy of the copyright assignment and to include it as an exhibit in complaints filed on behalf of AF Holdings LLC. Before filing any such complaints, I confirmed that AF Holdings LLC was in fact listed as the valid copyright holder.

12. Ingenuity was, and is, a limited liability company formed and existing under the laws of the Federation of Saint Kitts and Nevis. As explained to me, Ingenuity was and is a valid company with assets including, but not limited to, the copyrights at issues in these cases. I have never had a financial or fiduciary interest

(i.e., ownership) in Ingenuity. Ingenuity was a client of S&H and then Prenda. The face-to-face and direct interactions between S&H and later Prenda with Ingenuity were handled by the senior members of the law firms and not me.

13. On or around October 28, 2011, I, as counsel for Ingenuity, filed the first copyright infringement case on behalf of Ingenuity entitled *In the Matter of Ingenuity 13 LLC*, United States District Court for the Eastern District of California, Case No. 2:11-mc-00084-JAM-DAD ("Case No. 84"). I had never heard of Ingenuity before representing Ingenuity in Case No. 84 and other copyright infringement actions. When filing Case No 84 and representing Ingenuity in other cases, I had only one clearly defined relationship with Ingenuity: I was acting as a contracted outside attorney representing Ingenuity in California in copyright infringement actions on behalf of S&H (and later Prenda) in my role as Of Counsel to those law firms. I was informed and believe that Ingenuity is and was a company that owns the rights to copyrighted movies that were being uploaded and downloaded over the Internet by anonymous infringers.

14. Case No. 84 was based on a verified petition to perpetuate testimony and, as stated therein, was intended to allow Ingenuity to identify alleged copyright infringers of Ingenuity's copyrighted works. The petition was verified through an electronic signature by "Alan Cooper". Pursuant to Eastern District of California Local Rule 131(f), I confirmed that counsel for Ingenuity had a signed original notarized verification for the petition.

15. Prior to filing *any* verified petitions on behalf of Ingenuity, it was my custom and practice to confirm that the verification of the authorized agent of the client existed. I confirmed the existence of the client-executed verification either by seeing a copy of the signed verification, or at the very least, being informed by a representative of S&H or Prenda that a signed verification was in the possession of S&H or Prenda.

5

1  16. In Case No. 84, Mr. Pietz first asked for a copy of Mr. Cooper's
2  verification to the petition to perpetuate testimony on or about December 2012, well
3  after the petition had been discharged. Given the length of time since the case was
4  discharged, I was informed and understand that S&H (and later Prenda) no longer
5  has a copy of Mr. Cooper's verification to the petition to perpetuate testimony.
6  17. Mr. Pietz made a similar claim that the verified petition was improper
7  or possibly fraudulent in another action he contested entitled *Guava, LLC v.*
8  *Comcast Cable Communications, LLC*, In the Circuit Court for the Twentieth
9  Judicial Circuit, St. Clair County, Illinois Case No. 12-MR-417. However, the
10 verification in that case was notarized.
11 18. On August 30, 2012, AF Holdings issued a subpoena to defendant's
12 ISP, Verizon Online LLC, in order to obtain information regarding the subscriber
13 associated with the IP address in Case No. 6669. On September 5, 2012 and
14 September 6, 2012, AF Holdings issued a subpoena to ISP, Verizon Online LLC, in
15 order to obtain information regarding the subscriber associated with the IP address
16 in Case No. 6636.
17 19. The subpoenas to the ISPs in Case Nos. 6669 and 6636 were issued by
18 a Prenda attorney from the U.S. District Court for the Northern District of Illinois.
19 Any responses to the subpoenas from the ISPs were mailed by the ISPs to a mailbox
20 located in Chicago and not to me. After the responses to the subpoenas are
21 processed, the information associated with these responses would then be made
22 available to me through a computer database.
23 20. On October 19, 2012, the Court, issued its Order Vacating Prior Early
24 Discovery Orders and Order to Show Cause in Case Nos. 6636 and 6669 (the
25 "October 19, 2012 Orders"). In light of the requirement of Rule 4(m) to identify
26 and serve the infringers within 120 days of the filing of the complaints, I reasonably
27 interpreted the October 19, 2012 Orders to cease "discovery" to preclude AF
28 Holdings from pursuing formal discovery related to the Rule 45 subpoenas, but did

not preclude AF Holdings from informal investigation to identify and name the infringers. In other words, I believed and interpreted the October 19, 2012 Orders as only precluding formal discovery efforts such as pressuring the ISPs to respond to the subpoenas that had been served and precluding serving any additional subpoenas.

