1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE OTIS D. WRIGHT

4      UNITED STATES DISTRICT JUDGE PRESIDING

5                  - - -

6
Ingenuity 13 LLC,                    )
7                   PLAINTIFF,        )
                                      )
8    VS.                              )   NO. CV 12-8333 ODW
                                      )
9    John Doe, et al.,                )
                    DEFENDANT,        )
10   _____)

11

12

13      REPORTER'S TRANSCRIPT OF PROCEEDINGS

14           LOS ANGELES, CALIFORNIA

15          MONDAY, MARCH 11, 2013

16

17

18   _____

19      KATIE E. THIBODEAUX, CSR 9858
        U.S. Official Court Reporter
20      312 North Spring Street, #436
        Los Angeles, California 90012

21

22

23                              COPY

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 1 of 119*

1    APPEARANCES OF COUNSEL:

2

3    FOR RESPONDENT GIBBS:

4        WAXLER CARNER BRODSKY LLP
         BY:  ANDREW J. WAXLER
5        -and- BARRY BRODSKY
         1960 E. Grand Avenue
6        Suite 1210
         El Segundo, CA  90245
7

8

9    FOR DEFENDANT:

10       THE PIETZ LAW FIRM
         BY:  MORGAN E. PIETZ
11       3770 Highland Avenue
         Suite 206
12       Manhattan Beach, CA  90266

13       -and-

14       NICHOLAS RANALLO LAW OFFICES
         BY:  NICHOLAS R. RANALLO
15       371 Dogwood Way
         Boulder Creek, CA  95006
16

17

18   SPECIALLY APPEARING:

19       KLINEDINST LAW OFFICES
         BY:  HEATHER ROSING
20       501 W. Broadway
         Suite 600
21       San Diego, CA  92101

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 2 of 119*

3

```
 1                        I N D E X

 2

 3   WITNESS NAME                              PAGE

 4   Alan Cooper
          Direct Examination by the Court      21
 5        Direct Examination by Mr. Pietz       26
          Cross-Examination by Mr. Brodsky      34
 6
     Bart Huffman
 7        Direct Examination by Mr. Pietz       39

 8   Benjamin Fox
          Direct Examination by Mr. Pietz       45
 9
     Jessie Nason
10        Direct Examination by Mr. Pietz       52

11   Brad Gibbs
          Direct Examination by Mr. Waxler      73
12        Cross-Examination by Mr. Pietz       105

13

14   EXHIBIT                    I.D.      IN EVID.

15   1                          36         37
     2                          36         37
16   3,4,5                      36
     6,7                        43         44
17   8                          50         50
     9                          56
18   10                         67         67
     11                         68         68
19   12                         73         73
     13                        107        107
20   14                        108        108
     15,16,17,18               110        110
21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 3 of 119*

4

```
 1        LOS ANGELES, CALIFORNIA; MONDAY, MARCH 11, 2013

 2                        1:38 P.M.

 3                      - - - - -

 4

 5

 6        THE CLERK:  Calling Item No. 4, CV 12-8333-ODW,

 7   CV 12-6662, ODW, CV 12-6668, Ingenuity 13 LLC versus John

 8   Doe, additionally, CV 12-6636 ODW, CV 12-6669, AF

 9   Holdings LLC versus John Doe.

10            Counsel, please state your appearances.

11        MR. WAXLER:  Andrew Waxler, your Honor, and Barry

12   Brodsky for Mr. Gibbs who is present in the courtroom.

13   Thank you.

14        THE COURT:  Good afternoon, counsel.

15        MR. PIETZ:  Good afternoon, your Honor.  Morgan

16   Pietz, P-I-E-T-Z, for the putative John Doe defendant in

17   12-CV-8333.

18        MR. RANALLO:  Nicholas Ranallo, co-counsel for the

19   same Doe.

20        THE COURT:  All right.  Gentlemen, thank you.

21            All right.  We are here in response to an OSC

22   set by this court as to why sanctions should not be

23   imposed for various violations including Rule 11 and

24   Local Rule 83-3.

25            I have received from Mr. Waxler on behalf of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 4 of 119*

5

1   Mr. Gibbs his response, supplemental response, a number

2   of documents.  Spent the weekend reading a depo which was

3   perhaps the most informative thing I have read in this

4   litigation so far primarily because of what you didn't

5   want revealed.  So, in any event, I have extended an

6   offer to all of the principles concerned to offer them an

7   opportunity to explain.

8           It is my understanding that they have declined

9   that invitation.  Therefore --

10          MS. ROSING:  Your Honor?

11          THE COURT:  And you are?

12          MS. ROSING:  If I may approach.

13          THE COURT:  Please.

14          MS. ROSING:  My name is Heather Rosing, and I

15   filed an ex parte application with this court.

16          THE COURT:  When?

17          MS. ROSING:  Friday?

18          THE COURT:  When?

19          MS. ROSING:  It was filed I believe at 3:54 p.m.?

20          THE COURT:  Guaranteed for the court to actually

21   see it; right?  Was it electronically filed?

22          MS. ROSING:  The local rule says we're not

23   allowed --

24          THE COURT:  Answer my question.  Was it

25   electronically filed?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 5 of 119*

6

1          MS. ROSING:  No.  Because we are not allowed to,

2     your Honor.

3          THE COURT:  Okay.  So what you did is you took it

4     downstairs to the intake window?

5          MS. ROSING:  Yes, your Honor?

6          THE COURT:  Late Friday afternoon addressing a

7     matter that is set for hearing on Monday morning?

8          MS. ROSING:  My clients received notice of this on

9     Thursday, your Honor.  We received notice on Thursday?

10         THE COURT:  I am just asking you a question.  You

11    can answer it "yes" or "no".

12         MS. ROSING:  I'm sorry.  Could you repeat the

13    question.

14         THE COURT:  What is -- why are you here?

15         MS. ROSING:  Again, my name is Heather Rosing with

16    the Klinedinst PC law firm.  I am specially appearing for

17    four of those people that received this notice on

18    Thursday, Angela Van Den Hemel, a paralegal at Prenda

19    law --

20         THE COURT:  Is this the long way of saying they

21    are not going to be here?

22         MS. ROSING:  I'm sorry.  I was just telling you

23    who I represent, your Honor?

24         THE COURT:  Are they here?

25         MS. ROSING:  No, your Honor.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 6 of 119*

1     THE COURT:  Have a seat.

2     MS. ROSING:  May I just finish?

3     THE COURT:  Have a seat.

4          Bottom line is the court is going to end up

5  drawing its own inferences from the information it

6  actually has.  An opportunity to be heard is all that is

7  required.  If you don't wish to exercise that, fine.

8          There was so much obstruction during the

9  course of this deposition that it is obvious that someone

10  has an awful lot to hide.  This has actually raised far

11  more questions of fraud than the court originally had,

12  but we will get to that later.

13         Initially, I have got a number of questions

14  regarding some of the filings that have been made with

15  the court.

16         I guess, Mr. Waxler, I guess you will be the

17  one that is addressing some of these things.  One of my

18  questions is this.  Why is it that in every single one of

19  these cases there is a form attached to the complaint

20  that asks for whether or not there are any related cases.

21  I have got a partial list of all of these cases that have

22  been filed in the Central District.  None of them have

23  indicated that there are any related cases.

24         Could you tell me why?

25     MR. WAXLER:  Well, your Honor, the downloads are

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 7 of 119*

8

1   done by separate infringers, and the plaintiffs, yes,

2   obviously, were a lot the same, and I believe that the

3   decision had been made that it didn't require the related

4   case filings to be made.

5       THE COURT:  Okay.

6       MR. WAXLER:  Perhaps that was in error, your

7   Honor, as we sit here today.

8       THE COURT:  Let me ask a question then.  Let's

9   just say on one date, that date being July 2nd of 2012,

10  four lawsuits were filed by AF Holdings LLC versus John

11  Doe all seeking a remedy for the infringement of the same

12  movie Popular Demand.

13          Now, can you tell me how on earth these aren't

14  related?

15      MR. WAXLER:  Well, they are obviously related in

16  the sense that --

17      THE COURT:  That is what I thought, too.  And that

18  is what this entire list is.  Okay.  They are all

19  related, but that box was always checked no.  And then we

20  are going to get to something separate in a minute, and

21  that is the issue of who has an interest, a financial

22  interest in the outcome of these cases.  We will look at

23  this shortly.

24          There is the issue of the court having vacated

25  and quashed the subpoenas that were served on various

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 8 of 119*

1   ISP's, and, then, of course, I have gotten other

2   responses to the OSC saying, well, we didn't know that

3   that meant we couldn't do other forms of discovery.  And,

4   by the way, we sent out a copy of the court's order to

5   the various ISP's letting them know that the court had

6   withdrawn those orders and surely that is not the conduct

7   of someone who was trying to disobey the court's order.

8   And I had to agree.   Sounded reasonable.

9            Have you all seen the declaration of Sean

10  Moriarty from Verizon?

11       MR. WAXLER:  Your Honor, we saw it this morning,

12  yes.

13       THE COURT:  Okay.  Good.

14            And what say you because he responds directly

15  to Mr. Gibbs' assertion that the ISP's were given notice

16  not to respond to the subpoenas.  He says this didn't

17  happen, that they didn't receive notice.

18       MR. WAXLER:  May I respond to that, your Honor?

19       THE COURT:  Sure.

20       MR. WAXLER:  Mr. Gibbs -- Prenda Law is one of

21  the, is one of the e-mail addresses that received a copy

22  of your October 19th, 2012 order.  As does Mr. Gibbs.

23  Mr. Gibbs had a conversation with Mr. Hansmeier and told

24  him that he thought that this order should be served on

25  the ISP's.  Mr. Hansmeier advised Mr. Gibbs that that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 9 of 119*

1    would be done.  Mr. Hansmeier later advised Mr. Gibbs

2    that his request had been taken care of.

3              Now, if you read page, Paragraph 4 at Line 18

4    and 19 of the declaration, all it says is based on the

5    Verizon records, it does not appear that Verizon received

6    from AF Holdings or its counsel a copy of the order.  It

7    does not say they did not.  And Verizon, like these other

8    ISP's, has a history of, as I understand it, eliminating

9    its records from their systems soon after, like within 30

10   days.  CT Corporation receives the subpoenas.  That was

11   who was supposed to be served, and they have a history of

12   not keeping them in their records for very long.

13             THE COURT:  So they eliminate their documents

14   pretty much the way Mr. Gibbs eliminates the original

15   signed application from Alan Cooper?

16             MR. WAXLER:  Mr. Gibbs never had the original

17   signed verification from Mr. Cooper.  Mr. Gibbs was told

18   by Prenda Law that they had it.  So Mr. Gibbs was never

19   in possession of that document, and Mr. Gibbs did not

20   lose that document, your Honor.

21             THE COURT:  One other thing you didn't really make

22   clear, was it only that document or was the entire file

23   lost?

24             MR. WAXLER:  I don't know the answer to that.

25             THE COURT:  Okay.  So here is the deal.  So what

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 10 of 119*

1   we have got, we have got CT Systems destroying the order

2   and the cover letter or transmittal of that order to

3   Verizon; right?  But they have got everything else.  They

4   have got all the other letters and the subpoena and all

5   that sort of thing.  So the only thing they have gotten

6   rid of it just the order quashing the subpoena; right?

7          MR. WAXLER:  No, your Honor.  CT Corporation is

8   the agent for service of process.

9          THE COURT:  I know who they are.

10          MR. WAXLER:  CT Corporation may have received

11   that, and I am just saying their history is they don't

12   keep records for very long of having received subpoenas

13   or service of those.  The other documents which are

14   attached to this declaration -- I believe since it was

15   given to me about an hour, actually 15 minutes ago out

16   there; I saw part of it online -- are documents that were

17   exchanged between Verizon directly and others.  So they

18   weren't going through CT Corporation.  So that is the

19   difference, your Honor.

20          THE COURT:  You are saying, then, that the notice

21   to Verizon that that subpoena had been quashed by the

22   court went to CT and not to Verizon?

23          MR. WAXLER:  That is their agent for service of

24   process.  That is who they served.  That is who

25   Mr. Gibbs, when he talked to Mr. Hansmeier, said please

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 11 of 119*

12

1    serve this order on them, and that is what Mr. Gibbs

2    understands was done.

3         THE COURT:  Okay.  Was the order served in the

4    same way that the subpoena was served?

5         MR. WAXLER:  That would be our understanding.  I

6    mean, it was served on CT Corporation.  That is how the

7    subpoena was served on CT Corporation.

8         THE COURT:  So the subpoena and all the various

9    letters, et cetera, that emanated from Prenda Law to

10   Verizon were served on CT Systems; right?

11        MR. WAXLER:  No.  As I understand it, your Honor,

12   the e-mails that may appear here were exchanged between

13   Verizon directly, once they got the subpoena, and members

14   of Prenda Law.  The only thing that would have gone

15   through CT Corporation was the service of the original

16   subpoena and a copy of the order.

17        THE COURT:  All right.  I am only going by the

18   declaration of Mr. Moriarty.  This is under tab, Exhibit

19   A.  The letter, Prenda Law, see that, September 5th?  It

20   says via hand delivery.

21        MR. WAXLER:  I see that.

22        THE COURT:  All right.  Enclosed please find a

23   subpoena and attachment.  So I am assuming that the

24   subpoena was also hand delivered.  It doesn't say to

25   whom.  Is this to CT?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 12 of 119*

13

```
1        MR. WAXLER:  That is our understanding, your
2   Honor.
3        THE COURT:  So what we have is a situation or at
4   least you are guessing, you are guessing that everything
5   seeking information from Verizon arrived intact, but the
6   order withdrawing or quashing that subpoena somehow got
7   misplaced.
8        MR. WAXLER:  There is no evidence before this
9   court that Verizon did not receive that subpoena, that
10  order from this court.  I can tell you that Mr. Gibbs'
11  intent was that that order be served so that they did
12  receive it.  And it was always his understanding until he
13  saw the declarations in the filings by Mr. Pietz that
14  some of the ISP's did not receive a copy of that order.
15       THE COURT:  It is also my understanding that I
16  guess a paralegal in the employ of one of these law firms
17  began following up with these Internet service providers
18  inquiring as to why certain information had not been
19  provided pursuant to those subpoenas.
20       MR. WAXLER:  And Mr. Gibbs read that for the first
21  time when the declarations were submitted in connection
22  with this OSC and was very surprised by it because he
23  understood, as he does today, that the order by this
24  court was served on CT Corporation and then would have
25  been transmitted to Verizon.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 13 of 119*

```
 1        THE COURT:  Okay.  All right.  There is a number

 2   of things, Mr. Waxler, which you state in your papers

 3   that I wanted to ask you about.  In more than one place,

 4   you indicate that Ingenuity 13 LLC and AF Holdings, et

 5   cetera, have assets which consist of without limitation

 6   their intellectual property rights in some of these

 7   films.  What other assets?

 8        MR. WAXLER:  AF Holdings and Ingenuity -- AF

 9   Holdings, at least, received the assignment.  So they

10   have those property rights, and the companies would have

11   obviously the right to, or rather the settlement funds

12   that were paid on some of these matters would have been

13   property of those companies.

14            But as I understand it from Mr. Hansmeier's

15   deposition which I, too, read over the weekend, that the

16   trust accounts of some of the lawyers were holding those

17   settlement funds.  Whether those settlement funds ever

18   made it to AF Holdings or Ingenuity 13, all I can do,

19   your Honor, is rely on what Mr. Hansmeier says because we

20   have no independent knowledge of it and nor does

21   Mr. Gibbs.  Mr. Gibbs did not receive those funds.  Those

22   funds were sent to Prenda Law.

23        THE COURT:  So you are telling me what you know is

24   what you gleaned from this this weekend pretty much as

25   the court did; right?
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 14 of 119*

15

1      MR. WAXLER:  Well, I mean, Mr. Gibbs may have more

2  knowledge than specifically what Mr. Hansmeier said.

3      THE COURT:  Oh.  Mr. Hansmeier has no knowledge of

4  anything.  So I just want to know if you got what the

5  court got which is the only entities which apparently

6  make any claim whatsoever to these settlement funds are

7  the law firms.  There appears to be no effort whatsoever

8  of transmitting any of these funds to the so-called

9  clients, Ingenuity 13 and AF Holdings, who don't file

10  income taxes anywhere because as Mr. Hansmeier says they

11  have no income.

12          Is that what you got?  That is what I got.

13      MR. WAXLER:  I thought that Mr. Hansmeier said

14  they didn't file income taxes because they were not

15  required in where they were domiciled, but you may be

16  right and I may be wrong.

17      THE COURT:  No.  He quite clearly said they have

18  not filed income taxes anywhere.

