# EXHIBIT KK

# Porn Piracy Lawyer John Steele Says He Shouldn't Be Sanctioned

By Rhett Pardon, XBIZ.com

Wed, Apr 10 2013 11:00am PDT

Tweet    Recommend

LOS ANGELES — Chicago attorney John Steele, who through his law firm has sued thousands for downloading porn through file-sharing networks and now sees himself at center of accusations over attorney misconduct, says he shouldn't be sanctioned by a federal judge in Los Angeles.

Steele told XBIZ on Wednesday that while he can't discuss details of his 5th Amendment invocation to the court two weeks ago, he and his law firm, Prenda Law, have done no wrong.

"Obviously I disagree with some of the bizarre claims of criminal conduct thrown around by people without any proof," Steele said.  "I can say that I never even heard of the case in front of Judge [Otis] Wright until two months ago, and have never appeared in a California case in my life."

Prenda Law and numerous affiliated attorneys nationwide have filed thousands of porn file-sharing suits during the past few years, with some describing the enterprise as mass copyright trolling.

But the practice of scooping up thousands upon thousands of John Doe defendants for porn piracy litigation may be coming to an end as U.S. District Judge Otis Wright weighs his next step against Steele and Prenda Law.

Prenda Law isn't the only law firm to sue defendants fingered by Internet service provider's under threat of subpoena, but it may be the most notorious. Steele, according to a Los Angeles Times article published today, has bragged about the huge value of porn-piracy litigation and told Forbes that he has collected as much as $15 million settling such suits.

Today, a San Francisco law firm filed court papers on Steele's behalf, responding to Wright's order to show cause why sanctions should not be levied.

The plaintiffs, Wright said, bet that "because of embarrassment, many Does will send back a nuisance-value check to the plaintiff. The cost to the plaintiff: a single filing fee, a bit of discovery, and stamps. The rewards: potentially hundreds of thousands of dollars."

Prenda's method of operation, according to testimony, was typical of copyright trolls: Obtain IP addresses, send out letters accusing defendants of piracy while mentioning a $150,000 statutory penalties and then offering lower figures, sometimes in the low thousands, to make them go away.

Last week, the court invited Steele to testify in response to an order to show cause over a case involving plaintiff Ingenuity 13 LLC.

But when Steele showed up, he relied on his Fifth Amendment privilege against compelled testimony, and later

Exhibits to Pietz Dec'l. (April 16, 2013) - 2

said that the court indicated it would draw reasonable inferences against him.

"However, the reasonable inferences the court may draw against Steele are limited, based on the lack of evidence against Steele before this court," Steele attorneys said in a response to the court. "Moreover, because of the criminal nature of these proceedings, where the court has raised and clearly made up its mind against Steele on questions of fraud and has threatened incarceration, Steele's invocation of the 5th Amendment may not be used to formulate presumptions against him."

Morgan Pietz, a Manhattan Beach, Calif., attorney who represents several defendants in the Prenda lawsuits told the Times that "it's unprecedented for a plaintiff's lawyer to invoke the 5th when asked to explain the conduct of his litigation."

According to Pietz, Prenda Law's strategy began to unravel in Wright's court after he submitted evidence that two production companies the firm supposedly represented as clients, Ingenuity 13 and AF Holdings, were shell companies Prenda lawyers set up on the West Indies island of Nevis.

Pietz noted to the court that the Prenda attorneys therefore concealed their direct interest in lawsuits they ostensibly brought on clients' behalf, which violates court rules.

Wright hasn't said what he'll do about Steele or Prenda Law, but his options could include asking federal prosecutors to probe the firm, referring lawyers to various state bars for discipline, even disbarment, and imposing monetary sanctions.

At a hearing last week, Wright delivered a warning to Steele on what might be next: "This court's focus has now shifted dramatically from the area of protecting intellectual property rights to attorney misconduct. If you say answering these kinds of questions would incriminate him, I'm inclined to take you at your word."

Steele on Wednesday admitted that the court proceedings are "unusual" and that he's hoping Wright, or a higher court, will see it his way.

" I am very confident that once the facts are reviewed by Judge Wright, or the 9th U.S. Circuit Court of Appeals if necessary, this latest effort funded by the Electronic Frontier Foundation to stop anti-piracy litigation will fail," he told XBIZ.

 View Document

Tweet    Recommend

**« Back to List**

| More Adult Industry News »

About / Contact

XBIZ.com | The leading source for adult industry news
XBIZ WORLD | Adult industry magazine for the digital media market
XBIZ PREMIERE | Adult industry magazine for the retail market
XBIZ RESEARCH | Adult industry market research organization

Copyright © 2013 Adnet Media. All Rights Reserved. XBIZ is a trademark of Adnet Media.

2 of 3

4/12/13 10:05 AM

Exhibits to Pietz Decl. (April 16, 2013) - 3

Reproduction in whole or in part in any form or medium without express written permission is prohibited.

# EXHIBIT LL

EXHIBIT LL
Exhibits to Pietz Dec'l. (April 16, 2013) - 5



# THE FLORIDA BAR

**444 BRICKELL AVENUE**
**RIVERGATE PLAZA, SUITE M-100**
**MIAMI, FL 33131-2404**

JOHN F. HARKNESS, JR.
EXECUTIVE DIRECTOR

**(305) 377-4445**
**WWW.FLORIDABAR.ORG**

February 3, 2012

RECEIVED FEB 0 6 2012

Graham W Syfert, Esq
1529 Margaret St, Unit 2
Jacksonville, FL 32204

**Re: Unlicensed Practice of Law Investigation of John L Steele**
      **The Florida Bar File No. 2012-04047(11B)**

Dear Mr. Syfert:

Enclosed please find a copy of a response dated January 26, 2012, from Mr. Steele's Attorney, David Raben, Esq., in this matter. If you wish to forward a reply regarding his response, please do so on or before **February 17, 2012**.

Thank you.

Very truly yours,

JACQUELYN PLASNER NEEDELMAN
Bar Counsel
Unlicensed Practice of Law Department - Miami

JPN:ah

Enclosure

# RTR

## ROBBINS TUNKEY ROSS
## AMSEL RABEN &WAXMAN

| | | |
|---|---|---|
| LAWYER'S PLAZA<br>2250 SW 3 AVENUE<br>4TH FLOOR<br>MIAMI FLORIDA 33129 | WWW.CRIMLAWFIRM.COM | TOLL FREE: 800-226-9550<br>DADE: 305-858-9550<br>BROWARD: 954-522-6244<br>FAX: 305-858-7491 |

January 26, 2012

**VIA EMAIL: jneedelman@flabar.org**
and U.S. Mail
Jacquelyn Needelman, Bar Counsel
Unlicensed Practice of Law Department, Miami
The Florida Bar
444 Brickell Avenue, Suite M-100
Miami, Florida   33131

RECEIVED

JAN 2 7 2012

THE FLORIDA BAR
MIAMI-UPL DEPARTMENT

### RE: *Florida Bar v. John Steele*

RECEIVED FEB 0 6 2012

The Complainant is identified as Graham Syfert, an attorney in Jacksonville, Florida. Not coincidentally, Mr. Syfert is the same complainant in Florida Bar #2012-403511(B). In the prior complaint, Mr. Syfert alleged Mr. Steele was engaged in the unauthorized practice of law (UPL) in Florida. The Bar and Mr. Steele entered into a Cease and Desist stipulation in which Mr. Steele acknowledged the elements constituting UPL and pertinent case law, and agreed to abide by the law.

Simultaneously with the settlement, Mr. Syfert has filed a new complaint alleging a violation of "(2)(b) of the UPL rules" pursuant to *Florida Bar v. Savitt*, 363 So. 2d 559 (1978). This provision provides:

> (2)   Pursuant to the foregoing provisions of this order, the above named firm and its members, associates and employees properly may conduct the following activities, which shall not constitute the unauthorized practice of law:
>
> (b)   Communicate with clients and others (including attorneys) provided it is initially and immediately

Florida Bar v. John Steele
Response to Complaint
January 26, 2012
Page 2

> confirmed in writing and at all times made clear to
> such clients and others, in a manner which avoids
> confusion, that the person (if not a member of the
> Florida Bar) so communicating is not a member of
> the Florida Bar and that such communication (if it
> deals with Florida law) this made either in the
> presence of, or with the written approval of, a
> member of the Florida Bar who assumes
> professional responsibility for any such
> communication and retains the direct relationship
> with the client.

While not completely clear, it appears Mr. Syfert contends Mr. Steele "communicated with me" and impersonated a member of the Florida Bar. These allegations will be completely refuted by affidavits and exhibits.

## THE COMPLAINANT

The Florida Bar should be mindful of the background and potential bias of the complainant, Graham Syfert. The materials submitted by Mr. Syfert were ostensibly accumulated in December of 2011. His second formal complaint against Mr. Steele was filed around the same time the first complaint was resolved. Mr. Syfert is no stranger to Mr. Steele.

The predecessor complaint involved the law firm of Steele Hansmeier ("SH") and litigation involving piracy of copyrighted films that have been illegally downloaded. The "SH" firm had filed numerous federal lawsuits intended to identify and sanction individuals engaged in the unlawful downloading of movies that are copyrighted. Attached and incorporated by reference hereto are excerpts from Mr. Syfert's law firm web pages. (Exhibit A). His website makes clear he is actively engaged in the representation of individuals involved in the very same activity Steele Hansmeier sought to prosecute. In addition to actively seeking clients in this representation niche, Mr. Syfert sells self-help kits and forms seeking to generate additional revenue from clients who may not be sufficiently funded to retain his

ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN

Florida Bar v. John Steele
Response to Complaint
January 26, 2012
Page 3

services.

## THE COMPLAINT

### The Alleged Impersonation of Balzebre by Steele.

Mr. Syfert initially maintains "Steele impersonated a Florida attorney by using an email account purported to belong to Robert Balzebre, Florida Bar number 979694." Mr. Syfert maintains this occurred on December 7th, 2011 and notes Mr. Balzebre, a licensed Florida attorney, was employed by Steele Hansmeier according to the Florida Bar's own records. Mr. Syfert also points out Steele Hansmeier was purchased by Prenda Law. Prenda Law is headed by Paul Duffy and Florida attorney Joseph Perea (Bar number 47782).

Syfert attaches as "Exhibit A" an email string with "rpbalzebre@wefightpiracy.com". Wefightpiracy.com is the former website of Steele Hansmeier and current website of Prenda Law. Mr. Syfert, who is actively engaged in the representation of individuals prosecuted by Steele Hansmeier/Prenda, threatened Bar complaints, accused Balzebre of felonious activity, and sought to record their conversation. This course of conduct was a direct result of *Syfert representing a client that had received a demand letter from the Prenda law firm.* Rule of Professional Conduct 4-3-4(g) prohibits "threatening to present criminal charges solely to obtain an advantage in a civil matter." Mr. Syfert admits calling on behalf of a client and raising the scepter of felonious activity. Even Syfert acknowledges:

> "I humbly admit that the only threat involved in the email
> chain was my own threat of a Bar Complaint and I omitted
> that fact."

