John Steele
1111 Lincoln Road Suite 400
Miami Beach, FL 33139

*Pro se*

FILED
CLERK, U.S. DISTRICT COURT

JUL 1 1 2013

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

INGENUITY 13 LLC,

     *Plaintiff,*

     v.

JOHN DOE,

     *Defendant.*

CASE NO. 2:12-CV-8333-ODW (JCx)

| | |
|---|---|
| Judge: | Hon. Otis D. Wright, II |
| Magistrate Judge: | Hon. Jacqueline Chooljian |
| Courtroom: | 11 |

| | |
|---|---|
| Complaint Filed: | September 27, 2012 |
| Trial Date: | None set |

*Exhibits to* BAR
COMPLAINTS AGAINST BRETT
GIBBS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

    PLEASE TAKE NOTICE that John Steele has lodged bar complaints filed against Brett Gibbs with the State Bar of California. The filings include a bar complaint filed by AF Holdings, LLC against Mr. Gibbs (Exhibit A) and a bar complaint filed by Mr. Steele against Mr. Gibbs (Exhibit B).

Dated: July 11, 2013

By: _____
    John Steele

1

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

INGENUITY 13 LLC,

     *Plaintiff,*

v.

JOHN DOE,

     *Defendant.*

CASE NO. 2:12-CV-8333-ODW (JCx)

Judge:          Hon. Otis D. Wright, II
Magistrate Judge:  Hon. Jacqueline Chooljian

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age.

My address is 1111 Lincoln Rd. Ste 400, Miami Beach, FL 33139. I have caused service of:

## EXHIBITS OF BAR COMPLAINTS AGAINST BRETT GIBBS

On the following parties via U.S. Mail first-class, postage prepaid:

| PARTIES | COUNSEL OF RECORD/PRO SE |
|---|---|
| Prenda Law, Inc. <br> 161 N.Clark St. Ste. 3200 <br> Chicago, IL 60601 | Klinedinst PC <br> 501 West Broadway, Suite 600 <br> San Diego, California 92101 <br> Telephone: (619) 239-8131 <br> Fax: (619) 238-8707 <br> e-mail: hrosing@klinedinstlaw.com <br> e-mail: dmajchrzak@klinedinstlaw.com |
| Ingenuity13, LLC <br> Springates East <br> Government Road <br> Charlestown, Nevis | Pro Se |
| Livewire Holdings, LLC <br> 2100 M Street Northwest, Suite 170-417 <br> Washington, D.C. 20037 | Pro Se |
| 6881 Forensics, LLC <br> Springates East <br> Government Road <br> Charlestown, Nevis | Pro Se |
| AF Holdings, LLC | Pro Se |

1

CASE NO. 2:12-CV-8333-ODW (JCx)

| | |
|---|---|
| Springates East<br>Government Road<br>Charlestown, Nevis | |
| Brett L. Gibbs<br>38 Miller Avenue, #263<br>Mill Valley, CA 94941 | Pro Se |
| Mark Lutz<br>2100 M Street Northwest, Suite 170-417<br>Washington, D.C. 20037 | Pro Se |
| John Steele<br>1111 Lincoln Rd<br>Ste. 400<br>Miami Beach, FL 33139 | Pro Se |
| Paul Hansmeier<br>Alpha Law Firm, LLC<br>900 IDS Center<br>80 South 8th St.<br>Minneapolis, MN 55402 | Pro Se |
| Peter Hansmeier<br>2100 M Street Northwest, Suite 170-417<br>Washington, D.C. 20037 | Pro Se |
| Angela Van Den Hemel<br>2100 M Street Northwest, Suite 170-417<br>Washington, D.C. 20037 | Pro Se |
| Non-Party Putative John Doe | Morgan Pietz (SBN 260629)<br>The Pietz Law Firm<br>3770 Highland Ave., Ste. 206<br>Manhattan Beach, CA 90266 |
| Morgan Pietz and Nicholas Ranallo | Heller & Edwards<br>Lawrence E. Heller<br>9454 Wilshire Boulevard, Suite 500<br>Beverly Hills, CA 90212-2983 |

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 11, 2013.

Signature

2

CASE NO. 2:12-CV-8333-ODW (JCx)

# Exhibit A

# 2:12-cv-8333-ODW (JCx)

Office of the Chief Trial Counsel/Intake
The State Bar of California
1149 South Hill Street
Los Angeles, California 90015-2299

July 8, 2013

Dear State Bar of California:

This letter is a formal complaint against California attorney, Brett Gibbs (Bar # 251000). I would respectfully ask your office to review this complaint on an expedited basis because it involves misconduct that is not only ongoing, but is also inflicting daily harm against the interests of my company, AF Holdings, LLC. I have forwarded a copy of this complaint to Mr. Gibbs so I can see if he has any explanation for his behavior.

*Background*

My name is Mark Lutz and I am the manager of a company, AF Holdings, LLC, ("AF") that until July 3, 2013, was represented by Mr. Gibbs. The thrust of this complaint is that AF's attorney, Mr. Gibbs, is actively assisting AF's adversaries in exchange for his own personal financial gain.

1. *Mr. Gibbs is actively aiding his former client's adversaries*

On June 4, 2013, Mr. Gibbs executed a declaration that now forms the factual backbone of a sanctions motion against AF filed by attorneys Morgan Pietz and Nicholas Ranallo in a case titled, *AF Holdings, LLC v. Navasca*. (Exhibit A). Mr. Gibbs previously represented AF in the *Navasca* matter. Six days later, on June 10, 2013, Mr. Gibbs and Mr. Pietz submitted a joint stipulation that relieved Mr. Gibbs of his obligation to post security for an $83,000 sanctions award that was entered against Gibbs in a case titled *Ingenuity13, LLC v. John Doe*. (Exhibit B). In other words, there was a *quid pro quo* between Messrs. Gibbs and Pietz: if Mr. Gibbs submitted a declaration against AF, Mr. Pietz would cut him a deal in a separate matter.

As a side note, the joint stipulation in the *Ingenuity13* matter also harmed AF by making AF responsible for Mr. Gibbs' portion of the $83,000 bond. Mr. Gibbs neither sought nor received my approval to do this. Up until, July 3, 2013, Mr. Gibbs was representing AF in a matter titled *AF Holdings, LLC v. Magsumbol*. (Exhibit C).

In his declaration, Mr. Gibbs paints my company as a sham company that I apparently do not even run and attempts to minimize his involvement in the cases where he served (by his own admission) as my attorney. Yet, in private, Mr. Gibbs has repeatedly acknowledged my status as the manager at AF. For example, when he attempted to part ways with AF, he issued a letter to me in which he identified himself as AF's lead

counsel. (Exhibit D.) Further, when he attempted to withdraw in the *Magsumbol* matter, he sought and received a declaration from me. (Exhibit E.)

In addition to being false, these statements plainly undermine my company's (and his client's) interests and are outrageous for my attorney to make. In light of the fact that Mr. Gibbs' statements undermine AF's interests. I hope the California Bar takes action against Mr. Gibbs to protect Californians from his behavior.

2.      *Mr. Gibbs stipulated to an attorneys' fees award against AF without my consent*

A week or so after Mr. Gibbs struck a deal with Messrs. Pietz and Ranallo regarding the facts discussed in #1, Mr. Gibbs submitted a statement of non-opposition to a motion for attorneys' fees filed by Mr. Ranallo in a case titled *AF Holdings, LLC v. Magsumbol*. (Exhibit F). Mr. Gibbs did not consult with me before filing this statement, did not obtain my consent and would not have been able to obtain my consent if he had tried. It is not in AF's best interests for Mr. Gibbs to consent to me paying an attorney's fee award that I did not even know about. The fact that the money is to be paid to the very attorney that Mr. Gibbs is working with (Mr. Ranallo) is also improper.

I want to be as clear as I can: until very recently I never even heard of any motion for attorneys fees being filed in the *Magsumbol* case, let alone my attorney agreeing to the fees.

3.      *Mr. Gibbs represented AF in a matter where he had a serious conflict of interest, and repeatedly sabotaged AF's interests for his personal benefit*

In February, 2013, Judge Wright issued an order to show cause solely against Mr. Gibbs with respect to a case where he was representing AF. (Exhibit G) Mr. Gibbs did not inform me of this hearing. I later learned that at the hearing, Mr. Gibbs repeatedly lied to the Court, making such claims as he was "essentially a secretary" and that other attorneys that I had never spoken to about that case were AF's attorneys. (Exhibit H) As a side note, I would like to inform the California bar that Mr. Gibbs has filed and supervised hundreds of cases on behalf of AF all across the country. Mr. Gibbs was the only attorney I EVER spoke with about the case before Judge Wright. After the March 11, 2013, hearing, Judge Wright issued another order to show cause and scheduled a hearing for it on April 2, 2013. (Exhibit I) Because of Mr. Gibbs' testimony at the March 11 hearing, AF was now a defendant in the new order to show cause. In other words, my own attorney transformed an OSC against him into an OSC against my company based on complete lies to the judge.

Between the March 11, 2013, hearing and the April 2, 2013, hearing, I was never contacted by Mr. Gibbs (except to learn that I had to show up to the hearing), who was still AF's attorney on several cases, including the one in front of Judge Wright. I wish to be clear: Prior to the April 2 hearing, during the hearing, and for more than two months after the April 2nd hearing, Mr. Gibbs was still the attorney of record for

AF.  Throughout this time, I believed that Mr. Gibbs was the attorney for AF Holdings and that he would defend AF's--and my own--interests in the matter before Judge Wright.

Regarding the April 2, 2013, hearing, since AF was represented by Mr. Gibbs. I assumed he was taking care of things, and that he would reach out to me when he needed to. At no time prior to the April 2nd hearing did Mr. Gibbs inform AF or me that he would not be representing AF at the hearing.  I would note that I never received the order from Judge Wright and I was never told by Mr. Gibbs that AF Holdings needed to appear on April 2nd.

I was very surprised to see Mr. Gibbs appear in court on April 2nd with his own attorney.  At first, I thought he had brought in additional attorneys to represent me.  I later learned that he had hired attorneys to defend him in regards to his actions in this matter.  I also learned, at the hearing, that Mr. Gibbs was refusing to represent AF that day.  Mr. Gibbs refused to even inform that court that AF was present in compliance with the Court's order. (Exhibit J)  Mr Gibbs did not even notify the Court that he represented AF when the Court instructed all the attorneys to state their name and clients to the Court.  In fact, Mr. Gibbs did not utter a single word the entire hearing.

Later, I learned why Mr. Gibbs had acted so strange.  I learned that Mr. Gibbs had made a deal with the opposing counsel, Mr. Pietz.  The crux of the deal--as I learned through later pleadings and affidavits filed by Mr. Gibbs--was that if Mr. Gibbs agreed to file joint pleadings with Messrs. Pietz and Ranallo against AF, Mr. Pietz would stop including Mr. Gibbs in his many motions for sanctions and fees.  In other words, AF's attorney Mr. Gibbs agreed to file pleadings against his own client in exchange for Mr. Gibbs getting off for writing the very pleadings that led to the OSC in the first place.  And Mr. Gibbs kept his word, filing a joint motion with Mr. Pietz shortly thereafter.

As a side note, when AF filed its appeal to the Ninth Circuit, Mr. Gibbs lied to the Ninth Circuit clerk and said he didn't represent AF in the district court.  The Ninth Circuit originally believed him, but when I called the clerk's office, I personally spoke to the lady who had spoken to Mr. Gibbs only one hour previous.  After I requested that the Ninth Circuit check the docket sheet from the district court.  After the clerks office reviewed the docket I spoke with the clerk's office again and the lady agreed that Mr. Gibbs was *still* AF's attorney.  After that, there was a document that AF needed to file in order to prevent being sanctioned by the Ninth Circuit.  Mr. Gibbs, even after I called him to ask him to file this document, flat-out refused to file the document and hung up on me.  I assume this was just part of his deal with Mr. Pietz.  As a non-attorney, I feel like Mr. Gibbs actions made my filing of the notice of appeal much more difficult, when it was still his job to help me.

Not to belabor the point, but the record is clear that Mr. Gibbs was my attorney on the case in front of Judge Wright until May 29, 2013, when an order was entered by the Court granting Mr. Gibbs leave to withdraw. Mr. Gibbs attempted to withdraw only after the sanctions order was entered against AF.  Further, Mr. Gibbs never said a word or filed a document in AF's defense during the whole order to show cause process, notwithstanding that he was AF's attorney.  Nor did he attempt to withdraw before this time.

4.      *Mr. Gibbs has refused to communicate with me:*

I have been unsuccessfully attempting to get some straight answers from my attorney Mr. Gibbs and he has refused to address them. I have included them below. I hope your office can get some answers on the following:

- Why didn't Mr. Gibbs raise any defense (or even talk) on AF's behalf throughout the Judge Wright order to show cause proceedings?

- Why didn't Mr. Gibbs inform AF prior to the April 2, 2013, hearing that he was going to refuse to say a single word on AF's behalf?

- Why did Mr. Gibbs agree that AF would pay Ranallo's attorney's fees in the *Magsumbol* case without even contacting AF first?

- Why did Mr. Gibbs disclose attorney-client privileged information about AF in the declaration he provided to Pietz and Ranallo?

- When was the last time Mr. Gibbs spoke with his client, AF?

- What agreements did Mr. Gibbs struck with Messrs. Pietz and Ranallo regarding AF? If Mr. Gibbs claims there is no agreement, why did Messrs. Pietz and Ranallo stop all actions against Mr. Gibbs personally at the same time that Mr. Gibbs started filing joint pleadings with opposing counsel against his own client?

- Why did Mr. Gibbs hire his own attorney for the Judge Wright order to show cause proceedings, but not advise me to do the same?

- I would like to review all correspondence between Mr. Gibbs and Mr. Pietz and/or Mr. Ranallo.

- I would like to review all correspondence between Mr. Gibbs and AF during the time he was representing AF in hundreds of cases.

- I would like to review all written correspondence between Mr. Gibbs and anyone else regarding AF during the time he was representing AF in hundreds of cases. I have already asked for this, but Mr. Gibbs has not spoken to me since I asked him for this information.