21. Following receipt of the October 19, 2012 Orders, I caused the Court's October 19, 2012 Orders to be served on the registered agents for service of process of Verizon Online LLC to ensure that Verizon Online LLC had notice not to respond to the subpoenas that had already been served.

22. In preparation to draft AF Holdings' response to the Court's October 19, 2012 Orders, I made a reasonable investigation by accessing the computer database to determine what information, if any, had been returned in response to the subpoenas. With respect to Case No. 6636 and 6669, I determined based on the information in the computer database that the ISPs had not responded to the subpoenas for the subscriber information.

23. On or about November 7, 2012, after AF Holdings filed its November 1, 2012 Report in response to the Court's October 19, 2012 Order—and after serving each ISP of notice of the Court's order—information in response to the subpoenas issued to Verizon Online LLC in Case No. 6636 and Case No. 6669 was uploaded to the computer database.

24. In November 2012, AF Holdings was still faced with the 120 day Rule 4(m) deadline to serve the complaints in Case No. 6636 and Case No. 6669. Thus, I believed I had a duty to perform further informal investigation to comply with the Rule 4(m) deadlines. I believed that the Court's October 19, 2012 Orders did not prevent AF Holdings from attempting to identify the infringers in Case Nos. 6636 and 6669 through informal means. Thus, I conducted an informal investigation in an attempt to identify the infringers in Case Nos. 6636 and Case No. 6669.

7

25. I did not appreciate that the Court, through its December 20, 2012 and December 21, 2012 OSCs re: Lack of Service in Case Nos. 6662 and 6668, had an expectation that Ingenuity would provide a complete recitation of all specific steps I took to indentify the infringers. I only understood the Court to be requesting Ingenuity summarize why the defendants in each case had not been served. Accordingly, Ingenuity's December 27, 2012 responses to the OSCs was intended to provide a summary of my efforts regarding service of the complaints and not a complete recitation of the steps I took to identify the infringers.

26. On August 28, 2012, Ingenuity issued a subpoena to defendant's ISP, Verizon Internet Services, in order to obtain information regarding the subscriber associated with the IP address in Case No. 6662. The subpoena return identified David Wagar as the Internet subscriber whose IP address had been observed uploading and downloading Ingenuity's movie, "Five Fan Favorites."

27. On November 7, 2012, I sent a letter to David Wagar informing him that he had been identified by Verizon, and his IP address assigned to him had been observed illegally downloading and sharing Ingenuity's movie. A true and correct copy of the November 7, 2012 letter is attached hereto as Exhibit 2. The letter further explained why the subscriber information had been requested/released; explained that, in light of the infringement, a lawsuit was likely to ensue against the infringer; informed him that he was "not being directly accused of committing the infringement" himself; notified he "or a member of [his] household" could be named in the suit; reached out to David Wagar on any information he had that could allow us to identify the infringer; and encouraged him to call me to "meet and confer prior to bringing any further litigation."

28. On November 8, 2012, I followed up the November 7, 2012 letter by calling David Wagar and spoke with him. In response to my question regarding the infringement, David Wagar stated that he was not the infringer. Mr. Wagar also informed me that it was only he and his wife in the household. I also inquired about

1 the specific time period surrounding the date and time of the alleged infringement--
2 i.e. June 28, 2012 at 7:19 UTC—and David Wagar stated that he and his wife were
3 the only ones at the house during that time, and had been for years.

4     29. Following my November 8, 2012 telephone discussion with David
5 Wagar, I conducted a further investigation of David Wagar. Based on the
6 information obtained from the subpoena return from Verizon, David Wagar lived at
7 1411 Paseo Jacaranda, Santa Maria, California 93458. I conducted a public
8 information search of David Wagar that revealed, among other things, that despite
9 David Wagar's claim that his household only consisted of he and his wife, that the
10 house was also occupied by their son, Benjamin Wagar, who according to the search
11 had been living at 1411 Paseo Jacaranda, Santa Maria, California 93458 since 1999.

12     30. I thereafter conducted a web 2.0 search which revealed that, among
13 other interactions with the Internet, Benjamin Wagar had a Facebook page whereby
14 he showed interest in online video games which demonstrated that Benjamin Wagar
15 likely had access to an Internet connection during this time while he appeared to be
16 living at 1411 Paseo Jacaranda, Santa Maria, California 93458.