19      MR. WAXLER:  I understand that.  I just thought it

20  was a different reason for not filing them.

21      THE COURT:  Well, probably because they don't do

22  anything, do they?

23      MR. WAXLER:  Well, they in hearing from Mr -- in

24  reading from what Mr. Hansmeier says, they obviously own

25  valid copyrights, and those entities retain law firms

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 15 of 119*

16

1    like Prenda Law, apparently, to file actions such as the

2    ones that are at issue today.

3         THE COURT:   They retain firms?   Seriously?

4              You can hardly keep a straight face, can you?

5         MR. WAXLER:   No, your Honor.

6         THE COURT:   These entities were basically created

7    by these lawyers; right?   They have no business.   They

8    have no employees.   They have no function really.   They

9    are not even really a shell, are they?

10        MR. WAXLER:   I don't know, your Honor.

11        THE COURT:   The law firms are basically

12   prosecuting these actions on their own behalf, aren't

13   they?

14        MR. WAXLER:   Mr. Gibbs never had any client

15   contact with those clients.   Mr. Gibbs received

16   information from Mr. Hansmeier and Mr. Steele, and those

17   individuals advised Mr. Gibbs that they had talked to the

18   clients.

19        THE COURT:   Hansmeier and Steele, are those the

20   individuals to whom you refer in your papers to as the

21   senior partners in the law firm.

22        MR. WAXLER:   Yes, they are.

23        THE COURT:   I have another question.   Does

24   Mr. Gibbs have an indemnity or hold harmless agreement

25   from these senior partners?   Or is he out there on his

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 16 of 119*

1    own?

2          MR. WAXLER:  He has no hold harmless agreement

3    from these partners that I am aware of.

4          THE COURT:  Okay.  All right.

5          MR. WAXLER:  He was an of counsel, W -- 1099,

6    independent contractor for Prenda Law.

7          THE COURT:  All right.  Now, the court is coming

8    to the conclusion, and this is why it has been wonderful

9    to have someone here to disabuse me of the notion that

10   all of these lawsuits are being prosecuted on behalf of

11   the lawyers, that all of the settlement funds inure

12   solely to the benefit of the lawyers because not dime

13   one has been transmitted to AF Holdings or to Ingenuity

14   13.

15          Now, if there is information to rebut that, I

16   would love to hear it.  But, otherwise, that is what I am

17   stuck with.  So now I am wondering why is it that no

18   disclosure has been made in this court and probably in

19   none of the federal courts that the lawyers have a

20   pecuniary interest in the outcome of these cases?

21          MR. WAXLER:  I don't believe that that is what

22   Mr. Gibbs understands the case to be.  The fact that the

23   settlement funds were not transmitted as of yet to those

24   entities doesn't mean those settlement funds aren't being

25   held in trust for those entities.  Mr. Gibbs has no

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 17 of 119*

1    information whatsoever, your Honor, to understand

2    anything different than what I just described.

3           MR. BRODSKY:  Your Honor, may I interject one

4    point?

5           THE COURT:  Sure.  Your name again?

6           MR. BRODSKY:  Barry Brodsky.

7           THE COURT:  All right.  Go ahead, sir.

8           MR. BRODSKY:  My understanding and it is only from

9    reading the same deposition transcript was that those

10   funds remained in the trust accounts of the various law

11   firms that were representing the companies to defray

12   future expenses.

13          THE COURT:  And what were those expenses other

14   than filing fees?

15          MR. BRODSKY:  I would assume they would be filing

16   fees, investigative fees, you know, basically that.

17          THE COURT:  To -- okay.

18          MR. BRODSKY:  But that is just my reading of the

19   deposition.

20          THE COURT:  Okay.  And after that is done, then

21   what?

22          MR. BRODSKY:  Apparently -- well, we don't know

23   where that trail ends, whether that trail has ended.  But

24   we do know this.  We know that none of those funds

25   reached Mr. Gibbs.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 18 of 119*

1        THE COURT:  And we also know none of those funds

2   reached Ingenuity 13 and AF Holdings.

3        MR. BRODSKY:  Apparently, from Mr. Hansmeier's

4   testimony, that is correct.

5        THE COURT:  Who was the corporate designee, the

6   30(b)(6) designee for AF Holdings; right?

7        MR. BRODSKY:  Yes.

8        THE COURT:  And none of those funds ever reached

9   AF Holdings.

10        MR. BRODSKY:  According to him, that's correct.

11        THE COURT:  All these lawsuits settled on behalf

12   of AF Holdings; right?  But they reside in the law firm's

13   trust account.

14        MR. BRODSKY:  Some obviously were settled, yes.

15        THE COURT:  You know what was really interesting,

16   a lawsuit handled by law firm A, the settlement funds

17   then are transmitted to law firm B's trust account, law

18   firm B being controlled by Mr. Steele.  I don't know.  I

19   just find these things curious.

20        All right.  Any other light to be shed on some

21   of the court's concerns with respect to this foolishness

22   here because -- by the way, is there a Mr. Cooper here?

23        MR. PIETZ:  Your Honor, Mr. Cooper is in

24   attendance today, and I believe prepared to confirm that

25   these documents are founded on forgeries.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 19 of 119*

20

1        THE COURT:  Is there an Alan Cooper in the

2  courtroom?  Don't be shy.  Come forward, sir.

3        (The witness was sworn.)

4        THE CLERK:  Thank you.  Have a seat.

5        THE COURT:  By the way, while we are on the

6  subject, is there a Mark Lutz in the courtroom as well?

7              Is either Hansmeier in the courtroom?

8        MS. ROSING:  Your Honor, I am the attorney

9  specially appearing for them and if I could finish my

10  request?

11        THE COURT:  I just want to know if they are here.

12        MS. ROSING:  They are not physically here, your

13  Honor?

14        THE COURT:  Thank you.  Good.

15        MR. PIETZ:  Your Honor, my understanding was that

16  Ms. Rosing was representing one of the Hansmeiers.  Is

17  that different, or are you also representing Peter

18  Hansmeier?

19        MS. ROSING:  I did not have an opportunity to say,

20  but I do not represent Peter Hansmeier.

21        THE COURT:  I didn't think you would be.  The

22  technician?  I didn't think you would be.

23        MR. WAXLER:  Your Honor, while those individuals

24  are not present, my understanding is they are available

25  by phone.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 20 of 119*

21

```
 1          THE COURT:  Is that right.  Okay.  I may take them
 2   up on that.  Maybe.  Anyway.
 3
 4                    DIRECT EXAMINATION
 5   BY THE COURT:
 6   Q     Mr. Cooper, your name is Alan Cooper?
 7   A     Yes, sir.
 8   Q     And where do you reside, sir?
 9   A     Isle, Minnesota.
10   Q     Isle, Minnesota.  Do you have any connection -- let
11   me just ask you specifically, do you have any connection
12   with Mr. Gibbs?
13   A     No, sir.
14   Q     Ever met Mr. Gibbs before?
15   A     No.
16   Q     What about Paul Hansmeier, any connection with him?
17   A     No.
18   Q     Ever meet him before?
19   A     No.
20   Q     What about John Steele?
21   A     Yes.
22   Q     What was your connection with Mr. Steele?
23   A     I was a caretaker for a piece of property that he
24   had in Northern Minnesota.
25   Q     And when was this?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 21 of 119*

22

```
1    A    I think from 2006 till last August.

2    Q    You worked for him from 2006 until August of 2012?

3    A    No, I did not work for him.  I was a caretaker for

4    his piece of property.  He had two houses.  I lived in

5    one and then took care of everything else there.

6    Q    Okay.  And he paid you?

7    A    No.

8    Q    Who paid you?

9    A    There was no pay.  It was I lived in the one house,

10   and I took care of everything on the property for free.

11   Q    Or in exchange for a place to live?

12   A    Yes.

13   Q    All right.  So you didn't have to pay for your

14   housing; correct?

15   A    Correct.

16   Q    So in exchange for housing on the property, you

17   took care of his property?

18   A    Yes.

19   Q    And this was a deal you negotiated with Mr. Steele?

20   A    Yes.

21   Q    All right.

22   A    It is in a lease agreement that we have.

23   Q    All right.  I guess you have been advised.  Matter

24   of fact, I have seen a letter written by an attorney who

25   apparently is acting on your behalf where you have become
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 22 of 119*

23

1  concerned that your name is being used as a corporate

2  representative of some West Indian entities that you know

3  nothing about; is that true?

4  A    Yes.  That's correct.

5  Q    I want you to explain.  I want you to elaborate.

6  What is it that you have heard?

7  A    That my name is being signed and forged and used

8  for whatever these offices or myself personally scams

9  that they have going on.

10  Q    Did you ever have a discussion with Mr. Steele

11  about these concerns of yours?

12  A    He had, on one of his trips up to the cabin, all he

13  had said was if anybody contacts you about any of my law

14  firm or anything that has to do with me, don't answer and

15  call me.

16  Q    Had he ever given you any advance notice that he

17  was contemplating embarking on -- let me back up.  Do you

18  know what his legal specialty was, say, back in 2006?

19  What kind of law was he practicing?

20  A    When I had first met him, he was still in law

21  school.

22  Q    In law school.  All right.  And, then, what area of

23  practice did he go into if you know?

24  A    He had originally said divorce, family law.

25  Q    Family law.  All right.  Did he ever indicate to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 23 of 119*

24

```
 1   you that he was contemplating embarking on a different
 2   specialty in the law?
 3   A    Yes.
 4   Q    And best as you can recall, what was this new
 5   specialty?
 6   A    Internet porn buyers.  I don't know exactly how to
 7   word it for you.
 8   Q    Oh.  Internet porn piracy sounds pretty good.  All
 9   right.
10        Do you recall anything he said about that?
11   A.   As far as?
12   Q    Anything about this new venture, this new method of
13   practicing law.
14   A    I tried not to talk to him very much, but what he
15   had -- what he had said on one of his trips was his goal
16   was $10,000 a day, to have a mailing of these letters.
17   Q    What letters?
18   A    To people that illegally downloaded on the
19   Internet.
20   Q    Did he explain what these letters would say and who
21   these letters would be sent to?
22   A    I am not very Internet savvy myself, so it would be
23   whoever downloaded something that they weren't paying for
24   or illegal.  I don't know exactly how this works.  That
25   he would just send out a letter stating that if they
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 24 of 119*

1    didn't send a check for a certain amount, that he would

2    make it public to these people's family and friends what

3    they were looking at.

4    Q    I see.  Okay.  Is that all you can remember him

5    saying about this new venture?

6    A    At this time.  Yes.

7    Q    All right.  Now, let's put this in context.  He

8    basically told you that if you started getting any

9    inquiry, that you were to, what, call him or direct the

10   callers to him?

11   A    To contact personally, personally contact him.

12   Q    Okay.  Now, back up.  If you received any calls or

13   inquiries regarding what?

14   A    He said anything that seemed out of place.

15   Q    And you took that to mean what?

16   A    I took that to mean the very next day I went and

17   talked to my father-in-law which is a retired sheriff and

18   talked to him, and he said until anybody contacts you, he

19   goes we have nothing to go to the court system with.

20   Q    And did that change?

21   A    I never heard anything from anybody.

22   Q    All right.  So no one ever contacted you?

23   A    No.

24   Q    And so what is it that made you go off and hire

25   Mr. Paul Godfread?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 25 of 119*

26

```
1    A     I had received a text asking if this was my
2    signature on a particular document, and I said no.  And
3    that is when I was given a number to call an attorney to
4    make sure that this didn't come back towards me.
5    Q     All right.  I am going to assume that that copy of
6    that document is probably in court; right?
7          MR. PIETZ:  Referring now to the copyright
8    assignment agreement, your Honor?
9          THE COURT:  Right.
10         MR. PIETZ:  Correct, your Honor.
11         THE COURT:  Okay.  Let me turn this over to you,
12   sir.  Go ahead.
13         MR. PIETZ:  Okay.  Thank you, your Honor.
14             If it please the court, I have some documents
15   which I can show on the monitor including to Mr. Cooper.
16   I just want to make sure we have both the copyright
17   assignments.
18         MR. PIETZ:  Are the monitors arrayed so that the
19   court can see them?
20         THE COURT:  Yes.  The court has its own.  We got
21   that before the sequester.
22         MR. PIETZ:  All right.
23                         DIRECT EXAMINATION
24   BY MR. PIETZ:
25   Q     Mr. Cooper, my name is attorney Morgan Pietz.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 26 of 119*

27

1   Thank you for coming here today.

2           Did anyone ever ask you to become a corporate

3   representative of AF Holdings LLC?

4   A     No.

5   Q     Did anybody ever ask you to become a corporate

6   representative of Ingenuity 13 LLC?

7   A     No.

8   Q     Mr. Cooper, now, I would like to show you some

9   documents, and Mr. Ranallo I believe just passed out

10  copies of the first.  So what we have here is a

11  complaint.

12          It is one of the consolidated cases presently

13  before the court.  For the record, it is Civil Action No.

14  212 CV 6636, an action filed here in the Central District

15  of California.

16          Mr. Cooper, have you ever seen this complaint

17  before?

18  A     No.

19  Q     I am going to skip now to the last page of this

20  complaint or actually it is not quite the last page.  It

21  is the last page of the main document, or, sorry, it is

22  actually Exhibit B to the complaint.  Here is the first

23  page of Exhibit B, now, Mr. Cooper.

24          It says copyright assignment agreement on the

25  top, and then I will note for the record that the

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 27 of 119*

28

1   copyright at issue is Popular Demand which it states in

2   the first paragraph.  Moving down to the second page of

3   the agreement, Mr. Cooper, you will note that there is a

4   signature on the right where it says Alan Cooper.

5            Is that your signature, sir?

6   A    No.  That is not.

7   Q    You are quite sure about that?

8   A    Yes.  I use a middle initial.

9   Q    Mr. Cooper, I would like to show you a similar

10  document which has appeared in a different case.  What we

11  have here is a copyright assignment agreement.  This is

12  for a different AF Holdings copyright styled Sexual

13  Obsession which it lists in the first paragraph.  For the

14  record, this is Northern District of California No. 12 CV

15  2048.

16           Mr. Cooper, I am going to turn now to the

17  second page of this copyright assignment agreement, or I

18  guess it would be the third page.  There is a signature

19  there on the right that says Alan Cooper.

20           Is that your signature, sir?

21  A    No, it is not.

22  Q    Did anybody ever ask you to become a corporate

23  representative or otherwise involved with a company

24  called AF Films LLC?

25  A    No.

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 28 of 119*

29

1    Q      And you are quite sure that is not your signature?

2    A      Very sure it is not mine.

3    Q      Mr. Cooper, I would like to show you now another

4    document, and I will note for the record that this is a

5    verified petition to perpetuate testimony filed in the

6    Eastern District of California, 12 CV 8333, have you ever

7    seen this document before, Mr. Cooper, prior to within

8    the last couple of days?

9    A      No.

10           MR. WAXLER:  Your Honor, I would like to object to

11    that question.

12           THE COURT:  Object to the question as to whether

13    or not he has seen the document?

14           MR. WAXLER:  Well, this inquiry is beyond the

15    scope of the OSC.  The OSC is about four cases that was

16    filed in the Central District of California.  Now, we

17    have heard about a Northern District case and Eastern

18    District case that he is being questioned about which we

19    did not address in our papers, and it is not what this

20    OSC is about.

21           THE COURT:  Well, it has become about it.  It has

22    become about fraudulent filings in federal court.

23           MR. PIETZ:  I would add, your Honor, that it all

24    goes to a pattern and practice.

25    Q      Mr. Cooper, looking now at the verified petition, I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 29 of 119*

1    am going to skip to the last page.  You will note that it

2    is signed by Mr. Gibbs.  On this page which reads at the

3    top notarized verification, there is a slash S,

4    type-printed signature that says Alan Cooper, and it says

5    Alan Cooper, Manager of Ingenuity 13 LLC.

6         Did you ever sign a notarized verification for

7    this document?

8    A    No, I did not.

9    Q    Did you ever give anyone permission to sign your

10   name for you on this document?

11   A    No.

12        MR. PIETZ:  Mr. Ran, would you pass out Exhibit

13   53.  I will note for the record that I am moving now to

14   what has been previously filed with this court as Exhibit

15   S which is the declaration of Nicholas Ranallo in

16   opposition to a motion to shorten time filed in the

17   Northern District of California.  And I am going to move

18   now to an exhibit to this motion.

19        It is actually the second to last page in that

20   filing, Exhibit S, and what we are looking at is a

21   business entity detail for an entity called VPR, Inc.

22   from the Minnesota Secretary of State website.