Mr. Syfert acknowledges his own unethical gamesmanship. His moral justification of chasing the piracy prosecutors rings hollow when it is done within the context of representing a client in a pending matter against Prenda. The Bar would be well advised to investigate this notorious admission by Syfert.

ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN

Florida Bar v. John Steele
Response to Complaint
January 26, 2012
Page 4

Moreover, Mr. Balzebre has provided an affidavit regarding his recollection of the brief interaction he had with Syfert. It is not surprising Balzebre would have a clear recollection of their conversation when one considers how infrequently a caller asks to record a phone conversation. Notably, Balzebre writes as a *former employee* of Steele Hansmeier so any allegation of bias to defend his employer would seemingly be substantially diminished. Mr. Balzebre recounts the brief conversation regarding Syfert's request to tape their conversation and affirms all emails contained in "Exhibit A" of the Syfert Complaint were in fact authored by Balzebre as a member of the Bar.

## THE HYPERLINK CONNECTION

Mr. Syfert concludes there is a hyperlink connection between "rpbalzebre@wefightpiracy.com" and "jlsteele@wefightpiracy.com" as evidenced by his "Exhibit B". The "jlsteele" email address is the address formerly used by John Steele prior to the sale of the Steele Hansmeier law firm to Prenda. Mr. Syfert engages in a number of intriguing possibilities but admits "web conjecture is somewhat unreliable." Notwithstanding, he spent several paragraphs speeding down that unreliable path proving absolutely nothing of consequence.

This is not a mystery and can be easily explained. Nearly every law firm uses a form of email signature block. Such signature blocks typically contain contact information and standard disclosures and disclaimers. One contact information item that is regularly included in signature blocks is a persons email address. When an email address is included in a signature block, an email program automatically assigns "meta" information to the text of the email address.

To use an example, the email address "admin@lawfirm.com" is automatically assigned the following "meta" information: mailto:admin@lawfirm.com. If an individual clicks on admin@lawfirm.com their computer will automatically open up an email client (i.e., Microsoft Outlook) using the "meta" information to auto fill the email's recipient field with "admin@lawfirm.com."

Florida Bar v. John Steele
Response to Complaint
January 26, 2012
Page 5

If one changes the text of an email address, this change doe *not* also alter the "meta" information. For example, one could change admin@lawfirm.com to support@lawfirm.com but unless the person also remembered to change the "meta" information, anyone clicking on the latter email address will continue to see "admin@lawfirm.com" in the recipient field. Mr. Steele was the first email address at wefightpiracy.com. The creation of subsequent email addresses would typically include the "cut and paste" from the lengthy disclaimer and disclosure created originally for the "jlsteele" email and subsequently utilized by all others.

Mr. Syfert claims that when he viewed the "meta" information associated with the email address in Mr. Balzebre's signature block, that he saw "mailto:jlsteele@wefightpiracy.com. The obvious explanation for this that Mr. Balzebre used the firm's form of signature block, but forgot to change the meta information associated with the signature block. This is hardly an uncommon or unusual occurrence, as many people are unaware that they need to change "meta" information.

## EXHIBIT D

Mr. Syfert provides an email from "Informant 99@gmail.com" to "jlsteele@wefightpiracy.com" dated December 5th, 2011. The "Informant" asks "Mr. Steele" to provide a correct address and makes reference to a federal case previously filed. Mr. Steele responds, thanking "informant" for pointing out an error. Notably, there is no discussion relating to any legal matter, only the correction of an address on pleadings previously filed. Since selling the Steele Hansmeier law firm to Prenda, the "jlsteele" email has been maintained to ensure continuity. As evidenced by "Exhibit D," there are numerous pleadings that contain the "jlsteele" email as the primary contact for the former Steele Hansmeier and now Prenda Law Firm. Mr. Steele is obliged to review all emails received at his former "jlsteele" address to ensure everything pertinent to Prenda is properly forwarded. Since the email provided in "Exhibit D" was not seeking any specific legal advice, Steele responded, noting the address error.

ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN

Florida Bar v. John Steele
Response to Complaint
January 26, 2012
Page 6

## THE AFFIDAVIT OF MARK LUTZ

We have also provided for the Bar's consideration the affidavit of Paralegal
Mark Lutz (Exhibit C), reflecting another phone call made by Mr. Syfert to the
Prenda firm on behalf of a civil client. This sworn statement from Mr. Lutz eerily
echoes the prior exchange between Syfert and Balzebre. Syfert acknowledged he
made threats to Balzebre regarding Bar complaints and "felonious" behavior. This
affidavit brings into clear focus Mr. Syfert's actual motivation to obtain civil leverage
on behalf of his clientele.

As previously indicated, the Prenda law firm has purchased Steele Hansmeier
and now operates out of the Lincoln Road address. The Prenda law firm is composed
of Attorney Joe Perea and Paralegal Mark Lutz. Mr. Steele is actually a client of
Prenda. Steele maintains an ownership interest in several of Prenda's larger clients.
His presence at Prenda would be solely in the capacity of a client.

I would be happy to meet with you in person to explain or clarify any of the
information provided. I look forward to hearing from you.

Sincerely,

DAVID RABEN

DR/lp

ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN

Home | Map and Location | Practice Areas ▽ | Current Clients ▽ | Contact Info ▽ | Syfert.com

**Click** to see my availability or schedule a meeting with me.

closure Defense

inal Lawyer

Syfert.com - Home of Graham W. Syfert, Esq., P.A.

**Graham Syfert**, Jacksonville Defense Attorney

*"I write every one of my websites in notepad, and th
I guess, is proof."*



This is the homepage of Graham W. Syfert, a Jacksonville attorney practicing in the areas of Criminal Defense and Foreclosure Defense. This is a personal webpage and will contain examples of the cases and issues which have shaped me, and the stories that surround them. It sounds boring, but I might have a sense of humor in one of these stories.

**The latest news:**

Sunday, August, 14th, 2011

As some of you may have read, or heard, I gained some notoriety for my sale of Self-Help defense forms which I previously offered. I believe the good use of putting the forms up for sale has run its course, and I am now urging everyone to download these forms and take them to a local attorney. I have offered the forms for free at http://www.syfert.com/ Click on the Download for free link, and when you close Payloadz, you will find yourself at a directory listing which contains Form v1.2 and Comments to Form 1.2. Payloadz is only now for those who wish to donate .99 cents or $19.95. The comments and the forms are now free to the general public.

I have released these forms for free due to the actions of the Plaintiff's attorney's, the so called "Copyright Trolls", which now are representing the shameless industry of pornography, in an effort to coerce innocent people to pay settlements.

They use coercion and extortion, threatening to out homosexuals, to ruin marriages, and the weirder the pornography, the better for their purposes.

Those who believe in the free flow of information guaranteed by the first amendment, made available by the use of the internet understand that anonymity in freedom of speech is as important as the Bill of Rights.

il 16, 2013) - 13

1/23/2012 7:39 AM

These methods of coercion, threatening to out homosexuals, threatening families, and putting people in a position to not want to help through the free flow of information and the uninhibited flow of packets. These actions have harmed our telecommunication industry by causing unnecessary and untold costs associated with the diligent research of each IP address requested by a Plaintiffs attorney. These actions have harmed too many innocent citizens, and are making a mockery of the rules regarding Fundamental Fairness and Jurisdiction. These actions have harmed small businesses by causing them to incur fees and costs associated with defending these actions. Providers of free wifi find themselves subject to a subpoena and a demand letter, coercing settlement.

In a perfect world, everyone would have open and publically available WiFi hotspots and these would be encouraged. Everyone would distribute files through <u>Tor</u>. This model of open communication, which has been greatly protected by organizations like the <u>Electronic Frontier Foundation</u> is fundamental to America.

Also fundamental, is the right to be proven innocent in court, and to not be held accountable for things that were not your responsibility. If someone else committed the infringement, **you need to contact an attorney.** No attorney should honestly believe, and no judge should find that creating access to one's own chattel property, and onto the internet, is an act of negligence. It should be solely governed by the contract between the consumer and the internet service provider, and even then, restrictions on access should be severely limited so as not to disrupt the normal flow of information **from all computers, to all computers**. It is the right of the consumer, when not limited by these contracts, to share access how the consumer sees fit. Providers of true internet access, be they public, or private entities, should be allowed to grant access how they see fit.

I would like thank all of the Federal judges who ruled favorably against these massacre lawsuits, and now, too many people are simply sending letters in their defense. Everyone contemplating sending a letter to the court, contact an attorney in your state.

---

**Lightspeed Media Corp. v. John Does 1-160, State Case No. 2011-034345-0000-01 / Local Case No. 2011-34345-CA-01 Pink Lotus Entertainment, LLC., Boy Racer, Inc., AF Holdings, LLC, Axel Braun Productions, Baseprotect UG, Ltd., CP Productions, Inc., Camelot Distribution Group, Inc., Digital Sin, Inc., Discount Video Center, Inc.,**

Evasive Angles Entertainment, Inc., Evasive Angles, Inc., First Time Videos, LLC, Future Blue Inc., Hard Drive Productions, Inc., IO Group, Inc., Imperial Enterprises, Inc., K-Beech, Inc., MCGIP LLC, Maverick Entertainment Group Inc, Media Products, Inc., Millenium TGA, Inc., New Sensations, Inc., Nu Image, Inc., Pacific Century International Limited, Patrick Collins, Inc., Raw Films, Inc., SBO Pictures, Inc., Third Degree Films, Inc., Third World Media, LLC, Voltage Pictures, LLC, West Coast Productions Inc.,

Steele Hansmeier, Prenda Law, Terik Hashmi, Paul Duffy, Paul A. Duffy, John Steele, Brett Gibbs, Brett L. Gibbs, Alexander Lian, Alexander O. Lian, Joseph Perea, Mark Lutz, Joanne Diez, Wayne O'Bryan, Timothy V. Anderson, Timothy Anderson, Neil Rubin, Neil H. Rubin, Michael O'Malley, Transnational Law Group.