Sincerely,

Mark Lutz

# Exhibit A

Nicholas Ranallo, Attorney at Law
SBN 275016
371 Dogwood Way
Boulder Creek, CA 95006
Phone: (831) 703 -4011
Fax:    (831) 533 – 5073
nick@ranallolawoffice.com

Attorney for Joe Navasca

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AF HOLDINGS, LLC, | Case No.: 3:12-cv-02396-EMC |
| Plaintiff, | DECLARATION OF BRETT GIBBS |
| vs. | |
| JOE NAVASCA, | |
| Defendant | |

1.  I am an attorney duly licensed to practice in the State of California and before the District Court for the Northern District of California.  This declaration is based on personal knowledge of the matters set forth herein.

2.  I am formerly "Of Counsel" for Prenda Law, Inc. in California, and represented AF Holdings in that capacity in the instant matter, as well as multiple other cases throughout the state of California until approximately February, 2013.

3.  As noted in my March 11, 2013, testimony before the Central District of California in the matter of Ingenuity 13 v. Doe, at all relevant times I was supervised by attorneys John Steele and Paul Hansmeier with regard to AF Holdings' litigation, including this case. John Steele and Paul Hansmeier were the attorneys who I was informed communicated with clients such as AF Holdings, and provided me with instructions and guidelines, which I was informed, originated from these clients, including AF Holdings.

4. I have reviewed the Affidavit of Mark Lutz filed in this case on May 13, 2013 (Doc. #80). I believe that the information provided in the fifth paragraph of that affidavit regarding my interactions with Mr. Lutz is not an accurate description of those events. I did not "from time to time" send certificates for Mr. Lutz to sign on behalf of the Salt Marsh Trust. I did not have the alleged conversations with Mr. Lutz. In fact, I did not know that Mark Lutz was directly affiliated with these companies, as an owner or otherwise, until months after filing the ADR Certification in this case.

5. Instead, I was specifically told by Mr. Hansmeier that Salt Marsh was the owner of AF Holdings, and that he, Salt Marsh, had read and understood the ADR handbook, and that I could go ahead and file the ADR Certification with the electronic signature of Salt Marsh. Again, I never spoke with Salt Marsh directly. Through my conversation with Mr. Hansmeier, I was under the impression that the Salt Marsh was an individual who had in fact complied with the Local Rule and that his original signature existed on a document that was being held by my then-employer, Prenda Law, Inc. Given that information, I proceeded to file the ADR Certification on that basis.

6. After I filed this case, I learned through a separate case filed in Minnesota that the assignment agreement may have been invalid because there was a dispute whether a signature on the agreement was in fact forged. Once alerted to this, I immediately discussed this matter with John Steele and Paul Hansmeier. They assured me that it was a valid signature, that the allegations were mere "conspiracy theories," and that I should have no concern in continuing to prosecute this and other AF Holdings' cases. I believe I was diligent in my factual and legal investigation of this matter.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration is executed on this __4th__ day of June 2013, in __Mill Valley__, California.

Brett L. Gibbs, Esq.
38 Miller Ave., #263
Mill Valley, CA 94941

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ___ day of June, 2013, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system and served on all of those parties receiving notification through the CM/ECF system.

By:___/s/_____
Nicholas Ranallo

Declaration of Brett L. Gibbs

# Exhibit B

Case 2:12-cv-08333-ODW-JC   Document 178   Filed 06/11/13   Page 1 of 4   Page ID #:3317

1  Brett Gibbs
2  38 Miller Avenue, #263
   Mill Valley, CA 94941
3  Telephone: (415) 381-3104
4  brett.gibbs@gmail.com
   *In Propria Persona*

5

6

7  **UNITED STATES DISTRICT COURT**
8  **CENTRAL DISTRICT OF CALIFORNIA**

9

10  INGENUITY 13 LLC,                    CASE NO. 2:12-CV-8333-ODW (JCx)

11        *Plaintiff,*

12     v.                               Judge:            Hon. Otis D. Wright, II
                                        Magistrate Judge: Hon. Jacqueline Chooljian
13  JOHN DOE,

14        *Defendant.*

15                                      **STIPULATION BETWEEN
                                        MOVANT BRETT L. GIBBS AND**
16                                      **ATTORNEY MORGAN E. PIETZ**

17

18                            **STIPULATION**

19        Pursuant to the Central District of California Local Rules, L.R. 7-1,

20  Movant Brett L. Gibbs and the Putative John Doe defendant in 12-cv-

21  8333, by and through counsel, Attorney Morgan E. Pietz (hereinafter

22  "Stipulating Parties"), have agreed to certain terms regarding the May 6,

23  2013 "Order Issuing Sanctions" (hereinafter "May 6 Order," Doc. No. 130), the

24  Court's May 21, 2013 "Order Denying Ex Parte Application for Stay of

25  Enforcement; Order to Show Cause Re Attorney's Fee Award" ("May 21 Order,"

26  Doc. No. 164), and the Court's Order Denying in Part and Conditionally Granting in

27

28

Case 2:12-cv-08333-ODW-JC   Document 178   Filed 06/11/13   Page 2 of 4   Page ID #:3318

1   Part Paul Duffy's Motion for Approval of Bond and Order Staying Enforcement of
2   May 6 and May 21 Orders Imposing Sanctions and Penalties ("June 7 Order," Doc.
3   No. 176).    After meeting and conferring in good faith on the issues
4   currently presented in this matter, the Stipulating Parties stipulate to the
5   following:

6      1. In view of a bond having been posted in the above-captioned matter,
7         and in consideration of Mr. Gibbs' current financial difficulties as
8         presented in his May 23, 2013 Response to the Court's May 21 Order,
9         the Stipulating Parties agree that the entire amount of the $1,000 per
10        day penalty should be vacated as to Mr. Gibbs, and only as to Mr.
11        Gibbs.

12     2. Mr. Gibbs' position is that because the Court's May 6 Order imposed
13        joint and several liability for the attorney's fee award on four
14        individuals and three entities, and the Court's June 7 Order required that
15        the bonds clearly set forth the joint and several liability of the parties,
16        the posted bond effectively applies to and secures payment from all of
17        the sanctioned parties, including Mr. Gibbs.    The putative John Doe
18        defendant, through counsel, does not object to this position.

19     3. The Stipulating Parties agree that Mr. Gibbs should not accrue an
20        additional sanction or penalty for failing to post the additional bond
21        required by the Court's June 7 Order; however, if the additional bond
22        required in the June 7 Order is not timely posted, this stipulation is
23        without prejudice to the putative defendant's right to seek further relief
24        as against any party, including Mr. Gibbs.

25  ///
26  ///
27
28

Case 2:12-cv-08333-ODW-JC   Document 178   Filed 06/11/13   Page 3 of 4   Page ID #:3319

1        4. As a "Prenda party," as defined in the Court's June 7 Order, Mr. Gibbs

2        shall execute and acknowledge the validity of the conditions presented

3        in the June 7 Order within the seven days allotted.

4

5   IT IS SO STIPULATED.

6

7

8                                  Respectfully submitted,

9   DATED: June 11, 2013

10                                  /s/ Brett L. Gibbs

11                                  Brett Gibbs
                                   38 Miller Avenue, #263

12                                  Mill Valley, CA 94941
                                 Telephone: (415) 381-3104

13                                  brett.gibbs@gmail.com

14

15   DATED: June 10, 2013

16

17                                  /s/ Morgan E. Pietz
                                 Morgan E. Pietz

18                                  THE PIETZ LAW FIRM
                                 3770 Highland Avenue, Suite 206

19                                  Manhattan Beach, CA 90266
                                 Telephone: (310) 424-5557

20                                  Facsimile: (310) 546-5301

21                                  mpietz@pietzlawfirm.com

22                                  *Attorney for Defendant John Doe*

23

24

25

26

27

28

Case 2:12-cv-08333-ODW-JC   Document 178   Filed 06/11/13   Page 4 of 4   Page ID #:3320

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED THAT:

 I, the undersigned, am a citizen of the United States and am at least eighteen years of age.  My business address is 38 Miller Avenue, Mill Valley, CA 94941.  The undersigned hereby certifies that on June 11, 2013, all individuals of record who are deemed to have consented to electronic service are being served a true and correct copy of the foregoing document using the Court's ECF system, in compliance with this Court's Local Rules.  Further, on June 11, 2013 a true and correct copy of the foregoing document was placed into the U.S. mail, which was delivered to the following addresses, postage paid, the list of which comprise the currently known service list of individuals with known addresses on this matter as required under the Local Rules:

Angela Van Den Hemel
Prenda Law, Inc.
161 N. Clark St., Suite 3200
Chicago, IL 60601
Email: pduffy@pduffygroup.com;
paulduffy2005@gmail.com

John Steele
1111 Lincoln Road, Suite 400
Miami Beach, FL 33139
Telephone: (708) 689-8131
*In Propria Persona*

/s/ Brett L/ Gibbs<br>Brett L. Gibbs

# Exhibit C

1  Brett L. Gibbs, Esq. (SBN 251000)
   38 Miller Avenue, #263
2  Mill Valley, CA 94941
   415-341-5318
3  brett.gibbs@gmail.com

4  *Attorney of Record for Plaintiff*

5

6

7              IN THE UNITED STATES DISTRICT COURT FOR THE

8                    NORTHERN DISTRICT OF CALIFORNIA

9                         SAN FRANCISCO DIVISION

10

11  AF HOLDINGS, LLC,                 )   **No. 3:12-cv-04221-SC**
                                      )
12              Plaintiff,            )   **[PROPOSED] ORDER GRANTING**
                                      )   **ADMINISTRATIVE MOTION FOR**
13        v.                          )   **RELIEF TO ALLOW ATTORNEY BRETT**
                                      )   **L. GIBBS WITHRAW AS COUNSEL**
14  ANDREW MAGSUMBOL,                 )   **OF RECORD PURSUANT TO LOCAL**
                                      )   **RULES 7-11 AND 11-5**
15              Defendant.            )
                                      )
16  _____)

17

18        For good cause shown, Mr. Gibbs' Administrative Motion for Relief to Allow

19  Attorney Brett L. Gibbs to Withdraw as Counsel is hereby GRANTED, and attorney Brett L.

20  Gibbs shall be terminated from this matter as of the date of this Order.

21  **IT IS SO ORDERED.**

22  DATED:07/03/2013

23

24

25  Hon. Samu
    United State

26

27

28

# Exhibit D

# BRETT L. GIBBS, ESQ.
## ATTORNEY AT LAW

January 29, 2013

Brett L. Gibbs, ESQ.

38 Miller
Avenue, #263

Mill Valley

California, 94941

P: 415.325.5900

blgibbs@wefightpiracy.com

Mark L. Lutz
Corporate Representative of AF Holdings LLC
C/O AF Holdings LLC
Springates East
Government Road
Charlestown, Nevis

*__Via Email and US Mail__*

*Re:*    *AF Holdings Case Nos.: 12-1064, 12-1066, 12-1067, 12-1068, 12-1075, 12-1078, 12-1079, 12-2049, 12-2394, 12-2393, 12-2404, 12-2411, 12-2415, 12-1654, 12-1656, 12-1657, 12-1659, 12-1660, 12-1661, 12-1663, 12-3249, 12-1519, 12-1523, 12-1525, 12-4219, 12-4221, 12-1840, 12-2204, 12-2206, 12-2207, 12-4446, 12-4982.*

   *Confirmation of Withdrawal as Counsel*

Dear Mr. Lutz:

Per our discussion this afternoon, I will be withdrawing as counsel of record in all of the above-referenced cases. Also, per our discussion, Mr. Paul Duffy will be substituting and entering his appearance as lead counsel in all of the above cases. Per our conversation, I will remain as counsel of record on Case No. 12-2396 through the Early Neutral Evaluation hearing; after which time, I will be withdrawing as counsel and substituting with Mr. Duffy.

This is letter is a confirmation of these mutually agreed upon actions. As we both agree, Mr. Paul Duffy will be sufficient in handling the above cases as lead counsel.

Sincerely,

Brett L. Gibbs, Esq.,

CC: Paul Duffy, Esq. (via email)

# Exhibit E

Case 2:12-cv-08333-ODW-JC   Document 218   Filed 07/11/13   Page 26 of 100   Page ID
#:3833
Case3:12-cv-04221-SC   Document37-1   Filed02/27/13   Page2 of 3

1   Brett L. Gibbs, Esq. (SBN 251000)
    38 Miller Avenue, #263
2   Mill Valley, CA 94941
    415-325-5900
3   blgibbs@wefightpiracy.com

4   *Attorney for Plaintiff*

5

6                IN THE UNITED STATES DISTRICT COURT FOR THE

7                      NORTHERN DISTRICT OF CALIFORNIA

8

9   AF HOLDINGS LLC,                    )    **No. 3:12-cv-04221-SC**
                                        )
10                Plaintiff,            )    **DEPOSITION OF MARK LUTZ**
                                        )    **SUPPORTING MOTION FOR**
11       v.                             )    **WITHDRAWAL OF COUNSEL**
                                        )
12  ANDREW MAGSUMBOL,                   )
                                        )
13                Defendant.            )
                                        )
14  _____    )

15          **DECLARATION OF MARK LUTZ IN SUPPORT OF**
                **APPLICATION FOR EXPEDITED DISCOVERY**
16

17       I, Mark Lutz, declare as follows:

18       1.      I am the CEO of AF Holdings LLC, the Plaintiff in this matter.

19       2.      I recently discussed Mr. Brett Gibbs' intent to withdraw as counsel of this case, and

20       we agreed that Mr. Gibbs' withdrawal would be best for Plaintiff in this suit.

21       3.      I was told by Mr. Gibbs that AF Holdings LLC must retain California counsel within

22       a reasonable amount of time as the LLC cannot go forward on its own without

23       counsel.   I understand this requirement and I assured Mr. Gibbs that I would be

24       actively looking for California counsel to litigate this case in his absence.