17     31. In addition, in order to rule out neighbors of the 1411 Paseo Jacaranda,
18 Santa Maria, California 93458 location utilizing the internet connection, I performed
19 a Google map search and obtained a satellite picture of the corner house located at
20 1411 Paseo Jacaranda, Santa Maria, California 93458. A further public search
21 revealed that the house was approximately 1,200 sq. ft. which sat on a 6,534 sq. ft.
22 lot. Considering the position of the house on the lot, and its position away from the
23 neighboring houses, it seemed clear that, should the household have wireless
24 internet, it would not have been accessible by the neighbors.

25     32. David Wagar did not respond to the November 7, 2013 letter.
26 Therefore, on November 21, 2013, I sent a second letter to David Wagar. A true and
27 correct copy of the November 21, 2013 letter is attached hereto as Exhibit 3. The
28 November 21, 2013 letter recommended that David Wagar "retain an attorney;" and

9

again encouraged him, or his attorney, to contact me to discuss the matter. Again, neither David Wagar, nor anyone else from his household, responded to my inquiries.

33. On December 11, 2012, I made a further attempt to telephone the Wagar household. I was not able to reach anyone in the household and left a message on the answering machine stating that Mr. Benjamin Wagar would be named in Case No. 6662 unless someone in the household could provide information that Benjamin Wagar was not the alleged infringer. Although I requested and encouraged Benjamin and/or David to respond with any potential facts to the contrary, the call was never returned.

34. On August 28, 2012, Ingenuity issued a subpoena to, Charter Communications, in order to obtain information regarding the subscriber associated with the IP address in Case No. 6668. The subpoena return identified Marvin Denton as the Internet subscriber whose IP address had been observed uploading and downloading Ingenuity's video, "Five Fan Favorites." On October 28, 2012, I called Marvin Denton. However, the phone number provided by Charter in its supboena return was no longer in service.

35. On November 8, 2012, I sent a letter to Marvin Denton. A true and correct copy of the November 8, 2012 letter is attached hereto as Exhibit 4. The November 8, 2012 letter informed Marvin Denton of the information that had been released by his ISP and why it was requested/released; explained that, in light of the infringement, a lawsuit was likely to ensue against the infringer; informed him that he was "not being directly accused of committing the infringement" himself; notified he "or a member of [his] household" could be named in the suit; reached out to Marvin Denton on any information he had that could allow Ingenuity to identify the infringer; and encouraged him to call me to "meet and confer prior to bringing any further litigation." I did not receive a response to the November 8, 2012 letter.

10

36. I also conducted a further investigation to identify the infringer. The return in response to the subpoena from Charter Communications stated that Marvin Denton lived at 635 S. Vanderwell Avenue, West Covina, California 91790. I conducted a public information search of Marvin Denton. The public information search revealed, among other things, that there were three other individuals who were living in the house located at 635 S. Vanderwell Avenue, West Covina, California 91790: two females (ages 65 and 33), and Mayon Denton (age 31).

37. I performed additional research as to Mayon Denton which revealed that he had been involved in, or the owner of, four different movie production companies during, or prior to, the alleged date of the infringement (i.e. July 4, 2012). At least one of those production companies was active and operating (according to the public database search) before, during and beyond July 7, 2012 and the business was located at the same address as the residence that Charter had provided Internet access to - 635 S. Vanderwell Avenue, West Covina, California 91790. This company, Against the Grain Film, LLC, which listed Mayon Denton as a "Member", has a website--http://www.againstthegrainfilm.com/-- that has video content on the site which directly stated that Mayon Denton was the "Film Editor" of the film advertised on the site and also that the film had been "Executive Produced by" Mayon Denton. In light of the fact that activities such as film editing are now almost exclusively performed on the computer, this suggested that not only did Mayon Denton have home Internet access through his father's Charter account, but also that he had a large amount of computer expertise with regard to online films. In addition, according to the public look-up investigation I performed, DRG Films LLC was also being operated from 635 S. Vanderwell Avenue, West Covina, California 91790 -- Mayon had also been involved with another company, Infamous Money, which had also been involved in the film production industry.