23   Q    Mr. Cooper, you will note there that under

24   officers, it says Alan Cooper and it lists an address of

25   4532 East Villa Teresa Drive, Phoenix, Arizona, 85032.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 30 of 119*

31

1              Mr. Cooper, have you ever been to Arizona?

2    A     No, I haven't.

3    Q     So that is not your residence, is it?

4    A     No.

5    Q     Do you have any knowledge of that address

6    whatsoever?

7    A     No, I do not.

8    Q     Did anybody ever ask you to be the president of

9    VPR, Inc.?

10   A     No.

11   Q     Did anybody ask you to be any other role in

12   connection with that company?

13   A     No.

14   Q     Mr. Cooper, I am going to move now to what has been

15   previously identified in the record as Exhibit T.  What

16   we have here is a notissues.com registration.

17              Mr. Cooper, did you ever register an Internet

18   domain name called notissues.com or perhaps it is

19   pronounced notissues.com?

20   A     No, I did not.

21   Q     I am going to zoom in now.  Mr. Cooper, I will note

22   that on the second page it says registrant Alan Cooper,

23   and it lists that same Phoenix address that we mentioned

24   a moment ago.  Am I correct in presuming that there where

25   it says administrative contact, and it lists the e-mail

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 31 of 119*

32

1   address, johnsteele@gmail.com.  Am I correct in assuming

2   that johnsteele@gmail.com is not your e-mail address,

3   Mr. Cooper?

4   A     No, it is not.

5   Q   Mr. Cooper, after you hired attorney Paul Godfread,

6   and he let the other side know that he was going to be

7   representing you in actions in Minnesota, did you hear

8   from John Steele?

9   A     Yes.  He called me twice and left two voicemails

10  and sent me two texts.

11  Q     So this was after Mr. Godfread let Prenda know that

12  he was your attorney; isn't that correct?

13  A     Yes.

14  Q     How many times in a row did Mr. Steele call you

15  when that happened?

16  A     I think five or six times right in a row.

17  Q     And that was, more or less, to your understanding,

18  was that more or less immediately after your attorney

19  Paul Godfread let the other side know that he was going

20  to be representing you?

21  A     Yes.  It was right after Paul let him know.

22  Q     Within a matter of minutes, would you say, sir?

23  A     Yes.

24  Q     Have you heard from Mr. Steele recently,

25  Mr. Cooper?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 32 of 119*

1   A    He had left two other voicemails on my phone and

2   two other texts within the last couple of weeks, I think

3   it was.

4   Q    And, more recently than that, have you heard from

5   him again?

6   A    Yes.  Yeah.  There was a two week spell between

7   them that he had called me twice.

8   Q    And, Mr. Cooper -- pardon me, I didn't mean to

9   interrupt you.  Go ahead, sir.

10  A    He left four voicemails altogether and four text

11  messages.

12  Q    And, Mr. Cooper, my understanding is that you

13  brought copies of these voicemails to potentially play

14  for the court; is that correct, sir?

15  A    Yes.

16  Q    If the court will indulge me a moment, I will play

17  those into the microphone for the record.

18       THE COURT:  Okay.

19       MR. PIETZ:  If it is okay with the court, I would

20  like to ask Mr. Stoltz to assist me with this.  He is the

21  brains of the operation on the technology here.

22       Apologize, your Honor.  We are starting from

23  the beginning.

24       (Audio recording played.)

25  Q    BY MR. PIETZ: Mr. Cooper, have you spoken with John

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 33 of 119*

```
 1   Steele enough times to recognize his voice?

 2   A     Oh, yeah.  That is his voice.  That is him.

 3   Q     So that was Mr. Steele on those recordings that we

 4   just heard a moment ago?

 5   A     Yes.

 6   Q     The three lawsuits that Mr. Steele was referring

 7   to, do you think he means the three defamation cases

 8   recently filed against you and your attorney, Paul

 9   Godfread by John Steele, Paul Duffy and Prenda Law in

10   Florida, the Northern District of Illinois and the

11   Central District of Illinois?  Do you think that is what

12   he was talking about?

13   A     Yes.

14   Q     Mr. Cooper, I, for my part, don't have anything

15   further.  Perhaps the court does, but, before I step

16   down, I would like to thank you for coming here today?

17         THE COURT:  Thank you, counsel.

18         MR. BRODSKY:  Very briefly, your Honor.  Thank

19   you.

20

21                  CROSS-EXAMINATION

22   BY MR. BRODSKY:

23   Q     Mr. Cooper, you have never met Mr. Gibbs; is that

24   correct?

25   A     Yes.
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 34 of 119*

35

1    Q    And you have never spoken to him as well; is that

2    correct?

3    A    No, I have not.

4    Q    And you have exchanged no correspondence with him

5    whatsoever; is that correct?

6    A    That is correct.

7    Q    Do you know a gentleman by the name of Grant Berry,

8    B-E-R-R-Y?

9    A    Yes, I do.

10   Q    Who is Mr. Berry?

11   A    He is the one that introduced me to John when I was

12   selling my house.

13   Q    And what type of relationship if any do you have

14   with Mr. Berry?

15   A    He was the realtor for -- he was a realtor that I

16   had for selling my house.

17   Q    And did you ever tell or ask Mr. Steele in

18   Mr. Berry's presence how is my porn company doing?

19   A    No, I have not.

20   Q    You sure about that?

21   A    Yes.

22        MR. BRODSKY:  Thank you, your Honor.  Nothing

23   further.

24        THE COURT:  All right.  Same questions that he

25   asked with respect to -- what about Mr. Paul Duffy, do

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 35 of 119*

36

```
1    you know him?
2         THE WITNESS:  No, I do not.
3         THE COURT:  Ever heard of him?
4         THE WITNESS:  Through these things that are going
5    on, yes.
6         THE COURT:  All right.
7         THE WITNESS:  That way only.
8         THE COURT:  All right.  Anyone else?
9         MR. PIETZ:  Your Honor, just very briefly, as a
10   technical matter, I would like to ask that the documents
11   I went through with Mr. Cooper be admitted into evidence.
12            That was the copyright assignment with Popular
13   Demand.  I would ask that that be admitted into evidence
14   as Exhibit 1.  The copyright assignment agreement for
15   sexual obsession, I would ask that that be admitted as
16   Exhibit 2.  The verified petition in the Eastern District
17   of California matter previously identified in this action
18   as Exhibit L, I would ask that it be admitted now as
19   trial Exhibit 3.  The declaration from Mr. Ranallo which
20   has the printout for VPR, Inc. previously filed here as
21   Exhibit S, I would ask that be admitted as trial Exhibit
22   4.  And the notissues.com registration previously
23   identified here as Exhibit T, I would ask be admitted as
24   trial Exhibit 5.
25            THE COURT:  Any objection?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 36 of 119*

37

1          MR. BRODSKY:  Yes, your Honor.  As to Exhibits 3,

2     4 and 5, we would object on the ground of relevance.

3          THE COURT:  Sustained.  All right.  Everything

4     else comes in.  What about the audio?  Is there a

5     transcript of the audio?

6          MR. PIETZ:  Your Honor, we can prepare it.

7          THE COURT:  Would you.  Thank you.

8          MR. PIETZ:  We would be happy to, and we will

9     lodge it with the court, your Honor.

10          THE COURT:  Thank you.  Okay.  That will be

11     received as well.

12               All right.

13               Anything, gentlemen?  Nothing.

14               You may step down, sir.  Appreciate you

15     coming.

16          MR. PIETZ:  Your Honor, at this time, I think it

17     might be helpful for me to suggest a few other things

18     that I am prepared to discuss today for the court.  We

19     have heard from Mr. Cooper.

20               What I might propose now is turning to

21     Mr. Gibbs.  Mr. Gibbs has noted in his declaration or

22     attempted to characterize himself as merely a, quote,

23     independent contract attorney for Prenda Law.  I am

24     prepared to present evidence today showing that, in fact,

25     Mr. Gibbs is really what amounts to a de facto chief

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 37 of 119*

38

1   operating officer of Prenda Law.  And I have a number of

2   documents and exhibits I am prepared to go through with

3   Mr. Gibbs on that account.

4          In addition, I am prepared to show through

5   cross-examination of Mr. Gibbs that his investigation in

6   these cases was objectively unreasonable.  Although I was

7   not able to contact Mr. Larguire(phonetic) or Mr. Denton,

8   a former client of mine in a previous case who was

9   previously named by Mr. Gibbs as a result of what I view

10  as a shoddy online investigation is here to testify that

11  the main fact that Mr. Gibbs relied upon in that case

12  turned out to be completely incorrect.

13         Fourth, your Honor or I should said say third,

14  there are representatives here today from both AT&T and

15  Verizon who can conform that the court's discovery orders

16  were unambiguously violated in this case.

17         Fifth, and, finally, your Honor, if the court

18  is inclined to hear it, I am prepared to explain my

19  understanding of how Prenda is organized and present

20  evidence showing that the court does indeed have personal

21  jurisdiction over Mr. Steele, Mr. Duffy, Mr. Paul

22  Hansmeier and Ms. Angela Van Den Hemel.

23      THE COURT:  Let's begin with the ISP's.

24      MR. PIETZ:  Very well, I would ask now that

25  Mr. Huffman come forward.  Is he here?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 38 of 119*

1           (The witness was sworn.)

2           THE CLERK:  Please have a seat.

3               Please state your full and true name for the

4    record, and spell your last name?

5           THE WITNESS:  My name is Bart Huffman,

6    H-U-F-F-M-A-N.

7           THE COURT:  One second.

8           THE CLERK:  Counsel, I think we are going to first

9    have our 2:30 matter.  I think it will be a little

10   shorter.  So I am going to call the next matter and then

11   we will have you guys come back.

12          (Recess from 2:30 to 2:31 p.m.)

13          THE COURT:  Okay.  Sorry for the interruption.

14   Let's go back on the record in the AF Holdings, Ingenuity

15   13 LLC.

16              All right.  Go ahead, counsel.

17          MR. PIETZ:  Thank you, your Honor.

18

19                    DIRECT EXAMINATION

20   BY MR. PIETZ:

21   Q    Mr. Huffman, what is your job, sir?

22   A    I am an attorney.

23   Q    With what firm?

24   A    Lock Lorde.

25   Q    And do you represent AT&T in that capacity, sir?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 39 of 119*

1    A    Yes, I do.

2    Q    And how long have you been -- how long have you

3    been representing AT&T, sir?

4    A    I have been representing AT&T for about six or

5    seven years, I suppose.

6    Q    And do you have personal familiarity with matters

7    before AT&T that involve the Prenda law firm?

8    A    I do.

9    Q    So on a day-to-day basis over the past few years,

10   have you handled Prenda matters for AT&T?

11   A    A number of them.

12   Q    Very well.  You prepared a declaration which I

13   submitted with the court in this matter; isn't that

14   correct, sir?

15   A    That is correct.

16   Q    And that declaration was based on an investigation

17   performed by your client, AT&T; is that correct?

18   A    Well, that declaration recounts a series of events

19   where Angela Van Den Hemel who has contacted us on a

20   regular basis to follow-up on subpoenas contacted us with

21   respect to the subpoenas in the case that was

22   consolidated with others in this proceeding.  And as we

23   looked into it, we discovered that the case had been

24   stayed as far as discovery goes.

25   Q    So you are familiar, then, with this court's

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 40 of 119*

41

1   October 19th, 2013 discovery order vacating the subpoenas

2   in the AF Holdings cases now before this court?

3   A     Yes.

4   Q     And as far as AT&T is aware, did Prenda in fact

5   stop seeking subpoena returns on the cases consolidated

6   before this court after October 19th, 2013?

7          MR. WAXLER:  Calls for speculation.

8          THE WITNESS:  I am not aware that they did.  AT&T

9   did not, to my knowledge, receive any notice of the order

10  and furthermore Ms. Van Den Hemel, I think I am saying

11  her name right, contacted us seeking to follow-up and

12  obtain information presumably with respect to the

13  subpoenas in that case.  And we received, I should add,

14  we received, I and my firm receive the information pretty

15  much directly as it comes in from CT Corporation so with

16  respect to these type of subpoenas.

17  Q     BY MR. PIETZ: So with respect to these type of

18  subpoenas, then, the receipt or non receipt by AT&T would

19  come into your office; is that correct?

20  A     Typically, it would.

21         MR. WAXLER:  Calls for speculation.

22         THE COURT:  Hang on.  What is your objection?

23         MR. WAXLER:  Calls for speculation, your Honor.

24         This witness is being asked to say whether

25  AT&T received something, and I think that is speculative

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 41 of 119*

1    for him to be able to testify as to whether AT&T might

2    have received it or not.

3          THE COURT:  I understood it to be how mail is

4    handled in his office, but let's walk through it again.

5          MR. PIETZ:  Very well.

6    Q     So did your office receive a copy of the

7    October 19th, 2013 order vacating the subpoenas in this

8    case?

9    A     Not independently.  When we looked on Pacer as

10   we -- we routinely do with respect to production requests

11   and the like, we found the order.

12   Q     So your office was not served by Prenda or anybody

13   affiliated with Prenda with this court's October 19th

14   discovery order?

15   A     That is correct.

16   Q     And did you investigate with your client, AT&T, as

17   to whether or not AT&T received a copy of the court's

18   October 19th order?

19   A     I did not specifically ask them that, no.

20   Q     And were you contacted only the once by Angela

21   Van Den Hemel regarding the court's October 19th order in

22   this action?

23   A     No.  She contacted my paralegal twice and my

24   paralegal would routinely refer those type of inquiries

25   to me.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 42 of 119*

1  Q     So she actually asked twice for subpoena returns to

2  be made after the October 19th discovery order?

3  A     That's correct.  And when I looked at the Pacer

4  records and saw the order, I then responded to

5  Ms. Van Den Hemel saying that the discovery had been

6  stayed and we of course would not be producing discovery

7  in the case at that time.

8       MR. PIETZ:  I would ask that the declaration of

9  Bart Huffman be admitted as evidence in this hearing.  I

10  think we are on Exhibit 6.

11      THE COURT:  Okay.

12      THE WITNESS:  And would you also want to have the

13  declaration of my paralegal admitted as well?

14      MR. PIETZ:  Yes.  I would ask as well that that be

15  admitted as Exhibit 7.  It is the next filing on the

16  docket.

17      THE WITNESS:  Camille Kerr.

18  Q  BY MR. PIETZ:Could you spell her name for the

19  record.

20  A     Certainly.  C-A-M-I-L-L-E, K-E-R-R.

21      THE COURT:  All right.  Any objection, gentlemen?

22      MR. BRODSKY:  Is she going to be testifying, your

23  Honor?

24      THE COURT:  I have no idea.

25      MR. BRODSKY:  Object on the ground of hearsay.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 43 of 119*

1          THE COURT:  Is she here?

2     Q    BY MR. PIETZ: Mr. Huffman, is Ms. Kerr here today?

3     A    Ms. Kerr is not here today.  I can testify though

4     that I oversaw and reviewed all of the items stated in

5     her declaration, and they are part of our regularly kept

6     records and they are consistent with our files, were

7     overseen by me at every single step and reviewed and they

8     are, in fact, true and correct.

9     Q    So you are personally familiar with the facts in

10    Ms. Kerr's declaration?

11    A    I am, and I reviewed it in detail.

12         THE COURT:  What is the substance or the subject

13    matter?

14         THE WITNESS:  Ms. Kerr submitted a separate

15    declaration simply because she was the addressee on the

16    e-mails from Ms. Van Den Hemel.

17         THE COURT:  All right.  And her declaration

18    attests to?

19         THE WITNESS:  Her declaration attests to the truth

20    and authenticity of the e-mails that I attached thereto.

21         THE COURT:  That is all?

22         THE WITNESS:  That is all.

23         THE COURT:  All right.  I will permit it.  Okay.

24         Gentlemen?

25         MR. BRODSKY:  No questions, your Honor.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 44 of 119*

1       THE COURT:  All right.  Sir, you may step down.

2  Thank you.

3       THE WITNESS:  Thank you, your Honor.

4       THE COURT:  I do have one question.

5  Ms. Van Den Hemel, when you advised her that you had

6  learned from Pacer of the court's order quashing those

7  subpoenas, did she sound surprised?

8       THE WITNESS:  She never responded at all.

9       THE COURT:  All right.  Thank you.

10       MR. PIETZ:  Your Honor, also in attendance today

11  is an attorney for Verizon, Mr. Benjamin Fox.  If it

12  please the court, I would suggest we offer him.

13       THE COURT:  Yes.  Please.

14       (The witness was sworn.)

15       THE CLERK:  Please have a seat.  And please state

16  your full and true name for the record and spell your

17  last name.