Home | Map and Location | Practice Areas ▽ | Current Clients ▽ | Contact Info ▽ | Syfert.com



# G S W

## FLORIDA & GEORGIA
### Attorney at Law
## 904-383-7448

I have questions regarding
Foreclosure Defense
*Click Here*

I have questions regarding
Criminal Defense
*Click Here*

Welcome to
Syfert . com
home of
**Attorney
Graham
Syfert**

1529 Margaret St,
Unit 2
Jacksonville, FL
32204

graham@syfert.com

**Attorneys:**

**Graham W. Syfert, Esq.** (Fla., Ga.)
[E-Mail: graham@syfert.com]

Criminal Defense * Civil Ligitation * Administrative
Law * Consumer Law * Technology Law

**Staff:**

Lucy I. Nord, Paralegal
[E-Mail: lucy@syfert.com]

ISP Subpoena FAQ

**This is required reading if you are not
located in Florida and Georgia and
wish to call me regarding a subpoena.**

Foreclosure Defense



Copyright Infringement Representation

Real Estate

Tech-Law

**If you are in Florida or Georgia, or involved in a
lawsuit in those states, and are accused of an illegal
download, call Graham today, at 904-383-7448. If not,
click here for a list of other attorneys who can assist
you.**

Copyright Defense Forms - $19.95

Free Download - Copyright Defense Forms

*Graham W. Syfert has been featured in all the
above publications for his work on Self-Help
forms for fighting bittorrent lawsuits.*

(Provided for **information purposes only, hire an
attorney.** Read here for why these forms are free. The
pay version of the forms are being only for those who
wish to donate. **Read disclaimer on paid version before
downloading.**)

---

## Graham Syfert - Jacksonville Defense Lawyer

Home * About Graham Syfert * Contact Us * Map and Location
Graham's Personal Blog * Foreclosure Defense Blog

Graham W. Syfert, Esq., P.A.
Phone: 904-383-7448

Fax: 904-638-4726

graham@syfert.com

**AFFIDAVIT**

PETITIONER AND AFFIANT, ROBERT BALZEBRE, states under oath as follows:

1.  I am Robert Balzebre, an attorney formerly associated with Steele Hansmeier, PLLC.

2.  I have reviewed the bar complaint 2012-4047(11B).

3.  I had one brief phone conversation with a person who stated he was Graham Syfert. Without properly introducing himself, he asked if he could record our telephone conversation, and I said "No". I then told him I had to go. At no time did I have a discussion with him regarding any emails or the pending litigation between Mr. Syfert's client and Steele Hansmeier PLLC. In fact, there were no issues discussed at all in the extremely brief telephone exchange.

4.  The emails referenced in Exhibit 'A' of Mr. Syfert's complaint were written by me.

ROBERT BALZEBRE
Petitioner and Affiant

SUBSCRIBED AND SWORN to before me
This ___ day of _____, 2012.

_____
Notary Public

Notary Public State of Florida
Vernon D Martin
My Commission EE014417
Expires 10/04/2014



hibits to Pietz Dec'l. (April 16, 2013) - 18

## AFFIDAVIT

PETITIONER AND AFFIANT, MARK LUTZ, states under oath as follows:

1.  I am Mark Lutz, a paralegal formally at Steele Hansmeier, PLLC, and now employed by Prenda Law, Inc.

2.  In the normal course of my duties I routinely interact with attorneys calling in to our office regarding pending litigation.

3.  On or about December 8th, 2011 I had a phone conversation with Graham Syfert, who claimed to be an attorney representing a 'John Doe' in a pending case, specifically 1:11-cv-23064, Hard Drive Productions Inc. vs. Does 1-16.

4.  Mr. Syfert's first comment to me after introducing himself to me was, "I am sure you guys hate me, I made your lawyers scramble around the last time I filed a complaint against them". I was not sure what Mr. Syfert meant, so I asked for clarification.

5.  Mr. Syfert began bragging about how he had gotten my law firm in trouble with the Florida Bar.

6.  I asked Mr. Syfert if he wished to discuss the case involving his client.

7.  Mr. Syfert proceeded to infer that it would be in the best interest of my firm if we were to drop his client from any potential litigation. I informed him that our client would not drop his client unless there was some settlement payment agreed to.

8.  Mr. Syfert kept bringing up the fact he liked to file complaints against our firm, and then would immediately follow up with a statement such as "are you sure you don't want to drop my client?"

9.  I understood Mr. Syfert's comments to be a threat that unless our firm drops his



Exhibits to Pietz Dec'l. (April 16, 2013) - 19

client from the pending litigation, Mr. Syfert would take some action that would harm either my office or the firm in general.

10. After going back and forth in this manner for several times, I informed Mr. Syfert that I could not settle the matter by simply dropping his client from the litigation, Mr. Syfert stated "Ok, Mr. Steele will be hearing from me again!" and hung up.

11. On December 30, 2011 I received a fax from Mr. Syfert formally stating that he represented Mr. Greg Funke in the above mentioned case. Mr. Syfert also called that same day. Unlike the previous call, Mr. Syfert informed me that his client no longer wished to settle under any circumstances.

MARK LUTZ
Petitioner and Affiant

SUBSCRIBED AND SWORN to before me
This 10 day of January , 2010.

Notary Public

Notary Public State of Florida
Raul L. Chavarria
My Commission DD765932
Expires 03/06/2012

# EXHIBIT MM

ORIGINAL

### Affidavit of Blair Chintella

I, Blair Chintella, do solemnly affirm under the penalties of perjury that the information contained in this document or statement is the truth:

1.

My name is Blair Chintella and I currently reside in the State of Georgia.

2.

I am an attorney who is licensed to practice law in the State of Georgia.

3.

I have had multiple clients over the last few years who were accused of copyright infringement, and I have communicated with John Steele and/or Paul Duffy and/or and Mark Lutz regarding these clients.

### *First Conversation with Female Answering the Phone*

4.

On March 7, 2013, at approximately 3:32 PM, I received a voice mail message from someone who identified themselves as Tommy Labriola ("Tommy") stating that he was returning a phone call on behalf of an "attorney Steven Goodhue,"[1] and that he (Tommy) could be reached at "800-380-0840."

5.

Prior to receiving this phone call, I had never heard of a person named Steven Goodhue or a person named Tommy Labriola.

6.

On March 7, 2013 at approximately 3:35 PM, I called 1-800-380-0840 and a female voice answered the phone saying: "Law office, how may I help you?"

7.

I told her that I was returning a phone call from Tommy who said that he was calling on behalf Steven Goodhue. In response she said, "We have Mr. John Steele in the office or Mark Lutz, so let me see if maybe they might know what it's in reference to."

8.

---

[1] Initially, I thought that the message said "Goodview" rather than Goodhue.

I asked the female if this was the office of John Steel and Mark Lutz and she said, "That's the office you're calling to right now, so that's why I'm going to see if they know anything about it because I don't know of a Tommy here."

9.

I asked a second time what office I was calling and she responded: "This is the offices of John Steele. We have an attorney Mark Lutz also in the office." She also said that their firm does "intellectual property litigation."

10.

I asked again to speak with Tommy and she said that she would try to find out who he was, and she then put me on hold.

*First Conversation with "Tommy"*

11.

After being on hold for approximately two minutes, someone answered the phone and identified himself as Tommy.

12.

I told him that I was returning a call from someone named Tommy. Tommy responded by saying that "somebody" left a voice mail message with Steven "about a letter that they received from their internet service provider" and that he (Tommy) was returning the phone call.

13.

I said that I was "confused" and asked if he was calling on behalf of Steven Goodhue and Tommy said, "Yeah, he's my boss."[2]

14.

I said that nobody from my number called trying to reach an attorney named Steven Goodhue and Tommy said, "That's odd. This number showed up on our caller ID."

15.

I asked "what firm is this?" and Tommy said "This is Livewire Holdings."

16.

_____

[2] I was confused because up until this point I thought that Tommy might have been trying to reach a Steven Goodhue...I just wasn't sure.

I asked if Livewire Holdings was a law firm and Tommy said that they were not, but that "we have attorneys working for us."

### 17.

Tommy asked how he could help me. I said that I didn't know because "you guys called me." I also said that if "John Steele," "Mark Lutz" or "Paul Duffy" want to talk with me why they didn't just call me.[3] In response, Tommy said "I don't know who any of those individuals are."

### 18.

I asked to be transferred back to the secretary. In response, Tommy said: "This is Tommy. I'm Vice President here, so I don't think my receptionist is going to be able to help you."

### 19.

I explained a second time that I hadn't called anyone named Steven Goodhue. Tommy said "hold on a second" and he put me on hold. I was hung up on approximately two minutes later at approximately 3:42 PM on March 7, 2013.

#### *Second Conversation with Female Answering the Phone*

### 20.

After being hung up on, I called 1-800-380-0840 again on March 7, 2013, and a female answered the phone saying "Law offices."

### 21.

I said that I was trying to reach Tommy and she said, "Hold on just a second, he's on another call."

#### *Second Conversation with "Tommy"*

### 22.

Approximately one minute and thirty second later a person came on the line and said "This is Tommy."

---

[3] I said this specific comment because, at this point, I was still trying to figure out why someone named Tommy was calling me from a number which, at least according to the female who answered the phone, belongs to the law offices of John Steele. I have had clients involved in cases where John Steele and/or Paul Duffy and/or Mark Lutz have communicated directly, so I was wondering why they were possibly having Tommy contact me instead of calling me themselves...

23.

I asked Tommy who the person was that he said I had called, and he said that "I'm guessing the attorney Steven Goodhue.  He's an attorney of ours in Phoenix."

24.

I said that I had never called an attorney Steven Goodhue, he said that it was his "mistake," and we ended the conversation.

25.

Everything that is in quotation marks in this affidavit is verbatim and not a paraphrase of what was spoken.

26.

I made a record of the above conversations and quotes either as they were occurring or shortly thereafter (within 1 minute).



Blair Chintella

State of Georgia
County of Coffee

Sworn to and subscribed before me this 8 day of March, 2013, Blair Chintella, whose identity I verified in the form of a Georgia driver's license.

SEAL

Notary Signature: _____.

Printed Notary Name: _____.

### Affidavit of Blair Chintella

I, Blair Chintella, do solemnly affirm under the penalties of perjury that the information contained in this document or statement is the truth:

1.

I am an attorney who is licensed to practice law in the State of Georgia.  I currently represent the defendant in a case filed in the United States District Court for the Northern District of Georgia styled *AF Holdings, LLC v. Rajesh Patel*; 2:12-cv-00262.

2.

I have an e-mail address that is "bchintel1@gmail.com."

3.

The plaintiff's attorney in the above lawsuit is Jacques Nazaire and he has an e-mail address of "nazaire.jacques@gmail.com" and he and I have corresponded using these e-mail addresses.

4.

Attached to this affidavit are a true and correct copy of two e-mails: one from Jacques with a time/date stamp of "Mar 5, 2013 at 4:00 PM" and one from me with a time/date stamp of "Mar 5, 2013 at 4:39 PM."