25

26       4.      I declare under penalty of perjury that the foregoing is true and correct based on my

27       own personal knowledge, except for those matters stated on information and belief,

28
                                         2
    _____
    DECLCARATION OF MARK LUTZ SUPPORTING MOTION TO WITHDRAW     No. C-12-04221 SC

Case 2:12-cv-08333-ODW-JC   Document 218   Filed 07/11/13   Page 27 of 100   Page ID
#:3884
Case3:12-cv-04221-SC   Document37-1   Filed02/27/13   Page3 of 3

and those matters I believe to be true.  If called upon to testify, I can and will competently testify as set forth above.

DATED:  February 27, 2013

By: _____

DECLCARATION OF MARK LUTZ SUPPORTING MOTION TO WITHDRAW     No. C-12-04221 SC

# Exhibit F

1   Brett L. Gibbs, Esq. (SBN 251000)
    38 Miller Avenue, #263
2   Mill Valley, CA 94941
    415-341-5318
3   brett.gibbs@gmail.com

4   *Attorney for Plaintiff*

5

6                IN THE UNITED STATES DISTRICT COURT FOR THE

7                     NORTHERN DISTRICT OF CALIFORNIA

8                          SAN FRANCISCO DIVISION

9

10

11   AF Holdings, LLC,                    )    **No. 3:12-cv-04221-SC**
                                          )
12            Plaintiff,                  )    **STATEMENT NON-OPPOSITION**
              v.                          )    **PURSUANT TO LOCAL RULE**
13                                        )    **7-3(b)**
     Andrew Magsumbol,                    )
14                                        )
              Defendants.                 )
15                                        )
                                          )
16   _____ )

17   **TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

18        **NOTICE IS HEREBY GIVEN** that pursuant to Local Rule 7-3(b), Plaintiff is not opposing

19   Defendant's Motion for Attorney's Fees (Doc. #54).

20   Respectfully Submitted,

21   **DATED: June 25, 2013**

22
                               By:      ____/s/  Brett L. Gibbs, Esq.____
23
                               Brett L. Gibbs, Esq. (SBN 251000)
24                             38 Miller Avenue, #263
                               Mill Valley, CA 94941
25                             Brett.gibbs@gmail.com

26

27

28

1

**<u>CERTIFICATE OF SERVICE</u>**

2

The undersigned hereby certifies that on June 25, 2013, all individuals of record who are deemed to have consented to electronic service are being served a true and correct copy of the foregoing document, and all attachments and related documents, using the Court's ECF system, in compliance with Local Rule 5-6 and General Order 45.

3

4

5

6

                                                                /s/  Brett L. Gibbs

7

                                                                Brett L. Gibbs, Esq.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR ADMINISTRATIVE RELIEF TO CONTINUE INITIAL CMC      No. C-11-01956 EDL

# Exhibit G

1
2
3
4
5
6
7                   **UNITED STATES DISTRICT COURT**
8                   **CENTRAL DISTRICT OF CALIFORNIA**
9
10   INGENUITY 13 LLC,                    Case Nos. 2:12-cv-8333-ODW(JCx)
11                          Plaintiff,    **ORDER TO SHOW CAUSE RE**
                                          **SANCTIONS FOR RULE 11 AND**
12           v.                           **LOCAL RULE 83-3 VIOLATIONS**
     JOHN DOE,
13
                            Defendant.
14

15          The Court hereby orders Brett L. Gibbs, attorney of record for AF Holdings

16   LLC and Ingenuity 13 LLC, to appear on March 11, 2013, at 1:30 p.m., to justify his

17   violations of Federal Rule of Civil Procedure 11 and Local Rule 83-3 discussed

18   herein.[1]

19   **A.     Legal Standard**

20          The Court has a duty to supervise the conduct of attorneys appearing before it.

21   *Erickson v. Newmar Corp.*, 87 F.3d 298, 301 (9th Cir. 1996).   The power to punish

22   contempt and to coerce compliance with issued orders is based on statutes and the

23   Court's inherent authority.   *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512

---

[1] The violations discussed herein were committed in the following related cases: *AF Holdings LLC v. Doe*, No. 2:12-cv-6636-ODW(JCx) (C.D. Cal. filed Aug. 1, 2012); *AF Holdings LLC v. Doe*, No. 2:12-cv-6669-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-8333-ODW(JCx) (C.D. Cal. filed Sept. 27, 2012).   To facilitate this matter, Mr. Gibbs will be given the opportunity to address these violations together in one hearing rather than in several separate hearings.

Case 2:12-cv-08333-ODW-JC   Document 218   Filed 07/11/13   Page 33 of 100   Page ID
#:3840
Case 2:12-cv-08333-ODW-JC   Document 48   Filed 02/07/13   Page 2 of 11   Page ID #:601

1   U.S. 821, 831 (1994).  And though this power must be exercised with restraint, the

2   Court has wide latitude in fashioning appropriate sanctions to fit the conduct.  *See*

3   *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–65 (1980).

4   **B.      Rule 11(b)(3) Violations**

5            By presenting a pleading to the Court, an attorney certifies that—after

6   conducting a reasonable inquiry—the factual contentions in the pleading have

7   evidentiary support or, if specifically so identified, will likely have evidentiary

8   support after a reasonable opportunity for further investigation or discovery.  Fed. R.

9   Civ. P. 11(b)(3).  This precomplaint duty to find supporting facts is "not satisfied by

10  rumor or hunch."  *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th

11  Cir. 1992).  The reasonableness of this inquiry is based on an objective standard, and

12  subjective good faith provides no safe harbor.   *Golden Eagle Distrib. Corp. v.*

13  *Burroughs Corp.*, 801 F.2d 1531, 1538 (9th Cir. 1986); *F.D.I.C. v. Calhoun*, 34 F.3d

14  1291, 1296 (5th Cir. 1994); *Knipe v. Skinner*, 19 F.3d 72, 75 (2d Cir. 1994).   The

15  Court wields the discretion to impose sanctions designed to "deter repetition of the

16  conduct or comparable conduct by others similarly situated." Fed R. Civ. P 11(c)(4).

17           In *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed

18  Aug. 2, 2012), the Court ordered Plaintiff on December 20, 2012, to show cause why

19  it failed to timely serve the Defendant or, if the Defendant has already been served, to

20  submit the proof of service.  (ECF No. 12.)  In response, Plaintiff noted that the delay

21  was because it waited to receive a response from the subscriber of the IP address

22  associated with the alleged act of infringement.  (ECF No. 14.)  Plaintiff further noted:

23  "Though the subscriber, David Wagar, remained silent, Plaintiff's investigation of his

24  household established that Benjamin Wagar was the likely infringer of Plaintiff's

25  copyright."  (ECF No. 14, at 2.)  Based on this investigation, Plaintiff filed an

26  Amended Complaint, substituting Benjamin Wagar for John Doe. (ECF No. 13.)

27           Plaintiff's Amended Complaint alleges the following in connection with

28  Benjamin Wagar:

2

- "Defendant Benjamin Wagar ('Defendant') knowingly and illegally reproduced and distributed Plaintiff's copyrighted Video by acting in concert with others via the BitTorrent file sharing protocol and, upon information and belief, continues to do the same." (AC ¶ 1);

- "Defendant is an individual who, upon information and belief, is over the age of eighteen and resides in this District." (AC ¶ 4);

- "Defendant was assigned the Internet Protocol ('IP') address of 96.248.225.171 on 2012-06-28 at 07:19:47 (UTC)." (AC ¶ 4);

- "Defendant, using IP address 96.248.225.171, without Plaintiff's authorization or license, intentionally downloaded a torrent file particular to Plaintiff's Video, purposefully loaded that torrent file into his BitTorrent client—in this case, Azureus 4.7.0.2—entered a BitTorrent swarm particular to Plaintiff's Video, and reproduced and distributed the Video to numerous third parties." (AC ¶ 22);

- "Plaintiff's investigators detected Defendant's illegal download on 2012-06-28 at 07:19:47 (UTC). However, this is a [*sic*] simply a snapshot observation of when the IP address was *observed* in the BitTorrent swarm; the conduct took itself [*sic*] place before and after this date and time." (AC ¶ 23);

- "The unique hash value in this case is identified as F016490BD8E60E184EC5B7052CEB1FA570A4AF11." (AC ¶ 24.)

In a different case, *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), Plaintiff essentially makes the same response to the Court's December 20, 2012 Order To Show Cause (ECF No. 12): "Though the subscriber, Marvin Denton, remained silent, Plaintiff's investigation of his household established that Mayon Denton was the likely infringer of Plaintiff's copyright." (ECF No. 13, at 2.) And based on this information, Plaintiff filed an Amended Complaint (ECF No. 16), similar in all respects to the one filed against Benjamin

Wagar in *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), with the following technical exceptions:

- "Defendant was assigned the Internet Protocol ('IP') address of 75.128.55.44 on 2012-07-04 at 07:51:30 (UTC)." (AC ¶ 4);
- "Defendant . . . purposefully loaded that torrent file into his BitTorrent client—in this case, μTorrent 3.1.3 . . . ." (AC ¶ 22);
- "The unique hash value in this case is identified as 0D47A7A035591B0BA4FA5CB86AFE986885F5E18E." (AC ¶ 24.)

Upon review of these allegations, the Court finds two glaring problems that Plaintiff's technical cloak fails to mask. Both of these are obvious to an objective observer having a working understanding of the underlying technology.

*1.   Lack of reasonable investigation of copyright infringement activity*

The first problem is how Plaintiff concluded that the Defendants actually downloaded the entire copyrighted video, when all Plaintiff has as evidence is a "snapshot observation."   (AC ¶ 23.)   This snapshot allegedly shows that the Defendants were downloading the copyrighted work—at least at that moment in time. But downloading a large file like a video takes time; and depending on a user's Internet-connection speed, it may take a long time. In fact, it may take so long that the user may have terminated the download.   The user may have also terminated the download for other reasons.   To allege copyright infringement based on an IP snapshot is akin to alleging theft based on a single surveillance camera shot: a photo of a child reaching for candy from a display does not automatically mean he stole it. No Court would allow a lawsuit to be filed based on that amount of evidence.

What is more, downloading data via the Bittorrent protocol is not like stealing candy. Stealing a piece of a chocolate bar, however small, is still theft; but copying an encrypted, unusable piece of a video file via the Bittorrent protocol may not be copyright infringement. In the former case, some chocolate was taken; in the latter case, an encrypted, unusable chunk of zeroes and ones. And as part of its prima facie

copyright claim, Plaintiff must show that Defendants copied the copyrighted work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  If a download was not completed, Plaintiff's lawsuit may be deemed frivolous.

In this case, Plaintiff's reliance on snapshot evidence to establish its copyright infringement claims is misplaced.  A reasonable investigation should include evidence showing that Defendants downloaded the entire copyrighted work—or at least a usable portion of a copyrighted work.  Plaintiff has none of this—no evidence that Defendants completed their download, and no evidence that what they downloaded is a substantially similar copy of the copyrighted work.  Thus, Plaintiff's attorney violated Rule 11(b)(3) for filing a pleading that lacks factual foundation.

>    2.    *Lack of reasonable investigation of actual infringer's identity*

The second problem is more troublesome.  Here, Plaintiff concluded that Benjamin Wagar is the person who illegally downloaded the copyrighted video.  But Plaintiff fails to allege facts in the Amended Complaint to show how Benjamin Wagar is the infringer, other than noting his IP address, the name of his Bittorrent client, and the alleged time of download.[2]  Plaintiff's December 27, 2012 Response to the Court's Order to Show Cause re Lack of Service sheds some light:

> Though the subscriber, David Wagar, remained silent, Plaintiff's investigation of his household established that Benjamin Wagar was the likely infringer of Plaintiff's copyright.  As such, Plaintiff mailed its Amended Complaint to the Court naming Benjamin Wagar as the Defendant in this action. (ECF No. 14, at 2.)

The disconnect is how Plaintiff arrived at this conclusion—that the actual infringer is a member of the subscriber's household (and not the subscriber himself or anyone else)—when all it had was an IP address, the name of the Bittorrent client used, the alleged time of download, and an unresponsive subscriber.

---

[2] This analysis similarly applies in *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), where Plaintiff fails to allege sufficient facts to show how Mayon Denton is the infringer.

Case 2:12-cv-08333-ODW-JC   Document 48   Filed 02/07/13   Page 6 of 11   Page ID #:605

Plaintiff's December 27, 2012 Discovery Status Report gives additional insight into Plaintiff's deductive process:

> In cases where the subscriber remains silent, Plaintiff conducts investigations to determine the likelihood that the subscriber, or someone in his or her household, was the actual infringer. . . . For example, if the subscriber is 75 years old, or the subscriber is female, it is statistically quite unlikely that the subscriber was the infringer.   In such cases, Plaintiff performs an investigation into the subscriber's household to determine if there is a likely infringer of Plaintiff's copyright. . . . Plaintiff bases its choices regarding whom to name as the infringer on factual analysis. (ECF No. 15, at 24.)

The Court interprets this to mean: if the subscriber is 75 years old or female, then Plaintiff looks to see if there is a pubescent male in the house; and if so, he is named as the defendant.  Plaintiff's "factual analysis" cannot be characterized as anything more than a hunch.

Other than invoking undocumented statistics, Plaintiff provides nothing to indicate that Benjamin Wagar is the infringer.  While it is plausible that Benjamin Wagar is the infringer, Plaintiff's deduction falls short of the reasonableness standard required by Rule 11.

For instance, Plaintiff cannot show that Benjamin is the infringer instead of someone else, such as: David Wagar; other members of the household; family guests; or, the next door neighbor who may be leeching from the Wagars' Internet access.  Thus, Plaintiff acted recklessly by naming Benjamin Wagar as the infringer based on its haphazard and incomplete investigation.