38. In order to rule out neighbors of the property located at 635 S. Vanderwell Avenue, West Covina, California 91790 utilizing the internet

1 connection, I utilized Google maps and obtained a satellite picture of the property.
2 The satellite photo revealed that the property was a very large estate consisting of a
3 gate for entry and multiple separate houses/structures on the property. Further,
4 through another publically available search, I was able to identify that the house was
5 approximately 1,304 sq. ft. sitting on a 7,620 sq. ft. lot. Considering the position of
6 the house and the neighboring properties, including the seemingly main house on
7 the lot, it seemed clear that, should the household have wireless Internet, it likely
8 was not accessible by its neighbors.

9     39. Marvin Denton did not respond to the November 8, 2013 letter.
10 Therefore, on November 22, 2013, I sent a second letter to Marvin Denton. A true
11 and correct copy of the November 22, 2013 letter is attached hereto as Exhibit 5.
12 The November 22, 2013 letter recommended that Marvin Denton "retain an
13 attorney;" and again encouraged him, or his attorney, to contact me to discuss this
14 matter. Again, neither Marvin Denton, nor anyone else from his household,
15 responded to my inquiries.

16     40. Although the respective complaints in Case No. 6662 and 6668 referred
17 to a "snapshot observation", the reference was not intended to be a complete
18 recitation of all of Ingenuity's pre-filing evidence of copyright infringement. The
19 allegations of the complaints were only intended to satisfy Ingenuity's obligation to
20 allege the basis for jurisdiction with a short and plain statement of the claim and
21 demand for relief as required by Fed. R. Civ. P. 8. In the *ex parte* applications for
22 early discovery in Case No. 6662 and 6668, Ingenuity submitted the declaration of
23 Paul Hansmeier who stated in relevant part:

24     "In this case, I personally observed John Doe's IP address, listed in the
25     Complaint (ECF No.1 ¶ 4), downloading and uploading the Video in a
26     BitTorrent swarm. **Once obtaining a full version of the Video file,**
27     **John Doe (then a 'seeder') shared pieces of the copyrighted Video**
28

**file (i.e. 'seed') with other individuals (i.e. 'peers').**" (Emphasis added).

The fact that the infringers in Case No. 6662 and 6668 had completely downloaded the movies in question and had viewable copies of the movies was also confirmed in monitoring reports provided by 6881 Forensics.

41. I compiled a list of cases filed in 2012 in the United States District Court for the Northern District of California in which I have been counsel for copyright holders alleging copyright infringement. In 2012, I filed 41 cases in the United States District Court for the Northern District of California as counsel for copyright holders alleging copyright infringement. Of those 41 suits, 10 were dismissed because there was no viable candidate that could be identified as the infringer, 6 were dismissed because the ISP failed to respond to a subpoena and the alleged infringer was identified in 16 suits of which 11 were served with an amended complaint.

42. The fact that the Wagars and Dentons ignored my requests for information that would potentially preclude members of their households as the infringers was significant. In other cases of alleged copyright infringement that I have prosecuted, I have been contacted by the alleged infringer who explained that they were not the infringer and provided information such as an unsecured Internet connection or possible unidentified third party guests to the residence. In those instances, the respective complaints were dismissed without naming a defendant.

43. I first became aware of a question regarding the identity of Alan Cooper when it was raised by Mr. Pietz. I have never been accused by Alan Cooper of misappropriating his identity or forging his signature.

44. A similar issue regarding the validity of the copyright assignments to AF Holdings was raised in a case entitled *AF Holdings, Inc. v. Does 1-96*, United States District Court for the Northern District of California Case No. C-11-03335 JSC ("Case No. 3335"). In Case No. 3335, an issue arose regarding whether there

13

was a valid assignment from Heartbreaker to AF Holdings because while the assignment was signed by a representative of Heartbreaker, it was not signed by a representative of AF Holdings. Instead, the assignment was signed by a representative of AF Films, LLC. Relying on 17 U.S.C. § 204 and *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990), the Magistrate Judge determined that the inconsistency did not prevent a prima facie showing of copyright ownership because the law only requires the assignment to be signed by the assignor. Given the court's finding that the copyright assignment in Case No. 3335 was prima facie valid despite an issue regarding whether the assignee had properly executed the assignment, I had and have a good faith belief that the assignments in Case No. 6636 and 6669 are valid despite any alleged issue regarding the identity of Alan Cooper.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is executed on the 19th day of February 2013, in San Francisco, California.

BRETT L. GIBBS