18       THE WITNESS:  Benjamin Fox, F-O-X.

19

20                   DIRECT EXAMINATION

21  BY MR. PIETZ:

22  Q    Mr. Fox, what is your occupation, sir?

23  A    I am a partner at Morrison and Foerster here in Los

24  Angeles.  I am a lawyer.

25  Q    And do you represent Verizon in that capacity?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 45 of 119*

46

1    A     I do.

2    Q     And how long have you represented Verizon in that

3    capacity?

4    A     I can't tell you the date.  I know that the first

5    matter was the Eastern District of California Rule 27

6    proceeding filed by Ingenuity 13, and that is the case

7    that you had a copyright assignment for that you showed

8    earlier this afternoon.

9    Q     So you appeared on behalf of Verizon in that Rule

10   27 petition action in the Eastern District of California;

11   is that correct?

12   A     Correct.

13   Q     And I believe that was in 2011.  Since then, have

14   you had occasion to deal with litigation matters

15   involving the Prenda law firm?

16   A     Yes.

17   Q     So you have handled those issues for Verizon on a

18   day-to-day basis in the past two years?

19   A     Yes.  Many of them.

20   Q     Very well.  You prepared and submitted, filed, I

21   should say, a declaration with the court earlier today;

22   isn't that correct, sir?

23   A     I prepared for Verizon and obtained a signature

24   from Mr. Sean Moriarty who is a Verizon representative in

25   Arlington, Virginia.  Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 46 of 119*

1   Q      So you are familiar with the facts that were

2   averred in the declaration filed with the court today?

3   A      Yes, I am.

4   Q      And did you investigate whether the facts are

5   correct prior to filing the document here today?

6   A      I did.

7   Q      And can you explain to me the substance of the

8   declaration with respect to whether or not Verizon

9   received a copy of the court's October 19th discovery

10  order?

11  A      Sure.  Verizon has been the recipient of I think

12  literally hundreds of subpoenas from the Prenda firm, and

13  Verizon is a party in a DC Circuit appeal where AF

14  Holdings was the plaintiff based on one of the copyright

15  assignments that bears the name of Mr. Cooper.  Verizon

16  is very focused on what has been happening in these cases

17  and has been paying close attention to it.

18          So if Verizon had received the October 19

19  order from this court, Verizon would have known that, and

20  I would have received it as well.  My e-mail doesn't have

21  any record of it.  I have searched.  I know that Verizon

22  has now searched.  Is there some theoretical possibility

23  that maybe it was sent to someone at Verizon and not

24  forwarded to the correct people?  Possible.  But having

25  not seen anything from Mr. Gibbs that suggests it was

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 47 of 119*

1   sent, you know, my conclusion is that it was not sent to

2   Verizon.

3   Q    So, then, in terms of the usual channels, the

4   custom and practice, the way subpoenas would normally

5   come in from Verizon, did you check all of these means of

6   receiving subpoena information?

7   A    I checked.

8        MR. WAXLER:  Calls for speculation, your Honor.

9        MR. PIETZ:  Let me rephrase.

10       THE COURT:  What is your objection?

11       MR. WAXLER:  Calls for speculation.  He is asking

12   this witness to speculate about what Verizon's policies

13   are in receiving subpoenas.

14       THE COURT:  I thought you were talking about

15   Morrison and Foerster's policy.

16       MR. PIETZ:  That's right.  I will rephrase and

17   make it more clear, your Honor.  Let me rephrase.

18   Q    So did you personally check Morrison and

19   Foerster's, the way that Morrison and Foerster would

20   normally receive information about a subpoena?  Did you

21   check and make sure that no notice was received of the

22   October 19th discovery order?

23   A    Yes.  I made a reasonable search, and I looked

24   wherever that I thought was appropriate to look.

25   Q    And you communicated with your client that you --

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 48 of 119*

49

1    well, let me back up.

2           The gentleman who executed the declaration

3    that was filed with the court today, what was his name,

4    again, sir?

5    A      Sean Moriarty.

6    Q      And is that somebody you normally communicate with

7    these type of matters.

8    A      Yes.

9    Q      And you spoke with Mr. Moriarty, and can you

10   explain, did you have him investigate, from Verizon's

11   end, whether notice was received?

12   A      The Verizon team investigated.  Yes.

13   Q      Including Mr. Moriarty?

14   A      Yes.

15   Q      Very well.  And so, then, to the best of your

16   knowledge, based on both his investigation and a review

17   of Morrison and Foerster's own records, Verizon did not

18   receive a copy of the October 19th discovery order; isn't

19   that correct?

20          MR. WAXLER:  Your Honor, it is basically taking

21   hearsay.  Calls for speculation.  He is asking the

22   witness what Verizon did.  Verizon has given a

23   declaration that says it does not appear.

24          THE COURT:  Overruled.

25          THE WITNESS:  Correct.

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 49 of 119*

1    Q    BY MR. PIETZ: I would ask, then, that the

2    declaration submitted by Mr. Moriarty with the court

3    earlier today be admitted into evidence as Exhibit 7.

4    Sorry.  Pardon.  Exhibit 8.

5         THE COURT:  It will be admitted.

6              All right.  Mr. Brodsky, do you wish to

7    inquire?

8         MR. BRODSKY:  I do not, your Honor.  I have no

9    questions.

10        THE COURT:  Sir, you may step down.

11        THE WITNESS:  Thank you.

12        THE COURT:  All right.  Now, I would also like to

13   hear from your former client?

14        MR. PIETZ:  Very well.  Mr. Nason, are you in

15   attendance today?

16        (The witness was sworn.)

17        MR. WAXLER:  Your Honor, I would object to this

18   line of questioning please.

19        THE COURT:  He hasn't asked any questions yet.

20        MR. WAXLER:  I know that, but this witness has no

21   relevant testimony to this subject matter.  He is not a

22   party to any of the four cases at issue in this OSC.  It

23   is not even a federal court case that he was a defendant

24   in, your Honor.  He has no relevant testimony that he

25   could state in connection with this OSC.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 50 of 119*

1    THE COURT:  Maybe yes.  Maybe no.  If we are

2    talking about a pattern and practice, and from what I

3    have seen, this is a cookie-cutter litigation.  Sometimes

4    the only thing that I see changed on the complaints are

5    the ISP's addresses and the name of the film, but, in all

6    other respects, they seem to be all the same even the

7    declaration from the technical expert as to what he did

8    in order to identify the infringer.  It is the same

9    document.  So I hear your point.  If I don't find it to

10   be relevant, I will discard it.

11   MR. WAXLER:  Your Honor, just for the record,

12   Mr. Gibbs' declaration does go through exactly the

13   different things that he did in order to determine

14   whether in the two cases that you cited in the OSC

15   whether he was able to locate the infringer and who that

16   was.  And there is nothing cookie cutter about that

17   effort that he put in his declaration.

18   THE COURT:  All right.  Thank you.

19   Go ahead.

20   THE CLERK:  Please state your full and true name

21   for the record and spell your last name.

22   THE WITNESS:  Jessie Nason.  That is N like Nancy,

23   A-S-O-N.

24   THE COURT:  Go ahead, counsel.

25   Is that one S or two?

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 51 of 119*

52

1     THE WITNESS:  One S.

2     THE COURT:  All right.

3     THE WITNESS:  Well, two in Jessie.  Sorry.

4

5                 DIRECT EXAMINATION

6  BY MR. PIETZ:

7  Q     Mr. Nason, have you heard the name Brent Gibbs

8  before?

9  A     Yes.

10 Q     And in what context, sir?

11 A     He was the lawyer who brought the case against me,

12 Lightspeed Media versus my name.

13 Q     And where was that -- and I represented you in that

14 case, did I not, sir?

15 A     Correct.

16 Q     And was that in the Los Angeles Superior Court

17 filed in 2012?

18 A     Yes.

19 Q     I will note for the record that the case is

20 Lightspeed Media Corporation versus Jessie Nason, Los

21 Angeles Superior Court No. NC057950.

22     MR. WAXLER:  Your Honor, I would like to object

23 again.  This case is not even a copyright case.  It was a

24 case where the individual here was alleged to --

25     THE COURT:  Where are you from?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 52 of 119*

1      MR. WAXLER:  I am from Los Angeles, your Honor.

2      THE COURT:  There are no speaking objections in

3   Los Angeles.

4      MR. WAXLER:  I'm sorry, your Honor.

5      THE COURT:  Okay.  What is this case about?

6      MR. PIETZ:  Your Honor, if I might speak to that

7   very briefly.  What we have seen from Prenda Law is a

8   slightly different twist in some of their cases on

9   copyright litigation, and what it is is essentially an

10  attempt to address a copyright infringement case in state

11  law clothing, well, state law and the Computer Fraud and

12  Abuse Act.

13      So the causes of action at issue in the

14  Lightspeed case was a computer fraud and abuse act claim

15  which essentially alleges that downloading and

16  distributing content, and the content is nebulously

17  specified in the complaint amounts to Computer Fraud and

18  Abuse Act violations.  And then there were a variety of

19  related claims all of which were preempted by the

20  Copyright Act for conversion, unjust enrichment and the

21  like.  But, really, what it was, and, in fact, and I can

22  speak to this longer although perhaps it is getting off

23  on a tangent, in reality what happened, was at some point

24  somebody probably hacked into a password protected

25  website, but, then, Prenda started logging IP addresses

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 53 of 119*

1    and suing people in CFAA claims even though really the

2    gravamen of the case was the use of BitTorrent.  So it is

3    similar, but, in any event, the issue in Mr. Nason's case

4    that I think is relevant here is the same, and that

5    specifically what was the investigation that was

6    performed prior to naming Mr. Nason as the defendant in

7    the case, and it is fairly bread and butter.

8            THE COURT:  Okay.  Go ahead.

9    Q    Mr. Nason, are you familiar with the reason that

10   Mr. Gibbs stated that he had named you as a defendant?

11   A    Yes.

12           MR. WAXLER:  Calls for speculation.

13           THE COURT:  He said stated.  You did say stated;

14   right?

15           MR. PIETZ:  Yes, your Honor.

16           THE COURT:  All right.  Overruled.

17   Q    BY MR. PIETZ: So, in any event, what was that

18   reason, Mr. Nason.

19   A    I believed it to be that he supposed I lived by

20   myself in my apartment, and so he considered me a single

21   male.

22   Q    And, Mr. Nason, is that correct?  Do you live

23   alone?

24   A    No, I do not.

25   Q    And who do you live with, Mr. Nason?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 54 of 119*

1    A     My wife of nine years.

2    Q     And have you lived with her for the past

3    nine years?

4    A     Correct.

5    Q     So, at any point, you know, save perhaps for a

6    vacation, consistently for the past nine years, you have

7    always lived with your wife; is that correct?

8    A     That's correct.

9         MR. PIETZ:  That is essentially all I need from

10   Mr. Nason, your Honor.  I might have some questions about

11   Mr. Gibbs, or perhaps now I could show the court the

12   section of the transcript from the hearing in the Nason

13   matter where Mr. Gibbs, when pressed by the court as to

14   how it is and why it is he justified having named

15   Mr. Nason as a defendant, Mr. Gibbs specifically stated,

16   well, because we determined that he lived alone.  It is

17   just incorrect.  And, indeed, the court denied my motion

18   on that basis even though it turned out to be incorrect.

19        MR. BRODSKY:  Your Honor, for the record, may we

20   move to strike the testimony on the ground that it is

21   irrelevant and beyond the scope of the court's OSC.

22        THE COURT:  You may step down, sir.  Thank you.

23        THE WITNESS:  Thank you.

24        MR. PIETZ:  I am looking now for the specific

25   section of the transcript.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 55 of 119*

56

1    THE COURT:  Don't worry about it.

2    MR. PIETZ:  All right.  I can find it afterwards.

3  Thank you, your Honor.

4    THE COURT:  All right.  Let's now switch to the

5  jurisdictional issue.

6    MR. PIETZ:  Oh, you know what, your Honor, I have

7  here the actual original copy of the transcript which

8  perhaps I will lodge with the court and move to mark as

9  Exhibit 9, I believe we are on.

10    THE COURT:  Okay.

11    MR. PIETZ:  And, Mr. Ranallo, if you can find the

12  pin cite, we will go ahead and add it.

13        May I approach to give this to the clerk, your

14  Honor?

15    MR. WAXLER:  We would object to the inclusion of

16  that transcript as an exhibit.

17    THE COURT:  I will take a look at it.  We will

18  see.

19        Where was this?  Was this in Torrance?

20    MR. PIETZ:  Yes, it was, your Honor.  Judge

21  Vicencia.

22    THE COURT:  Small world.  My old court reporter.

23  Okay.

24    MR. PIETZ:  I am just looking now for the diagram

25  which I think will assist in explaining all of this.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 56 of 119*

57

1          We seem to be a bit off kilter there, don't

2    we.  Interesting.  Well, in any event --

3          MR. WAXLER:  What exhibit is this?

4          MR. PIETZ:  Yes.  Marked as -- I will tell you in

5    just a moment.  Double H, previously on the record.

6          In any event, perhaps less useful than I hoped

7    it would be, but I can at least talk the court through

8    it.

9          THE COURT:  What is your source?  I mean,

10   electronic source?

11         MR. PIETZ:  This is a demonstrative exhibit, your

12   Honor.

13         THE COURT:  I know that.  What are you using,

14   laptop?

15         MR. PIETZ:  It is Trial Pad on my iPad, your

16   Honor.

17         THE COURT:  It is on your iPad?

18         MR. PIETZ:  Yes, sir.

19         THE COURT:  And you can't do anything to adjust

20   it?

21         MR. PIETZ:  We do have a color paper copy of the

22   document.  It will take just a moment to pull it.

23         THE COURT:  Okay.  Go ahead.

24         MR. PIETZ:  In any event, Mr. Ranallo, perhaps you

25   can look for that.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 57 of 119*

58

1       MR. BRODSKY:  Your Honor, may I inquire of the

2  court for a moment?

3       THE COURT:  Sure.

4       MR. BRODSKY:  I am not quite sure what the

5  relevance of this is, the foundation for it or exactly

6  what counsel is doing.  It just seems to be his own

7  statement of his investigation.

8       THE COURT:  Do you know the general subject that

9  we are going to discuss now?

10       MR. BRODSKY:  I believe so, your Honor.

11       THE COURT:  Okay.  That is what I think it is, and

12  hopefully it will help him.  Now, when it gets down to

13  the source of this material and the accuracy of this

14  material, I hope I will be hearing from you gentlemen.  I

15  don't have the independent knowledge of this one way or

16  the other.  Thank God for the adversarial process.

17       MR. WAXLER:  Your Honor, so, then, should

18  Mr. Pietz be on the stand if he is going to give

19  essentially testimony about this exhibit?

20       THE COURT:  I don't make a habit of placing

21  lawyers under oath, but this case may change that.  I

22  figure officers of the court will not knowingly make

23  misrepresentations to the court, will they.