_____
Blair Chintella

State of Georgia
County of Coffee

Sworn to and subscribed before me this 8 day of March, 2013, Blair Chintella, whose identity I verified in the form of a Georgia driver's license.

SEAL

Notary Signature: _Julie C Greene_.

Printed Notary Name: _Julie C. Greene_.

Gmail - Re: Settlement                                   https://mail.google.com/mail/u/0/?ui=2&ik=33fd3fe0fa&view=pt&q=naz.



bbc-Master bbc-Account <bbc.master.acct@gmail.com>

## Re: Settlement

| | |
|---|---|
| Jacques Nazaire <nazaire.jacques@gmail.com>
To: Bchintel1 <bchintel1@gmail.com> | Tue, Mar 5, 2013 at 4:00 PM |

Blair:

We are willing to set it aside. I will send you the stip. I just need time to do it. I am not in my office right now.

As far the motion.

I) Mr. Patel has no excuse for his default such as illness, or death in the family or that he never received the papers.
2) As for Alan Cooper, he appears to be a disgruntled employee who was probably not paid what he wanted to be
paid and as such he is suing Mr. Steele. Regardless of whether Cooper was branded as a janitor or president of AF
Holdings, he is what they deemed him to be. I would like to subpoena him and have him state under oath that he has
never received a dime from John Steele, who has interest in AF. Mr. Cooper's allegations are alone not enough to
create fraud.

In any event, I will send you the stip to withdraw the entry of default later. I will also call you so that we may discuss
where theses cases are going.

-Jacques

Gmail - Re: Settlement                                   https://mail.google.com/mail/u/0/?ui=2&ik=33fd3fe0fa&view=pt&q=naz.



bbc-Master bbc-Account <bbc.master.acct@gmail.com>

## Re: Settlement

| | |
|---|---|
| Bchintel1 <bchintel1@gmail.com>
To: Jacques Nazaire <nazaire.jacques@gmail.com> | Tue, Mar 5, 2013 at 4:39 PM |

As far as the basis for setting aside the default, our clients obviously disagree.  We don't think that it can only be set
aside when there's something as serious as a death in the family, illness or not receiving the papers, etc....but send
over the stipulation and I'll take a look at it so we can get the ball rolling on this thing...

Regarding Alan Cooper, if I understand you correctly: Alan Cooper was a disgruntled employee of AF Holdings who
was paid by John Steele, because apparently Steele has an interest in the company, a company?  When you say that
he was what "they" deemed him to be I'm assuming that you're referring to Steele?  So what was his actual position?
Janitor?  President?  Anyhow, have you talked to Alan Cooper or who is giving you this information?  Steele? Duffy?
Gibbs?

Sincerely,

Blair Chintella
912-850-1885
404-579-9668
www.chintellalaw.com

# EXHIBIT NN

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF GEORGIA

AF HOLDINGS, LLC,                    :     Civil Action No.  2:12-CV-00262

                Plaintiff,           :

        v.                           :

RAJESH PATEL,                        :          **COMPLAINT**

                Defendant.           :

                                     :     **JURY TRIAL DEMANDED**

                                     :

     Plaintiff AF Holdings, LLC ("Plaintiff"), through its undersigned counsel, hereby files this Complaint requesting damages and injunctive relief, and alleges as follows:

## NATURE OF THE CASE

    1.    Plaintiff files this action for copyright infringement under the United States Copyright Act and related civil conspiracy, contributory infringement and negligence claims under the common law to combat the willful and intentional infringement of its creative works. Defendant Rajesh Patel ("Defendant") knowingly and illegally reproduced and distributed Plaintiff's copyrighted Video by acting in concert with others via the BitTorrent file sharing protocol and, upon information and belief, continues to do the same. In using BitTorrent, Defendant's infringement actions furthered the efforts of numerous others in infringing on Plaintiff's copyrighted works. The result: exponential viral infringement. Plaintiff seeks a permanent injunction, statutory or actual damages, award of costs and attorney's fees, and other relief to curb this behavior.

## THE PARTIES

    2.    Plaintiff AF Holdings, LLC is a limited liability company organized and existing under the laws of the Federation of St. Kitts and Nevis. Plaintiff is a holder of rights to various

copyrighted works, and is the exclusive holder of the relevant rights with respect to the copyrighted creative work at issue in this Complaint.

3.    The copyrighted work at issue in this complaint is one of Plaintiff's adult entertainment videos, " Popular Demand" (the "Video").

4.    Defendant is an individual who, on information and belief, is over the age of 18, resides in this District, and was the account holder of Internet Protocol ("IP") address 75.89.36.80 at the time of the alleged infringing activity.  An IP address is a number assigned to devices, such as computers, that are connected to the Internet.  In the course of monitoring Internet-based infringement of its copyrighted content, Plaintiff's agents observed unlawful reproduction and distribution occurring over IP address 75.89.36.80 via the BitTorrent file transfer protocol.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over the copyright infringement claim under 17 U.S.C. §§ 101, *et seq.*, (the Copyright Act), 28 U.S.C. § 1331 (actions arising under the laws of the United States), and 28 U.S.C. § 1338(a) (actions arising under an Act of Congress relating to copyrights). This Court has supplemental jurisdiction over the civil conspiracy, contributory infringement and negligence claims under 28 U.S.C. § 1367(a) because they are so related to Plaintiff's copyright infringement claim, which is within this Court's original jurisdiction, that the claims form part of the same case and controversy under Article III of the United States Constitution.

6.    This Court has personal jurisdiction because, upon information and belief, Defendant either resides in or committed copyright infringement in the State of Georgia.

7.    Venue is properly founded in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because Defendant resides in this District, may be found in this District,

or a substantial part of the events giving rise to the claims in this action occurred within this District.

## BACKGROUND

8.     BitTorrent is a modern file sharing method ("protocol") used for distributing data via the Internet.

9.     Traditional file transfer protocols involve a central server, which distributes data directly to individual users. This method is prone to collapse when large numbers of users request data from the central server, in which case the server can become overburdened and the rate of data transmission can slow considerably or cease altogether. In addition, the reliability of access to the data stored on a server is largely dependent on the server's ability to continue functioning for prolonged periods of time under high resource demands.

10.     Standard P2P protocols involve a one-to-one transfer of whole files between a single uploader and single downloader. Although standard P2P protocols solve some of the issues associated with traditional file transfer protocols, these protocols still suffer from such issues as scalability. For example, when a popular file is released (e.g. an illegal copy of the latest blockbuster movie) the initial source of the file performs a one-to-one whole file transfer to a third party, who then performs similar transfers. The one-to-one whole file transfer method can significantly delay the spread of a file across the world because the initial spread is so limited.

11.     In contrast, the BitTorrent protocol is a decentralized method of distributing data. Instead of relying on a central server to distribute data directly to individual users, the BitTorrent protocol allows individual users to distribute data among themselves. Further, the BitTorrent protocol involves breaking a single large file into many small pieces, which can be transferred much more quickly than a single large file and in turn redistributed much more quickly than a single large file. Moreover, each peer can download missing pieces of the file from multiple

sources—often simultaneously—which causes transfers to be fast and reliable. After downloading a piece, a peer automatically becomes a source for the piece. This distribution method contrasts sharply with a one-to-one whole file transfer method.

12.     In BitTorrent vernacular, individual downloaders/distributors of a particular file are called peers. The group of peers involved in downloading/distributing a particular file is called a swarm. A server which stores a list of peers in a swarm is called a tracker. A computer program that implements the BitTorrent protocol is called a BitTorrent client. Each swarm is unique to a particular file.

13.     The BitTorrent protocol operates as follows. First, a user locates a small "torrent" file. This file contains information about the files to be shared and about the tracker, the computer that coordinates the file distribution. Second, the user loads the torrent file into a BitTorrent client, which automatically attempts to connect to the tracker listed in the torrent file. Third, the tracker responds with a list of peers and the BitTorrent client connects to those peers to begin downloading data from and distributing data to the other peers in the swarm. When the download is complete, the BitTorrent client continues distributing data to other peers in the swarm until the user manually disconnects from the swarm or the BitTorrent client otherwise does the same.

14.     The degree of anonymity provided by the BitTorrent protocol is extremely low. Because the protocol is based on peers connecting to one another, a peer must broadcast identifying information (i.e. an IP address) before it can receive data. Nevertheless, the actual names of peers in a swarm are unknown, as the users are allowed to download and distribute under the cover of their IP addresses.

15.     The BitTorrent protocol is an extremely popular method for transferring data. The size of swarms for popular files can reach into the tens of thousands of unique peers. A swarm will commonly have peers from many, if not every, state in the United States and several countries around the world. And every peer in the swarm participates in distributing the file to dozens, hundreds, or even thousands of other peers.

16.     The BitTorrent protocol is also an extremely popular method for unlawfully copying, reproducing, and distributing files in violation of the copyright laws of the United States. A broad range of copyrighted albums, audiovisual files, photographs, software, and other forms of media are available for illegal reproduction and distribution via the BitTorrent protocol.

17.     Efforts at combating BitTorrent-based copyright infringement have been stymied by BitTorrent's decentralized nature. Because there are no central servers to enjoin from unlawfully distributing copyrighted content, there is no primary target on which to focus anti-piracy efforts. Indeed, the same decentralization that makes the BitTorrent protocol an extremely robust and efficient means of transferring enormous quantities of data also acts to insulate it from anti-piracy measures. This lawsuit is Plaintiff's only practical means of combating BitTorrent-based infringement of the Video.

## ALLEGATIONS COMMON TO ALL COUNTS

18.     Plaintiff is the exclusive rights holder with respect to BitTorrent-based reproduction and distribution of the Video.

19.     The Video is currently registered in the United States Copyright Office (Copyright No. PA0001754383). (*See* Exhibit A to Complaint.) On December 20, 2011, Plaintiff received the rights to this Video pursuant to an assignment agreement, a true and correct copy of which is attached hereto as Exhibit B. (*See* Exhibit B to Complaint.)

20.     The torrent file used to access the copyrighted material was named in a manner that would have provided an ordinary individual with notice that the Video was protected by the copyright laws of the United States.

21.     Plaintiff employs proprietary peer-to-peer network forensic software to perform exhaustive real time monitoring of the BitTorrent-based swarm involved in distributing the Video. This software is effective in capturing data about the activity of peers in a swarm and their infringing conduct.

22.     Defendant, using IP address 75.89.36.80, without Plaintiff's authorization or license, intentionally downloaded a torrent file particular to Plaintiff's Video, purposefully loaded that torrent file into his BitTorrent client, entered a BitTorrent swarm particular to Plaintiff's Video, and reproduced and distributed the Video to numerous third parties.