Further, the Court is not convinced that there is no solution to the problem of identifying the actual infringer.  Here, since Plaintiff has the identity of the subscriber, Plaintiff can find the subscriber's home address and determine (by driving up and scanning the airwaves) whether the subscriber, (1) has Wi-Fi, and (2) has password-protected his Wi-Fi access, thereby reducing the likelihood that an unauthorized user outside the subscriber's home is the infringer.  In addition, since Plaintiff is tracking a

1    number of related copyrighted videos, Plaintiff can compile its tracking data to

2    determine whether other copyrighted videos were downloaded under the same IP

3    address.  This may suggest that the infringer is likely a resident of the subscriber's

4    home and not a guest.  And an old-fashioned stakeout may be in order: the presence of

5    persons within the subscriber's home may be correlated with tracking data—the

6    determination of who would have been in the subscriber's home when the download

7    was initiated may assist in discovering the actual infringer.

8          Such an investigation may not be perfect, but it narrows down the possible

9    infringers and is better than the Plaintiff's current investigation, which the Court finds

10    involves nothing more than blindly picking a male resident from a subscriber's home.

11    But this type of investigation requires time and effort, something that would destroy

12    Plaintiff's business model.

13          The Court has previously expressed concern that in pornographic copyright

14    infringement lawsuits like these, the economics of the situation makes it highly likely

15    for the accused to immediately pay a settlement demand.  Even for the innocent, a

16    four-digit settlement makes economic sense over fighting the lawsuit in court—not to

17    mention the benefits of preventing public disclosure (by being named in a lawsuit) of

18    allegedly downloading pornographic videos.

19          And copyright lawsuits brought by private parties for damages are different

20    than criminal investigations of cybercrimes, which sometimes require identification of

21    an individual through an IP address.  In these criminal investigations, a court has some

22    guarantee from law enforcement that they will bring a case only when they actually

23    have a case and have confidently identified a suspect.   In civil lawsuits, no such

24    guarantees are given.  So, when viewed with a court's duty to serve the public interest,

25    a plaintiff cannot be given free rein to sue anyone they wish—the plaintiff has to

26    actually show facts supporting its allegations.

27    / / /

28    / / /

## C.  Local Rule 83-3 Violations

Under Local Rule 83-3, the Court possesses the power to sanction attorney misconduct, including: disposing of the matter; referring the matter to the Standing Committee on Discipline; or taking "any action the Court deems appropriate." L.R. 83-3.1. This includes the power to fine and imprison for contempt of the Court's authority, for: (1) misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) misbehavior of any of its officers in their official transactions; or, (3) disobedience or resistance to its lawful writ, process, order, rule, decree, or command. 18 U.S.C. § 401.

The Court is concerned with three instances of attorney misconduct. The first and second instances are related and concern violating the Court's discovery order. The third instance concerns possible fraud upon the Court.

### 1.  Failure to comply with the Court's discovery order

In *AF Holdings LLC v. Doe*, No. 2:12-cv-6636-ODW(JCx) (C.D. Cal. filed Aug. 1, 2012) and *AF Holdings LLC v. Doe*, No. 2:12-cv-6669-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), the Court ordered Plaintiff to "cease its discovery efforts relating to or based on information obtained through any abovementioned Rule 45 subpoenas." (ECF No. 13, at 1; ECF No. 10, at 1.) Further, Plaintiff was required to name all persons that were identified through any Rule 45 subpoenas. (*Id.*)

Plaintiff responded on November 1, 2012, and indicated that it did not obtain any information about the subscribers in both of these cases. (ECF No. 10, at 6–7, 10.)[3] But in response to the Court's subsequent Orders to Show Cause, Plaintiff not only named the subscribers, but recounted its efforts to contact the subscriber and find additional information. (ECF No. 15; ECF No. 18.)

This conduct contravenes the Court's order to cease discovery. Plaintiff has provided no justification why it ignored the Court's order.

---

[3] This response was filed in *AF Holdings LLC v. Doe*, No. 2:12-cv-5709-ODW(JCx) (C.D. Cal. filed July 2, 2012).

### 2.   Fraud on the Court

Upon review of papers filed by attorney Morgan E. Pietz, the Court perceives that Plaintiff may have defrauded the Court. (ECF No. 23.)[4] At the center of this issue is the identity of a person named Alan Cooper and the validity of the underlying copyright assignments.[5] If it is true that Alan Cooper's identity was misappropriated and the underlying copyright assignments were improperly executed using his identity, then Plaintiff faces a few problems.

First, with an invalid assignment, Plaintiff has no standing in these cases. Second, by bringing these cases, Plaintiff's conduct can be considered vexatious, as these cases were filed for a facially improper purpose. And third, the Court will not idle while Plaintiff defrauds this institution.

### D.   Conclusion

Accordingly, the Court hereby **ORDERS** Brett L. Gibbs, **TO SHOW CAUSE** why he should not be sanctioned for the following:

- In *AF Holdings LLC v. Doe*, No. 2:12-cv-6636-ODW(JCx) (C.D. Cal. filed Aug. 1, 2012), violating the Court's October 19, 2012 Order instructing AF Holdings to cease its discovery efforts based on information obtained through any earlier-issued subpoenas;

- In *AF Holdings LLC v. Doe*, No. 2:12-cv-6669-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), violating the Court's October 19, 2012 Order instructing AF Holdings to cease its discovery efforts based on information obtained through any earlier-issued subpoenas;

/ / /

---

[4] Although the papers revealing this possible fraud were filed in *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-8333-ODW(JCx) (C.D. Cal. filed Sept. 27, 2012), this fraud, if true, was likely committed by Plaintiff in each of its cases before this Court.

[5] For example, in *AF Holdings LLC v. Doe*, No. 2:12-cv-6669-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), Plaintiff filed a copyright assignment signed by Alan Cooper on behalf of Plaintiffs. (ECF No. 16-1.)

Case 2:12-cv-08333-ODW-JC   Document 48   Filed 02/07/13   Page 10 of 11   Page ID #:609

- In *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), violating Rule 11(b)(2) by:
  - alleging copyright infringement based on a snapshot of Internet activity, without conducting a reasonable inquiry; or,
  - alleging that Benjamin Wagar is the infringer, without conducting a reasonable inquiry;
- In *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), violating Rule 11(b)(2) by:
  - alleging copyright infringement based on a snapshot of Internet activity, without conducting a reasonable inquiry; or,
  - alleging that Mayon Denton is the infringer, without conducting a reasonable inquiry;
- In *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-8333-ODW(JCx) (C.D. Cal. filed Sept. 27, 2012), perpetrating fraud on the Court by misappropriating the identity of Alan Cooper and filing lawsuits based on an invalid copyright assignment.

This order to show cause is scheduled for hearing on March 11, 2013, at 1:30 p.m., to provide Mr. Gibbs the opportunity to justify his conduct. Based on the unusual circumstances of this case, the Court invites Morgan E. Pietz to present evidence concerning the conduct outlined in this order. The Court declines to sanction Plaintiffs AF Holdings LLC and Ingenuity 13 LLC at this time for two reasons: (1) Mr. Gibbs appears to be closely related to or have a fiduciary interest in Plaintiffs; and; (2) it is likely Plaintiffs are devoid of assets.

If Mr. Gibbs or Mr. Pietz so desire, they each may file by February 19, 2013, a brief discussing this matter. The Court will also welcome the appearance of Alan Cooper—to either confirm or refute the fraud allegations.

Based on the evidence presented at the March 11, 2013 hearing, the Court will consider whether sanctions are appropriate, and if so, determine the proper

Case 2:12-cv-08333-ODW-JC   Document 218   Filed 07/11/13   Page 42 of 100   Page ID
#:3849
Case 2:12-cv-08333-ODW-JC   Document 48   Filed 02/07/13   Page 11 of 11   Page ID #:610

1   punishment.   This may include a monetary fine, incarceration, or other sanctions

2   sufficient to deter future misconduct.   Failure by Mr. Gibbs to appear will result in the

3   automatic imposition of sanctions along with the immediate issuance of a bench

4   warrant for contempt.

5       **IT IS SO ORDERED.**

6       February 7, 2012

7

8

9                               **OTIS D. WRIGHT, II**
                            **UNITED STATES DISTRICT JUDGE**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit H

1

1                   UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3                   HONORABLE OTIS D. WRIGHT

4             UNITED STATES DISTRICT JUDGE PRESIDING

5                            - - -

6
    Ingenuity 13 LLC,                    )
7                        PLAINTIFF,      )
                                         )
8   VS.                                  )   NO. CV 12-8333 ODW
                                         )
9   John Doe, et al.,                    )
                             DEFENDANT,  )
10  _____ )

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                  LOS ANGELES, CALIFORNIA

15                  MONDAY, MARCH 11, 2013

16

17

18        _____

19            KATIE E. THIBODEAUX, CSR 9858
              U.S. Official Court Reporter
20            312 North Spring Street, #436
              Los Angeles, California 90012
21

22

23

24

25

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR RESPONDENT GIBBS:

 4         WAXLER CARNER BRODSKY LLP
           BY:  ANDREW J. WAXLER
 5         -and- BARRY BRODSKY
           1960 E. Grand Avenue
 6         Suite 1210
           El Segundo, CA  90245
 7

 8

 9    FOR DEFENDANT:

10         THE PIETZ LAW FIRM
           BY:  MORGAN E. PIETZ
11         3770 Highland Avenue
           Suite 206
12         Manhattan Beach, CA  90266

13         -and-

14         NICHOLAS RANALLO LAW OFFICES
           BY:  NICHOLAS R. RANALLO
15         371 Dogwood Way
           Boulder Creek, CA  95006
16

17

18    SPECIALLY APPEARING:

19         KLINEDINST LAW OFFICES
           BY:  HEATHER ROSING
20         501 W. Broadway
           Suite 600
21         San Diego, CA  92101

22

23

24

25
```

3

1                            I N D E X

2

3    WITNESS NAME                                    PAGE

4    Alan Cooper
         Direct Examination by the Court      21
5        Direct Examination by Mr. Pietz       26
         Cross-Examination by Mr. Brodsky     34
6
     Bart Huffman
7        Direct Examination by Mr. Pietz       39

8    Benjamin Fox
         Direct Examination by Mr. Pietz       45
9
     Jessie Nason
10       Direct Examination by Mr. Pietz       52

11   Brad Gibbs
         Direct Examination by Mr. Waxler      73
12       Cross-Examination by Mr. Pietz       105

13


14   EXHIBIT                    I.D.      IN EVID.

15   1                           36          37
     2                           36          37
16   3,4,5                       36
     6,7                         43          44
17   8                           50          50
     9                           56
18   10                          67          67
     11                          68          68
19   12                          73          73
     13                         107         107
20   14                         108         108
     15,16,17,18               110         110
21

22

23

24

25

4

```
 1          LOS ANGELES, CALIFORNIA; MONDAY, MARCH 11, 2013

 2                          1:38 P.M.

 3                       - - - - -

 4

 5

 6          THE CLERK:  Calling Item No. 4, CV 12-8333-ODW,

 7   CV 12-6662, ODW, CV 12-6668, Ingenuity 13 LLC versus John

 8   Doe, additionally, CV 12-6636 ODW, CV 12-6669, AF

 9   Holdings LLC versus John Doe.

10          Counsel, please state your appearances.

11          MR. WAXLER:  Andrew Waxler, your Honor, and Barry

12   Brodsky for Mr. Gibbs who is present in the courtroom.

13   Thank you.

14          THE COURT:  Good afternoon, counsel.

15          MR. PIETZ:  Good afternoon, your Honor.  Morgan

16   Pietz, P-I-E-T-Z, for the putative John Doe defendant in

17   12-CV-8333.

18          MR. RANALLO:  Nicholas Ranallo, co-counsel for the

19   same Doe.