24       MR. WAXLER:  No, they won't.

25       THE COURT:  Until this case.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 58 of 119*

```
 1          MR. WAXLER:  My client hasn't in this case.

 2          MR. PIETZ:  Your Honor, to explain what it is,

 3     what I thought I might do is to give a very brief

 4     overview of the organization, and, then, I thought I

 5     would go through some specific documents about Mr. Steele

 6     and a couple of arguments.  So this is really argument,

 7     essentially, a couple of exhibits that go to Mr. Steele's

 8     connection to the California as well as a couple of

 9     points about Mr. Paul Hansmeier and Mr. Duffy.

10          THE COURT:  Okay.

11          MR. PIETZ:  So, in any event, this is a chart that

12     was essentially prepared.  This was prepared by my office

13     essentially as a tool to aid in the understanding of how

14     Prenda Law appears to have evolved over the past few

15     years.

16          Essentially, it started out here with Steele

17     Hansmeier, and John Steele -- I know that is a little

18     hard to see -- John Steele, Paul Hansmeier and Brett

19     Gibbs.  Mr. Steele and Mr. Hansmeier were the named

20     partners in the firm, and Mr. Gibbs was the of counsel

21     originally.  When they first started out, circa 2011 --

22          THE COURT:  I am going to have to stop you.  How

23     do you know that Mr. Gibbs was of counsel with Steele and

24     Hansmeier?

25          MR. PIETZ:  Your Honor, I can point to the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 59 of 119*

60

1    specific exhibit, but there are pleadings of which the

2    court can take judicial notice where he is listed on the

3    pleadings as of counsel to Steele Hansmeier.

4         THE COURT:  You are aware of the fact that

5    Mr. Hansmeier doesn't know what capacity Mr. Gibbs was

6    working at his law firm?

7         MR. PIETZ:  Correct, your Honor.  So, in any

8    event, let me put it this way.  Mr. Gibbs filed documents

9    in federal court indicating on the caption that he was of

10   counsel to Steele Hansmeier.

11        THE COURT:  Okay.

12        MR. PIETZ:  Now, I believe I can also speak to

13   this if the court is so inclined that Mr. Lutz was

14   holding himself out to the world as a paralegal at that

15   time, working, according to Mr. Paul Hansmeier, solely

16   for Mr. Steele.  At this time, most of the lawsuits with

17   a few exceptions filed by Prenda around 2011 were on

18   behalf of a porno production, pardon me, adult

19   entertainment production company that actually people

20   have heard of before.  And that is this list of clients

21   here.

22             What happened is that sometime in 2012, the

23   Steele Hansmeier firm was disbanded or become Prenda,

24   sold its client book to Prenda Law.  We are not entirely

25   sure exactly the nature of the transaction, but, in any

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 60 of 119*

61

1    event, at that point, Paul Duffy became involved as the

2    nominal figurehead of the Prenda Law enterprise.

3    However, there are indications that Mr. Steele and

4    Mr. Hansmeier remain involved and Mr. Gibbs has declared

5    that he essentially continued on as of counsel handling

6    the same cases only now on behalf of Prenda Law, Inc.

7    rather than Steele Hansmeier LLC.

8            At the same time that Steele Hansmeier became

9    Prenda, sometime around, then, in 2012, I am not exactly

10   sure, Mr. Hansmeier started up his own shingle in

11   Minnesota, the virtual office called the Alpha Law Firm

12   LLC.  So, essentially, Mr. Hansmeier sometimes files

13   pleadings in federal court that list his affiliation as

14   Alpha Law Firm LLC, but, by the same token, Mr. Gibbs has

15   identified Mr. Paul Hansmeier as being the person from

16   whom he took direction at Prenda.

17           And, indeed, the court may recall from the

18   deposition transcript read over the weekend that

19   Mr. Hansmeier testified that, indeed, his clients

20   deposited their trust account funds into the Prenda Law

21   Firm account rather than to the Alpha Law Firm account.

22           THE COURT:  Stop.  I hate to interrupt you.

23           But she means more to me than this argument,

24   and we have had her going at light speed for an

25   hour-and-a-half.  Right.  So I am going to take a break,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 61 of 119*

1    and we can all take a break.   How about 10 minutes.

2    Okay.

3         MR. PIETZ:   Very good.   Thank you, your Honor.

4         (Recess from 2:58 to 3:09.)

5         THE COURT:   All right.   Mr. Pietz.

6         MR. PIETZ:   Thank you.   I will attempt to keep

7    this section very brief, and then we will move on to some

8    documentary evidence.   This is just a summary.

9              So, as I was saying, sometime around 2012,

10   there was a bit of a shift in the Prenda business

11   strategy.   Mr. Hansmeier -- so what happened is these

12   companies, AF Holdings, LLC, Ingenuity 13 LLC and then

13   there is a couple of other companies which are the ones

14   in the CFAA cases.   That is Arte de Oaxaca LLC and Guava

15   LLC.   And the CFAA cases have primarily been filed in

16   state court and have indeed tried to use -- certain

17   states have presuit discovery procedures that are more

18   lenient than Federal Rule of Civil Procedure 27.   So it

19   is sort of a newer twist is these state court CFAA cases

20   and Arte de Oaxaca.

21             But, in any event, according to Mr. Hansmeier

22   in his deposition, these essentially shell company

23   plaintiffs are owned by a mystery trust.   Mr. Hansmeier,

24   as 30(b)(6) deponent -- well, anyway, I won't go into

25   that.   The court read it.   According to Mr. Gibbs'

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 62 of 119*

1   special counsel, though, on the same day, February 19th,

2   there is conflicting testimony essentially saying that

3   Livewire Holdings LLC is actually the current holder of

4   AF Holdings and Ingenuity 13.

5   So, in any event, these are the parent

6   companies, some mystery trust and Livewire Holdings LLC.

7   There is documents, you know, I had this sort of set

8   aside to potentially go through with Mr. Gibbs, but I can

9   also just show the documents, show what I have.  In any

10  event, there is documents showing Mr. Gibbs as in-house

11  counsel for Livewire Holdings.

12  There are various other connections between

13  Livewire Holdings and the attorneys we see over here.

14  Mr. Dugas is a local counsel who has worked at both

15  Prenda and Alpha Law which I can show through his

16  LinkedIn profiles, obviously, not central to the case.

17  Mr. Dugas' wife has been identified on LinkedIn as

18  in-house counsel for Livewire Holdings.

19  In addition, what I will talk about now is the

20  way that we see the lawyers.  Mr. Hansmeier has been both

21  30BC deponent for AF and as its counsel.  In any event,

22  what seemed to happen is that at some point these cases

23  filed on behalf of Ingenuity, AF Holdings, Arte de Oaxaca

24  and Guava LLC are cases where what appears to have

25  happened is the lawyers essentially took assignment of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 63 of 119*

1  the underlying intellectual property rights in these

2  mysterious shell companies. One recurring theme here is

3  the way that when we are seeing the straw men, there is

4  always a connection to John Steele. So, for example, in

5  the VPR International, we see John Steele is the

6  attorney. We see Alan Cooper listed on the corporate

7  registration. The address listed for VPR International,

8  the 4532 East Villa Teresa Drive. My understanding based

9  on documents that have been submitted with the court is

10  that is an address that comes up for John Steele's sister

11  and a gentleman named Anthony Saltmarsh, in addition, of

12  course, to being the address listed for Mr. Cooper.

13          So on various federal court filings in the

14  Northern District of California, all of which are

15  attached as exhibits to the deposition that was lodged

16  with the court which the court read over the weekend,

17  when pressed to identify the person at AF Holdings who

18  would be made available for an early neutral settlement

19  evaluation conference, there are various court filings

20  listing the owner of AF Holdings as somebody named Salt

21  Marsh, two words.

22          So, in any event, what seems to perhaps be the

23  case is that this Anthony Saltmarsh lived at this address

24  with John Steele's sister which was essentially used as a

25  front for various entities involved in Prenda activities.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 64 of 119*

```
 1              I don't want to spend too much time on just

 2   the overview.  What I thought I might do is shift instead

 3   to taking the nonappearing folks individually.  And I

 4   thought I might start with Mr. Steele.  So I have some

 5   documents which go to that, and I will switch back now

 6   to -- okay.  There we go.  So I will note that in the

 7   declaration submitted to the court by Mr. Steele on

 8   Friday, he claims that he resides in the State of

 9   Florida.

10              I will point out that when Mr. Steele was

11   under threat of sanction in the state of Florida, he

12   declared to the court there that he resided in the State

13   of Nevada and only visited the State of Florida.  So I

14   have here the affidavit of John Steele that he filed, and

15   you can see the file stamp on the top.  It is Middle

16   District of Florida, Case No. 812 CV 1685 that was filed

17   on December 20th, 2012.  And, in Paragraph 2, Mr. Steele

18   swore to the court that my legal residence is Las Vegas,

19   Nevada, and I also spend one to two weeks a month in

20   Miami, Florida.  So my understanding must be then that

21   sometime between last December and now Mr. Steele has

22   decided that his residence is not Nevada but rather

23   Florida.

24              In any event, and before moving on, I would

25   ask the court to take judicial notice of the fact that in
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 65 of 119*

66

1    the -- that this affidavit which was filed in the public

2    record in the Middle District of Florida that Mr. Steele

3    states that he spends one to two weeks a month in Miami,

4    Florida.  Mr. Ranallo can pass out copies of the

5    affidavit to everybody.

6            So, in any event, let's look at some other

7    documents about Mr. Steele.  And what I would start with,

8    I believe, is a declaration here, and I will ask

9    Mr. Ranallo again to pass this out for the court, the

10   declaration of Michael B. Stone, and what this

11   declaration is, the declaration itself is essentially

12   just authenticating the document, but the document at

13   issue is a collection of pleadings in a Northern District

14   of California action in which it was a case filed on

15   behalf of a Prenda client.

16           Well, this I think was an actual company that

17   people have heard of in an earlier case, but in any

18   event, here, we see the pleading.  So the declaration

19   authenticates it, and then Exhibit 1 is a copy of the

20   complaint which as we can see was filed in the United

21   States District Court for the Northern District of

22   California, and it is Civil Action No. 511 CV 3648.

23           Well, in any event, the interesting thing

24   about this complaint is who signed the subpoena that was

25   directed in this case at a John Doe defendant who resided

*Exhibit 1 - Page 66 of 119*

1    in California.  And the answer, and here we see a copy of

2    the subpoena, pardon me, authenticated by Mr. Stone.

3    This is the letter that the ISP normally sends out, and,

4    here, we see a copy of the subpoena itself.  And this is

5    in the same action.

6            Then, we see, there, that this subpoena which

7    again was signed by John Steele in a California action

8    requesting information of a John Doe defendant in the

9    State of California.  So, essentially, I would ask that

10   this declaration of Michael Stone be admitted into

11   evidence as Exhibit, I believe, we are on 9.

12           Is that correct, Madam Clerk?

13       THE CLERK:  10.

14       MR. PIETZ:  Pardon me.  10.  I am one behind.

15       THE COURT:  All right.  Any objection?

16       MR. WAXLER:  Your Honor, I just question the

17   relevancy of it as to Mr. Gibbs.  Again, it is not one of

18   the cases that you put in your OSC.

19       THE COURT:  It will be admitted.

20       MR. PIETZ:  Similar document that I will move onto

21   next.  What we have here is a declaration which was filed

22   on the docket in a case in the Northern District of

23   California by a man named Samuel Teitelbaum.  It is

24   Northern District of California No. 311 CV 5628.  And we

25   can see here that it is pending in the Northern District

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 67 of 119*

68

1   of California.

2          In this declaration, Mr. Teitelbaum explains

3   that he received a letter directed to him in California

4   from Prenda Law and that the letter which was mailed to

5   him in California which is there is a copy of it right

6   here.  It is on Steele Hansmeier letterhead, and if we go

7   to the last page, we see that the letter, mailed into the

8   State of California in a case pending in the Northern

9   District of California, is signed by John Steele,

10  attorney and counselor at law.

11         So, in any event, I would ask that this be

12  admitted into evidence as Exhibit 11, and these both go

13  to showing that Mr. Steele has indeed reached into the

14  State of California in terms of his actions in BitTorrent

15  copyright litigation cases.

16         THE COURT:  All right.  Will be received.

17         MR. PIETZ:  So what I will do now, I think that

18  the other facts that I had already pointed out about the

19  other gentlemen who are not here today, so I mean Paul

20  Hansmeier and Paul Duffy, I pointed out in my opposition

21  to the objections which was filed on Friday, but, in

22  general, I would argue the jurisdictional issue as

23  follows.

24         What we have from Mr. Gibbs is a declaration

25  saying that anything that was potentially improper in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 68 of 119*

1    these cases was done at the direction of his superiors at

2    the Prenda law firm.  He identifies those people as John

3    Steele and Paul Hansmeier.   Interestingly enough,

4    Mr. Duffy isn't on the list or perhaps maybe not as much.

5              Mr. Duffy has his California bar license in

6    the state of California and has substituted in in

7    Mr. Gibbs' place in a variety of actions in the Northern

8    District of California.  Mr. Hansmeier, in addition to

9    being identified by Mr. Gibbs as essentially running a

10    law firm doing business in California, flew to California

11    apparently of his own free will to appear as the

12    corporate 30(b)(6) deponent of AF Holdings LLC.  So we

13    have Mr. Hansmeier reaching into the state of California,

14    attending a deposition in California in a Northern

15    District of California case, representing essentially

16    that the same plaintiff that is at issue here, AF

17    Holdings LLC.

18              So at least with respect to Mr. Duffy who has

19    his bar license here and Mr. Hansmeier who flew here as a

20    30(b)(6) deponent and has been identified, I think it is

21    fairly clear that probably both general and specific

22    jurisdiction exists.

23              Mr. Steele has perhaps been a little more

24    careful about trying to keep his fingerprints off here,

25    but I would remind the court that Mr. Gibbs has

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 69 of 119*

70

1    identified him as essentially running a law firm in

2    California which by the way is not qualified to do

3    business in California, and I checked with the state bar

4    and it is not registered as a law firm here.

5            But in any event --

6        THE COURT:  You talking about Prenda now?

7        MR. PIETZ:  Talking about Prenda.  Yes, sir.

8            In any event, I apologize.  I don't have

9    documents to back that up, but I can provide them.  But,

10   in any event, I think that with respect to Mr. Steele

11   when you take Mr. Gibbs' declaration and add it together

12   with a subpoena signed by Mr. Steele.  And, pardon me, I

13   will note one other thing about the declaration of

14   Michael Stone.  In addition to authenticating the

15   documents, he also included some back and forth, some

16   meet and confer correspondence he had with Mr. Steele.

17           So, essentially, Mr. Stone noticed the fact

18   that Mr. Steele was not licensed in California and that

19   he had signed the subpoena and wrote to Mr. Gibbs saying

20   this subpoena is invalid.  And what happened is that

21   Mr. Steele wrote back directly without cc'ing Mr. Gibbs

22   and essentially shrugged off the concerns about the

23   subpoena being signed by an attorney who doesn't have a

24   license in California.

25           So, in any event, I think that with respect to

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 70 of 119*

1   Mr. Steele, when you add together the subpoena issued

2   into the state of California, a demand letter issued

3   under the state of California as well as Mr. Gibbs'

4   testimony, it is pretty clear that the court has personal

5   jurisdiction.

6          I don't have a tremendous number of additional

7   exhibits on this topic.  However, I do have quite a few

8   with respect to what I view as Mr. Gibbs' central role in

9   the Prenda law organization.

10          MR. BRODSKY:  Your Honor, may I make one comment?

11          THE COURT:  You can make more than that.  Thank

12   you.

13          Yes.  Go ahead.

14          MR. BRODSKY:  We are not taking a position at the

15   present time on the jurisdictional issues that the court

16   is deciding, but there were statements made about my

17   client that I believe mischaracterize the evidence that

18   has been put forward.

19          THE COURT:  Okay.  Listen, let me just sort of

20   tell you the way we are going to proceed here.  At this

21   point, you will have the floor.  All right.  I can't

22   imagine you are going to raise too much in opposition to

23   the jurisdictional issue.  Otherwise, he is in.  So you

24   go right ahead.

25          Now, a number of things -- I am just going to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 71 of 119*

1   give you some of my thinking.  A number of things were

2   stated in your papers.  Some of them caused me some

3   concern because they were inaccurate.  For example, you

4   make the argument that certain people were identified as

5   infringers because there was no way, for example, that

6   someone else could have been piggy-backing off of their

7   modem because of the size of the lot, where the house is

8   situated on the lot, the proximity or lack of proximity

9   of other residences around, et cetera.

10          Your representation of these homes and the

11  neighborhoods and juxtaposition of other houses around

12  them was simply not accurate.  Not in the least bit.  And

13  I found that troublesome when you are asking me, then, to

14  accept all of your our arguments.

15          So I just want to throw that out there to let

16  you know some of my thinking.

17      MR. WAXLER:  Our turn, your Honor?

18      THE COURT:  I don't care who.  It is this side.

19      MR. WAXLER:  We will call Mr. Gibbs to the stand,

20  your Honor.

21      THE COURT:  All right.

22      (The witness was sworn.)

23      MR. PIETZ:  Your Honor, before we move onto

24  Mr. Gibbs, may I request that we admit into evidence the

25  affidavit of John Steele as Exhibit 12, the Michael Stone

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 72 of 119*

73

1    declaration as Exhibit 13 -- oh.  Pardon me.  Stone and

2    Teitelbaum have already been admitted so just the

3    affidavit of John Steele.  I would ask that that be

4    admitted as Exhibit 12.

5         THE COURT:  I think that's right.  Are we up to

6    12?  Okay.  All right.

7         THE CLERK:  If you could state your full and true

8    name for the record and spell your last name.

9         THE WITNESS:  Sure.  Brad Gibbs, G-I-B-B-S.

10

11                   DIRECT EXAMINATION

12   BY MR. WAXLER:

13   Q    Mr. Gibbs, who is your present employer?

14   A    I am not currently employed.

15   Q    You became employed -- I'm sorry.  You became an of

16   counsel, 1099 independent contractor for Steele

17   Hansmeier; correct?

18   A    Yes.

19   Q    Was Steele Hansmeier an existing law firm at the

20   time that occurred?

21   A    I believe they had been existing for a number of

22   months at that point.