23.     Plaintiff's investigators detected Defendant's illegal download on December 4, 2011 at 21:39:23 UTC.  However, this is a simply a snapshot observation of when the IP address was *observed* in the BitTorrent swarm; the conduct itself took place before and after this date and time.

24.     Defendant was part of a group of BitTorrent users or peers in a single swarm—a process generally described above—whose computers were collectively interconnected for the sharing of a particular unique file.  The particular file a BitTorrent swarm is associated with has a unique file "hash"—i.e. a unique file identifier generated by an algorithm (hereinafter "Hash Tag.")—and common to all of the participants in the swarm.

## COUNT I – COPYRIGHT INFRINGEMENT – REPRODUCTION
### (17 U.S.C. § 106(1))

25.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth fully herein.

26. Plaintiff is the copyright owner of the Video.

27. Defendant, without authorization, unlawfully obtained a copy of the Video.

28. Normally, Plaintiff offers the Video for purchase. Defendant, however, did not purchase the Video and/or obtain the Video legally.

29. Defendant used IP address 75.89.36.80 to access the Video on the Internet, and download the unique file containing the Video onto a hard drive through the unique swarm associated with the unique Hash Tag using the BitTorrent protocol.

30. Defendant's actions constituted copyright infringement of Plaintiff's Video.

31. Defendant knew or had constructive knowledge that his acts constituted copyright infringement of Plaintiff's Video.

32. Defendant's conduct was willful within the meaning of the Copyright Act: intentional, and with indifference to the Plaintiff's rights.

33. Defendant's conduct infringed upon Plaintiff's exclusive rights of reproduction of the Video that are protected under the Copyright Act.

34. Plaintiff has been damaged by Defendant's conduct, including, but not limited to, economic and reputation losses. Plaintiff continues to be damaged by such conduct, and has no adequate remedy at law to compensate the Plaintiff for all of the possible damages stemming from Defendant's conduct.

35. As Defendant's infringement was intentional and willful, the Plaintiff is entitled to an award of actual damages and/or statutory damages (pursuant to 17 U.S.C. § 504(c)) at its own election, exemplary damages, attorneys' fees (pursuant to 17 U.S.C. § 505), injunctive relief (pursuant to 17 U.S.C. §§ 502, 503) and the costs of the suit.

///

## COUNT II – COPYRIGHT INFRINGEMENT – DISTRIBUTION
### (17 U.S.C. § 106(3))

36.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

37.     Plaintiff holds the exclusive rights under the Copyright Act to distribute the Video.

38.     Defendant has used, and continues to use, the BitTorrent file transfer protocol to unlawfully distribute the Video to other individuals over the Internet by publishing the Video to hundreds of thousands of BitTorrent users from a computer owned or controlled by Defendant, which, in essence, served as a distribution server for the Video.  In doing so, Defendant violated Plaintiff's exclusive rights to distribute the Video.

39.     Defendant was not given any permission to conduct such reproduction, and Plaintiff never consented to such.

40.     Defendant's actions constitute infringement of Plaintiff's copyrights and exclusive rights under the Copyright Act.

41.     Defendant knew or had constructive knowledge that his acts constituted copyright infringement of Plaintiff's Video.

42.     Defendant's conduct was willful within the meaning of the Copyright Act: intentional, and with indifference to the Plaintiff's rights.

43.     Plaintiff has been damaged by Defendant's conduct, including but not limited to economic and reputation losses. Plaintiff continues to be damaged by such conduct, and has no adequate remedy at law to compensate the Plaintiff for all of the possible damages stemming from the Defendant's conduct.

44.     As Defendant's infringement was intentional and willful, the Plaintiff is entitled to an award of actual damages and/or statutory damages (pursuant to 17 U.S.C. § 504(c)) at its own election, exemplary damages, attorneys' fees (pursuant to 17 U.S.C. § 505), injunctive relief (pursuant to 17 U.S.C. §§ 502, 503) and the costs of the suit.

## COUNT III – CONTRIBUTORY INFRINGEMENT

45.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

46.     When users in this unique swarm all possess the same infringing work with the same exact hash value, it is because each infringer possesses an exact digital copy, containing the exact bits and pieces unique to that specific file of Plaintiff's original copyrighted work.  They only way this happens in a BitTorrent swarm is through the sharing of these bits and pieces of each same unique file, with the same unique hash value, between the users in the swarm.  In essence, although hundreds of users may be uploading the copyrighted work, a single user will receive only the exact parts of a singular upload through that exact swarm, not a compilation of available pieces from various uploads.

47.     Defendant published the Hash Tag to the BitTorrent network.

48.     Defendant downloaded, uploaded and distributed the Video to other BitTorrent users through use of the hash-specified protocol in the unique swarm.

49.     As each of the thousands of people who illegally downloaded the movie accessed this illegal publication, they derived portions of their illegal replication of the file from multiple persons, including, but not limited to, Defendant.

50.     Defendant knew of the infringement, was conscious of his own infringement, and Defendant was fully conscious that his actions resulted in multiple other persons derivatively downloading the file containing Plaintiff's Video.

51.     The infringement by the other BitTorrent users could not have occurred without Defendant's participation in uploading Plaintiff's copyrighted works.  As such, Defendant's participation in the infringing activities of others is substantial and contributed, for profit, to the infringing activity of thousands of other peers over the Internet across the world.

52.     Defendant profited from this contributory infringement by way of being granted access to a greater library of other infringing works, some of which belonged to Plaintiff and some of which belonged to other copyright owners.

## COUNT IV – CIVIL CONSPIRACY

53.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

54.     In using the peer-to-peer BitTorrent file distribution method, Defendant engaged in a concerted action with other unnamed individuals to reproduce and distribute Plaintiff's Video by exchanging pieces of the Video file in the torrent swarm.

55.     Defendant and his co-conspirators downloaded a torrent file, opened it using a BitTorrent client, and then entered a torrent swarm comprised of other individuals distributing and reproducing Plaintiff's Video. In participating in said conspiratorial network, Defendant agreed with others to engage in a concerted tortious action in the network to reproduce and distribute Plaintiff's Video.

56. Participants in the torrent swarm have conspired to provide other individuals with pieces of the Video in exchange for receiving other pieces of the same Video to eventually obtain a complete copy of the file.

57. In furtherance of this civil conspiracy, Defendant committed overt tortious and unlawful acts by using BitTorrent software to download the Video from and distribute it to others, and were willful participants in this joint activity.

58. As a proximate result of this conspiracy, Plaintiff has been damaged, as is more fully alleged above.

## COUNT V – NEGLIGENCE

59. Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

60. In the alternative, Defendant was negligent and/or reckless in allowing a third-party to commit the allegations of infringement, contributory infringement, and civil conspiracy described above through his Internet connection.

61. Defendant accessed, or controlled access to, the Internet connection used in performing the unauthorized copying and sharing of Plaintiff's Video, proximately causing financial harm to Plaintiff.

62. Defendant had a duty to secure his Internet connection. Defendant breached that duty by failing to secure his Internet connection.

63. Reasonable Internet users take steps to secure their Internet access accounts preventing the use of such accounts for an illegal purpose. Defendant's failure to secure his Internet access account, thereby allowing for its illegal use, constitutes a breach of the ordinary care that a reasonable Internet account holder would do under like circumstances.

64.     In the alternative, Defendant secured his connection, but knowingly permitted an unknown third party to use his Internet connection to infringe on Plaintiff's Video.  Defendant knew, or should have known, that this unidentified individual used Defendant's Internet connection for the aforementioned illegal activities.  Defendant declined to monitor the unidentified third-party infringer's use of his computer Internet connection, demonstrating further negligence.

65.     In the alternative, Defendant knew of, and allowed for, the unidentified third party infringer's use of his Internet connection for illegal purposes and thus was complicit in the unidentified third party's actions.

66.     Upon information and belief, Defendant's failure to secure his Internet access account directly allowed for the copying and sharing of Plaintiff's Video over the BitTorrent protocol through Defendant's Internet connection, and interfered with Plaintiff's exclusive rights in the copyrighted work.

67.     Upon information and belief, Defendant knew, or should have known of, the unidentified third party's infringing actions, and, despite this, Defendant directly, or indirectly, allowed for the copying and sharing of Plaintiff's Video over the BitTorrent protocol through Defendant's Internet connection, and interfered with Plaintiff's exclusive rights in the copyrighted Video.

68.     By virtue of his unsecured access, Defendant negligently allowed the use of his Internet access account to perform the above-described copying and sharing of Plaintiff's copyrighted Video.

69.     Had Defendant taken reasonable care in securing access to this Internet connection, or monitoring the unidentified third-party individual's use of his Internet connection,

such infringements as those described above would not have occurred by the use of Defendant's Internet access account.

70. Defendant's negligent actions allowed numerous others to unlawfully copy and share Plaintiff's copyrighted Video, proximately causing financial harm to Plaintiff and unlawfully interfering with Plaintiff's exclusive rights in the Video.

**JURY DEMAND**

71. Plaintiff hereby demands a jury trial in this case.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests Judgment and relief as follows:

1) Judgment against Defendant that he has: a) willfully infringed Plaintiff's rights in federally registered copyrights pursuant to 17 U.S.C. § 501; and b) otherwise injured the business reputation and business of Plaintiff by Defendant's acts and conduct set forth in this Complaint;

2) Judgment in favor of the Plaintiff against Defendant for actual damages or statutory damages pursuant to 17 U.S.C. § 504, at the election of Plaintiff, in an amount to be ascertained at trial;

3) Order of impoundment under 17 U.S.C. §§ 503 & 509(a) impounding all infringing copies of Plaintiff's audiovisual works, photographs or other materials, which are in Defendant's possession or under his control;

4) As to Count III, that the Court order the Defendant jointly and severally liable to Plaintiff in the full amount of the Judgment along with the damages associated with the infringing activities of his co-conspirators;

5) As to Count IV, an order that Defendant is liable to the Plaintiff in the full amount of Judgment on the basis of a common law claim for contributory infringement of copyright; for

an award of compensatory damages in favor of the Plaintiff and against Defendant in an amount to be determined at trial;

6) On Count IV, in the alternative, an order that Defendant is jointly and severally liable to the Plaintiff in the full amount of Judgment on the basis of Defendant's negligence in allowing an unidentified third party access his Internet account and, through it, violate Plaintiff's copyrighted works; for an award of compensatory damages in favor of the Plaintiff and against Defendant, jointly and severally, in an amount to be determined at trial;

7) Judgment in favor of Plaintiff against the Defendant awarding the Plaintiff attorneys' fees, litigation expenses (including fees and costs of expert witnesses), and other costs of this action; and

8) Judgment in favor of the Plaintiff against the Defendant, awarding Plaintiff declaratory and injunctive or other equitable relief as may be just and warranted under the circumstances.