20          THE COURT:  All right.  Gentlemen, thank you.

21          All right.  We are here in response to an OSC

22   set by this court as to why sanctions should not be

23   imposed for various violations including Rule 11 and

24   Local Rule 83-3.

25          I have received from Mr. Waxler on behalf of
```

5

1    Mr. Gibbs his response, supplemental response, a number

2    of documents.  Spent the weekend reading a depo which was

3    perhaps the most informative thing I have read in this

4    litigation so far primarily because of what you didn't

5    want revealed.  So, in any event, I have extended an

6    offer to all of the principles concerned to offer them an

7    opportunity to explain.

8           It is my understanding that they have declined

9    that invitation.  Therefore --

10          MS. ROSING:  Your Honor?

11          THE COURT:  And you are?

12          MS. ROSING:  If I may approach.

13          THE COURT:  Please.

14          MS. ROSING:  My name is Heather Rosing, and I

15   filed an ex parte application with this court.

16          THE COURT:  When?

17          MS. ROSING:  Friday?

18          THE COURT:  When?

19          MS. ROSING:  It was filed I believe at 3:54 p.m.?

20          THE COURT:  Guaranteed for the court to actually

21   see it; right?  Was it electronically filed?

22          MS. ROSING:  The local rule says we're not

23   allowed --

24          THE COURT:  Answer my question.  Was it

25   electronically filed?

6

1          MS. ROSING:  No.  Because we are not allowed to,

2     your Honor.

3          THE COURT:  Okay.  So what you did is you took it

4     downstairs to the intake window?

5          MS. ROSING:  Yes, your Honor?

6          THE COURT:  Late Friday afternoon addressing a

7     matter that is set for hearing on Monday morning?

8          MS. ROSING:  My clients received notice of this on

9     Thursday, your Honor.  We received notice on Thursday?

10         THE COURT:  I am just asking you a question.  You

11    can answer it "yes" or "no".

12         MS. ROSING:  I'm sorry.  Could you repeat the

13    question.

14         THE COURT:  What is -- why are you here?

15         MS. ROSING:  Again, my name is Heather Rosing with

16    the Klinedinst PC law firm.  I am specially appearing for

17    four of those people that received this notice on

18    Thursday, Angela Van Den Hemel, a paralegal at Prenda

19    law --

20         THE COURT:  Is this the long way of saying they

21    are not going to be here?

22         MS. ROSING:  I'm sorry.  I was just telling you

23    who I represent, your Honor?

24         THE COURT:  Are they here?

25         MS. ROSING:  No, your Honor.

7

1          THE COURT:  Have a seat.

2          MS. ROSING:  May I just finish?

3          THE COURT:  Have a seat.

4               Bottom line is the court is going to end up

5     drawing its own inferences from the information it

6     actually has.  An opportunity to be heard is all that is

7     required.  If you don't wish to exercise that, fine.

8               There was so much obstruction during the

9     course of this deposition that it is obvious that someone

10    has an awful lot to hide.  This has actually raised far

11    more questions of fraud than the court originally had,

12    but we will get to that later.

13               Initially, I have got a number of questions

14    regarding some of the filings that have been made with

15    the court.

16               I guess, Mr. Waxler, I guess you will be the

17    one that is addressing some of these things.  One of my

18    questions is this.  Why is it that in every single one of

19    these cases there is a form attached to the complaint

20    that asks for whether or not there are any related cases.

21    I have got a partial list of all of these cases that have

22    been filed in the Central District.  None of them have

23    indicated that there are any related cases.

24               Could you tell me why?

25          MR. WAXLER:  Well, your Honor, the downloads are

8

1    done by separate infringers, and the plaintiffs, yes,

2    obviously, were a lot the same, and I believe that the

3    decision had been made that it didn't require the related

4    case filings to be made.

5        THE COURT:  Okay.

6        MR. WAXLER:  Perhaps that was in error, your

7    Honor, as we sit here today.

8        THE COURT:  Let me ask a question then.  Let's

9    just say on one date, that date being July 2nd of 2012,

10   four lawsuits were filed by AF Holdings LLC versus John

11   Doe all seeking a remedy for the infringement of the same

12   movie Popular Demand.

13           Now, can you tell me how on earth these aren't

14   related?

15       MR. WAXLER:  Well, they are obviously related in

16   the sense that --

17       THE COURT:  That is what I thought, too.  And that

18   is what this entire list is.  Okay.  They are all

19   related, but that box was always checked no.  And then we

20   are going to get to something separate in a minute, and

21   that is the issue of who has an interest, a financial

22   interest in the outcome of these cases.  We will look at

23   this shortly.

24           There is the issue of the court having vacated

25   and quashed the subpoenas that were served on various

1    ISP's, and, then, of course, I have gotten other

2    responses to the OSC saying, well, we didn't know that

3    that meant we couldn't do other forms of discovery.  And,

4    by the way, we sent out a copy of the court's order to

5    the various ISP's letting them know that the court had

6    withdrawn those orders and surely that is not the conduct

7    of someone who was trying to disobey the court's order.

8    And I had to agree.  Sounded reasonable.

9         Have you all seen the declaration of Sean

10   Moriarty from Verizon?

11        MR. WAXLER:  Your Honor, we saw it this morning,

12   yes.

13        THE COURT:  Okay.  Good.

14        And what say you because he responds directly

15   to Mr. Gibbs' assertion that the ISP's were given notice

16   not to respond to the subpoenas.  He says this didn't

17   happen, that they didn't receive notice.

18        MR. WAXLER:  May I respond to that, your Honor?

19        THE COURT:  Sure.

20        MR. WAXLER:  Mr. Gibbs -- Prenda Law is one of

21   the, is one of the e-mail addresses that received a copy

22   of your October 19th, 2012 order.  As does Mr. Gibbs.

23   Mr. Gibbs had a conversation with Mr. Hansmeier and told

24   him that he thought that this order should be served on

25   the ISP's.  Mr. Hansmeier advised Mr. Gibbs that that

10

1    would be done.  Mr. Hansmeier later advised Mr. Gibbs

2    that his request had been taken care of.

3              Now, if you read page, Paragraph 4 at Line 18

4    and 19 of the declaration, all it says is based on the

5    Verizon records, it does not appear that Verizon received

6    from AF Holdings or its counsel a copy of the order.  It

7    does not say they did not.  And Verizon, like these other

8    ISP's, has a history of, as I understand it, eliminating

9    its records from their systems soon after, like within 30

10   days.  CT Corporation receives the subpoenas.  That was

11   who was supposed to be served, and they have a history of

12   not keeping them in their records for very long.

13             THE COURT:  So they eliminate their documents

14   pretty much the way Mr. Gibbs eliminates the original

15   signed application from Alan Cooper?

16             MR. WAXLER:  Mr. Gibbs never had the original

17   signed verification from Mr. Cooper.  Mr. Gibbs was told

18   by Prenda Law that they had it.  So Mr. Gibbs was never

19   in possession of that document, and Mr. Gibbs did not

20   lose that document, your Honor.

21             THE COURT:  One other thing you didn't really make

22   clear, was it only that document or was the entire file

23   lost?

24             MR. WAXLER:  I don't know the answer to that.

25             THE COURT:  Okay.  So here is the deal.  So what

11

1   we have got, we have got CT Systems destroying the order

2   and the cover letter or transmittal of that order to

3   Verizon; right?  But they have got everything else.  They

4   have got all the other letters and the subpoena and all

5   that sort of thing.  So the only thing they have gotten

6   rid of it just the order quashing the subpoena; right?

7          MR. WAXLER:  No, your Honor.  CT Corporation is

8   the agent for service of process.

9          THE COURT:  I know who they are.

10         MR. WAXLER:  CT Corporation may have received

11  that, and I am just saying their history is they don't

12  keep records for very long of having received subpoenas

13  or service of those.  The other documents which are

14  attached to this declaration -- I believe since it was

15  given to me about an hour, actually 15 minutes ago out

16  there; I saw part of it online -- are documents that were

17  exchanged between Verizon directly and others.  So they

18  weren't going through CT Corporation.  So that is the

19  difference, your Honor.

20         THE COURT:  You are saying, then, that the notice

21  to Verizon that that subpoena had been quashed by the

22  court went to CT and not to Verizon?

23         MR. WAXLER:  That is their agent for service of

24  process.  That is who they served.  That is who

25  Mr. Gibbs, when he talked to Mr. Hansmeier, said please

12

1    serve this order on them, and that is what Mr. Gibbs

2    understands was done.

3         THE COURT:  Okay.  Was the order served in the

4    same way that the subpoena was served?

5         MR. WAXLER:  That would be our understanding.  I

6    mean, it was served on CT Corporation.  That is how the

7    subpoena was served on CT Corporation.

8         THE COURT:  So the subpoena and all the various

9    letters, et cetera, that emanated from Prenda Law to

10   Verizon were served on CT Systems; right?

11        MR. WAXLER:  No.  As I understand it, your Honor,

12   the e-mails that may appear here were exchanged between

13   Verizon directly, once they got the subpoena, and members

14   of Prenda Law.  The only thing that would have gone

15   through CT Corporation was the service of the original

16   subpoena and a copy of the order.

17        THE COURT:  All right.  I am only going by the

18   declaration of Mr. Moriarty.  This is under tab, Exhibit

19   A.  The letter, Prenda Law, see that, September 5th?  It

20   says via hand delivery.

21        MR. WAXLER:  I see that.

22        THE COURT:  All right.  Enclosed please find a

23   subpoena and attachment.  So I am assuming that the

24   subpoena was also hand delivered.  It doesn't say to

25   whom.  Is this to CT?

13

1        MR. WAXLER:  That is our understanding, your

2   Honor.

3        THE COURT:  So what we have is a situation or at

4   least you are guessing, you are guessing that everything

5   seeking information from Verizon arrived intact, but the

6   order withdrawing or quashing that subpoena somehow got

7   misplaced.

8        MR. WAXLER:  There is no evidence before this

9   court that Verizon did not receive that subpoena, that

10  order from this court.  I can tell you that Mr. Gibbs'

11  intent was that that order be served so that they did

12  receive it.  And it was always his understanding until he

13  saw the declarations in the filings by Mr. Pietz that

14  some of the ISP's did not receive a copy of that order.

15       THE COURT:  It is also my understanding that I

16  guess a paralegal in the employ of one of these law firms

17  began following up with these Internet service providers

18  inquiring as to why certain information had not been

19  provided pursuant to those subpoenas.

20       MR. WAXLER:  And Mr. Gibbs read that for the first

21  time when the declarations were submitted in connection

22  with this OSC and was very surprised by it because he

23  understood, as he does today, that the order by this

24  court was served on CT Corporation and then would have

25  been transmitted to Verizon.

14

1          THE COURT:  Okay.  All right.  There is a number

2     of things, Mr. Waxler, which you state in your papers

3     that I wanted to ask you about.  In more than one place,

4     you indicate that Ingenuity 13 LLC and AF Holdings, et

5     cetera, have assets which consist of without limitation

6     their intellectual property rights in some of these

7     films.  What other assets?

8          MR. WAXLER:  AF Holdings and Ingenuity -- AF

9     Holdings, at least, received the assignment.  So they

10    have those property rights, and the companies would have

11    obviously the right to, or rather the settlement funds

12    that were paid on some of these matters would have been

13    property of those companies.

14          But as I understand it from Mr. Hansmeier's

15    deposition which I, too, read over the weekend, that the

16    trust accounts of some of the lawyers were holding those

17    settlement funds.  Whether those settlement funds ever

18    made it to AF Holdings or Ingenuity 13, all I can do,

19    your Honor, is rely on what Mr. Hansmeier says because we

20    have no independent knowledge of it and nor does

21    Mr. Gibbs.  Mr. Gibbs did not receive those funds.  Those

22    funds were sent to Prenda Law.

23          THE COURT:  So you are telling me what you know is

24    what you gleaned from this this weekend pretty much as

25    the court did; right?

15

1        MR. WAXLER:  Well, I mean, Mr. Gibbs may have more

2    knowledge than specifically what Mr. Hansmeier said.

3        THE COURT:  Oh.  Mr. Hansmeier has no knowledge of

4    anything.  So I just want to know if you got what the

5    court got which is the only entities which apparently

6    make any claim whatsoever to these settlement funds are

7    the law firms.  There appears to be no effort whatsoever

8    of transmitting any of these funds to the so-called

9    clients, Ingenuity 13 and AF Holdings, who don't file

10   income taxes anywhere because as Mr. Hansmeier says they

11   have no income.

12            Is that what you got?  That is what I got.

13       MR. WAXLER:  I thought that Mr. Hansmeier said

14   they didn't file income taxes because they were not

15   required in where they were domiciled, but you may be

16   right and I may be wrong.

17       THE COURT:  No.  He quite clearly said they have

18   not filed income taxes anywhere.

19       MR. WAXLER:  I understand that.  I just thought it

20   was a different reason for not filing them.

21        THE COURT:  Well, probably because they don't do

22   anything, do they?

23       MR. WAXLER:  Well, they in hearing from Mr -- in

24   reading from what Mr. Hansmeier says, they obviously own

25   valid copyrights, and those entities retain law firms

1    like Prenda Law, apparently, to file actions such as the

2    ones that are at issue today.

3         THE COURT:  They retain firms?  Seriously?

4              You can hardly keep a straight face, can you?

5         MR. WAXLER:  No, your Honor.

6         THE COURT:  These entities were basically created

7    by these lawyers; right?  They have no business.  They

8    have no employees.  They have no function really.  They

9    are not even really a shell, are they?

10        MR. WAXLER:  I don't know, your Honor.

11        THE COURT:  The law firms are basically

12   prosecuting these actions on their own behalf, aren't

13   they?

14        MR. WAXLER:  Mr. Gibbs never had any client

15   contact with those clients.  Mr. Gibbs received

16   information from Mr. Hansmeier and Mr. Steele, and those

17   individuals advised Mr. Gibbs that they had talked to the

18   clients.

19        THE COURT:  Hansmeier and Steele, are those the

20   individuals to whom you refer in your papers to as the

21   senior partners in the law firm.

22        MR. WAXLER:  Yes, they are.

23        THE COURT:  I have another question.  Does

24   Mr. Gibbs have an indemnity or hold harmless agreement

25   from these senior partners?  Or is he out there on his

17

1   own?

2       MR. WAXLER:  He has no hold harmless agreement

3   from these partners that I am aware of.

4       THE COURT:  Okay.  All right.

5       MR. WAXLER:  He was an of counsel, W -- 1099,

6   independent contractor for Prenda Law.

7       THE COURT:  All right.  Now, the court is coming

8   to the conclusion, and this is why it has been wonderful

9   to have someone here to disabuse me of the notion that

10  all of these lawsuits are being prosecuted on behalf of

11  the lawyers, that all of the settlement funds inure

12  solely to the benefit of the lawyers because not dime

13  one has been transmitted to AF Holdings or to Ingenuity

14  13.

15          Now, if there is information to rebut that, I

16  would love to hear it.  But, otherwise, that is what I am

17  stuck with.  So now I am wondering why is it that no

18  disclosure has been made in this court and probably in

19  none of the federal courts that the lawyers have a

20  pecuniary interest in the outcome of these cases?

21      MR. WAXLER:  I don't believe that that is what

22  Mr. Gibbs understands the case to be.  The fact that the

23  settlement funds were not transmitted as of yet to those

24  entities doesn't mean those settlement funds aren't being

25  held in trust for those entities.  Mr. Gibbs has no

18

```
1    information whatsoever, your Honor, to understand

2    anything different than what I just described.

3         MR. BRODSKY:  Your Honor, may I interject one

4    point?

5         THE COURT:  Sure.  Your name again?

6         MR. BRODSKY:  Barry Brodsky.

7         THE COURT:  All right.  Go ahead, sir.

8         MR. BRODSKY:  My understanding and it is only from

9    reading the same deposition transcript was that those

10   funds remained in the trust accounts of the various law

11   firms that were representing the companies to defray

12   future expenses.

13        THE COURT:  And what were those expenses other

14   than filing fees?

15        MR. BRODSKY:  I would assume they would be filing

16   fees, investigative fees, you know, basically that.

17        THE COURT:  To -- okay.

18        MR. BRODSKY:  But that is just my reading of the

19   deposition.

20        THE COURT:  Okay.  And after that is done, then

21   what?