23   Q    What were you told your role would be at Steele

24   Hansmeier?

25   A    Basically, California counsel for Steele Hansmeier

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 73 of 119*

74

```
 1   in bringing lawsuits on behalf of their clients.
 2   Q      Were you paid as an employee?
 3   A      No.
 4   Q      Did you share in Steele Hansmeier profits?
 5   A      No.
 6   Q      Were you on the management of Steele Hansmeier?
 7   A      No.
 8   Q      And who did you understand were the decision makers
 9   of Steele Hansmeier?
10   A      John Steele and Paul Hansmeier.
11   Q      When you were an of counsel to Steele Hansmeier,
12   who supervised you?
13   A      John Steele and Paul Hansmeier.
14   Q      Did you have periodic meetings while at Steele
15   Hansmeier to discuss cases?
16   A      Yes, we did.
17   Q      And were those weekly meetings?
18   A      Yes.  Sometimes they would be sending the schedule,
19   but, yes, mostly weekly meetings.
20   Q      Who participated in those meetings?
21   A      John and Paul would call me, and they would hold a
22   weekly meeting.
23   Q      And were these by phone or in person?
24   A      These were by phone.
25          THE COURT:  Were they ever in person.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 74 of 119*

1       THE WITNESS:  I went sometimes and met them, and

2   then we had meetings, yes, in person at that point, but

3   this was only a couple of times.

4       THE COURT:  This is out of California?

5       THE WITNESS:  Yes.  Well, I have met with Paul

6   Hansmeier in California prior to this deposition, but the

7   other, everything was out of California.

8   Q     BY MR. WAXLER: When -- were any cases that you filed

9   while at -- while of counsel to Steele Hansmeier, were

10  any of those cases settled?

11  A     Yes.

12  Q     And did the checks, the settlement checks come to

13  you?

14  A     No.

15  Q     Did you have a client trust account in any account

16  in which you had an interest at all as a signatory?

17  A     No.  Actually, I don't even have a client trust

18  account.

19  Q     So the checks were sent to Steele Hansmeier's trust

20  account?

21  A     I don't know.  I would assume they were.  They

22  weren't sent to me.  They were sent to Steele Hansmeier.

23  Q     And how did you learn that Prenda law was going to

24  substitute in or take over the cases from Steele

25  Hansmeier?

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 75 of 119*

1    A     Basically, I heard of the name Prenda Law.  They

2    told me that Prenda Law was now taking over the business.

3    Steele Hansmeier was no longer going to exist at that

4    point.

5    Q     And who is they in that answer?

6    A     That would be John Steele and Paul Hansmeier.

7    Q     Were you on the management committee at all of

8    Prenda Law?

9    A     No.

10   Q     Were you partner at Prenda Law?

11   A     No.

12   Q     What was your affiliation with Prenda Law?

13   A     The same as it was for Steele Hansmeier which would

14   be of counsel, California counsel essentially for Prenda

15   Law.

16   Q     So you were compensated with a 1099?

17   A     Yes.  That is correct.

18   Q     And did that ever change over the course of the

19   time which you were counsel to Prenda Law?

20   A     In terms of what?

21   Q     In terms of your relationship with that firm?

22   A     No.  I would only say that they, John and Paul, had

23   asked me to help the other counsel in different states,

24   basically, like, give them advice in doing their own

25   cases in different states.  That was the only change

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 76 of 119*

1   really.  Other than that, I was just California counsel.

2   Q      While of counsel to Prenda Law, did you ever

3   receive any settlement checks?

4   A      Myself personally, no.

5   Q      Did you have a client trust account at Prenda Law

6   that you somehow administered or controlled?

7   A      No.

8   Q      And were you supervised at Prenda Law?

9   A      Yes, I was.

10  Q      Who were you supervised by?

11  A      Paul Hansmeier and John Steele.

12  Q      Were you supervised by Paul Duffy?

13  A      No.

14  Q      And when you say supervised, could you just

15  describe what you mean by that?  How did they supervise

16  you?

17  A      Sure.  You know, they essentially were the ones

18  that would initiate cases.  By that, I mean, they would

19  tell me they wanted to file certain cases in California,

20  for instance, and they would instruct me to go ahead and

21  file those.  And they would give me the authority to do

22  so.  I would be told what cases we are looking at and how

23  many cases we are talking about, and then I would file

24  the cases.

25             And they would give me general guidelines on

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 77 of 119*

78

1    what to do and sometimes the cases would be settled by

2    John as was pointed out earlier, and sometimes they gave

3    me certain parameters which I could settle the case

4    myself.

5    Q    Did you ever talk to anybody that you understood to

6    be the client, AF Holdings?

7    A    No.  The communications were solely through Paul

8    Hansmeier and John Steele.

9    Q    Did you ever talk to anybody who said they were

10   affiliated with Ingenuity 13?

11   A    Well, I mean, aside from Mark Lutz who is the CEO

12   of Ingenuity 13, but aside from that, no.  All my

13   communications were straight through Paul Hansmeier and

14   John Steele.

15   Q    Did Mr. Lutz ever give you direction on the

16   handling of any of these cases directly?

17   A    No.  Actually, I only found out about that

18   connection, I would say, after the cases in the Central

19   District were filed, about him being the CEO.  I didn't

20   know that before.

21   Q    And the cases that were filed in the Central

22   District were dismissed; correct?

23   A    That is correct.

24   Q    And whose decision was it to dismiss those cases?

25   A    Ultimately, it was John Steele and Paul Hansmeier's

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 78 of 119*

1    decisions.  We had talked about it.  As counsel of record

2    here, I just kind of broke down like a cost benefit

3    analysis of those cases.  And they said, basically, go

4    ahead and dismiss them because -- they said go ahead and

5    dismiss them.

6    Q    When the cases were filed, did you have a

7    discussion with anybody about whether notice of

8    interested parties should be filed?

9    A    I did.  Yeah.

10   Q    And who did you have discussions with?

11   A    Mostly Paul Hansmeier.  Yes.  Mostly Paul Hansmeier

12   but sometimes John Steele, I guess.  I don't know.  It

13   was a while ago I guess.

14   Q    Did you file those notices of interested parties?

15   A    Yes.

16   Q    What did they say in connection with AF Holdings.

17   A    They said there was no other interested parties.

18   Q    Do you have any personal knowledge of that

19   statement as untrue?

20   A    No, I did not.  No.  I still don't.  I mean, in

21   terms of I know there is other things involved in terms

22   of the trust and stuff like that, but in terms of other

23   people involved, I was only taking direction from these

24   guys in terms of these types of filings.

25   Q    And these guys are?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 79 of 119*

80

1    A      These guys are Paul Hansmeier and John Steele.

2    Q      In connection with Ingenuity 13 cases did you file

3    notices of interested parties?

4    A      That is correct.  Yes.

5    Q      And were you ever advised that the information --

6    how did you obtain the information for those notices?

7    A      Well, I just, I would ask them, you know, are there

8    any other people that I should be noticing on this

9    document that I am filing with the court.

10   Q      Who is them in your response?

11   A      That would be Paul Hansmeier and John Steele.

12   Q      Were you told not to do that again.  Instead of

13   saying them, were you told by Paul Hansmeier, John Steel

14   that the information you included in those notice of

15   interested parties was correct?

16   A      So they actually told me, I was instructed to fill

17   those documents out like I did.

18   Q      There was a question raised by the court this

19   morning about the failure to have filed notices of

20   related cases.  My question is did you consider filing

21   notices of related cases when you filed the actions in

22   the Central District of California?

23   A      Yes, we did.

24   Q      And could you please describe for the court what

25   your thought process was as a result of, in not filing

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 80 of 119*

1    these notices?

2    A    So we had filed -- well, I filed on behalf of

3    Steele Hansmeier, then Prenda Law, a number of cases in

4    the Northern District of California, and those were cases

5    with multiple people in them.

6        And what the court in the Northern District of

7    California concluded, almost every court, at that point,

8    after filing multiple cases was that joinder was not

9    valid and that they basically told us in no uncertain

10   terms that these cases weren't related.  Therefore, that

11   informed my belief in terms of whether we wanted to

12   relate these cases or not.  They said these cases,

13   essentially, through their orders and through live

14   hearings, that these cases aren't related, they should be

15   brought as individual actions.  So it was just a decision

16   to bring those individual actions and not relate the

17   cases based on that.

18   Q    And your experience in Northern California, that

19   predated the filings of the Central District actions that

20   we are here to discuss today?

21   A    Yes.  I don't even know if I was admitted into the

22   Central District at that point.

23       THE COURT:  Let me jump in a second.  You were

24   told in the Northern District of California that when you

25   filed a lawsuit on behalf of either AF Holdings or

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 81 of 119**

1    Ingenuity 13 versus Does 1 through many, that that

2    joinder was improper; correct?

3         THE WITNESS:  Some cases.  Some cases it was not

4    improper.  Some judges felt differently.

5         THE COURT:  All right.  But if it involved

6    different movies, downloads, different times, different

7    people, different places, different ISP addresses, they

8    said you need to file separate lawsuits; right?

9         THE WITNESS:  Some of them were the same clients,

10   same videos.

11        THE COURT:  Okay.  But even then?

12        THE WITNESS:  Yes.

13        THE COURT:  Even then, you had to file separate

14   lawsuits?

15        THE WITNESS:  Yes.  We were pointing that

16   direction even there was a footnote in one of the courts'

17   opinions saying basically that we were trying to get

18   around the filing fee, and that is what they thought so

19   we should file individual cases from there on out.

20        THE COURT:  Of course, you were, but that is not

21   where we are going here.  Now, that deals with joinder in

22   one lawsuit and consolidating really separate and

23   complete causes of action, different parties in a single

24   lawsuit.

25             Now, what we are talking about here is with

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 82 of 119*

83

1    respect to your notice of related case.

2         THE WITNESS:  I understand.

3         THE COURT:  You do because I can hear it now.  I

4    can hear you going it is compound, all the stuff that you

5    do.

6         Do you realize -- no.  Did you equate the

7    instructions you got from the court regarding improper

8    consolidation of a lot of cases, a lot of claims into a

9    single complaint, did you somehow conflate that with the

10   issue of related cases, notices of related cases?  And

11   you know what that is for, here; right?

12        THE WITNESS:  I understand.

13        THE COURT:  You understand why we are looking for

14   that.

15        THE WITNESS:  I understand.

16        THE COURT:  Tell me what your understanding is as

17   to why the court is interested in knowing whether or not

18   there are related cases.

19        THE WITNESS:  Because if they are similar cases,

20   my belief is the court wants to know about those so the

21   court can handle it so that there are uniform decisions

22   essentially that are held from the same court.

23        THE COURT:  Excellent.  A completely different

24   objective -- right -- than consolidating a lot of

25   different lawsuits in one complaint; right?  Completely

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 83 of 119*

1    different.  This is judicial economy.

2         THE WITNESS:  I understand.  Yes.  I understand

3    what you are saying.  In terms of that it was just the

4    decision that was made, and perhaps it was the wrong

5    decision, but, you know, the decision was made.

6         THE COURT:  Okay.  Don't do that.  Decision that

7    was made.  Who made that decision?

8         THE WITNESS:  It was a discussion amongst myself,

9    Paul Hansmeier and John Steele and, probably, mostly,

10   Paul Hansmeier.  I don't even know if Steele was involved

11   in that discussion or not, and that is just what we

12   decided to do.

13        THE COURT:  All right.  The law firm that you were

14   working for -- and I guess initially we are talking

15   Steele Hansmeier or the other way around.

16        THE WITNESS:  It was Steele Hansmeier.

17        THE COURT:  Okay.  Did that firm have, in its

18   California office, did it have a client trust account?

19        THE WITNESS:  In California.

20        THE COURT:  Yes.

21        THE WITNESS:  Well, I was working of counsel to

22   them.  So, no, I never had my own client trust account.

23   The funds were always going through the law firm.

24        THE COURT:  Were you operating out of your home?

25        THE WITNESS:  Yes, I was originally.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 84 of 119*

85

```
 1          THE COURT:  Did at any time you ever have a
 2    business office even if it was a suite any place?
 3          THE WITNESS:  Not for Steele Hansmeier.
 4          THE COURT:  What about Prenda?
 5          THE WITNESS:  Prenda Law, yes.  They wanted me to
 6    get an office.  So I got an office, and I actually moved
 7    twice.
 8          THE COURT:  At that time, did you have a client
 9    trust account?
10          THE WITNESS:  No, your Honor.
11          THE COURT:  Was it your understanding that in
12    California that you were required to have a client trust
13    account?
14          THE WITNESS:  My belief was that considering I was
15    working as of counsel to the Prenda Law, and Prenda Law
16    had the trust account, that was my understanding of how
17    the money was dealt with.  I didn't ever -- they never
18    saw my bank account.  I was paid like by Prenda Law as an
19    attorney, of counsel attorney, 1099.  And so my
20    understanding was that they had a trust account.  And,
21    therefore, you know, the people that were working with
22    them did not need trust accounts themselves.
23          THE COURT:  Okay.  All right.  And you only handle
24    one kind of business; right?
25          THE WITNESS:  What do you mean by that, your
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 85 of 119*

1    Honor?  I only handle one kind of business?

2         THE COURT:  Yes.

3         THE WITNESS:  Can you explain your question?  You

4    mean in terms of just being plaintiff's lawyer?

5         THE COURT:  Plaintiff's lawyer for copyright

6    infringement for the adult film industry.

7         THE WITNESS:  Well, no, actually.  So originally

8    when I was working for Steele Hansmeier, I was also

9    working for an arbitrator.  So I had other business, but

10   it was just a 1099 worker at the same time.  I was

11   helping him out with his cases, and so when Prenda law

12   came around, we basically, I said, look, you guys are

13   trying to put a lot of work on my plate essentially, and

14   I am kind of split here.  And they said, well, we would

15   like to basically have you work solely for Prenda Law,

16   this is being Paul Hansmeier and John Steele.  And so I

17   wrapped up my arrangement with the arbitrator, and I

18   became exclusive doing stuff for Prenda Law at that

19   point.

20        THE COURT:  Listen, last January, this past

21   January, a few weeks ago, I guess you started withdrawing

22   as counsel of record.