Respectfully submitted,

AF Holdings, LLC,

DATED: November 2, 2012

By:     /s/ Jacques Nazaire

Jacques Nazaire, Esq. (Bar No. 142388)
Of Counsel to Prenda Law Inc.
125 Town Park Drive, Suite 300
Kennesaw, Georgia 30144
Telephone: (415) 325-5900
Email: blgibbs@wefightpiracy.com

*Attorney for Plaintiff*

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided by FRCP 38(a).


By:     /s/ Jacques Nazaire

        Jacques Nazaire, Esq.

        *Attorney for Plaintiff*

# EXHIBIT OO

4months,CLOSED

# U.S. District Court
## Northern District of Georgia (Gainesville)
## CIVIL DOCKET FOR CASE #: 2:12-cv-00262-WCO

AF Holdings, LLC v. Patel                          Date Filed: 11/02/2012
Assigned to: Judge William C. O'Kelley            Date Terminated: 03/18/2013
Cause: 17:504 Copyright Infringement              Jury Demand: Plaintiff
                                                  Nature of Suit: 820 Copyright
                                                  Jurisdiction: Federal Question

**Plaintiff**

**AF Holdings, LLC**              represented by    **Jacques Nazaire**
                                                   Jacques Nazaire, Attorney at Law
                                                   Suite 300
                                                   125 Town Park Drive
                                                   Kennesaw, GA 30144
                                                   404-923-0529
                                                   Fax: 678-559-0798
                                                   Email: nazaire.jacques@gmail.com
                                                   *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Rajesh Patel**                 represented by    **Blair Chintella**
                                                   Blair Chintella, Esq.
                                                   806 Meadowlane Drive
                                                   Douglas, GA 31533
                                                   404-579-9668
                                                   Email: BChintel1@gmail.com
                                                   *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/02/2012 | 1 | COMPLAINT with Jury Demand filed and summon(s) issued. Consent form to proceed before U.S. Magistrate and pretrial instructions provided. ( Filing fee $350, receipt number 113E-4243602), filed by AF Holdings, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Civil Cover Sheet)(vld) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. Modified on 11/6/2012 (rth). (Entered: 11/05/2012) |

Exhibits to Pietz Dec'l. (April 16, 2013) - 45

| 11/05/2012 | 2 | Electronic Summons Issued as to Rajesh Patel. (vld) (Entered: 11/05/2012) |
|---|---|---|
| 11/05/2012 | 3 | AO Form 121 forwarded to Commissioner. (vld) (Entered: 11/05/2012) |
| 11/11/2012 | 4 | Corporate Disclosure Statement by AF Holdings, LLC by AF Holdings, LLC.(Nazaire, Jacques) (Entered: 11/11/2012) |
| 11/19/2012 | 5 | Corporate Disclosure Statement by AF Holdings, LLC by AF Holdings, LLC.(Nazaire, Jacques) (Entered: 11/19/2012) |
| 01/15/2013 | 6 | NOTICE Of Filing Summons by AF Holdings, LLC re 2 Electronic Summons Issued, 1 Complaint, (Nazaire, Jacques) (Entered: 01/15/2013) |
| 01/15/2013 | 7 | Electronic Summons Re-Issued as to Rajesh Patel. (sk) (Entered: 01/15/2013) |
| 01/15/2013 | 8 | NOTICE Of Filing Summons by AF Holdings, LLC re 2 Electronic Summons Issued, 1 Complaint, (Nazaire, Jacques) (Entered: 01/15/2013) |
| 01/16/2013 | 9 | Electronic Summons Re-Issued as to Rajesh Patel. (sk) (Entered: 01/16/2013) |
| 02/04/2013 | 10 | Return of Service Executed by AF Holdings, LLC. Rajesh Patel served on 2/4/2013, answer due 2/25/2013. (Nazaire, Jacques) Modified on 2/27/2013 to correct defendant name (sk). (Entered: 02/04/2013) |
| 02/27/2013 | 11 | MOTION for Clerks Entry of Default with Brief In Support by AF Holdings, LLC. (Attachments: # 1 Brief Declaration, # 2 Exhibit Proof of Service) (Nazaire, Jacques) (Entered: 02/27/2013) |
| 02/27/2013 | | Clerks Entry of Default as to Rajesh Patel. (sk) (Entered: 02/27/2013) |
| 03/01/2013 | 12 | NOTICE of Appearance by Blair Chintella on behalf of Rajesh Patel (Chintella, Blair) (Entered: 03/01/2013) |
| 03/04/2013 | 13 | MOTION to Set Aside Default with Brief In Support by Rajesh Patel. (Attachments: # 1 Exhibit Alan Cooper lawsuit, # 2 Exhibit Alan Cooper declaration, # 3 Exhibit Brett Gibbs declaration, # 4 Exhibit List of Cases, # 5 Exhibit Defendant's Declaration)(Chintella, Blair) (Entered: 03/04/2013) |
| 03/18/2013 | 14 | NOTICE of Voluntary Dismissal *With Prejudice* filed by AF Holdings, LLC (Nazaire, Jacques) (Entered: 03/18/2013) |
| 03/18/2013 | | Clerk's Entry of Dismissal APPROVING 14 Notice of Voluntary Dismissal pursuant to Fed.R.Civ.P.41(a)(1)(i). (sk) (Entered: 03/18/2013) |
| 03/18/2013 | | Civil Case Terminated. (sk) (Entered: 03/18/2013) |
| 03/18/2013 | 15 | AO Form 121 forwarded to Commissioner. (sk) (Entered: 03/18/2013) |
| 04/06/2013 | 16 | MOTION for Sanctions with Brief In Support by Rajesh Patel. (Attachments: # (Exhibit A, # 2Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 |

Exhibit P)(Chintella, Blair) Modified on 4/8/2013 to remove duplicative wording (sk). (Entered: 04/06/2013)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 04/12/2013 12:32:29 | | | |
| **PACER Login:** | th9592 | **Client Code:** | Subpoena Defense |
| **Description:** | Docket Report | **Search Criteria:** | 2:12-cv-00262-WCO |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Exhibits to Pietz Decl. (April 16, 2013) - 47

# EXHIBIT PP



**Brent Berry**
Realtor/Auctioneer
3351 Round Lake Blvd
Anoka, MN  55303
brent.berry@results.net

Cell:  612-390-3621
Main:  763-323-8080
Other:  612-412-1313

Brent Berry › Search › 21251 220th St, Mcgrath, MN 56350                                                                    **Sign In**

**Back To Search**  |  Listing 1 of 4                                                                                            **Next**

**PROPERTY ACTIONS**

Save to Favorites            Request Information

Calculate Mortgage                      Print Brochures

Explore Neighborhoods and Schools       Get Map and Directions

E-mail This Listing

| 0 | Tweet | 0 |      | Share |      | Like | 0 |

**LISTED BY**



**Brent Berry**
Realtor/Auctioneer
**RE/MAX Results**

E-mail Me

**Cell:**  612-390-3621
**Main:**  763-323-8080

Exhibits to Pietz Dec'l. (April 16, 2013) - 49



Case 2:12-cv-08333-ODW-JC Document 117-2 Filed 04/16/13 Page 50 of 70 Page ID #:2767

**Photo Tour**

4 of 18

**21251 220th St**
**Mcgrath, MN 56350**

**$417,000**

MLS ID: 4183515

**Request Information**

**First Name:**

**Last Name:**

**E-mail Address:**

**Phone Number:**

**Message:**

I am interested in receiving more information about MLS ID# 4183515 located at 21251 220th St, Mcgrath, MN 56350

All Fields Required Send

**Property Details**

| | |
|---|---|
| MLS ID: | 4183515 |
| Style: | 2-Story |
| Year Built: | 2006 |
| Bedrooms: | 3 |
| Bathrooms: | 3 (Full: 0 3/4: 3 1/2: 0 Other: 0) |
| Status: | Sold on 2/28/2013 |
| Parking Type Description: | Unpaved / Gravel / Dirt 4 cars |
| New Construction: | No |
| **LOT INFORMATION** | |
| Acreage: | 125 |
| Lot Size: | 1884x3204x2640x1320x. |
| **LOCALE** | |
| County: | Aitkin |
| School District: | Mcgregor |

Listed by RE/MAX Results

**Neighborhood View** Find Properties In Neighborhood

**Back To Search**  | Listing 1 of 4                                                                          **Next**

The IDX information is provided exclusively for consumers' personal, non-commercial use, and may not be used for any purpose other than to identify prospective
properties consumers may be interested in purchasing. All data is deemed reliable but is not guaranteed to be accurate by the MLS.

Equal Housing Opportunity

Nationwide, RE/MAX Results REALTORS® sell more homes per Associate! Our agents specialize in real estate houses for sale or purchase in Minnesota and Western
Wisconsin; including the Twin Cities of Minneapolis and St. Paul. Start your property search at Results.net. Find homes for sale and real estate agents using our real estate
search engine.

All information deemed reliable but not guaranteed. All properties are subject to prior sale, change or withdrawal. Neither broker(s), agent(s) nor WhereToLive.com, Inc. shall be
responsible for any typographical errors, misinformation or misprints, and shall be held totally harmless.

© 1999-2013 WhereToLive.com, Inc. - Winning Real Estate Solutions

Case 2:12-cv-08338-ODW-JC Document 117-2 Filed 04/16/13 Page 52 of 70 Page ID #:2769



**Brent Berry**
Realtor/Auctioneer
3351 Round Lake Blvd
Anoka, MN 55303
brent.berry@results.net

Cell: 612-390-3621
Main: 763-323-8080
Other: 612-412-1313

Brent Berry › Search › 21251 220th St, Mcgrath, MN 56350                                                    **Sign In**

**Back To Search** | Listing 1 of 4                                                                         **Next**

**PROPERTY ACTIONS**                                              **LISTED BY**

Save to Favorites          Request Information

Calculate Mortgage                    Print Brochures

Explore Neighborhoods and Schools     Get Map and Directions

E-mail This Listing



**Brent Berry**
Realtor/Auctioneer
RE/MAX Results

E-mail Me

**Cell:** 612-390-3621
**Main:** 763-323-8080

| 0 | Tweet | 0 | Share | Like | 0 |

Exhibits to Pietz Dec'l. (April 16, 2013) - 52

## Photo Tour

5 of 18

**21251 220th St**
**Mcgrath, MN 56350**

**$417,000**

MLS ID: 4183515

### Request Information

| | |
|---|---|
| **First Name:** | |
| **Last Name:** | |
| **E-mail Address:** | |
| **Phone Number:** | |

**Message:**

I am interested in receiving more information about MLS ID# 4183515 located at 21251 220th St, Mcgrath, MN 56350

All Fields Required                                                    Send

### Property Details

| | |
|---|---|
| MLS ID: | 4183515 |
| Style: | 2-Story |
| Year Built: | 2006 |
| Bedrooms: | 3 |
| Bathrooms: | 3  (Full: 0  3/4: 3  1/2: 0  Other: 0) |
| Status: | Sold on 2/28/2013 |
| Parking Type Description: | Unpaved / Gravel / Dirt 4 cars |
| New Construction: | No |
| **LOT INFORMATION** | |
| Acreage: | 125 |
| Lot Size: | 1884x3204x2640x1320x. |
| **LOCALE** | |
| County: | Aitkin |
| School District: | Mcgregor |

Listed by RE/MAX Results

### Neighborhood View

Find Properties In Neighborhood

N          Road

250 feet          50 m

© 2012 Nokia    © 2013 Microsoft Corporation

Back To Search | Listing 1 of 4                                                          Next

Welcome | Area Properties | My Solds | My Office Locations | My Blog | Contact Me | Privacy Policy | Feedback | RE/MAX Results | OnlineOffice | Mobile Site
Property Information Last Updated: 4/14/2013 at 11:25 PM.