22        MR. BRODSKY:  Apparently -- well, we don't know

23   where that trail ends, whether that trail has ended.  But

24   we do know this.  We know that none of those funds

25   reached Mr. Gibbs.
```

19

1          THE COURT:  And we also know none of those funds

2     reached Ingenuity 13 and AF Holdings.

3          MR. BRODSKY:  Apparently, from Mr. Hansmeier's

4     testimony, that is correct.

5          THE COURT:  Who was the corporate designee, the

6     30(b)(6) designee for AF Holdings; right?

7          MR. BRODSKY:  Yes.

8          THE COURT:  And none of those funds ever reached

9     AF Holdings.

10         MR. BRODSKY:  According to him, that's correct.

11         THE COURT:  All these lawsuits settled on behalf

12    of AF Holdings; right?  But they reside in the law firm's

13    trust account.

14         MR. BRODSKY:  Some obviously were settled, yes.

15         THE COURT:  You know what was really interesting,

16    a lawsuit handled by law firm A, the settlement funds

17    then are transmitted to law firm B's trust account, law

18    firm B being controlled by Mr. Steele.  I don't know.  I

19    just find these things curious.

20              All right.  Any other light to be shed on some

21    of the court's concerns with respect to this foolishness

22    here because -- by the way, is there a Mr. Cooper here?

23         MR. PIETZ:  Your Honor, Mr. Cooper is in

24    attendance today, and I believe prepared to confirm that

25    these documents are founded on forgeries.

1          THE COURT:  Is there an Alan Cooper in the

2    courtroom?  Don't be shy.  Come forward, sir.

3          (The witness was sworn.)

4          THE CLERK:  Thank you.  Have a seat.

5          THE COURT:  By the way, while we are on the

6    subject, is there a Mark Lutz in the courtroom as well?

7               Is either Hansmeier in the courtroom?

8          MS. ROSING:  Your Honor, I am the attorney

9    specially appearing for them and if I could finish my

10   request?

11         THE COURT:  I just want to know if they are here.

12         MS. ROSING:  They are not physically here, your

13   Honor?

14         THE COURT:  Thank you.  Good.

15         MR. PIETZ:  Your Honor, my understanding was that

16   Ms. Rosing was representing one of the Hansmeiers.  Is

17   that different, or are you also representing Peter

18   Hansmeier?

19         MS. ROSING:  I did not have an opportunity to say,

20   but I do not represent Peter Hansmeier.

21         THE COURT:  I didn't think you would be.  The

22   technician?  I didn't think you would be.

23         MR. WAXLER:  Your Honor, while those individuals

24   are not present, my understanding is they are available

25   by phone.

21

1          THE COURT:  Is that right.  Okay.  I may take them

2     up on that.  Maybe.  Anyway.

3

4                    DIRECT EXAMINATION

5     BY THE COURT:

6     Q     Mr. Cooper, your name is Alan Cooper?

7     A     Yes, sir.

8     Q     And where do you reside, sir?

9     A     Isle, Minnesota.

10    Q     Isle, Minnesota.  Do you have any connection -- let

11    me just ask you specifically, do you have any connection

12    with Mr. Gibbs?

13    A     No, sir.

14    Q     Ever met Mr. Gibbs before?

15    A     No.

16    Q     What about Paul Hansmeier, any connection with him?

17    A     No.

18    Q     Ever meet him before?

19    A     No.

20    Q     What about John Steele?

21    A     Yes.

22    Q     What was your connection with Mr. Steele?

23    A     I was a caretaker for a piece of property that he

24    had in Northern Minnesota.

25    Q     And when was this?

22

1   A      I think from 2006 till last August.

2   Q      You worked for him from 2006 until August of 2012?

3   A      No, I did not work for him.  I was a caretaker for

4   his piece of property.  He had two houses.  I lived in

5   one and then took care of everything else there.

6   Q      Okay.  And he paid you?

7   A      No.

8   Q      Who paid you?

9   A      There was no pay.  It was I lived in the one house,

10  and I took care of everything on the property for free.

11  Q      Or in exchange for a place to live?

12  A      Yes.

13  Q      All right.  So you didn't have to pay for your

14  housing; correct?

15  A      Correct.

16  Q      So in exchange for housing on the property, you

17  took care of his property?

18  A      Yes.

19  Q      And this was a deal you negotiated with Mr. Steele?

20  A      Yes.

21  Q      All right.

22  A      It is in a lease agreement that we have.

23  Q      All right.  I guess you have been advised.  Matter

24  of fact, I have seen a letter written by an attorney who

25  apparently is acting on your behalf where you have become

1   concerned that your name is being used as a corporate

2   representative of some West Indian entities that you know

3   nothing about; is that true?

4   A    Yes.  That's correct.

5   Q    I want you to explain.  I want you to elaborate.

6   What is it that you have heard?

7   A    That my name is being signed and forged and used

8   for whatever these offices or myself personally scams

9   that they have going on.

10   Q    Did you ever have a discussion with Mr. Steele

11   about these concerns of yours?

12   A    He had, on one of his trips up to the cabin, all he

13   had said was if anybody contacts you about any of my law

14   firm or anything that has to do with me, don't answer and

15   call me.

16   Q    Had he ever given you any advance notice that he

17   was contemplating embarking on -- let me back up.  Do you

18   know what his legal specialty was, say, back in 2006?

19   What kind of law was he practicing?

20   A    When I had first met him, he was still in law

21   school.

22   Q    In law school.  All right.  And, then, what area of

23   practice did he go into if you know?

24   A    He had originally said divorce, family law.

25   Q    Family law.  All right.  Did he ever indicate to

24

1   you that he was contemplating embarking on a different

2   specialty in the law?

3   A    Yes.

4   Q    And best as you can recall, what was this new

5   specialty?

6   A    Internet porn buyers.  I don't know exactly how to

7   word it for you.

8   Q    Oh.  Internet porn piracy sounds pretty good.  All

9   right.

10        Do you recall anything he said about that?

11   A    As far as?

12   Q    Anything about this new venture, this new method of

13   practicing law.

14   A    I tried not to talk to him very much, but what he

15   had -- what he had said on one of his trips was his goal

16   was $10,000 a day, to have a mailing of these letters.

17   Q    What letters?

18   A    To people that illegally downloaded on the

19   Internet.

20   Q    Did he explain what these letters would say and who

21   these letters would be sent to?

22   A    I am not very Internet savvy myself, so it would be

23   whoever downloaded something that they weren't paying for

24   or illegal.  I don't know exactly how this works.  That

25   he would just send out a letter stating that if they

1    didn't send a check for a certain amount, that he would

2    make it public to these people's family and friends what

3    they were looking at.

4    Q    I see.  Okay.  Is that all you can remember him

5    saying about this new venture?

6    A    At this time.  Yes.

7    Q    All right.  Now, let's put this in context.  He

8    basically told you that if you started getting any

9    inquiry, that you were to, what, call him or direct the

10   callers to him?

11   A    To contact personally, personally contact him.

12   Q    Okay.  Now, back up.  If you received any calls or

13   inquiries regarding what?

14   A    He said anything that seemed out of place.

15   Q    And you took that to mean what?

16   A    I took that to mean the very next day I went and

17   talked to my father-in-law which is a retired sheriff and

18   talked to him, and he said until anybody contacts you, he

19   goes we have nothing to go to the court system with.

20   Q    And did that change?

21   A    I never heard anything from anybody.

22   Q    All right.  So no one ever contacted you?

23   A    No.

24   Q    And so what is it that made you go off and hire

25   Mr. Paul Godfread?

1    A    I had received a text asking if this was my

2    signature on a particular document, and I said no.  And

3    that is when I was given a number to call an attorney to

4    make sure that this didn't come back towards me.

5    Q    All right.  I am going to assume that that copy of

6    that document is probably in court; right?

7         MR. PIETZ:  Referring now to the copyright

8    assignment agreement, your Honor?

9         THE COURT:  Right.

10        MR. PIETZ:  Correct, your Honor.

11        THE COURT:  Okay.  Let me turn this over to you,

12   sir.  Go ahead.

13        MR. PIETZ:  Okay.  Thank you, your Honor.

14             If it please the court, I have some documents

15   which I can show on the monitor including to Mr. Cooper.

16   I just want to make sure we have both the copyright

17   assignments.

18        MR. PIETZ:  Are the monitors arrayed so that the

19   court can see them?

20        THE COURT:  Yes.  The court has its own.  We got

21   that before the sequester.

22        MR. PIETZ:  All right.

23                       DIRECT EXAMINATION

24   BY MR. PIETZ:

25   Q    Mr. Cooper, my name is attorney Morgan Pietz.

1    Thank you for coming here today.

2              Did anyone ever ask you to become a corporate

3    representative of AF Holdings LLC?

4    A    No.

5    Q    Did anybody ever ask you to become a corporate

6    representative of Ingenuity 13 LLC?

7    A    No.

8    Q    Mr. Cooper, now, I would like to show you some

9    documents, and Mr. Ranallo I believe just passed out

10   copies of the first.  So what we have here is a

11   complaint.

12             It is one of the consolidated cases presently

13   before the court.  For the record, it is Civil Action No.

14   212 CV 6636, an action filed here in the Central District

15   of California.

16             Mr. Cooper, have you ever seen this complaint

17   before?

18   A    No.

19   Q    I am going to skip now to the last page of this

20   complaint or actually it is not quite the last page.  It

21   is the last page of the main document, or, sorry, it is

22   actually Exhibit B to the complaint.  Here is the first

23   page of Exhibit B, now, Mr. Cooper.

24             It says copyright assignment agreement on the

25   top, and then I will note for the record that the

28

1    copyright at issue is Popular Demand which it states in

2    the first paragraph.  Moving down to the second page of

3    the agreement, Mr. Cooper, you will note that there is a

4    signature on the right where it says Alan Cooper.

5              Is that your signature, sir?

6    A    No.  That is not.

7    Q    You are quite sure about that?

8    A    Yes.  I use a middle initial.

9    Q    Mr. Cooper, I would like to show you a similar

10   document which has appeared in a different case.  What we

11   have here is a copyright assignment agreement.  This is

12   for a different AF Holdings copyright styled Sexual

13   Obsession which it lists in the first paragraph.  For the

14   record, this is Northern District of California No. 12 CV

15   2048.

16             Mr. Cooper, I am going to turn now to the

17   second page of this copyright assignment agreement, or I

18   guess it would be the third page.  There is a signature

19   there on the right that says Alan Cooper.

20             Is that your signature, sir?

21   A    No, it is not.

22   Q    Did anybody ever ask you to become a corporate

23   representative or otherwise involved with a company

24   called AF Films LLC?

25   A    No.

29

1    Q      And you are quite sure that is not your signature?

2    A      Very sure it is not mine.

3    Q      Mr. Cooper, I would like to show you now another

4    document, and I will note for the record that this is a

5    verified petition to perpetuate testimony filed in the

6    Eastern District of California, 12 CV 8333, have you ever

7    seen this document before, Mr. Cooper, prior to within

8    the last couple of days?

9    A      No.

10          MR. WAXLER:  Your Honor, I would like to object to

11   that question.

12          THE COURT:  Object to the question as to whether

13   or not he has seen the document?

14          MR. WAXLER:  Well, this inquiry is beyond the

15   scope of the OSC.  The OSC is about four cases that was

16   filed in the Central District of California.  Now, we

17   have heard about a Northern District case and Eastern

18   District case that he is being questioned about which we

19   did not address in our papers, and it is not what this

20   OSC is about.

21          THE COURT:  Well, it has become about it.  It has

22   become about fraudulent filings in federal court.

23          MR. PIETZ:  I would add, your Honor, that it all

24   goes to a pattern and practice.

25   Q      Mr. Cooper, looking now at the verified petition, I

30

1   am going to skip to the last page.  You will note that it

2   is signed by Mr. Gibbs.  On this page which reads at the

3   top notarized verification, there is a slash S,

4   type-printed signature that says Alan Cooper, and it says

5   Alan Cooper, Manager of Ingenuity 13 LLC.

6           Did you ever sign a notarized verification for

7   this document?

8   A     No, I did not.

9   Q     Did you ever give anyone permission to sign your

10  name for you on this document?

11  A     No.

12      MR. PIETZ:  Mr. Ran, would you pass out Exhibit

13  53.  I will note for the record that I am moving now to

14  what has been previously filed with this court as Exhibit

15  S which is the declaration of Nicholas Ranallo in

16  opposition to a motion to shorten time filed in the

17  Northern District of California.  And I am going to move

18  now to an exhibit to this motion.

19          It is actually the second to last page in that

20  filing, Exhibit S, and what we are looking at is a

21  business entity detail for an entity called VPR, Inc.

22  from the Minnesota Secretary of State website.

23  Q     Mr. Cooper, you will note there that under

24  officers, it says Alan Cooper and it lists an address of

25  4532 East Villa Teresa Drive, Phoenix, Arizona, 85032.

31

1              Mr. Cooper, have you ever been to Arizona?

2    A     No, I haven't.

3    Q     So that is not your residence, is it?

4    A     No.

5    Q     Do you have any knowledge of that address

6    whatsoever?

7    A     No, I do not.

8    Q     Did anybody ever ask you to be the president of

9    VPR, Inc.?

10   A     No.

11   Q     Did anybody ask you to be any other role in

12   connection with that company?

13   A     No.

14   Q     Mr. Cooper, I am going to move now to what has been

15   previously identified in the record as Exhibit T.   What

16   we have here is a notissues.com registration.

17              Mr. Cooper, did you ever register an Internet

18   domain name called notissues.com or perhaps it is

19   pronounced notissues.com?

20   A     No, I did not.

21   Q     I am going to zoom in now.  Mr. Cooper, I will note

22   that on the second page it says registrant Alan Cooper,

23   and it lists that same Phoenix address that we mentioned

24   a moment ago.  Am I correct in presuming that there where

25   it says administrative contact, and it lists the e-mail

1    address, johnsteele@gmail.com.  Am I correct in assuming

2    that johnsteele@gmail.com is not your e-mail address,

3    Mr. Cooper?

4    A    No, it is not.

5    Q    Mr. Cooper, after you hired attorney Paul Godfread,

6    and he let the other side know that he was going to be

7    representing you in actions in Minnesota, did you hear

8    from John Steele?

9    A    Yes.  He called me twice and left two voicemails

10   and sent me two texts.

11   Q    So this was after Mr. Godfread let Prenda know that

12   he was your attorney; isn't that correct?

13   A    Yes.

14   Q    How many times in a row did Mr. Steele call you

15   when that happened?

16   A    I think five or six times right in a row.

17   Q    And that was, more or less, to your understanding,

18   was that more or less immediately after your attorney

19   Paul Godfread let the other side know that he was going

20   to be representing you?

21   A    Yes.  It was right after Paul let him know.

22   Q    Within a matter of minutes, would you say, sir?

23   A    Yes.

24   Q    Have you heard from Mr. Steele recently,

25   Mr. Cooper?

33

1    A      He had left two other voicemails on my phone and

2    two other texts within the last couple of weeks, I think

3    it was.

4    Q      And, more recently than that, have you heard from

5    him again?

6    A      Yes.  Yeah.  There was a two week spell between

7    them that he had called me twice.

8    Q      And, Mr. Cooper -- pardon me, I didn't mean to

9    interrupt you.  Go ahead, sir.

10   A      He left four voicemails altogether and four text

11   messages.

12   Q      And, Mr. Cooper, my understanding is that you

13   brought copies of these voicemails to potentially play

14   for the court; is that correct, sir?

15   A      Yes.

16   Q      If the court will indulge me a moment, I will play

17   those into the microphone for the record.

18          THE COURT:  Okay.

19          MR. PIETZ:  If it is okay with the court, I would

20   like to ask Mr. Stoltz to assist me with this.  He is the

21   brains of the operation on the technology here.

22             Apologize, your Honor.  We are starting from

23   the beginning.

24          (Audio recording played.)

25   Q      BY MR. PIETZ: Mr. Cooper, have you spoken with John

34

1    Steele enough times to recognize his voice?