23        THE WITNESS:  That is correct, yes.

24        THE COURT:  All right.  And you just testified

25   that you are no longer employed by Prenda?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 86 of 119*

```
1          THE WITNESS:  That is correct.  I am no longer
2   employed by Prenda or any other corporation or LLC that
3   is involved in these cases.  I have moved on.  I am going
4   to work again for the arbitrator and find some other work
5   essentially.  You know, so that is where I am right now.
6   Actually, I was working for Livewire for two months, but
7   there was actually a couple of things that happened in
8   terms of I never even got paid for my two months there.
9          THE COURT:  Two months where?
10         THE WITNESS:  Two months at Livewire.
11         THE COURT:  You did get paid by Prenda though;
12  right?
13         THE WITNESS:  Before that, yes.  During 2012, yes.
14         THE COURT:  So why did you leave?
15         THE WITNESS:  Well, there is multiple reasons for
16  it.  Personal reasons, I am getting married soon.  So I
17  wanted to focus on that, but, you know, to be honest with
18  you --
19         THE COURT:  That would be good.
20         THE WITNESS:  Yeah.  No.  I am looking forward to
21  it.  And to be honest with you, these types of things
22  raising up themselves, I just didn't want to be
23  affiliated with it anymore.  It wasn't worth it.  I was
24  getting a lot of harassment.  My family was receiving
25  e-mails and correspondence from people, my fiance, my
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 87 of 119*

88

1    parents.  I just didn't see, and I was getting a lot of

2    negative exposure that, you know, I just didn't want

3    anymore ultimately.

4            And, then, also, I didn't really get along

5    with one of the people that managed me.  So I, you know,

6    I decided to go ahead and exit and told them about that,

7    and, yeah, and that is the situation essentially.

8        THE COURT:  Okay.

9    Q    BY MR. WAXLER: Just to complete your employment

10   picture because there was perhaps some gaps.  You learned

11   sometime in late 2012 that Prenda Law was no longer going

12   to be your, I will just say the word employer but you

13   weren't going to be of counsel to Prenda Law anymore;

14   correct?

15   A    That is correct.

16   Q    And how were you informed of that?

17   A    I was told I would say middle December or so.

18   There was a brainstorming issue about -- they were, John

19   Steele and Paul Hansmeier were brainstorming about

20   whether they wanted basically to start their own company,

21   I guess.  And the company was Livewire, turned out to be

22   Livewire.  And that Livewire would essentially buy AF

23   Holdings and Ingenuity 13 and Guava.

24           And so I was informed that as of January 1,

25   you know, Livewire extends you this offer, and basically

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 88 of 119**

1    if you don't accept this offer, then, you know, we are

2    going to part ways.  So the offer was to be in house

3    counsel for Livewire, and so I was hired W2 employee for

4    this company which is a holding company of copyrights.

5    Q     And you understood that one of the subsidiaries of

6    that company included AF Holdings; correct?

7    A     That was my understanding, yeah.

8    Q     When did you come to a different understanding?

9    A     Oh.  Well, during the deposition, I came to a

10   different understanding because obviously the deposition

11   was said what was said, and I asked Paul Hansmeier about

12   that.

13   Q     And what we are talking about here is

14   Mr. Hansmeier's testimony that there was a trust that

15   owned AF --

16   A     That is correct.

17   Q     And before that testimony, you heard that

18   testimony, you understood as of January 1, that Livewire

19   would own --

20   A     Yes.

21   Q     Livewire would own AF Holdings?

22   A     That is correct.

23   Q     And that is why in at least one of the pleadings

24   you put that you are in house counsel for AF Holdings

25   because that was a company that was owned by Livewire;

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 89 of 119*

90

1 correct?

2 A    I was specifically told to sign as in house counsel

3 for AF Holdings by Paul Hansmeier in that case.  I was

4 actually because of Mark Lutz' position as CEO, I was

5 trying to get his signature for that document, but Paul

6 Hansmeier said, no, you are in house counsel for Livewire

7 thereby in house counsel for AF Holdings, you sign it on

8 behalf of the client.

9 Q    Is one of the other reasons you decided to leave

10 Livewire is because you learned that the stamp was being

11 used for your signature?

12 A    Yes.  Certain letters were sent out without my

13 knowledge.  I never authorized them, never approved them.

14 When I questioned John about them, he was, like,

15 basically said, this is your role.  This is what you have

16 to do.  You have to send these letters out, and I said I

17 don't feel comfortable, these aren't even my cases,

18 essentially.  And, you know, I actually e-mailed Mark

19 Lutz about that, and he said you got to talk with John

20 and Paul about this.

21       THE COURT:  I'm sorry.  What kind of letters are

22 we talking about?  Is that the settlement letters?

23       THE WITNESS:  Settlement letters.  They had been

24 using -- they originally said they were going to do a

25 stamp for me for certain things, but I thought they were

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 90 of 119*

1    only for my cases.  And, you know, later, I found out

2    that stamp might have been used for cases that I never

3    even participated in or seen the letters before they went

4    out.

5         THE COURT:  Let me make sure I understand now.

6    Livewire eventually became the parent of AF Holings and

7    Ingenuity 13 LLC?

8         THE WITNESS:  That was my understanding.  I was

9    told that, yeah.  And that is why I was hired and a lot

10   of people were hired in terms of working as W2 employees

11   for Livewire.  So it was the company that was a holdings

12   company that would do litigation as well as distribution.

13   That is what they told me.

14        THE COURT:  And you were a W2 employee?

15        THE WITNESS:  That's correct.  And I still have

16   not been paid for that position.

17   Q    BY MR. WAXLER: That was for a period of two months;

18   correct?

19   A    That's correct.  And I gave him my notice early

20   February essentially.

21        THE COURT:  Where was Livewire's offices?

22        THE WITNESS:  Livewire has an address of

23   Washington DC address, but, obviously, I don't know if it

24   has an office to be honest with you.  It is just a matter

25   of, kind of a cloud type office.  It might be a situation

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 91 of 119*

1    where -- I am just speculating right now.

2         THE COURT:  You have never visited Washington DC

3    offices?

4         THE WITNESS:  No.  I believe it is just a PO box

5    over there.  That is just a mailing address for them.

6         THE COURT:  Did that form letter requesting

7    payment of the settlement sums, did that letter change to

8    reflect that payment now should be sent to Livewire at

9    the Washington DC address?

10        THE WITNESS:  Absolutely.  It wasn't sent to me or

11   anything like that.  It was sent to that mailbox, and

12   then I believe it would be sent back to somebody at some

13   point somewhere.  But that is the kind of issues that I

14   started having, and along with a lot of other different

15   issues.  So I just decided to -- I asked them if I could

16   go ahead and substitute out with Paul Duffy who had a

17   license in California.  I talked to Paul Duffy about

18   that, he said sure, and then I proceeded to do that.

19        THE COURT:  All right.  So you substituted out.

20   Now, how long were you general counsel for Livewire?

21        THE WITNESS:  Two months basically.  I mean, I

22   guess you could say, I think the official documents were

23   signed.  It never actually specified that I was in house

24   counsel, but that is what I was told.  The documents were

25   just general employment documents, but that was from I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 92 of 119*

93

1    think January 7th on.  That's when I signed the

2    documents.

3    Q    BY MR. WAXLER: You were not general counsel.  You

4    were in house counsel; right?

5    A    In house counsel.  Sorry.

6    Q    You have never held the position of general

7    counsel, have you?

8    A    No.

9         THE COURT:  Did you know about any other employees

10   there?

11        THE WITNESS:  Yes.

12        THE COURT:  Was there a bookkeeper or an

13   accountant?

14        THE WITNESS:  Yes.

15        THE COURT:  Do you know whether -- well, okay.

16        Thank you.

17        MEMBER OF THE AUDIENCE:  Your Honor?

18        THE COURT:  You are?

19        MEMBER OF THE AUDIENCE:  Jason (inaudible).  I

20   represent Godfread and Cooper in some of the defamation

21   cases.

22        THE COURT:  You represent Godfread?

23        MEMBER OF THE AUDIENCE:  Yes.

24        THE COURT:  So back in Minnesota, lawyers have

25   lawyers?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 93 of 119*

1      MEMBER OF THE AUDIENCE:  I am from Massachusetts.

2      THE COURT:  And how can I help you?

3      MEMBER OF THE AUDIENCE:  I had a conversation with

4   Mr. Gibbs probably back in October regarding AF Holdings

5   where he told me that he was national counsel for AF

6   Holdings and that any settlement negotiations were to be

7   made through him.  And the local counsel for that case

8   confirmed that he was the one who told me to contact

9   Mr. Gibbs.

10     THE COURT:  Have you come to understand as have I

11  that every representation made by a lawyer associated

12  with Prenda is not necessarily true?

13     MEMBER OF THE AUDIENCE:  I have known that for

14  three years.

15     THE COURT:  Okay.  Good.  So you aren't shocked,

16  are you?

17     MEMBER OF THE AUDIENCE:  No.

18     THE COURT:  Nor am I, but thank you.

19     MEMBER OF THE AUDIENCE:  You are welcome.

20  Q    BY MR. WAXLER: Mr. Gibbs, you know you are under

21  penalty of perjury testifying here today?

22  A    That is correct.

23  Q    Have you ever made a representation to a court in

24  the Central District of California or any other court

25  that you know is untrue?

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 94 of 119*

1    A      No.

2           THE COURT:  Well, that isn't exactly accurate, is

3    it?  You have caused documents to be filed with, let's

4    just be kind and say falsified signatures.

5           THE WITNESS:  Your Honor, I had no idea that these

6    were allegations --

7           THE COURT:  That is "yes" or "no".

8           THE WITNESS:  Your Honor, I think it is still an

9    open question.

10          THE COURT:  Oh.  No.  It is not an open question.

11   We have had the individual testify under oath.  Those

12   were not his signatures on these documents.

13          THE WITNESS:  And that is the first time I have

14   heard in terms of him saying out loud that he absolutely

15   did not sign those papers, those exact papers.  He said

16   before he was not associated with the companies, but that

17   is the first time I heard him say he did not sign those

18   exact papers.

19          THE COURT:  Are you saying that you have had prior

20   conversations with him where he either admitted or

21   tacitly admitted that he signed?

22          THE WITNESS:  No, your Honor.  I haven't had any

23   conversations with Mr. Cooper.

24          THE COURT:  That was my thought.  I thought that

25   you had never met the man.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 95 of 119*

1      THE WITNESS:  No.  I never met the man.  He never

2   met me, and I have never talked with him.

3      THE COURT:  And you were acting on the

4   representation of John Steele that --

5      THE WITNESS:  And Paul Hansmeier.

6      THE COURT:  -- that they actually had the

7   signatures, the authentic signature of the real Alan

8   Cooper?

9      THE WITNESS:  Yes.  I was told that.  And I

10  investigated that in terms of, you know, what is going on

11  here when the first Alan Cooper issue arose, and I was

12  told that there was no issue, that he -- that he did sign

13  the document.  And so I also did a little bit of research

14  and found out that the assignor, even if the assignor is

15  invalid, it still is a valid document.  So combining

16  those two things, I still believed -- I don't think I

17  filed a case after that.  It was just a matter of kind of

18  addressing with these guys, and they were my sole

19  information for this type of thing.

20     THE COURT:  Okay.  You also indicated that you had

21  on file the original or notarized signature of Alan

22  Cooper, but you really don't, do you?

23     THE WITNESS:  No.  No.  I never said I had on

24  file.  No.  Prenda law or Steele Hansmeier had it on

25  file.  They told me they had it on file, and that is I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 96 of 119*

97

1   believe what was in the declaration.  So I said, okay,

2   you know, do we have this notarized copy, do you guys

3   have it over there?  I don't think I ever saw it, but

4   they told me, yes, we have copies of this, it is here,

5   and you can go ahead and file that based on our

6   representation to you.

7          THE COURT:  Do you feel like you have been duped

8   by Hansmeier and Steele?

9          THE WITNESS:  In a way, yes.

10         THE COURT:  Okay.  This has been very

11  enlightening.

12  Q    BY MR. WAXLER: Mr. Gibbs -- I just have a few more

13  your Honor.  Mr. Gibbs, have you ever been a 30(b)(6)

14  witness for AF Holdings?

15  A    No.

16  Q    Have you ever been a 30(b)(6) witness for Ingenuity

17  13?

18  A    No.

19  Q    Have you ever received client funds in any of your

20  capacities as counsel affiliated with Steele Hansmeier or

21  Prenda Law?

22  A    No.

23  Q    The court expressed some disappointment in the

24  manner in which you described how you determined the

25  location of the houses that sat on the lots, and the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 97 of 119*

1    router, the ability for the router to pick up people who

2    were not authorized to pick up that signal.  And let me

3    ask you some questions about that.

4    A    Sure.

5    Q    It is your understanding that when wireless routers

6    are used and they determine what the distance is where

7    they would be able to pick up a signal, that those

8    determinations are made where there is an open field and

9    not placed in the middle of a structure?

10   A    Yeah.  I have read some reports on that and that

11   the projections are basically favorable to them because

12   there is no obstacles in the middle, there is nothing

13   like walls or fences or bushes or trees which have a

14   great effect on wireless signals.

15   Q    Tell me how you described the Denton residence and

16   what facts you had to support your description of the

17   Denton residence?

18        THE COURT:  Which city?  Is this Santa Maria or

19   West Covina?

20        THE WITNESS:  I believe it is the second one.

21        MR. WAXLER:  I will find it, your Honor.

22        MR. PIETZ:  Your Honor, I might suggest we look at

23   Exhibit II which is the picture, the geographical Google

24   maps picture of the two residences.

25        THE COURT:  That is why I wanted to know.  I mean,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 98 of 119*

1   I went to Google Earth as well, and I just want to know

2   which one we are talking about because in West Covina,

3   you made some representations of fact that you cannot

4   possibly know to be true.

5        THE WITNESS:  Well, your Honor, based on my

6   personal knowledge of wireless networks, I believed they

7   were true.

8        THE COURT:  I am talking about of the residence

9   itself.  It is a gated community.

10           I'm sorry.  I didn't mean to interrupt you.

11       MR. WAXLER:  I am happy to address that, your

12  Honor.

13  Q    Mr. Gibbs, the map that you have seen that was

14  offered by Mr. Gibbs and Mr. Pietz -- and I apologize if

15  I am butchering your name, by the way --

16       MR. PIETZ:  Pietz.

17       MR. WAXLER:  Pietz.

18  Q    That is not the type of map that you saw; correct?

19  A    No, that is not.

20  Q    Please describe the map that you looked at when you

21  made the representations in the filings that we have done

22  in this courthouse.

23  A    It was a map that you could go down the street, it

24  is actually focused on the house, not on an overview like

25  that, but it is on, basically, there is like a street

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 99 of 119*

1  view on Google that allows you to, like, look around the

2  house essentially.  Kind of.  It is limited to a certain

3  extent though.

4  Q     What did you see when you looked at that map?

5  A     I saw a house that I believed it was likely not

6  something that wifi could have broadcasted out to

7  neighbors.

8  Q     Did you see a gate?

9  A     I did see a gate.

10 Q     Did you see several structures?

11 A     I did.

12 Q     Did you see bushes and shrubs and trees around,

13 between the house structure and the street where someone

14 might be driving by?

15 A     I did.  Actually, the aerial view, I think, is even

16 covering the house if I remember correctly.  So, yeah, it

17 is -- I mean, in terms of trees, there is a lot of trees

18 there.

19 Q     And it is your understanding that the wireless

20 signal doesn't just fly over these trees, does it?

21 A     No.  Actually, I mean, there is just certain things

22 that -- I mean, I think everyone kind of knows when they

23 go into certain people's houses and say, hey, I want to

24 use the wifi connection, there are certain rooms in the

25 house that don't get, even in the same house that don't

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

Exhibit 1 - Page 100 of 119

101

1   get the wifi connection.  So, yes, walls, trees, these

2   things definitely have a dramatic effect.  Sometimes,

3   concrete wall, for instance, sometimes it just altogether

4   stops something.  That is my understanding of it.

5   Q    Was your description of the residence in West

6   Covina when you signed your declaration and submitted

7   these papers and we submitted these papers on your behalf

8   accurate to the best of your knowledge.

9   A    Yes, it was.  It was based on my personal

10  knowledge.  Yes.

11  Q    And do you still believe it is accurate despite the

12  very different map that was submitted to the court?

13  A    That is correct.  I believe that map might be -- I

14  don't even know where the yards come, or I don't know how

15  that works.

16  Q    Would the same be true for the residence in Santa

17  Maria?

18  A    It was the same analysis essentially.  It was just

19  part of the full analysis, but yeah.

20  Q    In other words, there were walls, there were

21  buildings, there were shrubs, all of which would block

22  the signal and reduce by a great extent the range of the

23  wireless network?

24  A    Yes.  That was my impression from them, the street

25  maps from Google.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 101 of 119**

102

1          MR. WAXLER:  May I have one moment, your Honor?

2          THE COURT:  Certainly.

3    Q    BY MR. WAXLER: Mr. Gibbs, did you knowingly violate

4    the discovery orders from this court?

5    A    No.

6    Q    Did you cause to be served on the ISP providers the

7    October 19, 2012 discovery order by this court?

8    A    Yes.  I mean, at least, I thought I did.  I had

9    requested it.

10   Q    And it was your understanding that that was done?

11   A    It was my understanding.  I confirmed it

12   afterwards, and they said it was taken care of.

13   Q    And the first time you learned that an ISP may not

14   have received a copy of that order was when?

15   A    I believe it was in the response by the ISP, AT&T

16   possibly.

17         MR. WAXLER:  I have nothing further, your Honor.

18   Thank you.

19         THE COURT:  Okay.  Thank you.  But you started

20   getting responses from some of the Internet service

21   providers, didn't you?

22         THE WITNESS:  I didn't get the responses.

23         THE COURT:  All right.  You filed a status report

24   with the court?

25         THE WITNESS:  Yes.

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

Exhibit 1 - Page 102 of 119

1      THE COURT:  Right?

2      THE WITNESS:  Yes.

3      THE COURT:  And at the time you filed that status

4  report, there had been no returns on those subpoenas;

5  right?

6      THE WITNESS:  Yes.

7      THE COURT:  Then about a week later --

8      THE WITNESS:  Well, sorry, let me qualify my

9  answer.  There were -- at that point, there was nothing

10  in the computers that showed there was any returns on the

11  subpoenas.

12      THE COURT:  Okay.  That changed a few days later.

13      THE WITNESS:  It changed, I think, on the 7th.

14  Yes.

15      THE COURT:  And, of course, you updated that

16  status report, you advised the court, then -- right --

17  that suddenly, for whatever reason, people are now

18  starting to send you information on your subscribers;

19  right?  You updated your filing, didn't you?

20          Actually, no, you didn't.

21      THE WITNESS:  I didn't, your Honor, but if I can

22  explain why.

23      THE COURT:  Yes.

24      THE WITNESS:  Okay.  So I did some investigation

25  on that, and what I was told, and, again, I don't handle

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 103 of 119**

104

1    the subpoenas.  These are handled out of the Chicago and

2    Minnesota offices.  I was told that these things are

3    usually delivered and that either hand-delivered or I

4    believe mailed but most likely they are just a few blocks

5    away.  Like CT Corporation is just a few blocks away,

6    that CT Corporation would send, mail back the

7    information.

8             I didn't realize that that information was

9    faxed back by Verizon.  I never knew that.  And I did

10   some investigation on it.  And I, also, I talked to Paul

11   Duffy, and the exact date of the court's order in that

12   case, there had been -- he had had some eye surgery and

13   he also had some trauma related to it.

14            So what he said was he wasn't picking up his

15   mail as frequently during that time period.  So I thought

16   that the information had been received essentially by,

17   through his mailbox at that point but hadn't been input

18   in the computer until later.  So that was my

19   understanding.  That was my understanding of what had

20   happened.

21   Q    BY MR. WAXLER: Do you now regret not advising the

22   court when you learned on November 7th that Prenda Law

23   had received information in response to those subpoenas

24   and that there was information in the status report that

25   was not correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 104 of 119**

105

```
 1   A     Absolutely.  Absolutely.