The IDX information is provided exclusively for consumers' personal, non-commercial use, and may not be used for any purpose other than to identify prospective
properties consumers may be interested in purchasing. All data is deemed reliable but is not guaranteed to be accurate by the MLS.

Equal Housing Opportunity

Nationwide, RE/MAX Results REALTORS® sell more homes per Associate! Our agents specialize in real estate houses for sale or purchase in Minnesota and Western
Wisconsin; including the Twin Cities of Minneapolis and St. Paul. Start your property search at Results.net. Find homes for sale and real estate agents using our real estate
search engine.

All information deemed reliable but not guaranteed. All properties are subject to prior sale, change or withdrawal. Neither broker(s), agent(s) nor WhereToLive.com, Inc. shall be
responsible for any typographical errors, misinformation or misprints, and shall be held totally harmless.

© 1999-2013 WhereToLive.com, Inc. - Winning Real Estate Solutions

Exhibits to Pietz Decl. (April 16, 2013) - 54

# EXHIBIT QQ

1

94KVBISC                    Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:  BISYS SECURITIES
    LITIGATION,
4                                           04 CV 03840 (JSR)

    ------------------------------x
5                                           New York, N.Y.
                                            April 20, 2009
6

7   Before:

8                    HON. JED S. RAKOFF,

9                                           District Judge

10                       APPEARANCES

11  CARNEY WILLIAMS
         Attorneys for Plaintiffs
12  BY:  J. ALLEN CARNEY
         CURTIS BOWMAN
13
    KIRBY McINERNEY
14       Attorneys for Plaintiffs
    BY:  PETER S. LINDEN
15       IRA M. PRESS

16  MORVILLO ABRAMOWITZ GRAND IASON ANELLO & BOHRER
         Attorneys for Plaintiffs
17  BY:  CATHERINE M. FOTI

18  SKADDEN ARPS SLATE MEAGHER & FLOM
         Attorneys for Defendants
19  BY:  JEROME S. HIRSCH
         JONATHAN L. FRANK
20
    JENNER & BLOCK
21       Attorneys for Defendants
    BY:  SHARMILA SOHONI
22
    LAW OFFICES OF JOHN WESLEY HALL, JR.
23       Attorney for S. Gene Cauley
    BY:  JOHN WESLEY HALL, JR.
24
    ALSO PRESENT:  LISA BUCKSER-SCHULZ, ESQ.
25                 S. GENE CAULEY, ESQ.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1

94KVBISC                    Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:  BISYS SECURITIES
    LITIGATION,
4                                       04 CV 03840 (JSR)
    ------------------------------x
5                                       New York, N.Y.
                                        April 20, 2009
6                                       9:35 a.m.

7   Before:

8                      HON. JED S. RAKOFF,

9                                          District Judge

10                      APPEARANCES

11  CARNEY WILLIAMS
         Attorneys for Plaintiffs
12  BY:  J. ALLEN CARNEY
         CURTIS BOWMAN
13
    KIRBY McINERNEY
14       Attorneys for Plaintiffs
    BY:  PETER S. LINDEN
15       IRA M. PRESS

16  MORVILLO ABRAMOWITZ GRAND IASON ANELLO & BOHRER
         Attorneys for Plaintiffs
17  BY:  CATHERINE M. FOTI

18  SKADDEN ARPS SLATE MEAGHER & FLOM
         Attorneys for Defendants
19  BY:  JEROME S. HIRSCH
         JONATHAN L. FRANK
20
    JENNER & BLOCK
21       Attorneys for Defendants
    BY:  SHARMILA SOHONI
22
    LAW OFFICES OF JOHN WESLEY HALL, JR.
23       Attorney for S. Gene Cauley
    BY:  JOHN WESLEY HALL, JR.
24
    ALSO PRESENT:  LISA BUCKSER-SCHULZ, ESQ.
25                 S. GENE CAULEY, ESQ.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    2
       94KVBISC                     Conference

  1                (In open court)

  2           THE DEPUTY CLERK:  April 20, 2009.  Robert Grant v.

  3      The Bisys Group.  Counsel, please state your name for the

  4      record.

  5           MR. CARNEY:  Allen Carney, your Honor.

  6           MR. BOWMAN:  Curtis Bowman, your Honor.

  7           MR. LINDEN:  Peter Linden of Kirby McInerney, your

  8      Honor.

  9           MR. PRESS:  Ira Press of Kirby McInerney, your Honor.

 10           MS. FOTI:  Catherine Foti from Morvillo, Abramowitz on

 11      behalf of AB Data.  With me is vice president and general

 12      counsel of class administration section of AB Data, Lisa

 13      Buckser-Schulz.

 14           THE COURT:  Good morning.

 15           MR. HIRSCH:  Good morning, your Honor.  Jerome Hirsch

 16      on half of The Bisys Group.

 17           MR. FRANK:  Jonathan Frank on behalf of The Bisys

 18      Group.

 19           MS. SOHONI:  Sharmila Sohoni for Jenner & Block for

 20      Mr. Fradin.

 21           MR. HALL:  Good morning, your Honor.  John Wesley Hall

 22      of Little Rock on behalf of Mr. Cauley.

 23           MR. CAULEY:  Gene Cauley, your Honor.

 24           THE COURT:  All right.  Mr. Cauley, before we get into

 25      the details, maybe you can explain what's going on.

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

3

94KVBISC                    Conference

1          MR. HALL:  Your Honor, I've only been in this since

2    Friday.  My limited ability to find out what's going on tells

3    me that the funds are presently unavailable to be delivered,

4    hopefully will be.

5          THE COURT:  What does that mean?

6          MR. HALL:  They cannot be liquidated.

7          THE COURT:  And why is that?

8          MR. HALL:  Your Honor, if I go into anymore detail, I

9    think I might violate a privilege against self-incrimination.

10         THE COURT:  All right.  I think that is not unlikely,

11   so let me give the background of this.  Is there someone here

12   from the U.S. Attorney's Office?  You want to identify

13   yourself?

14         MR. STELLMACH:  Yes, your Honor.  William Stellmach

15   from the U.S. Attorney's Office.

16         THE COURT:  All right.  It appears not unlikely from

17   the little information available to me that Mr. Cauley may have

18   committed a crime or several crimes, that he may have committed

19   disbarrable conduct in one or many ways.  Here is all I know

20   about it.

21         I received a letter that was faxed with permission to

22   my chambers on April 15th from the Carney Williams firm and

23   signed by Mr. Bowman, Mr. Williams, and Mr. Carney, which

24   indicated that after the then firm of Cauley, Bowman, Carney &

25   Williams was designated as co-lead counsel representing the

4

94KVBISC                    Conference

1    class in this litigation, Mr. Cauley designated himself as the

2    sole signatory on the account.  He established to accommodate

3    the settlement fund of $65,875,000.  That was the result of the

4    settlement in this case.

5           In that position as, in effect, a fiduciary escrow

6    agent, Mr. Cauley represented that the settlement proceeds were

7    to be invested in U.S. Treasury bonds.  And pursuant to the

8    order that I signed ordering the distribution, various

9    transmissions were made to AB Data on December 19th, 2008,

10   December 24th, 2008, December 30th, 2008, and February 19th,

11   2009.  The last conveyance, totaling approximately $9.3

12   million, was supposed to have occurred, according to the

13   parties, on April 2nd.  Instead, Mr. Cauley, according to the

14   letter I'm referring to, informed Mr. Bowman on April 13th that

15   the remaining funds in excess of $9,000,000 were "unavailable,"

16   and that he believed they would be available within 90 days.

17          Immediately after my chambers received this letter,

18   although I was out of the country at the time, I directed my

19   law clerk to have counsel convene a joint telephone call to

20   include Mr. Cauley, but I am told he declined to participate in

21   that call.  I then issued the order requiring his appearance

22   and appearance of the other parties here today.

23          Since this is a civil matter, although Mr. Cauley has

24   the right to invoke his Fifth Amendment privilege, as he has

25   just done, in effect, across-the-board, the Court can and at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

94KVBISC                    Conference

1   this stage does draw an adverse inference, which the law

2   permits in a civil matter, from the invocation of the Fifth

3   Amendment.  And the inference I'm drawing is that Mr. Cauley

4   has either misappropriated or otherwise misallocated these

5   funds.  And because of that possibility, I asked the U.S.

6   Attorney's Office to have someone here today.  I'm delighted

7   they are.  I trust there will be a prompt investigation of this

8   matter by the U.S. Attorney's Office.

9           Mr. Cauley, by virtue of his appearance in this case,

10  is also subject to the Grievance Committee of the Southern

11  District of New York.  I will, unless further information is

12  received that warrants reconsideration, refer the matter of

13  Mr. Cauley to that committee.  I am chair of that committee,

14  but I will recuse myself from participation in the committee's

15  proceedings regarding Mr. Cauley.

16          Now, the most immediate problem we have is that the

17  victims of this alleged fraud have been deprived over

18  $9,000,000 or so it would seem.  I need to find out now from

19  everyone here what they know about this situation.  I preface

20  this by also noting for the record that earlier in this case,

21  although it is minor compared to what has now emerged, there

22  was less than assiduous monitoring of this case by any of the

23  parties which caused the Court to have to convene a conference

24  at that time and to order and receive the parties' agreement to

25  various prophylactic measures.  I am, therefore, doubly

6

94KVBISC                    Conference

1   disappointed that something further has happened.

2          I commend the partners of the Carney Williams firm for

3   bringing this to my attention.  I should note for the record I

4   also received a me-too letter from Mr. Linden at Kirby

5   McInerney.

6          Now, let's start with AB Data.

7          MS. FOTI:  Your Honor, thank you.  Precisely what

8   you've already put on the record in terms of the facts is what

9   AB Data is aware of.  They did receive those transfers.  They

10  were in communication early in April about the other transfer.