2    A    Oh, yeah.  That is his voice.  That is him.

3    Q    So that was Mr. Steele on those recordings that we

4    just heard a moment ago?

5    A    Yes.

6    Q    The three lawsuits that Mr. Steele was referring

7    to, do you think he means the three defamation cases

8    recently filed against you and your attorney, Paul

9    Godfread by John Steele, Paul Duffy and Prenda Law in

10   Florida, the Northern District of Illinois and the

11   Central District of Illinois?  Do you think that is what

12   he was talking about?

13   A    Yes.

14   Q    Mr. Cooper, I, for my part, don't have anything

15   further.  Perhaps the court does, but, before I step

16   down, I would like to thank you for coming here today?

17        THE COURT:  Thank you, counsel.

18        MR. BRODSKY:  Very briefly, your Honor.  Thank

19   you.

20

21                 CROSS-EXAMINATION

22   BY MR. BRODSKY:

23   Q    Mr. Cooper, you have never met Mr. Gibbs; is that

24   correct?

25   A    Yes.

1   Q      And you have never spoken to him as well; is that

2   correct?

3   A      No, I have not.

4   Q      And you have exchanged no correspondence with him

5   whatsoever; is that correct?

6   A      That is correct.

7   Q      Do you know a gentleman by the name of Grant Berry,

8   B-E-R-R-Y?

9   A      Yes, I do.

10  Q      Who is Mr. Berry?

11  A      He is the one that introduced me to John when I was

12  selling my house.

13  Q      And what type of relationship if any do you have

14  with Mr. Berry?

15  A      He was the realtor for -- he was a realtor that I

16  had for selling my house.

17  Q      And did you ever tell or ask Mr. Steele in

18  Mr. Berry's presence how is my porn company doing?

19  A      No, I have not.

20  Q      You sure about that?

21  A      Yes.

22      MR. BRODSKY:  Thank you, your Honor.  Nothing

23  further.

24      THE COURT:  All right.  Same questions that he

25  asked with respect to -- what about Mr. Paul Duffy, do

36

1    you know him?

2            THE WITNESS:  No, I do not.

3            THE COURT:  Ever heard of him?

4            THE WITNESS:  Through these things that are going

5    on, yes.

6            THE COURT:  All right.

7            THE WITNESS:  That way only.

8            THE COURT:  All right.  Anyone else?

9            MR. PIETZ:  Your Honor, just very briefly, as a

10   technical matter, I would like to ask that the documents

11   I went through with Mr. Cooper be admitted into evidence.

12            That was the copyright assignment with Popular

13   Demand.  I would ask that that be admitted into evidence

14   as Exhibit 1.  The copyright assignment agreement for

15   sexual obsession, I would ask that that be admitted as

16   Exhibit 2.  The verified petition in the Eastern District

17   of California matter previously identified in this action

18   as Exhibit L, I would ask that it be admitted now as

19   trial Exhibit 3.  The declaration from Mr. Ranallo which

20   has the printout for VPR, Inc. previously filed here as

21   Exhibit S, I would ask that be admitted as trial Exhibit

22   4.  And the notissues.com registration previously

23   identified here as Exhibit T, I would ask be admitted as

24   trial Exhibit 5.

25            THE COURT:  Any objection?

1        MR. BRODSKY:  Yes, your Honor.  As to Exhibits 3,

2    4 and 5, we would object on the ground of relevance.

3        THE COURT:  Sustained.  All right.  Everything

4    else comes in.  What about the audio?  Is there a

5    transcript of the audio?

6        MR. PIETZ:  Your Honor, we can prepare it.

7        THE COURT:  Would you.  Thank you.

8        MR. PIETZ:  We would be happy to, and we will

9    lodge it with the court, your Honor.

10       THE COURT:  Thank you.  Okay.  That will be

11   received as well.

12            All right.

13            Anything, gentlemen?  Nothing.

14            You may step down, sir.  Appreciate you

15   coming.

16       MR. PIETZ:  Your Honor, at this time, I think it

17   might be helpful for me to suggest a few other things

18   that I am prepared to discuss today for the court.  We

19   have heard from Mr. Cooper.

20            What I might propose now is turning to

21   Mr. Gibbs.  Mr. Gibbs has noted in his declaration or

22   attempted to characterize himself as merely a, quote,

23   independent contract attorney for Prenda Law.  I am

24   prepared to present evidence today showing that, in fact,

25   Mr. Gibbs is really what amounts to a de facto chief

38

1   operating officer of Prenda Law.  And I have a number of

2   documents and exhibits I am prepared to go through with

3   Mr. Gibbs on that account.

4            In addition, I am prepared to show through

5   cross-examination of Mr. Gibbs that his investigation in

6   these cases was objectively unreasonable.  Although I was

7   not able to contact Mr. Larguire(phonetic) or Mr. Denton,

8   a former client of mine in a previous case who was

9   previously named by Mr. Gibbs as a result of what I view

10  as a shoddy online investigation is here to testify that

11  the main fact that Mr. Gibbs relied upon in that case

12  turned out to be completely incorrect.

13           Fourth, your Honor or I should said say third,

14  there are representatives here today from both AT&T and

15  Verizon who can conform that the court's discovery orders

16  were unambiguously violated in this case.

17           Fifth, and, finally, your Honor, if the court

18  is inclined to hear it, I am prepared to explain my

19  understanding of how Prenda is organized and present

20  evidence showing that the court does indeed have personal

21  jurisdiction over Mr. Steele, Mr. Duffy, Mr. Paul

22  Hansmeier and Ms. Angela Van Den Hemel.

23       THE COURT:  Let's begin with the ISP's.

24       MR. PIETZ:  Very well, I would ask now that

25  Mr. Huffman come forward.  Is he here?

1        (The witness was sworn.)

2        THE CLERK:  Please have a seat.

3            Please state your full and true name for the

4    record, and spell your last name?

5        THE WITNESS:  My name is Bart Huffman,

6    H-U-F-F-M-A-N.

7        THE COURT:  One second.

8        THE CLERK:  Counsel, I think we are going to first

9    have our 2:30 matter.  I think it will be a little

10   shorter.  So I am going to call the next matter and then

11   we will have you guys come back.

12       (Recess from 2:30 to 2:31 p.m.)

13       THE COURT:  Okay.  Sorry for the interruption.

14   Let's go back on the record in the AF Holdings, Ingenuity

15   13 LLC.

16           All right.  Go ahead, counsel.

17       MR. PIETZ:  Thank you, your Honor.

18

19                   DIRECT EXAMINATION

20   BY MR. PIETZ:

21   Q    Mr. Huffman, what is your job, sir?

22   A    I am an attorney.

23   Q    With what firm?

24   A    Lock Lorde.

25   Q    And do you represent AT&T in that capacity, sir?

40

1    A       Yes, I do.

2    Q       And how long have you been -- how long have you

3    been representing AT&T, sir?

4    A       I have been representing AT&T for about six or

5    seven years, I suppose.

6    Q       And do you have personal familiarity with matters

7    before AT&T that involve the Prenda law firm?

8    A       I do.

9    Q       So on a day-to-day basis over the past few years,

10   have you handled Prenda matters for AT&T?

11   A       A number of them.

12   Q       Very well.  You prepared a declaration which I

13   submitted with the court in this matter; isn't that

14   correct, sir?

15   A       That is correct.

16   Q       And that declaration was based on an investigation

17   performed by your client, AT&T; is that correct?

18   A       Well, that declaration recounts a series of events

19   where Angela Van Den Hemel who has contacted us on a

20   regular basis to follow-up on subpoenas contacted us with

21   respect to the subpoenas in the case that was

22   consolidated with others in this proceeding.  And as we

23   looked into it, we discovered that the case had been

24   stayed as far as discovery goes.

25   Q       So you are familiar, then, with this court's

41

1   October 19th, 2013 discovery order vacating the subpoenas

2   in the AF Holdings cases now before this court?

3   A    Yes.

4   Q    And as far as AT&T is aware, did Prenda in fact

5   stop seeking subpoena returns on the cases consolidated

6   before this court after October 19th, 2013?

7        MR. WAXLER:  Calls for speculation.

8        THE WITNESS:  I am not aware that they did.  AT&T

9   did not, to my knowledge, receive any notice of the order

10  and furthermore Ms. Van Den Hemel, I think I am saying

11  her name right, contacted us seeking to follow-up and

12  obtain information presumably with respect to the

13  subpoenas in that case.  And we received, I should add,

14  we received, I and my firm receive the information pretty

15  much directly as it comes in from CT Corporation so with

16  respect to these type of subpoenas.

17  Q    BY MR. PIETZ: So with respect to these type of

18  subpoenas, then, the receipt or non receipt by AT&T would

19  come into your office; is that correct?

20  A    Typically, it would.

21       MR. WAXLER:  Calls for speculation.

22       THE COURT:  Hang on.  What is your objection?

23       MR. WAXLER:  Calls for speculation, your Honor.

24            This witness is being asked to say whether

25  AT&T received something, and I think that is speculative

42

1     for him to be able to testify as to whether AT&T might

2     have received it or not.

3          THE COURT:  I understood it to be how mail is

4     handled in his office, but let's walk through it again.

5          MR. PIETZ:  Very well.

6     Q    So did your office receive a copy of the

7     October 19th, 2013 order vacating the subpoenas in this

8     case?

9     A    Not independently.  When we looked on Pacer as

10    we -- we routinely do with respect to production requests

11    and the like, we found the order.

12    Q    So your office was not served by Prenda or anybody

13    affiliated with Prenda with this court's October 19th

14    discovery order?

15    A    That is correct.

16    Q    And did you investigate with your client, AT&T, as

17    to whether or not AT&T received a copy of the court's

18    October 19th order?

19    A    I did not specifically ask them that, no.

20    Q    And were you contacted only the once by Angela

21    Van Den Hemel regarding the court's October 19th order in

22    this action?

23    A    No.  She contacted my paralegal twice and my

24    paralegal would routinely refer those type of inquiries

25    to me.

43

1   Q     So she actually asked twice for subpoena returns to

2   be made after the October 19th discovery order?

3   A     That's correct.  And when I looked at the Pacer

4   records and saw the order, I then responded to

5   Ms. Van Den Hemel saying that the discovery had been

6   stayed and we of course would not be producing discovery

7   in the case at that time.

8         MR. PIETZ:  I would ask that the declaration of

9   Bart Huffman be admitted as evidence in this hearing.  I

10  think we are on Exhibit 6.

11        THE COURT:  Okay.

12        THE WITNESS:  And would you also want to have the

13  declaration of my paralegal admitted as well?

14        MR. PIETZ:  Yes.  I would ask as well that that be

15  admitted as Exhibit 7.  It is the next filing on the

16  docket.

17        THE WITNESS:  Camille Kerr.

18  Q     BY MR. PIETZ:Could you spell her name for the

19  record.

20  A     Certainly.  C-A-M-I-L-L-E, K-E-R-R.

21        THE COURT:  All right.  Any objection, gentlemen?

22        MR. BRODSKY:  Is she going to be testifying, your

23  Honor?

24        THE COURT:  I have no idea.

25        MR. BRODSKY:  Object on the ground of hearsay.

44

1          THE COURT:  Is she here?

2    Q    BY MR. PIETZ: Mr. Huffman, is Ms. Kerr here today?

3    A    Ms. Kerr is not here today.  I can testify though

4    that I oversaw and reviewed all of the items stated in

5    her declaration, and they are part of our regularly kept

6    records and they are consistent with our files, were

7    overseen by me at every single step and reviewed and they

8    are, in fact, true and correct.

9    Q    So you are personally familiar with the facts in

10   Ms. Kerr's declaration?

11   A    I am, and I reviewed it in detail.

12          THE COURT:  What is the substance or the subject

13   matter?

14          THE WITNESS:  Ms. Kerr submitted a separate

15   declaration simply because she was the addressee on the

16   e-mails from Ms. Van Den Hemel.

17          THE COURT:  All right.  And her declaration

18   attests to?

19          THE WITNESS:  Her declaration attests to the truth

20   and authenticity of the e-mails that I attached thereto.

21          THE COURT:  That is all?

22          THE WITNESS:  That is all.

23          THE COURT:  All right.  I will permit it.  Okay.

24          Gentlemen?

25   MR. BRODSKY:  No questions, your Honor.

45

1          THE COURT:  All right.  Sir, you may step down.

2   Thank you.

3          THE WITNESS:  Thank you, your Honor.

4          THE COURT:  I do have one question.

5   Ms. Van Den Hemel, when you advised her that you had

6   learned from Pacer of the court's order quashing those

7   subpoenas, did she sound surprised?

8          THE WITNESS:  She never responded at all.

9          THE COURT:  All right.  Thank you.

10          MR. PIETZ:  Your Honor, also in attendance today

11   is an attorney for Verizon, Mr. Benjamin Fox.  If it

12   please the court, I would suggest we offer him.

13          THE COURT:  Yes.  Please.

14          (The witness was sworn.)

15          THE CLERK:  Please have a seat.  And please state

16   your full and true name for the record and spell your

17   last name.

18          THE WITNESS:  Benjamin Fox, F-O-X.

19

20                    DIRECT EXAMINATION

21   BY MR. PIETZ:

22   Q    Mr. Fox, what is your occupation, sir?

23   A    I am a partner at Morrison and Foerster here in Los

24   Angeles.  I am a lawyer.

25   Q    And do you represent Verizon in that capacity?

46

1    A      I do.

2    Q      And how long have you represented Verizon in that

3    capacity?

4    A      I can't tell you the date.  I know that the first

5    matter was the Eastern District of California Rule 27

6    proceeding filed by Ingenuity 13, and that is the case

7    that you had a copyright assignment for that you showed

8    earlier this afternoon.

9    Q      So you appeared on behalf of Verizon in that Rule

10   27 petition action in the Eastern District of California;

11   is that correct?

12   A      Correct.

13   Q      And I believe that was in 2011.  Since then, have

14   you had occasion to deal with litigation matters

15   involving the Prenda law firm?

16   A      Yes.

17   Q      So you have handled those issues for Verizon on a

18   day-to-day basis in the past two years?

19   A      Yes.  Many of them.

20   Q      Very well.  You prepared and submitted, filed, I

21   should say, a declaration with the court earlier today;

22   isn't that correct, sir?

23   A      I prepared for Verizon and obtained a signature

24   from Mr. Sean Moriarty who is a Verizon representative in

25   Arlington, Virginia.  Yes.

47

1   Q       So you are familiar with the facts that were

2   averred in the declaration filed with the court today?

3   A       Yes, I am.

4   Q       And did you investigate whether the facts are

5   correct prior to filing the document here today?

6   A       I did.

7   Q       And can you explain to me the substance of the

8   declaration with respect to whether or not Verizon

9   received a copy of the court's October 19th discovery

10  order?

11  A       Sure.  Verizon has been the recipient of I think

12  literally hundreds of subpoenas from the Prenda firm, and

13  Verizon is a party in a DC Circuit appeal where AF

14  Holdings was the plaintiff based on one of the copyright

15  assignments that bears the name of Mr. Cooper.  Verizon

16  is very focused on what has been happening in these cases

17  and has been paying close attention to it.

18          So if Verizon had received the October 19

19  order from this court, Verizon would have known that, and

20  I would have received it as well.  My e-mail doesn't have

21  any record of it.  I have searched.  I know that Verizon

22  has now searched.  Is there some theoretical possibility

23  that maybe it was sent to someone at Verizon and not

24  forwarded to the correct people?  Possible.  But having

25  not seen anything from Mr. Gibbs that suggests it was

48

1   sent, you know, my conclusion is that it was not sent to

2   Verizon.

3   Q    So, then, in terms of the usual channels, the

4   custom and practice, the way subpoenas would normally

5   come in from Verizon, did you check all of these means of

6   receiving subpoena information?

7   A    I checked.

8         MR. WAXLER:  Calls for speculation, your Honor.

9         MR. PIETZ:  Let me rephrase.

10        THE COURT:  What is your objection?

11        MR. WAXLER:  Calls for speculation.  He is asking

12   this witness to speculate about what Verizon's policies

13   are in receiving subpoenas.

14        THE COURT:  I thought you were talking about

15   Morrison and Foerster's policy.

16        MR. PIETZ:  That's right.  I will rephrase and

17   make it more clear, your Honor.  Let me rephrase.

18   Q    So did you personally check Morrison and

19   Foerster's, the way that Morrison and Foerster would

20   normally receive information about a subpoena?  Did you

21   check and make sure that no notice was received of the

22   October 19th discovery order?

23   A    Yes.  I made a reasonable search, and I looked

24   wherever that I thought was appropriate to look.

25   Q    And you communicated with your client that you --

49