 2         MR. WAXLER:  Thank you, your Honor.

 3         THE COURT:  Mr. Pietz.

 4

 5                    CROSS-EXAMINATION

 6   BY MR. PIETZ:

 7   Q     Mr. Gibbs, I would ask you to refer to the binder

 8   that is there with you to Exhibit EE which is the

 9   substitution of counsel that was filed apparently with

10   your CM/ECF account listing you as in house counsel for

11   AF Holdings.

12   A     Yes, I am familiar with that document.

13   Q     So Mr. Gibbs, just to clarify, then, your testimony

14   is that when you filed that document, that was an

15   accurate representation -- correct -- that you were at

16   that moment in house counsel for AF Holding?

17   A     When I filed that document, I believed I was.  What

18   I was told afterwards and after the deposition was that

19   that merger or that acquisition hadn't happened therefore

20   it was still owned by the trust.  So I, essentially, I

21   had been told to go ahead and file as in house counsel,

22   but, for some reason, Livewire didn't own AF Holdings at

23   that time.

24   Q     So can you just pin down for me exactly when it was

25   that your capacity as in house counsel for AF Holdings
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

Exhibit 1 - Page 105 of 119

106

1    begun and exactly when it terminated?

2    A    Well, my understanding was that -- my understanding

3    when I was told that I was in house counsel for Livewire

4    that I was therefore in house counsel for AF Holdings and

5    the other companies as well, Ingenuity and Guava.

6              And only did I find out later when I was

7    exiting and I was already leaving all these cases

8    essentially, only then, I found out that they had not

9    actually acquired -- Livewire had not acquired AF

10   Holdings according to Mr. Hansmeier.

11   Q    Mr. Gibbs, have you ever authorized anyone else to

12   use your CM/ECF password?

13   A    I don't -- I might have.  I don't know.

14   Q    Who?

15   A    An individual by the name of Carl.  He worked for

16   me, or he worked with me, I guess you would say.  He

17   actually worked for Prenda Law.

18   Q    How about John Steele?

19   A    No.  I don't think so.  Not to my knowledge.  I am

20   not saying -- in terms of authority, I did not, no.

21   Q    How about Paul Hansmeier, did you ever authorize

22   him to use your CM/ECF password?

23   A    I don't believe so.  I mean, I know he had my -- he

24   had access to my passwords at one point, so he might

25   have, yeah.

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 106 of 119**

107

1  Q     What was your business telephone number while you
2  worked for Prenda Law?
3  A     It was (415)325-5900.
4  Q     And what was your business e-mail address when you
5  worked for Prenda Law?
6  A     It was blgibbs@wefightpiracy.com.
7  Q     Have you ever instructed Prenda local counsel to
8  file pleadings using your business e-mail and business
9  telephone number on the pleadings even though it was
10 their name and physical address?
11 A     So, yes, my name is on -- my e-mail address and my
12 number and my phone number is on certain cases in other
13 states.  I was instructed to do so like that by Paul
14 Hansmeier.  And, essentially, the way that was explained
15 to me was that I would essentially forward all of the
16 communications to the outside counsel.  Yeah.  So.
17       MR. PIETZ:  Before we move on any farther, I would
18 ask that Exhibit EE be admitted into evidence as Exhibit
19 13.
20 Q     Mr. Gibbs, I have some copies of a few different
21 complaints, one that was filed by a local counsel in
22 Nebraska and three complaints filed by local counsel in
23 Florida all of which list the name of the local counsel,
24 a mailing address in those respective states and an
25 e-mail address, blgibbs@wefightpiracy.com and your 415

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 107 of 119*

108

1    telephone number, is that consistent with your

2    understanding of what the normal practice was at Prenda

3    that your business e-mail and phone would be on pleadings

4    all around the country?

5         MR. WAXLER:  Objection.  Irrelevant, your Honor.

6         THE COURT:  Overruled.

7         THE WITNESS:  That was what I was instructed to do

8    by Prenda, yeah, was to do that because I was essentially

9    helping those guys out on their cases.  It was their

10   case, but, yes.

11   Q    BY MR. PIETZ:I would ask Mr. Ranallo to pass out

12   No. 2 which is the declaration of Matt Catlett, an

13   attorney in Nebraska, and he is authenticating the

14   service copy of the complaint filed in Nebraska listing

15   Mr. Gibbs.  I would ask that that be admitted into

16   evidence as Exhibit 14.

17        Similarly, Mr. Ranallo, if you would be so

18   kind as to pass out 3, 4 and 5 which are the complaint in

19   Sunlust v. Nguyen, First Time Video.  Here is Sunlust v.

20   Nguyen.  That is Middle District, Florida.  We also have

21   First Time Videos v. Paul Uphold and Openmind Solutions

22   v. Barry Wolfson.

23        MR. WAXLER:  Your Honor, I would object to the

24   introduction of those exhibits.

25        THE COURT:  Right.  We don't need this.  We have

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 108 of 119**

1    basically got his testimony.

2        MR. PIETZ:  Fair enough.

3        THE COURT:  And we have got the testimony on the

4    reason why, but I got to tell you, that doesn't sound

5    reasonable to me that you would be inviting telephone

6    calls, litigation in Florida on a case that you know

7    nothing about.  How do you field these calls?

8        THE WITNESS:  No, sir.  I would pass the messages

9    on to the other attorneys.

10       THE COURT:  Back to Florida?

11       THE WITNESS:  Yes.  I would pass the messages on

12   to them because, essentially, it was just easy for them

13   at that point.  I was like their secretary essentially,

14   and that is the way that Prenda wanted to do it.

15       THE COURT:  Why?

16       THE WITNESS:  I don't know.  I mean, they changed

17   the practice at some point where people were putting

18   their own e-mails, their own numbers, but I don't know

19   why that was the way it was structured originally.

20       And I don't know.  I mean, I don't know who

21   had access to my e-mail either.  So I don't know, like, I

22   have no idea if I was sent something or if someone else

23   read it.

24   Q   BY MR. PIETZ: Did John Steele have access to your

25   e-mail?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 109 of 119**

1  A     He did.  I don't know if he did throughout, but he

2  did.

3  Q     Would he routinely respond to e-mail inquiries at

4  the blgibbs@wefightpiracy.com e-mail address?

5  A     I never knew it because he didn't CC me on them, or

6  he didn't let me know he was doing them.  But I believe

7  he did.

8  Q     Did Paul Hansmeier have access to that e-mail

9  address?

10 A     I think he had access.  I have no idea whether he

11 used it or not.

12 Q     How about Mr. Duffy, Paul Duffy, did he have access

13 to that e-mail account?

14 A     I don't think so.

15 Q     Mr. Gibbs, earlier, you testified that some things

16 were sent out with your signature stamped on there that

17 didn't have your approval.  I would like to refer now --

18 actually, before I venture any farther afield, I would

19 ask that the court take judicial notice of the complaints

20 I have just identified as Exhibits, I think, 15, 16 and

21 17.

22        In any event, moving on, now, to what has been

23 previously identified in this action as Exhibit X, ask

24 that it be admitted now as Exhibit 18.

25        Essentially, I would just like to ask you a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 110 of 119*

111

1   question to confirm.

2   A     Sure.

3   Q     Is this the kind of letter you are talking about?

4   This was a demand letter sent in the Guava, St. Clair

5   County, Illinois case.  I note that it is dated -- what

6   is the date on it?  January 30th.  And it is,

7   essentially, a, you know, a demand letter.  And then I

8   will go to the last page there.  It has a pleading in

9   there.  So, in any event, on the last page of the letter

10   itself, there is a stamped signature, what appears to be

11   a stamped signature that says Brett Gibbs.  Is it your

12   testimony that this letter was sent out without your

13   authorization?

14   A     That is my testimony.

15   Q     You had no knowledge whatsoever that this letter

16   was being sent out?

17   A     No.  Not with my name on it.  I don't even

18   remember -- no one ever told me about this before I found

19   out.  I actually found out through an opposing counsel

20   that contacted me and wrote me a letter saying,

21   basically, you know, you have nothing on my client, and

22   you communicate through me.  So I was kind of confused,

23   but I eventually saw the letter, and it had my stamped

24   signature on it.

25   Q     Mr. Gibbs -- I will represent to the court that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 111 of 119*

112

1   this letter has been sent to over 300 Internet users

2   across the country.  Have you done anything to correct

3   the fact that this letter went out with your signature on

4   it without your authorization?  I note that it was filed

5   in late January.

6   A     Yeah.  I actually talked with Mark Lutz, and Mark

7   said, I said, Mark, do not send any of these letters out

8   anymore that are, you know, please contact me and let me

9   know what is happening before you send out these letters.

10  And the response from Mr. Lutz was I don't control those

11  types of things, you have to talk with Paul and John.

12  Q     Fair enough.  Mr. Gibbs, have you ever hired local

13  counsel for Prenda Law?

14  A     Actually, the hiring, no, because the hiring

15  process was done by John Steele.

16  Q     Are you familiar with an attorney in Florida named

17  Matthew Wasinger?

18  A     Yes.  Yes.

19  Q     Are you aware of the fact that Mr. Wasinger

20  testified under oath in federal court in Florida at the

21  Sunlust hearing that you hired him and that, as far as he

22  understood, you were a principal of Prenda law?  Are you

23  aware of that, Mr. Gibbs?

24        MR. WAXLER:  Objection, your Honor.  It is

25  irrelevant.  It is also hearsay.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 112 of 119**

113

1          MR. PIETZ:   I am asking Mr. Gibbs if he is aware

2     of it.

3          THE COURT:   Sustained.  I have got the picture.

4     Okay.  And I appreciate it.  Thank you.

5          MR. PIETZ:   I will move along, your Honor.

6          THE COURT:   Okay.  To what?  Give me a blueprint.

7          MR. PIETZ:   Fair enough, your Honor.  I will

8     explain the broad strokes of the categories I have, and

9     whatever the court is interested in, we will move to

10    that.

11         In addition to a few more things about

12    Mr. Gibbs hiring, firing and even threatening local

13    counsel, I have evidence on him being delegated

14    independent authority to settle cases which he actually

15    concluded.  Contrary to Mr. Gibbs' assertion which is a

16    little confusing in light of the fact that he says I

17    spoke to Mark Lutz, in any event, with respect to his

18    assertion that he never had any direct client contact, I

19    have a number of documents which actually show -- some of

20    which are Mr. Gibbs' own prior words showing that, in

21    fact, at least according to him, he was communicating

22    back and forth with the client, whatever that means, and

23    my theory is that that may mean John Steele.

24         But in any event, beyond the direct client

25    interaction, you know, I could ask Mr. Gibbs about his

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 113 of 119**

114

1   investigation in the case, about the petition, but those

2   are the broad strokes, your Honor.  If the court has got

3   the picture, I don't need to necessarily get into all the

4   documents.

5           THE COURT:  I do have the picture, and I know who

6   the client is.  We have talked about the client, and the

7   client has been running everything.  Yeah, I know who the

8   client is.

9           MR. PIETZ:  Very good.

10          THE COURT:  Okay.  Thank you.

11              Gentlemen.  Mr. Brodsky, you look bored.

12          MR. BRODSKY:  I am not bored, your Honor.

13          THE COURT:  All right.

14          MR. WAXLER:  We have no further questions, your

15   Honor.

16          THE COURT:  All right.

17              Unless anyone has anything else in terms of

18   evidence to offer, the matter will stand submitted.  All

19   right.

20              Thank you, sir.  You may step down?

21          THE WITNESS:  Thank you, your Honor.

22          THE COURT:  Good luck to you.

23              All right.  How about this, I will leave this

24   up to counsel, if you wish.  If you would like to sum up

25   your position, you may do so at this time.  It is not

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 1 - Page 114 of 119**

1   necessary.  I am just making that offer.

2       MR. WAXLER:  Thank you, your Honor for giving us

3   the opportunity to clear Mr. Gibbs' name, and what I

4   would like to add to the declarations that he has

5   submitted and the papers that we have submitted is that

6   Mr. Gibbs did not intend to disrespect this court or

7   disobey any orders of this court.  Mr. Gibbs had no

8   knowledge that perhaps others may have knowingly or

9   unknowingly disregarded some orders of this court in

10  terms of the service of the knowledge of the October 17th

11  order.

12      The order itself, you know, did not require

13  service on the ISP's, but that was what Mr. Gibbs wanted

14  to do.  And that is the undisputed testimony here today

15  that that is what he wanted to do was to have those ISP's

16  notified of that.  And he took no action whatsoever, your

17  Honor, to do discovery, formal discovery of those ISP's

18  or ask the ISP's to follow-up on the information

19  provided.

20      So Mr. Gibbs stands before you, your Honor, he

21  is I think we could say humbled by this experience, and I

22  think he is regretful that he has perhaps been put in a

23  position where the court at least in the original OSC

24  made comments suggesting that he was a culpable party

25  here.  And he is not, your Honor.  And I hope you see it

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 115 of 119*

116

1    that way too.

2            And I thank you very much for your time.

3    Appreciate the opportunity you have given us to clear his

4    name.

5            THE COURT:  Thank you, counsel.

6            Anything from this side?  You don't have to.

7            MR. PIETZ:  I will keep it very brief, your Honor.

8            I can appreciate that there may be more

9    parties, other people who are more culpable than

10   Mr. Gibbs with respect to what has occurred in these

11   cases.  However, I think the assertion that Mr. Gibbs is

12   merely an independent contract attorney is simply not

13   credible.  I would just simply leave it at this, there is

14   ample evidence showing that Mr. Gibbs was been involved

15   since day one or at least very shortly thereafter on a

16   key level exercising operational control over this

17   litigation on a national basis.

18           So while I am sympathetic that perhaps to a

19   certain extent, maybe there are other people more

20   culpable, I will just leave it that certainly there is

21   ample evidence showing that Mr. Gibbs indeed played a key

22   role in all of this.

23           Thank you, your Honor.

24           THE COURT:  Okay.  I just have one question,

25   gentlemen.  As a licensed attorney in this state,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 116 of 119*

1  particularly when it is only your name on the pleadings,

2  don't you think you have some responsibility to assure

3  the accuracy of those pleadings?  Or is it permissible

4  simply to go they told me to do so or the senior partner

5  said it is okay, it may not have sounded right to me, but

6  they said it was okay.  Could you do that really?

7       MR. WAXLER:  Your Honor, I am going to suggest

8  that that is not what happened on a key issue.

9       THE COURT:  Okay.

10      MR. WAXLER:  On a key issue, the issue involving

11  Alan Cooper, there was not one shred of information that

12  Alan Cooper wasn't Alan Cooper until Mr. Gottfried's

13  letter in November of 2012 at which point Mr. Gibbs

14  immediately questioned whether this was accurate or not.

15  And the most important thing is that Mr. Gibbs filed no

16  further pleadings after that time which purported to rely

17  on Mr. Cooper being the assignee of AF Holdings.  And so

18  Mr. Gibbs reacted to the notion.

19       He investigated and he did nothing further on

20  it.  He was assured that Alan Cooper was Alan Cooper, but

21  so he -- he did something other than said somebody told

22  me.  And on the other issues, your Honor, these were not

23  examples of him relying on anybody else to do things that

24  were improper.  He was doing discovery.  He was doing

25  investigations.  They were supervising him, but he was

118

1    acting like a California lawyer doing what he thought in

2    his best judgment should be done as a California lawyer

3    in these cases.

4         THE COURT:  All right.

5         MR. WAXLER:  Thank you.

6         THE COURT:  Thank you, counsel.

7              All right.  Again, the matter stands

8    submitted.  We are adjourned.

9         MR. WAXLER:  Thank you, your Honor.

10        MR. PIETZ:  Thank you, your Honor.

11        (Proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 118 of 119*

```
 1                        CERTIFICATE
 2
 3
 4   I hereby certify that pursuant to Section 753, Title 28,
 5   United States Code, the foregoing is a true and correct
 6   transcript of the stenographically reported proceedings held
 7   in the above-entitled matter and that the transcript page
 8   format is in conformance with the regulations of the
 9   Judicial Conference of the United States.
10   Date:  March 17, 2013
11
12    /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR
13
14
15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*Exhibit 1 - Page 119 of 119*