11         THE COURT:  What was your understanding as to why the

12  remaining funds wouldn't be available until April?

13         MS. FOTI:  There was an email received through

14  Mr. Carney from Mr. Cauley that said that the funds were in a

15  T-bill, were going to mature on April 2nd, possibly will not be

16  available till April 8th because of settlement issues.  And

17  shortly thereafter, there were communications as to when will

18  the funds arrive.  And, in fact, there was an understanding

19  from AB Data, there was request for wiring instructions, an

20  understanding that, in fact, the funds were going to be

21  transmitted on April 8th.  And then there were additional

22  communications as to where are the funds.  And then we also

23  received a letter.

24         THE COURT:  At any time did you ever receive from

25  Mr. Cauley or from anyone else an actual breakdown or some sort

7

94KVBISC                    Conference

1   of form or some sort of specification of what T-bills were in

2   what account, where, under what circumstances, etc.?

3           MS. FOTI:  No, your Honor.  There was information

4   provided concerning the amount of funds that would be

5   available, amount of funds that would eventually be

6   transferred.  On April 8th there was a specific number

7   provided, but not specifications as to what the investments

8   were.

9           THE COURT:  I signed the order directing a

10  distribution back in December.  And most of the transfers were

11  made or many of the transfers were made immediately after my

12  order.  Did it not occur to you that it seemed unlikely that

13  $9,000,000 of this would not be available till April?

14          MS. FOTI:  Your Honor, what the understanding was from

15  the emails from Mr. Cauley, was that right prior to your order,

16  immediately -- shortly prior to your order, one of the

17  investments had essentially sort of rolled over into another

18  90-day investment, so that did not seem unusual that that

19  particular -- that not all the funds were going to be

20  available.  So when the funds started coming in at fairly

21  regular transfers, nothing seemed amiss.

22          THE COURT:  How did you determine to whom to make the

23  distribution while some of the funds were still outstanding?

24          MS. FOTI:  My understanding is that they were waiting

25  for all the funds to make a decision, to do a pro rata and make

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

94KVBISC                      Conference

1    an ultimate decision.

2            THE COURT:  So none of the distribution has been made.

3            MS. FOTI:  No.

4            THE COURT:  To this very day.

5            MS. FOTI:  To this very day.  The funds were

6    transferred into a bank account that AB Data established.  And

7    ultimately what would happen is once all the funds reached

8    their bank account that AB Data established, there would be a

9    pro rata calculation made as to what the distribution should be

10   for each of the plaintiffs.

11           THE COURT:  Well, is there any reason why AB Data

12   shouldn't distribute what it has now with a notification to the

13   parties that there remains some additional funds that may be

14   distributed subsequently?

15           MS. FOTI:  The only issue, your Honor, may be that

16   there would be additional administrative expenses for the class

17   to do another pro rata --

18           THE COURT:  Right.  Which I think should be borne by

19   AB Data.

20           MS. FOTI:  We certainly will take that into

21   consideration, your Honor.

22           THE COURT:  Well, let's put it this way:  You're going

23   to make that distribution; you're going to make it in the next

24   week.  That's an order.

25           MS. FOTI:  OK.  Yes, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

94KVBISC                    Conference

1        THE COURT:  And if there are additional expenses with

2    respect to the funds that are recovered at the moment, it seems

3    to me perfectly appropriate for AB Data to bear the expense of

4    that.  But I won't decide that till I've heard from AB Data and

5    everyone else at that time.

6        At the moment, I'm concerned that we'll even be able

7    to get those $9,000,000.  So this may be a long process.  But

8    it would be absurd not to give the victims what we have in hand

9    while we're waiting for that just because it might cause a

10   little bit of administrative expense to a company whose

11   performance during this entire case leaves something to be

12   desired.

13       MS. FOTI:  Your Honor, a couple of comments.  The time

14   period that will be required for the distribution I believe is

15   actually -- takes five to six weeks to actually do the

16   calculations.

17       THE COURT:  Good.  You can start on it tomorrow.

18       MS. FOTI:  We certainly can do that, your Honor.  And

19   just in terms of AB Data, AB Data is the class administrator.

20   The information they receive is from Mr. Cauley.  He had sole

21   signature authority over the escrow funds.  They have taken all

22   the steps that they are required to take as class

23   administrator.

24       THE COURT:  Well, if this were the first problem that

25   had arisen in this case, I would be more sympathetic to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

94KVBISC                    Conference

1   position, but it's not.

2              MS. FOTI:  There is not --

3              THE COURT:  And you were right in the middle of the

4   previous problem.  And I would have thought that that would

5   have led you to be more punctilious, more aggressive, more

6   inquiring than perhaps the law required you to be just because

7   the history of this matter.

8              MS. FOTI:  Your Honor, I believe that they were more

9   punctilious, more aggressive, and more inquiring, even though I

10  may not be able to pronounce punctilious.  But the fact of the

11  matter is --

12             THE COURT:  As long as the reporter gets it right,

13  that's all that matters.

14             MS. FOTI:  She can spell it.  But the fact of the

15  matter is, your Honor, the AB Data undertook -- immediately

16  upon receiving the docketed order that these funds could be

17  distributed, they undertook to set up the bank account, they

18  were in communication with Mr. Cauley's firm, Mr. Carney, they

19  were in communications.  We sent the wire instructions, they

20  received a number of transfers fairly quickly thereafter.

21             They were informed in what seemed perfectly reasonable

22  at the time that the money was in T-bill; it had not matured.

23  And when they expected the money to mature, they were in

24  communication.  So they did everything that they could possibly

25  have done in terms of these funds over which they had no

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

94KVBISC                    Conference

1    control.

2         So to say that they were not doing their job, which is

3    essentially what you're saying, I don't think that's accurate.

4         THE COURT:  No, I don't have enough data to make that

5    assertion.  I'm just disappointed that somehow one individual,

6    Mr. Cauley, was left with total control of the situation and

7    apparently no oversight or scrutiny from any of the other

8    players involved.  But you make a fair point.

9         In any event, let's get the money we do have out as

10   quickly as possible -- if it takes five six weeks, so be it --

11   and we'll deal with the remaining money and the remaining

12   expenses if and when that becomes ripe.

13        MS. FOTI:  Yes, your Honor.  Thank you.

14        THE COURT:  So let me hear from whoever wants to speak

15   for Carney Williams.

16        MR. CARNEY:  Allen Carney, your Honor.  I'm not sure,

17   I think the full experience of our understanding of what's

18   going on was reflected in the letter to you that was sent last

19   week.

20        THE COURT:  Well, I think I need to appoint you as

21   co-escrow agent at this point.  I can't release Mr. Cauley from

22   his legal obligations.  And he has, I hope, the money

23   somewhere, but we need to have someone else also involved.  So

24   that is so ordered and I'll issue a written order later to

25   that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

94KVBISC                    Conference

1          MR. CARNEY:  Yes, your Honor.

2          THE COURT:  I'll ask the same question I asked of AB

3    Data, which is you were being told orally, as I gather from

4    Mr. Cauley, that this was all T-bills, but I take it nothing in

5    writing was ever -- other than maybe an email or something like

6    that, but nothing in the way of, Here's the account, here are

7    the specific T-bills, anything like that, correct?

8          MR. CARNEY:  No, your Honor.  That is correct.

9          THE COURT:  All right.  I am concerned that if this

10   money is recovered, that there will be some additional

11   expenses.  And based on what happened, when we had the what now

12   seems to be the much more modest snafu earlier in this case, I

13   think maybe the parties want to talk about some arrangement to

14   share those expenses.  That's probably the sensible way to

15   proceed.  Certainly we don't want to take that money away from

16   the victims.

17          Anyone from Kirby McInerney wants to be heard?  Yes.

18          MR. LINDEN:  Yes, your Honor.  Peter Linden.  When we

19   learned after the Court's order of distribution, we contacted

20   AB Data promptly and the Carney Williams firm and told them

21   that we wanted the monies to be provided and wire transferred

22   as soon as possible.  And we were told that there was some

23   staggered funds; that these treasury bills were being

24   staggered.  And so that they were being provided, wired, on an

25   intermittent basis, as the Court has indicated.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

94KVBISC                    Conference

1      We communicated with both AB Data and with our
2  co-counsel on a regular basis asking when would the next
3  tranche be wired, when would the next tranche be wired.
4      In approximately late February/early March, we had
5  anticipated that there would be an earlier wire which had not
6  occurred.  And so we wrote to our co-counsel asking for
7  assurances as to where and when the money would be transferred.
8  And at that point we were advised that Mr. Cauley had the
9  information and would provide us with the detail.  And we did
10  receive at that point, I think it's been referred to earlier
11  today, a written email from Mr. Cauley through Mr. Carney --
12  Mr. Carney provided it to us -- that specified the detail, and
13  said that the money would be --
14      THE COURT:  Excuse me for interrupting.  All of these
15  documents should be turned over by the parties to the U.S.
16  Attorney's Office.
17      MR. LINDEN:  Yes, your Honor.
18      THE COURT:  Go ahead.
19      MR. LINDEN:  And we asked when that would occur, and
20  were told that it would occur at the beginning -- I'm sorry, no
21  later than April 8th.  I think there was some -- the April 2nd
22  date had been mentioned, but we're told that it would occur no
23  later than April 8th.
24      I was away on vacation the week of April 8th.  I
25  returned to the office the week of April 13th.  And I received

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

94KVBISC                          Conference

1    a note from AB Data saying that the money had not been wired

2    the prior week.  So I promptly wrote to Mr. Carney asking where

3    the money was, which led ultimately to the letter that was sent

4    to the Court on the 15th.

5            THE COURT:  All right.  Thank you very much.  Anyone

6    from defense want to be heard on this?

7            MR. HIRSCH:  Only to point out, your Honor, that on

8    behalf of The Bisys Group, our knowledge of this situation came

9    at the same time as your Honor in a letter that I received.

10           THE COURT:  Well, every indication is that this is a

11   matter for the U.S. Attorney's Office.  I am just hopeful that

12   one way or another we can still recover these funds.  But we

13   will -- I'll ask Mr. Carney to keep me apprised of everything

14   that's going on, and then we'll see whether we need to

15   reconvene again.

16           When I hear people cracking lawyer jokes, I always

17   take umbrage and point out that the profession of Lincoln, the

18   profession of Madison and Jefferson often represents the

19   highest ideals in our society.  But recent events give me pause

20   about how true that is.

21           All right.  Thank you very much.

22           We will adjourn *sine die*.

23                        *    *    *

24

25