```
1    well, let me back up.

2              The gentleman who executed the declaration

3    that was filed with the court today, what was his name,

4    again, sir?

5    A    Sean Moriarty.

6    Q    And is that somebody you normally communicate with

7    these type of matters.

8    A    Yes.

9    Q    And you spoke with Mr. Moriarty, and can you

10   explain, did you have him investigate, from Verizon's

11   end, whether notice was received?

12   A    The Verizon team investigated.  Yes.

13   Q    Including Mr. Moriarty?

14   A    Yes.

15   Q    Very well.  And so, then, to the best of your

16   knowledge, based on both his investigation and a review

17   of Morrison and Foerster's own records, Verizon did not

18   receive a copy of the October 19th discovery order; isn't

19   that correct?

20        MR. WAXLER:  Your Honor, it is basically taking

21   hearsay.  Calls for speculation.  He is asking the

22   witness what Verizon did.  Verizon has given a

23   declaration that says it does not appear.

24        THE COURT:  Overruled.

25        THE WITNESS:  Correct.
```

50

1   Q    BY MR. PIETZ: I would ask, then, that the

2   declaration submitted by Mr. Moriarty with the court

3   earlier today be admitted into evidence as Exhibit 7.

4   Sorry.  Pardon.  Exhibit 8.

5        THE COURT:  It will be admitted.

6            All right.  Mr. Brodsky, do you wish to

7   inquire?

8        MR. BRODSKY:  I do not, your Honor.  I have no

9   questions.

10       THE COURT:  Sir, you may step down.

11       THE WITNESS:  Thank you.

12       THE COURT:  All right.  Now, I would also like to

13  hear from your former client?

14       MR. PIETZ:  Very well.  Mr. Nason, are you in

15  attendance today?

16       (The witness was sworn.)

17       MR. WAXLER:  Your Honor, I would object to this

18  line of questioning please.

19       THE COURT:  He hasn't asked any questions yet.

20       MR. WAXLER:  I know that, but this witness has no

21  relevant testimony to this subject matter.  He is not a

22  party to any of the four cases at issue in this OSC.  It

23  is not even a federal court case that he was a defendant

24  in, your Honor.  He has no relevant testimony that he

25  could state in connection with this OSC.

51

1          THE COURT:  Maybe yes.  Maybe no.  If we are

2     talking about a pattern and practice, and from what I

3     have seen, this is a cookie-cutter litigation.  Sometimes

4     the only thing that I see changed on the complaints are

5     the ISP's addresses and the name of the film, but, in all

6     other respects, they seem to be all the same even the

7     declaration from the technical expert as to what he did

8     in order to identify the infringer.  It is the same

9     document.  So I hear your point.  If I don't find it to

10    be relevant, I will discard it.

11         MR. WAXLER:  Your Honor, just for the record,

12    Mr. Gibbs' declaration does go through exactly the

13    different things that he did in order to determine

14    whether in the two cases that you cited in the OSC

15    whether he was able to locate the infringer and who that

16    was.  And there is nothing cookie cutter about that

17    effort that he put in his declaration.

18         THE COURT:  All right.  Thank you.

19             Go ahead.

20         THE CLERK:  Please state your full and true name

21    for the record and spell your last name.

22         THE WITNESS:  Jessie Nason.  That is N like Nancy,

23    A-S-O-N.

24         THE COURT:  Go ahead, counsel.

25             Is that one S or two?

52

```
 1              THE WITNESS:  One S.

 2              THE COURT:  All right.

 3              THE WITNESS:  Well, two in Jessie.  Sorry.

 4

 5                       DIRECT EXAMINATION

 6   BY MR. PIETZ:

 7   Q     Mr. Nason, have you heard the name Brent Gibbs

 8   before?

 9   A     Yes.

10   Q     And in what context, sir?

11   A     He was the lawyer who brought the case against me,

12   Lightspeed Media versus my name.

13   Q     And where was that -- and I represented you in that

14   case, did I not, sir?

15   A     Correct.

16   Q     And was that in the Los Angeles Superior Court

17   filed in 2012?

18   A     Yes.

19   Q     I will note for the record that the case is

20   Lightspeed Media Corporation versus Jessie Nason, Los

21   Angeles Superior Court No. NC057950.

22              MR. WAXLER:  Your Honor, I would like to object

23   again.  This case is not even a copyright case.  It was a

24   case where the individual here was alleged to --

25              THE COURT:  Where are you from?
```

53

1          MR. WAXLER:  I am from Los Angeles, your Honor.

2          THE COURT:  There are no speaking objections in

3     Los Angeles.

4          MR. WAXLER:  I'm sorry, your Honor.

5          THE COURT:  Okay.  What is this case about?

6          MR. PIETZ:  Your Honor, if I might speak to that

7     very briefly.  What we have seen from Prenda Law is a

8     slightly different twist in some of their cases on

9     copyright litigation, and what it is is essentially an

10    attempt to address a copyright infringement case in state

11    law clothing, well, state law and the Computer Fraud and

12    Abuse Act.

13          So the causes of action at issue in the

14    Lightspeed case was a computer fraud and abuse act claim

15    which essentially alleges that downloading and

16    distributing content, and the content is nebulously

17    specified in the complaint amounts to Computer Fraud and

18    Abuse Act violations.  And then there were a variety of

19    related claims all of which were preempted by the

20    Copyright Act for conversion, unjust enrichment and the

21    like.  But, really, what it was, and, in fact, and I can

22    speak to this longer although perhaps it is getting off

23    on a tangent, in reality what happened, was at some point

24    somebody probably hacked into a password protected

25    website, but, then, Prenda started logging IP addresses

54

1    and suing people in CFAA claims even though really the

2    gravamen of the case was the use of BitTorrent.  So it is

3    similar, but, in any event, the issue in Mr. Nason's case

4    that I think is relevant here is the same, and that

5    specifically what was the investigation that was

6    performed prior to naming Mr. Nason as the defendant in

7    the case, and it is fairly bread and butter.

8         THE COURT:  Okay.  Go ahead.

9    Q    Mr. Nason, are you familiar with the reason that

10   Mr. Gibbs stated that he had named you as a defendant?

11   A    Yes.

12        MR. WAXLER:  Calls for speculation.

13        THE COURT:  He said stated.  You did say stated;

14   right?

15        MR. PIETZ:  Yes, your Honor.

16        THE COURT:  All right.  Overruled.

17   Q    BY MR. PIETZ: So, in any event, what was that

18   reason, Mr. Nason.

19   A    I believed it to be that he supposed I lived by

20   myself in my apartment, and so he considered me a single

21   male.

22   Q    And, Mr. Nason, is that correct?  Do you live

23   alone?

24   A    No, I do not.

25   Q    And who do you live with, Mr. Nason?

55

1    A       My wife of nine years.

2    Q       And have you lived with her for the past

3    nine years?

4    A       Correct.

5    Q       So, at any point, you know, save perhaps for a

6    vacation, consistently for the past nine years, you have

7    always lived with your wife; is that correct?

8    A       That's correct.

9            MR. PIETZ:  That is essentially all I need from

10   Mr. Nason, your Honor.  I might have some questions about

11   Mr. Gibbs, or perhaps now I could show the court the

12   section of the transcript from the hearing in the Nason

13   matter where Mr. Gibbs, when pressed by the court as to

14   how it is and why it is he justified having named

15   Mr. Nason as a defendant, Mr. Gibbs specifically stated,

16   well, because we determined that he lived alone.  It is

17   just incorrect.  And, indeed, the court denied my motion

18   on that basis even though it turned out to be incorrect.

19           MR. BRODSKY:  Your Honor, for the record, may we

20   move to strike the testimony on the ground that it is

21   irrelevant and beyond the scope of the court's OSC.

22           THE COURT:  You may step down, sir.  Thank you.

23           THE WITNESS:  Thank you.

24           MR. PIETZ:  I am looking now for the specific

25   section of the transcript.

56

1          THE COURT:  Don't worry about it.

2          MR. PIETZ:  All right.  I can find it afterwards.

3     Thank you, your Honor.

4          THE COURT:  All right.  Let's now switch to the

5     jurisdictional issue.

6          MR. PIETZ:  Oh, you know what, your Honor, I have

7     here the actual original copy of the transcript which

8     perhaps I will lodge with the court and move to mark as

9     Exhibit 9, I believe we are on.

10         THE COURT:  Okay.

11         MR. PIETZ:  And, Mr. Ranallo, if you can find the

12    pin cite, we will go ahead and add it.

13            May I approach to give this to the clerk, your

14    Honor?

15         MR. WAXLER:  We would object to the inclusion of

16    that transcript as an exhibit.

17         THE COURT:  I will take a look at it.  We will

18    see.

19            Where was this?  Was this in Torrance?

20         MR. PIETZ:  Yes, it was, your Honor.  Judge

21    Vicencia.

22         THE COURT:  Small world.  My old court reporter.

23    Okay.

24         MR. PIETZ:  I am just looking now for the diagram

25    which I think will assist in explaining all of this.

57

1              We seem to be a bit off kilter there, don't

2    we.  Interesting.  Well, in any event --

3         MR. WAXLER:  What exhibit is this?

4         MR. PIETZ:  Yes.  Marked as -- I will tell you in

5    just a moment.  Double H, previously on the record.

6              In any event, perhaps less useful than I hoped

7    it would be, but I can at least talk the court through

8    it.

9         THE COURT:  What is your source?  I mean,

10   electronic source?

11        MR. PIETZ:  This is a demonstrative exhibit, your

12   Honor.

13        THE COURT:  I know that.  What are you using,

14   laptop?

15        MR. PIETZ:  It is Trial Pad on my iPad, your

16   Honor.

17        THE COURT:  It is on your iPad?

18        MR. PIETZ:  Yes, sir.

19        THE COURT:  And you can't do anything to adjust

20   it?

21        MR. PIETZ:  We do have a color paper copy of the

22   document.  It will take just a moment to pull it.

23        THE COURT:  Okay.  Go ahead.

24        MR. PIETZ:  In any event, Mr. Ranallo, perhaps you

25   can look for that.