1          MR. BRODSKY:  Your Honor, may I inquire of the

2   court for a moment?

3          THE COURT:  Sure.

4          MR. BRODSKY:  I am not quite sure what the

5   relevance of this is, the foundation for it or exactly

6   what counsel is doing.  It just seems to be his own

7   statement of his investigation.

8          THE COURT:  Do you know the general subject that

9   we are going to discuss now?

10         MR. BRODSKY:  I believe so, your Honor.

11         THE COURT:  Okay.  That is what I think it is, and

12   hopefully it will help him.  Now, when it gets down to

13   the source of this material and the accuracy of this

14   material, I hope I will be hearing from you gentlemen.  I

15   don't have the independent knowledge of this one way or

16   the other.  Thank God for the adversarial process.

17         MR. WAXLER:  Your Honor, so, then, should

18   Mr. Pietz be on the stand if he is going to give

19   essentially testimony about this exhibit?

20         THE COURT:  I don't make a habit of placing

21   lawyers under oath, but this case may change that.  I

22   figure officers of the court will not knowingly make

23   misrepresentations to the court, will they.

24         MR. WAXLER:  No, they won't.

25         THE COURT:  Until this case.

59

1          MR. WAXLER:  My client hasn't in this case.

2          MR. PIETZ:  Your Honor, to explain what it is,

3     what I thought I might do is to give a very brief

4     overview of the organization, and, then, I thought I

5     would go through some specific documents about Mr. Steele

6     and a couple of arguments.  So this is really argument,

7     essentially, a couple of exhibits that go to Mr. Steele's

8     connection to the California as well as a couple of

9     points about Mr. Paul Hansmeier and Mr. Duffy.

10         THE COURT:  Okay.

11         MR. PIETZ:  So, in any event, this is a chart that

12    was essentially prepared.  This was prepared by my office

13    essentially as a tool to aid in the understanding of how

14    Prenda Law appears to have evolved over the past few

15    years.

16              Essentially, it started out here with Steele

17    Hansmeier, and John Steele -- I know that is a little

18    hard to see -- John Steele, Paul Hansmeier and Brett

19    Gibbs.  Mr. Steele and Mr. Hansmeier were the named

20    partners in the firm, and Mr. Gibbs was the of counsel

21    originally.  When they first started out, circa 2011 --

22         THE COURT:  I am going to have to stop you.  How

23    do you know that Mr. Gibbs was of counsel with Steele and

24    Hansmeier?

25         MR. PIETZ:  Your Honor, I can point to the

1    specific exhibit, but there are pleadings of which the

2    court can take judicial notice where he is listed on the

3    pleadings as of counsel to Steele Hansmeier.

4         THE COURT:  You are aware of the fact that

5    Mr. Hansmeier doesn't know what capacity Mr. Gibbs was

6    working at his law firm?

7         MR. PIETZ:  Correct, your Honor.  So, in any

8    event, let me put it this way.  Mr. Gibbs filed documents

9    in federal court indicating on the caption that he was of

10   counsel to Steele Hansmeier.

11        THE COURT:  Okay.

12        MR. PIETZ:  Now, I believe I can also speak to

13   this if the court is so inclined that Mr. Lutz was

14   holding himself out to the world as a paralegal at that

15   time, working, according to Mr. Paul Hansmeier, solely

16   for Mr. Steele.  At this time, most of the lawsuits with

17   a few exceptions filed by Prenda around 2011 were on

18   behalf of a porno production, pardon me, adult

19   entertainment production company that actually people

20   have heard of before.  And that is this list of clients

21   here.

22             What happened is that sometime in 2012, the

23   Steele Hansmeier firm was disbanded or become Prenda,

24   sold its client book to Prenda Law.  We are not entirely

25   sure exactly the nature of the transaction, but, in any

1    event, at that point, Paul Duffy became involved as the

2    nominal figurehead of the Prenda Law enterprise.

3    However, there are indications that Mr. Steele and

4    Mr. Hansmeier remain involved and Mr. Gibbs has declared

5    that he essentially continued on as of counsel handling

6    the same cases only now on behalf of Prenda Law, Inc.

7    rather than Steele Hansmeier LLC.

8          At the same time that Steele Hansmeier became

9    Prenda, sometime around, then, in 2012, I am not exactly

10    sure, Mr. Hansmeier started up his own shingle in

11    Minnesota, the virtual office called the Alpha Law Firm

12    LLC.  So, essentially, Mr. Hansmeier sometimes files

13    pleadings in federal court that list his affiliation as

14    Alpha Law Firm LLC, but, by the same token, Mr. Gibbs has

15    identified Mr. Paul Hansmeier as being the person from

16    whom he took direction at Prenda.

17          And, indeed, the court may recall from the

18    deposition transcript read over the weekend that

19    Mr. Hansmeier testified that, indeed, his clients

20    deposited their trust account funds into the Prenda Law

21    Firm account rather than to the Alpha Law Firm account.

22        THE COURT:  Stop.  I hate to interrupt you.

23          But she means more to me than this argument,

24    and we have had her going at light speed for an

25    hour-and-a-half.  Right.  So I am going to take a break,

1   and we can all take a break.  How about 10 minutes.

2   Okay.

3         MR. PIETZ:  Very good.  Thank you, your Honor.

4         (Recess from 2:58 to 3:09.)

5         THE COURT:  All right.  Mr. Pietz.

6         MR. PIETZ:  Thank you.  I will attempt to keep

7   this section very brief, and then we will move on to some

8   documentary evidence.  This is just a summary.

9         So, as I was saying, sometime around 2012,

10  there was a bit of a shift in the Prenda business

11  strategy.  Mr. Hansmeier -- so what happened is these

12  companies, AF Holdings, LLC, Ingenuity 13 LLC and then

13  there is a couple of other companies which are the ones

14  in the CFAA cases.  That is Arte de Oaxaca LLC and Guava

15  LLC.  And the CFAA cases have primarily been filed in

16  state court and have indeed tried to use -- certain

17  states have presuit discovery procedures that are more

18  lenient than Federal Rule of Civil Procedure 27.  So it

19  is sort of a newer twist is these state court CFAA cases

20  and Arte de Oaxaca.

21        But, in any event, according to Mr. Hansmeier

22  in his deposition, these essentially shell company

23  plaintiffs are owned by a mystery trust.  Mr. Hansmeier,

24  as 30(b)(6) deponent -- well, anyway, I won't go into

25  that.  The court read it.  According to Mr. Gibbs'

1   special counsel, though, on the same day, February 19th,

2   there is conflicting testimony essentially saying that

3   Livewire Holdings LLC is actually the current holder of

4   AF Holdings and Ingenuity 13.

5         So, in any event, these are the parent

6   companies, some mystery trust and Livewire Holdings LLC.

7   There is documents, you know, I had this sort of set

8   aside to potentially go through with Mr. Gibbs, but I can

9   also just show the documents, show what I have.  In any

10  event, there is documents showing Mr. Gibbs as in-house

11  counsel for Livewire Holdings.

12        There are various other connections between

13  Livewire Holdings and the attorneys we see over here.

14  Mr. Dugas is a local counsel who has worked at both

15  Prenda and Alpha Law which I can show through his

16  LinkedIn profiles, obviously, not central to the case.

17  Mr. Dugas' wife has been identified on LinkedIn as

18  in-house counsel for Livewire Holdings.

19        In addition, what I will talk about now is the

20  way that we see the lawyers.  Mr. Hansmeier has been both

21  30BC deponent for AF and as its counsel.  In any event,

22  what seemed to happen is that at some point these cases

23  filed on behalf of Ingenuity, AF Holdings, Arte de Oaxaca

24  and Guava LLC are cases where what appears to have

25  happened is the lawyers essentially took assignment of

64

1    the underlying intellectual property rights in these

2    mysterious shell companies.  One recurring theme here is

3    the way that when we are seeing the straw men, there is

4    always a connection to John Steele.  So, for example, in

5    the VPR International, we see John Steele is the

6    attorney.  We see Alan Cooper listed on the corporate

7    registration.  The address listed for VPR International,

8    the 4532 East Villa Teresa Drive.  My understanding based

9    on documents that have been submitted with the court is

10   that is an address that comes up for John Steele's sister

11   and a gentleman named Anthony Saltmarsh, in addition, of

12   course, to being the address listed for Mr. Cooper.

13          So on various federal court filings in the

14   Northern District of California, all of which are

15   attached as exhibits to the deposition that was lodged

16   with the court which the court read over the weekend,

17   when pressed to identify the person at AF Holdings who

18   would be made available for an early neutral settlement

19   evaluation conference, there are various court filings

20   listing the owner of AF Holdings as somebody named Salt

21   Marsh, two words.

22          So, in any event, what seems to perhaps be the

23   case is that this Anthony Saltmarsh lived at this address

24   with John Steele's sister which was essentially used as a

25   front for various entities involved in Prenda activities.

65

```
 1              I don't want to spend too much time on just
 2   the overview.  What I thought I might do is shift instead
 3   to taking the nonappearing folks individually.  And I
 4   thought I might start with Mr. Steele.  So I have some
 5   documents which go to that, and I will switch back now
 6   to -- okay.  There we go.  So I will note that in the
 7   declaration submitted to the court by Mr. Steele on
 8   Friday, he claims that he resides in the State of
 9   Florida.
10              I will point out that when Mr. Steele was
11   under threat of sanction in the state of Florida, he
12   declared to the court there that he resided in the State
13   of Nevada and only visited the State of Florida.  So I
14   have here the affidavit of John Steele that he filed, and
15   you can see the file stamp on the top.  It is Middle
16   District of Florida, Case No. 812 CV 1685 that was filed
17   on December 20th, 2012.  And, in Paragraph 2, Mr. Steele
18   swore to the court that my legal residence is Las Vegas,
19   Nevada, and I also spend one to two weeks a month in
20   Miami, Florida.  So my understanding must be then that
21   sometime between last December and now Mr. Steele has
22   decided that his residence is not Nevada but rather
23   Florida.
24              In any event, and before moving on, I would
25   ask the court to take judicial notice of the fact that in
```

1   the -- that this affidavit which was filed in the public

2   record in the Middle District of Florida that Mr. Steele

3   states that he spends one to two weeks a month in Miami,

4   Florida.  Mr. Ranallo can pass out copies of the

5   affidavit to everybody.

6            So, in any event, let's look at some other

7   documents about Mr. Steele.  And what I would start with,

8   I believe, is a declaration here, and I will ask

9   Mr. Ranallo again to pass this out for the court, the

10  declaration of Michael B. Stone, and what this

11  declaration is, the declaration itself is essentially

12  just authenticating the document, but the document at

13  issue is a collection of pleadings in a Northern District

14  of California action in which it was a case filed on

15  behalf of a Prenda client.

16           Well, this I think was an actual company that

17  people have heard of in an earlier case, but in any

18  event, here, we see the pleading.  So the declaration

19  authenticates it, and then Exhibit 1 is a copy of the

20  complaint which as we can see was filed in the United

21  States District Court for the Northern District of

22  California, and it is Civil Action No. 511 CV 3648.

23           Well, in any event, the interesting thing

24  about this complaint is who signed the subpoena that was

25  directed in this case at a John Doe defendant who resided

1   in California.  And the answer, and here we see a copy of

2   the subpoena, pardon me, authenticated by Mr. Stone.

3   This is the letter that the ISP normally sends out, and,

4   here, we see a copy of the subpoena itself.  And this is

5   in the same action.

6          Then, we see, there, that this subpoena which

7   again was signed by John Steele in a California action

8   requesting information of a John Doe defendant in the

9   State of California.  So, essentially, I would ask that

10  this declaration of Michael Stone be admitted into

11  evidence as Exhibit, I believe, we are on 9.

12          Is that correct, Madam Clerk?

13  THE CLERK:  10.

14  MR. PIETZ:  Pardon me.  10.  I am one behind.

15  THE COURT:  All right.  Any objection?

16  MR. WAXLER:  Your Honor, I just question the

17  relevancy of it as to Mr. Gibbs.  Again, it is not one of

18  the cases that you put in your OSC.

19  THE COURT:  It will be admitted.

20  MR. PIETZ:  Similar document that I will move onto

21  next.  What we have here is a declaration which was filed

22  on the docket in a case in the Northern District of

23  California by a man named Samuel Teitelbaum.  It is

24  Northern District of California No. 311 CV 5628.  And we

25  can see here that it is pending in the Northern District

68

 1    of California.

 2              In this declaration, Mr. Teitelbaum explains

 3    that he received a letter directed to him in California

 4    from Prenda Law and that the letter which was mailed to

 5    him in California which is there is a copy of it right

 6    here.  It is on Steele Hansmeier letterhead, and if we go

 7    to the last page, we see that the letter, mailed into the

 8    State of California in a case pending in the Northern

 9    District of California, is signed by John Steele,

10    attorney and counselor at law.

11              So, in any event, I would ask that this be

12    admitted into evidence as Exhibit 11, and these both go

13    to showing that Mr. Steele has indeed reached into the

14    State of California in terms of his actions in BitTorrent

15    copyright litigation cases.

16              THE COURT:  All right.  Will be received.

17              MR. PIETZ:  So what I will do now, I think that

18    the other facts that I had already pointed out about the

19    other gentlemen who are not here today, so I mean Paul

20    Hansmeier and Paul Duffy, I pointed out in my opposition

21    to the objections which was filed on Friday, but, in

22    general, I would argue the jurisdictional issue as

23    follows.

24              What we have from Mr. Gibbs is a declaration

25    saying that anything that was potentially improper in

1    these cases was done at the direction of his superiors at

2    the Prenda law firm.  He identifies those people as John

3    Steele and Paul Hansmeier.  Interestingly enough,

4    Mr. Duffy isn't on the list or perhaps maybe not as much.

5            Mr. Duffy has his California bar license in

6    the state of California and has substituted in in

7    Mr. Gibbs' place in a variety of actions in the Northern

8    District of California.  Mr. Hansmeier, in addition to

9    being identified by Mr. Gibbs as essentially running a

10   law firm doing business in California, flew to California

11   apparently of his own free will to appear as the

12   corporate 30(b)(6) deponent of AF Holdings LLC.  So we

13   have Mr. Hansmeier reaching into the state of California,

14   attending a deposition in California in a Northern

15   District of California case, representing essentially

16   that the same plaintiff that is at issue here, AF

17   Holdings LLC.

18           So at least with respect to Mr. Duffy who has

19   his bar license here and Mr. Hansmeier who flew here as a

20   30(b)(6) deponent and has been identified, I think it is

21   fairly clear that probably both general and specific

22   jurisdiction exists.

23           Mr. Steele has perhaps been a little more

24   careful about trying to keep his fingerprints off here,

25   but I would remind the court that Mr. Gibbs has

70

1    identified him as essentially running a law firm in

2    California which by the way is not qualified to do

3    business in California, and I checked with the state bar

4    and it is not registered as a law firm here.

5              But in any event --

6         THE COURT:  You talking about Prenda now?

7         MR. PIETZ:  Talking about Prenda.  Yes, sir.

8              In any event, I apologize.  I don't have

9    documents to back that up, but I can provide them.  But,

10   in any event, I think that with respect to Mr. Steele

11   when you take Mr. Gibbs' declaration and add it together

12   with a subpoena signed by Mr. Steele.  And, pardon me, I

13   will note one other thing about the declaration of

14   Michael Stone.  In addition to authenticating the

15   documents, he also included some back and forth, some

16   meet and confer correspondence he had with Mr. Steele.

17             So, essentially, Mr. Stone noticed the fact

18   that Mr. Steele was not licensed in California and that

19   he had signed the subpoena and wrote to Mr. Gibbs saying

20   this subpoena is invalid.  And what happened is that

21   Mr. Steele wrote back directly without cc'ing Mr. Gibbs

22   and essentially shrugged off the concerns about the

23   subpoena being signed by an attorney who doesn't have a

24   license in California.

25             So, in any event, I think that with respect to

71

1   Mr. Steele, when you add together the subpoena issued

2   into the state of California, a demand letter issued

3   under the state of California as well as Mr. Gibbs'

4   testimony, it is pretty clear that the court has personal

5   jurisdiction.

6           I don't have a tremendous number of additional

7   exhibits on this topic.  However, I do have quite a few

8   with respect to what I view as Mr. Gibbs' central role in

9   the Prenda law organization.

10      MR. BRODSKY:  Your Honor, may I make one comment?

11      THE COURT:  You can make more than that.  Thank

12  you.

13          Yes.  Go ahead.

14      MR. BRODSKY:  We are not taking a position at the

15  present time on the jurisdictional issues that the court

16  is deciding, but there were statements made about my

17  client that I believe mischaracterize the evidence that

18  has been put forward.

19      THE COURT:  Okay.  Listen, let me just sort of

20  tell you the way we are going to proceed here.  At this

21  point, you will have the floor.  All right.  I can't

22  imagine you are going to raise too much in opposition to

23  the jurisdictional issue.  Otherwise, he is in.  So you

24  go right ahead.

25          Now, a number of things -- I am just going to

1    give you some of my thinking.  A number of things were

2    stated in your papers.  Some of them caused me some

3    concern because they were inaccurate.  For example, you

4    make the argument that certain people were identified as

5    infringers because there was no way, for example, that

6    someone else could have been piggy-backing off of their

7    modem because of the size of the lot, where the house is

8    situated on the lot, the proximity or lack of proximity

9    of other residences around, et cetera.

10          Your representation of these homes and the

11   neighborhoods and juxtaposition of other houses around

12   them was simply not accurate.  Not in the least bit.  And

13   I found that troublesome when you are asking me, then, to

14   accept all of your our arguments.

15          So I just want to throw that out there to let

16   you know some of my thinking.

17          MR. WAXLER:  Our turn, your Honor?

18          THE COURT:  I don't care who.  It is this side.

19          MR. WAXLER:  We will call Mr. Gibbs to the stand,

20   your Honor.

21          THE COURT:  All right.

22          (The witness was sworn.)

23          MR. PIETZ:  Your Honor, before we move onto

24   Mr. Gibbs, may I request that we admit into evidence the

25   affidavit of John Steele as Exhibit 12, the Michael Stone

73

1    declaration as Exhibit 13 -- oh.  Pardon me.  Stone and

2    Teitelbaum have already been admitted so just the

3    affidavit of John Steele.  I would ask that that be

4    admitted as Exhibit 12.

5         THE COURT:  I think that's right.  Are we up to

6    12?  Okay.  All right.

7         THE CLERK:  If you could state your full and true

8    name for the record and spell your last name.

9         THE WITNESS:  Sure.  Brad Gibbs, G-I-B-B-S.

10

11                    DIRECT EXAMINATION

12   BY MR. WAXLER:

13   Q    Mr. Gibbs, who is your present employer?

14   A    I am not currently employed.

15   Q    You became employed -- I'm sorry.  You became an of

16   counsel, 1099 independent contractor for Steele

17   Hansmeier; correct?

18   A    Yes.

19   Q    Was Steele Hansmeier an existing law firm at the

20   time that occurred?

21   A    I believe they had been existing for a number of

22   months at that point.

23   Q    What were you told your role would be at Steele

24   Hansmeier?

25   A    Basically, California counsel for Steele Hansmeier

74

1    in bringing lawsuits on behalf of their clients.

2    Q    Were you paid as an employee?

3    A    No.

4    Q    Did you share in Steele Hansmeier profits?

5    A    No.

6    Q    Were you on the management of Steele Hansmeier?

7    A    No.

8    Q    And who did you understand were the decision makers

9    of Steele Hansmeier?

10   A    John Steele and Paul Hansmeier.

11   Q    When you were an of counsel to Steele Hansmeier,

12   who supervised you?

13   A    John Steele and Paul Hansmeier.

14   Q    Did you have periodic meetings while at Steele

15   Hansmeier to discuss cases?

16   A    Yes, we did.

17   Q    And were those weekly meetings?

18   A    Yes.  Sometimes they would be sending the schedule,

19   but, yes, mostly weekly meetings.

20   Q    Who participated in those meetings?

21   A    John and Paul would call me, and they would hold a

22   weekly meeting.

23   Q    And were these by phone or in person?

24   A    These were by phone.

25        THE COURT:  Were they ever in person.

1      THE WITNESS:  I went sometimes and met them, and

2    then we had meetings, yes, in person at that point, but

3    this was only a couple of times.

4      THE COURT:  This is out of California?

5      THE WITNESS:  Yes.  Well, I have met with Paul

6    Hansmeier in California prior to this deposition, but the

7    other, everything was out of California.

8    Q    BY MR. WAXLER: When -- were any cases that you filed

9    while at -- while of counsel to Steele Hansmeier, were

10   any of those cases settled?

11   A    Yes.

12   Q    And did the checks, the settlement checks come to

13   you?

14   A    No.

15   Q    Did you have a client trust account in any account

16   in which you had an interest at all as a signatory?

17   A    No.  Actually, I don't even have a client trust

18   account.

19   Q    So the checks were sent to Steele Hansmeier's trust

20   account?

21   A    I don't know.  I would assume they were.  They

22   weren't sent to me.  They were sent to Steele Hansmeier.

23   Q    And how did you learn that Prenda law was going to

24   substitute in or take over the cases from Steele

25   Hansmeier?

1    A     Basically, I heard of the name Prenda Law.  They

2    told me that Prenda Law was now taking over the business.

3    Steele Hansmeier was no longer going to exist at that

4    point.

5    Q     And who is they in that answer?

6    A     That would be John Steele and Paul Hansmeier.

7    Q     Were you on the management committee at all of

8    Prenda Law?

9    A     No.

10   Q     Were you partner at Prenda Law?

11   A     No.

12   Q     What was your affiliation with Prenda Law?

13   A     The same as it was for Steele Hansmeier which would

14   be of counsel, California counsel essentially for Prenda

15   Law.

16   Q     So you were compensated with a 1099?

17   A     Yes.  That is correct.

18   Q     And did that ever change over the course of the

19   time which you were counsel to Prenda Law?

20   A     In terms of what?

21   Q     In terms of your relationship with that firm?

22   A     No.  I would only say that they, John and Paul, had

23   asked me to help the other counsel in different states,

24   basically, like, give them advice in doing their own

25   cases in different states.  That was the only change

77

1    really.   Other than that, I was just California counsel.

2    Q     While of counsel to Prenda Law, did you ever

3    receive any settlement checks?

4    A     Myself personally, no.

5    Q     Did you have a client trust account at Prenda Law

6    that you somehow administered or controlled?

7    A     No.

8    Q     And were you supervised at Prenda Law?

9    A     Yes, I was.

10   Q     Who were you supervised by?

11   A     Paul Hansmeier and John Steele.

12   Q     Were you supervised by Paul Duffy?

13   A     No.

14   Q     And when you say supervised, could you just

15   describe what you mean by that?  How did they supervise

16   you?

17   A     Sure.  You know, they essentially were the ones

18   that would initiate cases.  By that, I mean, they would

19   tell me they wanted to file certain cases in California,

20   for instance, and they would instruct me to go ahead and

21   file those.  And they would give me the authority to do

22   so.  I would be told what cases we are looking at and how

23   many cases we are talking about, and then I would file

24   the cases.

25              And they would give me general guidelines on

78

1    what to do and sometimes the cases would be settled by

2    John as was pointed out earlier, and sometimes they gave

3    me certain parameters which I could settle the case

4    myself.

5    Q    Did you ever talk to anybody that you understood to

6    be the client, AF Holdings?

7    A    No.  The communications were solely through Paul

8    Hansmeier and John Steele.

9    Q    Did you ever talk to anybody who said they were

10   affiliated with Ingenuity 13?

11   A    Well, I mean, aside from Mark Lutz who is the CEO

12   of Ingenuity 13, but aside from that, no.  All my

13   communications were straight through Paul Hansmeier and

14   John Steele.

15   Q    Did Mr. Lutz ever give you direction on the

16   handling of any of these cases directly?

17   A    No.  Actually, I only found out about that

18   connection, I would say, after the cases in the Central

19   District were filed, about him being the CEO.  I didn't

20   know that before.

21   Q    And the cases that were filed in the Central

22   District were dismissed; correct?

23   A    That is correct.

24   Q    And whose decision was it to dismiss those cases?

25   A    Ultimately, it was John Steele and Paul Hansmeier's

1   decisions.  We had talked about it.  As counsel of record

2   here, I just kind of broke down like a cost benefit

3   analysis of those cases.  And they said, basically, go

4   ahead and dismiss them because -- they said go ahead and

5   dismiss them.

6   Q     When the cases were filed, did you have a

7   discussion with anybody about whether notice of

8   interested parties should be filed?

9   A     I did.  Yeah.

10  Q     And who did you have discussions with?

11  A     Mostly Paul Hansmeier.  Yes.  Mostly Paul Hansmeier

12  but sometimes John Steele, I guess.  I don't know.  It

13  was a while ago I guess.

14  Q     Did you file those notices of interested parties?

15  A     Yes.

16  Q     What did they say in connection with AF Holdings.

17  A     They said there was no other interested parties.

18  Q     Do you have any personal knowledge of that

19  statement as untrue?

20  A     No, I did not.  No.  I still don't.  I mean, in

21  terms of I know there is other things involved in terms

22  of the trust and stuff like that, but in terms of other

23  people involved, I was only taking direction from these

24  guys in terms of these types of filings.

25  Q     And these guys are?

80

 1   A      These guys are Paul Hansmeier and John Steele.

 2   Q      In connection with Ingenuity 13 cases did you file

 3   notices of interested parties?

 4   A      That is correct.  Yes.

 5   Q      And were you ever advised that the information --

 6   how did you obtain the information for those notices?

 7   A      Well, I just, I would ask them, you know, are there

 8   any other people that I should be noticing on this

 9   document that I am filing with the court.

10   Q      Who is them in your response?

11   A      That would be Paul Hansmeier and John Steele.

12   Q      Were you told not to do that again.  Instead of

13   saying them, were you told by Paul Hansmeier, John Steel

14   that the information you included in those notice of

15   interested parties was correct?

16   A      So they actually told me, I was instructed to fill

17   those documents out like I did.

18   Q      There was a question raised by the court this

19   morning about the failure to have filed notices of

20   related cases.  My question is did you consider filing

21   notices of related cases when you filed the actions in

22   the Central District of California?

23   A      Yes, we did.

24   Q      And could you please describe for the court what

25   your thought process was as a result of, in not filing

81

1    these notices?

2    A    So we had filed -- well, I filed on behalf of

3    Steele Hansmeier, then Prenda Law, a number of cases in

4    the Northern District of California, and those were cases

5    with multiple people in them.

6           And what the court in the Northern District of

7    California concluded, almost every court, at that point,

8    after filing multiple cases was that joinder was not

9    valid and that they basically told us in no uncertain

10   terms that these cases weren't related.  Therefore, that

11   informed my belief in terms of whether we wanted to

12   relate these cases or not.  They said these cases,

13   essentially, through their orders and through live

14   hearings, that these cases aren't related, they should be

15   brought as individual actions.  So it was just a decision

16   to bring those individual actions and not relate the

17   cases based on that.

18   Q    And your experience in Northern California, that

19   predated the filings of the Central District actions that

20   we are here to discuss today?

21   A    Yes.  I don't even know if I was admitted into the

22   Central District at that point.

23        THE COURT:  Let me jump in a second.  You were

24   told in the Northern District of California that when you

25   filed a lawsuit on behalf of either AF Holdings or

1    Ingenuity 13 versus Does 1 through many, that that

2    joinder was improper; correct?

3           THE WITNESS:  Some cases.  Some cases it was not

4    improper.  Some judges felt differently.

5           THE COURT:  All right.  But if it involved

6    different movies, downloads, different times, different

7    people, different places, different ISP addresses, they

8    said you need to file separate lawsuits; right?

9           THE WITNESS:  Some of them were the same clients,

10   same videos.

11          THE COURT:  Okay.  But even then?

12          THE WITNESS:  Yes.

13          THE COURT:  Even then, you had to file separate

14   lawsuits?

15          THE WITNESS:  Yes.  We were pointing that

16   direction even there was a footnote in one of the courts'

17   opinions saying basically that we were trying to get

18   around the filing fee, and that is what they thought so

19   we should file individual cases from there on out.

20          THE COURT:  Of course, you were, but that is not

21   where we are going here.  Now, that deals with joinder in

22   one lawsuit and consolidating really separate and

23   complete causes of action, different parties in a single

24   lawsuit.

25                Now, what we are talking about here is with

83

1    respect to your notice of related case.

2          THE WITNESS:  I understand.

3          THE COURT:  You do because I can hear it now.  I

4    can hear you going it is compound, all the stuff that you

5    do.

6          Do you realize -- no.  Did you equate the

7    instructions you got from the court regarding improper

8    consolidation of a lot of cases, a lot of claims into a

9    single complaint, did you somehow conflate that with the

10   issue of related cases, notices of related cases?  And

11   you know what that is for, here; right?

12         THE WITNESS:  I understand.

13         THE COURT:  You understand why we are looking for

14   that.

15         THE WITNESS:  I understand.

16         THE COURT:  Tell me what your understanding is as

17   to why the court is interested in knowing whether or not

18   there are related cases.

19         THE WITNESS:  Because if they are similar cases,

20   my belief is the court wants to know about those so the

21   court can handle it so that there are uniform decisions

22   essentially that are held from the same court.

23         THE COURT:  Excellent.  A completely different

24   objective -- right -- than consolidating a lot of

25   different lawsuits in one complaint; right?  Completely

84

1    different.  This is judicial economy.

2         THE WITNESS:  I understand.  Yes.  I understand

3    what you are saying.  In terms of that it was just the

4    decision that was made, and perhaps it was the wrong

5    decision, but, you know, the decision was made.

6         THE COURT:  Okay.  Don't do that.  Decision that

7    was made.  Who made that decision?

8         THE WITNESS:  It was a discussion amongst myself,

9    Paul Hansmeier and John Steele and, probably, mostly,

10   Paul Hansmeier.  I don't even know if Steele was involved

11   in that discussion or not, and that is just what we

12   decided to do.

13        THE COURT:  All right.  The law firm that you were

14   working for -- and I guess initially we are talking

15   Steele Hansmeier or the other way around.

16        THE WITNESS:  It was Steele Hansmeier.

17        THE COURT:  Okay.  Did that firm have, in its

18   California office, did it have a client trust account?

19        THE WITNESS:  In California.

20        THE COURT:  Yes.

21        THE WITNESS:  Well, I was working of counsel to

22   them.  So, no, I never had my own client trust account.

23   The funds were always going through the law firm.

24        THE COURT:  Were you operating out of your home?

25        THE WITNESS:  Yes, I was originally.

85

1       THE COURT:  Did at any time you ever have a

2   business office even if it was a suite any place?

3       THE WITNESS:  Not for Steele Hansmeier.

4       THE COURT:  What about Prenda?

5       THE WITNESS:  Prenda Law, yes.  They wanted me to

6   get an office.  So I got an office, and I actually moved

7   twice.

8       THE COURT:  At that time, did you have a client

9   trust account?

10       THE WITNESS:  No, your Honor.

11       THE COURT:  Was it your understanding that in

12   California that you were required to have a client trust

13   account?

14       THE WITNESS:  My belief was that considering I was

15   working as of counsel to the Prenda Law, and Prenda Law

16   had the trust account, that was my understanding of how

17   the money was dealt with.  I didn't ever -- they never

18   saw my bank account.  I was paid like by Prenda Law as an

19   attorney, of counsel attorney, 1099.  And so my

20   understanding was that they had a trust account.  And,

21   therefore, you know, the people that were working with

22   them did not need trust accounts themselves.

23       THE COURT:  Okay.  All right.  And you only handle

24   one kind of business; right?

25       THE WITNESS:  What do you mean by that, your

1   Honor?  I only handle one kind of business?

2           THE COURT:  Yes.

3           THE WITNESS:  Can you explain your question?  You

4   mean in terms of just being plaintiff's lawyer?

5           THE COURT:  Plaintiff's lawyer for copyright

6   infringement for the adult film industry.

7           THE WITNESS:  Well, no, actually.  So originally

8   when I was working for Steele Hansmeier, I was also

9   working for an arbitrator.  So I had other business, but

10  it was just a 1099 worker at the same time.  I was

11  helping him out with his cases, and so when Prenda law

12  came around, we basically, I said, look, you guys are

13  trying to put a lot of work on my plate essentially, and

14  I am kind of split here.  And they said, well, we would

15  like to basically have you work solely for Prenda Law,

16  this is being Paul Hansmeier and John Steele.  And so I

17  wrapped up my arrangement with the arbitrator, and I

18  became exclusive doing stuff for Prenda Law at that

19  point.

20          THE COURT:  Listen, last January, this past

21  January, a few weeks ago, I guess you started withdrawing

22  as counsel of record.

23          THE WITNESS:  That is correct, yes.

24          THE COURT:  All right.  And you just testified

25  that you are no longer employed by Prenda?

87

```
1          THE WITNESS:  That is correct.  I am no longer

2     employed by Prenda or any other corporation or LLC that

3     is involved in these cases.  I have moved on.  I am going

4     to work again for the arbitrator and find some other work

5     essentially.  You know, so that is where I am right now.

6     Actually, I was working for Livewire for two months, but

7     there was actually a couple of things that happened in

8     terms of I never even got paid for my two months there.

9          THE COURT:  Two months where?

10          THE WITNESS:  Two months at Livewire.

11          THE COURT:  You did get paid by Prenda though;

12     right?

13          THE WITNESS:  Before that, yes.  During 2012, yes.

14          THE COURT:  So why did you leave?

15          THE WITNESS:  Well, there is multiple reasons for

16     it.  Personal reasons, I am getting married soon.  So I

17     wanted to focus on that, but, you know, to be honest with

18     you --

19          THE COURT:  That would be good.

20          THE WITNESS:  Yeah.  No.  I am looking forward to

21     it.  And to be honest with you, these types of things

22     raising up themselves, I just didn't want to be

23     affiliated with it anymore.  It wasn't worth it.  I was

24     getting a lot of harassment.  My family was receiving

25     e-mails and correspondence from people, my fiance, my
```

1    parents.  I just didn't see, and I was getting a lot of

2    negative exposure that, you know, I just didn't want

3    anymore ultimately.

4             And, then, also, I didn't really get along

5    with one of the people that managed me.  So I, you know,

6    I decided to go ahead and exit and told them about that,

7    and, yeah, and that is the situation essentially.

8         THE COURT:  Okay.

9    Q    BY MR. WAXLER:  Just to complete your employment

10   picture because there was perhaps some gaps.  You learned

11   sometime in late 2012 that Prenda Law was no longer going

12   to be your, I will just say the word employer but you

13   weren't going to be of counsel to Prenda Law anymore;

14   correct?

15   A    That is correct.

16   Q    And how were you informed of that?

17   A    I was told I would say middle December or so.

18   There was a brainstorming issue about -- they were, John

19   Steele and Paul Hansmeier were brainstorming about

20   whether they wanted basically to start their own company,

21   I guess.  And the company was Livewire, turned out to be

22   Livewire.  And that Livewire would essentially buy AF

23   Holdings and Ingenuity 13 and Guava.

24             And so I was informed that as of January 1,

25   you know, Livewire extends you this offer, and basically

1    if you don't accept this offer, then, you know, we are

2    going to part ways.  So the offer was to be in house

3    counsel for Livewire, and so I was hired W2 employee for

4    this company which is a holding company of copyrights.

5    Q    And you understood that one of the subsidiaries of

6    that company included AF Holdings; correct?

7    A    That was my understanding, yeah.

8    Q    When did you come to a different understanding?

9    A    Oh.  Well, during the deposition, I came to a

10   different understanding because obviously the deposition

11   was said what was said, and I asked Paul Hansmeier about

12   that.

13   Q    And what we are talking about here is

14   Mr. Hansmeier's testimony that there was a trust that

15   owned AF --

16   A    That is correct.

17   Q    And before that testimony, you heard that

18   testimony, you understood as of January 1, that Livewire

19   would own --

20   A    Yes.

21   Q    Livewire would own AF Holdings?

22   A    That is correct.

23   Q    And that is why in at least one of the pleadings

24   you put that you are in house counsel for AF Holdings

25   because that was a company that was owned by Livewire;

90

1    correct?

2    A      I was specifically told to sign as in house counsel

3    for AF Holdings by Paul Hansmeier in that case.  I was

4    actually because of Mark Lutz' position as CEO, I was

5    trying to get his signature for that document, but Paul

6    Hansmeier said, no, you are in house counsel for Livewire

7    thereby in house counsel for AF Holdings, you sign it on

8    behalf of the client.

9    Q      Is one of the other reasons you decided to leave

10   Livewire is because you learned that the stamp was being

11   used for your signature?

12   A      Yes.  Certain letters were sent out without my

13   knowledge.  I never authorized them, never approved them.

14   When I questioned John about them, he was, like,

15   basically said, this is your role.  This is what you have

16   to do.  You have to send these letters out, and I said I

17   don't feel comfortable, these aren't even my cases,

18   essentially.  And, you know, I actually e-mailed Mark

19   Lutz about that, and he said you got to talk with John

20   and Paul about this.

21          THE COURT:  I'm sorry.  What kind of letters are

22   we talking about?  Is that the settlement letters?

23          THE WITNESS:  Settlement letters.  They had been

24   using -- they originally said they were going to do a

25   stamp for me for certain things, but I thought they were

1    only for my cases.  And, you know, later, I found out

2    that stamp might have been used for cases that I never

3    even participated in or seen the letters before they went

4    out.

5         THE COURT:  Let me make sure I understand now.

6    Livewire eventually became the parent of AF Holings and

7    Ingenuity 13 LLC?

8         THE WITNESS:  That was my understanding.  I was

9    told that, yeah.  And that is why I was hired and a lot

10   of people were hired in terms of working as W2 employees

11   for Livewire.  So it was the company that was a holdings

12   company that would do litigation as well as distribution.

13   That is what they told me.

14        THE COURT:  And you were a W2 employee?

15        THE WITNESS:  That's correct.  And I still have

16   not been paid for that position.

17   Q    BY MR. WAXLER: That was for a period of two months;

18   correct?

19   A    That's correct.  And I gave him my notice early

20   February essentially.

21        THE COURT:  Where was Livewire's offices?

22        THE WITNESS:  Livewire has an address of

23   Washington DC address, but, obviously, I don't know if it

24   has an office to be honest with you.  It is just a matter

25   of, kind of a cloud type office.  It might be a situation

92

1    where -- I am just speculating right now.

2         THE COURT:  You have never visited Washington DC

3    offices?

4         THE WITNESS:  No.  I believe it is just a PO box

5    over there.  That is just a mailing address for them.

6         THE COURT:  Did that form letter requesting

7    payment of the settlement sums, did that letter change to

8    reflect that payment now should be sent to Livewire at

9    the Washington DC address?

10        THE WITNESS:  Absolutely.  It wasn't sent to me or

11   anything like that.  It was sent to that mailbox, and

12   then I believe it would be sent back to somebody at some

13   point somewhere.  But that is the kind of issues that I

14   started having, and along with a lot of other different

15   issues.  So I just decided to -- I asked them if I could

16   go ahead and substitute out with Paul Duffy who had a

17   license in California.  I talked to Paul Duffy about

18   that, he said sure, and then I proceeded to do that.

19        THE COURT:  All right.  So you substituted out.

20   Now, how long were you general counsel for Livewire?

21        THE WITNESS:  Two months basically.  I mean, I

22   guess you could say, I think the official documents were

23   signed.  It never actually specified that I was in house

24   counsel, but that is what I was told.  The documents were

25   just general employment documents, but that was from I

93

1    think January 7th on.  That's when I signed the

2    documents.

3    Q    BY MR. WAXLER: You were not general counsel.  You

4    were in house counsel; right?

5    A    In house counsel.  Sorry.

6    Q    You have never held the position of general

7    counsel, have you?

8    A    No.

9         THE COURT:  Did you know about any other employees

10   there?

11        THE WITNESS:  Yes.

12        THE COURT:  Was there a bookkeeper or an

13   accountant?

14        THE WITNESS:  Yes.

15        THE COURT:  Do you know whether -- well, okay.

16        Thank you.

17        MEMBER OF THE AUDIENCE:  Your Honor?

18        THE COURT:  You are?

19        MEMBER OF THE AUDIENCE:  Jason (inaudible).  I

20   represent Godfread and Cooper in some of the defamation

21   cases.

22        THE COURT:  You represent Godfread?

23        MEMBER OF THE AUDIENCE:  Yes.

24        THE COURT:  So back in Minnesota, lawyers have

25   lawyers?

94

1          MEMBER OF THE AUDIENCE:  I am from Massachusetts.

2          THE COURT:  And how can I help you?

3          MEMBER OF THE AUDIENCE:  I had a conversation with

4    Mr. Gibbs probably back in October regarding AF Holdings

5    where he told me that he was national counsel for AF

6    Holdings and that any settlement negotiations were to be

7    made through him.  And the local counsel for that case

8    confirmed that he was the one who told me to contact

9    Mr. Gibbs.

10         THE COURT:  Have you come to understand as have I

11   that every representation made by a lawyer associated

12   with Prenda is not necessarily true?

13         MEMBER OF THE AUDIENCE:  I have known that for

14   three years.

15         THE COURT:  Okay.  Good.  So you aren't shocked,

16   are you?

17         MEMBER OF THE AUDIENCE:  No.

18         THE COURT:  Nor am I, but thank you.

19         MEMBER OF THE AUDIENCE:  You are welcome.

20   Q    BY MR. WAXLER: Mr. Gibbs, you know you are under

21   penalty of perjury testifying here today?

22   A    That is correct.

23   Q    Have you ever made a representation to a court in

24   the Central District of California or any other court

25   that you know is untrue?

95

1   A    No.

2          THE COURT:  Well, that isn't exactly accurate, is

3   it?  You have caused documents to be filed with, let's

4   just be kind and say falsified signatures.

5          THE WITNESS:  Your Honor, I had no idea that these

6   were allegations --

7          THE COURT:  That is "yes" or "no".

8          THE WITNESS:  Your Honor, I think it is still an

9   open question.

10         THE COURT:  Oh.  No.  It is not an open question.

11   We have had the individual testify under oath.  Those

12   were not his signatures on these documents.

13         THE WITNESS:  And that is the first time I have

14   heard in terms of him saying out loud that he absolutely

15   did not sign those papers, those exact papers.  He said

16   before he was not associated with the companies, but that

17   is the first time I heard him say he did not sign those

18   exact papers.

19         THE COURT:  Are you saying that you have had prior

20   conversations with him where he either admitted or

21   tacitly admitted that he signed?

22         THE WITNESS:  No, your Honor.  I haven't had any

23   conversations with Mr. Cooper.

24         THE COURT:  That was my thought.  I thought that

25   you had never met the man.

96

1          THE WITNESS:  No.  I never met the man.  He never

2    met me, and I have never talked with him.

3          THE COURT:  And you were acting on the

4    representation of John Steele that --

5          THE WITNESS:  And Paul Hansmeier.

6          THE COURT:  -- that they actually had the

7    signatures, the authentic signature of the real Alan

8    Cooper?

9          THE WITNESS:  Yes.  I was told that.  And I

10   investigated that in terms of, you know, what is going on

11   here when the first Alan Cooper issue arose, and I was

12   told that there was no issue, that he -- that he did sign

13   the document.  And so I also did a little bit of research

14   and found out that the assignor, even if the assignor is

15   invalid, it still is a valid document.  So combining

16   those two things, I still believed -- I don't think I

17   filed a case after that.  It was just a matter of kind of

18   addressing with these guys, and they were my sole

19   information for this type of thing.

20         THE COURT:  Okay.  You also indicated that you had

21   on file the original or notarized signature of Alan

22   Cooper, but you really don't, do you?

23         THE WITNESS:  No.  No.  I never said I had on

24   file.  No.  Prenda law or Steele Hansmeier had it on

25   file.  They told me they had it on file, and that is I

1   believe what was in the declaration.  So I said, okay,

2   you know, do we have this notarized copy, do you guys

3   have it over there?  I don't think I ever saw it, but

4   they told me, yes, we have copies of this, it is here,

5   and you can go ahead and file that based on our

6   representation to you.

7        THE COURT:  Do you feel like you have been duped

8   by Hansmeier and Steele?

9        THE WITNESS:  In a way, yes.

10       THE COURT:  Okay.  This has been very

11   enlightening.

12   Q    BY MR. WAXLER: Mr. Gibbs -- I just have a few more

13   your Honor.  Mr. Gibbs, have you ever been a 30(b)(6)

14   witness for AF Holdings?

15   A    No.

16   Q    Have you ever been a 30(b)(6) witness for Ingenuity

17   13?

18   A    No.

19   Q    Have you ever received client funds in any of your

20   capacities as counsel affiliated with Steele Hansmeier or

21   Prenda Law?

22   A    No.

23   Q    The court expressed some disappointment in the

24   manner in which you described how you determined the

25   location of the houses that sat on the lots, and the

```
 1    router, the ability for the router to pick up people who
 2    were not authorized to pick up that signal.  And let me
 3    ask you some questions about that.
 4    A    Sure.
 5    Q    It is your understanding that when wireless routers
 6    are used and they determine what the distance is where
 7    they would be able to pick up a signal, that those
 8    determinations are made where there is an open field and
 9    not placed in the middle of a structure?
10    A    Yeah.  I have read some reports on that and that
11    the projections are basically favorable to them because
12    there is no obstacles in the middle, there is nothing
13    like walls or fences or bushes or trees which have a
14    great effect on wireless signals.
15    Q    Tell me how you described the Denton residence and
16    what facts you had to support your description of the
17    Denton residence?
18         THE COURT:  Which city?  Is this Santa Maria or
19    West Covina?
20         THE WITNESS:  I believe it is the second one.
21         MR. WAXLER:  I will find it, your Honor.
22         MR. PIETZ:  Your Honor, I might suggest we look at
23    Exhibit II which is the picture, the geographical Google
24    maps picture of the two residences.
25         THE COURT:  That is why I wanted to know.  I mean,
```

99

 1   I went to Google Earth as well, and I just want to know

 2   which one we are talking about because in West Covina,

 3   you made some representations of fact that you cannot

 4   possibly know to be true.

 5        THE WITNESS:  Well, your Honor, based on my

 6   personal knowledge of wireless networks, I believed they

 7   were true.

 8        THE COURT:  I am talking about of the residence

 9   itself.  It is a gated community.

10           I'm sorry.  I didn't mean to interrupt you.

11        MR. WAXLER:  I am happy to address that, your

12   Honor.

13   Q    Mr. Gibbs, the map that you have seen that was

14   offered by Mr. Gibbs and Mr. Pietz -- and I apologize if

15   I am butchering your name, by the way --

16        MR. PIETZ:  Pietz.

17        MR. WAXLER:  Pietz.

18   Q    That is not the type of map that you saw; correct?

19   A    No, that is not.

20   Q    Please describe the map that you looked at when you

21   made the representations in the filings that we have done

22   in this courthouse.

23   A    It was a map that you could go down the street, it

24   is actually focused on the house, not on an overview like

25   that, but it is on, basically, there is like a street

100

1   view on Google that allows you to, like, look around the

2   house essentially.  Kind of.  It is limited to a certain

3   extent though.

4   Q     What did you see when you looked at that map?

5   A     I saw a house that I believed it was likely not

6   something that wifi could have broadcasted out to

7   neighbors.

8   Q     Did you see a gate?

9   A     I did see a gate.

10   Q     Did you see several structures?

11   A     I did.

12   Q     Did you see bushes and shrubs and trees around,

13   between the house structure and the street where someone

14   might be driving by?

15   A     I did.  Actually, the aerial view, I think, is even

16   covering the house if I remember correctly.  So, yeah, it

17   is -- I mean, in terms of trees, there is a lot of trees

18   there.

19   Q     And it is your understanding that the wireless

20   signal doesn't just fly over these trees, does it?

21   A     No.  Actually, I mean, there is just certain things

22   that -- I mean, I think everyone kind of knows when they

23   go into certain people's houses and say, hey, I want to

24   use the wifi connection, there are certain rooms in the

25   house that don't get, even in the same house that don't

101

1   get the wifi connection.  So, yes, walls, trees, these

2   things definitely have a dramatic effect.  Sometimes,

3   concrete wall, for instance, sometimes it just altogether

4   stops something.  That is my understanding of it.

5   Q     Was your description of the residence in West

6   Covina when you signed your declaration and submitted

7   these papers and we submitted these papers on your behalf

8   accurate to the best of your knowledge.

9   A     Yes, it was.  It was based on my personal

10  knowledge.  Yes.

11  Q     And do you still believe it is accurate despite the

12  very different map that was submitted to the court?

13  A     That is correct.  I believe that map might be -- I

14  don't even know where the yards come, or I don't know how

15  that works.

16  Q     Would the same be true for the residence in Santa

17  Maria?

18  A     It was the same analysis essentially.  It was just

19  part of the full analysis, but yeah.

20  Q     In other words, there were walls, there were

21  buildings, there were shrubs, all of which would block

22  the signal and reduce by a great extent the range of the

23  wireless network?

24  A     Yes.  That was my impression from them, the street

25  maps from Google.

102

1      MR. WAXLER:  May I have one moment, your Honor?

2      THE COURT:  Certainly.

3   Q    BY MR. WAXLER: Mr. Gibbs, did you knowingly violate

4   the discovery orders from this court?

5   A    No.

6   Q    Did you cause to be served on the ISP providers the

7   October 19, 2012 discovery order by this court?

8   A    Yes.  I mean, at least, I thought I did.  I had

9   requested it.

10  Q    And it was your understanding that that was done?

11  A    It was my understanding.  I confirmed it

12  afterwards, and they said it was taken care of.

13  Q    And the first time you learned that an ISP may not

14  have received a copy of that order was when?

15  A    I believe it was in the response by the ISP, AT&T

16  possibly.

17      MR. WAXLER:  I have nothing further, your Honor.

18  Thank you.

19      THE COURT:  Okay.  Thank you.  But you started

20  getting responses from some of the Internet service

21  providers, didn't you?

22      THE WITNESS:  I didn't get the responses.

23      THE COURT:  All right.  You filed a status report

24  with the court?

25      THE WITNESS:  Yes.

1            THE COURT:  Right?

2            THE WITNESS:  Yes.

3            THE COURT:  And at the time you filed that status

4    report, there had been no returns on those subpoenas;

5    right?

6            THE WITNESS:  Yes.

7            THE COURT:  Then about a week later --

8            THE WITNESS:  Well, sorry, let me qualify my

9    answer.  There were -- at that point, there was nothing

10   in the computers that showed there was any returns on the

11   subpoenas.

12           THE COURT:  Okay.  That changed a few days later.

13           THE WITNESS:  It changed, I think, on the 7th.

14   Yes.

15           THE COURT:  And, of course, you updated that

16   status report, you advised the court, then -- right --

17   that suddenly, for whatever reason, people are now

18   starting to send you information on your subscribers;

19   right?  You updated your filing, didn't you?

20           Actually, no, you didn't.

21           THE WITNESS:  I didn't, your Honor, but if I can

22   explain why.

23           THE COURT:  Yes.

24           THE WITNESS:  Okay.  So I did some investigation

25   on that, and what I was told, and, again, I don't handle

104

1    the subpoenas.  These are handled out of the Chicago and

2    Minnesota offices.  I was told that these things are

3    usually delivered and that either hand-delivered or I

4    believe mailed but most likely they are just a few blocks

5    away.  Like CT Corporation is just a few blocks away,

6    that CT Corporation would send, mail back the

7    information.

8              I didn't realize that that information was

9    faxed back by Verizon.  I never knew that.  And I did

10   some investigation on it.  And I, also, I talked to Paul

11   Duffy, and the exact date of the court's order in that

12   case, there had been -- he had had some eye surgery and

13   he also had some trauma related to it.

14             So what he said was he wasn't picking up his

15   mail as frequently during that time period.  So I thought

16   that the information had been received essentially by,

17   through his mailbox at that point but hadn't been input

18   in the computer until later.  So that was my

19   understanding.  That was my understanding of what had

20   happened.

21   Q    BY MR. WAXLER: Do you now regret not advising the

22   court when you learned on November 7th that Prenda Law

23   had received information in response to those subpoenas

24   and that there was information in the status report that

25   was not correct?

```
 1    A       Absolutely.  Absolutely.

 2            MR. WAXLER:  Thank you, your Honor.

 3            THE COURT:  Mr. Pietz.

 4

 5                        CROSS-EXAMINATION

 6    BY MR. PIETZ:

 7    Q       Mr. Gibbs, I would ask you to refer to the binder

 8    that is there with you to Exhibit EE which is the

 9    substitution of counsel that was filed apparently with

10    your CM/ECF account listing you as in house counsel for

11    AF Holdings.

12    A       Yes, I am familiar with that document.

13    Q       So Mr. Gibbs, just to clarify, then, your testimony

14    is that when you filed that document, that was an

15    accurate representation -- correct -- that you were at

16    that moment in house counsel for AF Holding?

17    A       When I filed that document, I believed I was.  What

18    I was told afterwards and after the deposition was that

19    that merger or that acquisition hadn't happened therefore

20    it was still owned by the trust.  So I, essentially, I

21    had been told to go ahead and file as in house counsel,

22    but, for some reason, Livewire didn't own AF Holdings at

23    that time.

24    Q       So can you just pin down for me exactly when it was

25    that your capacity as in house counsel for AF Holdings
```

106

1    begun and exactly when it terminated?

2    A    Well, my understanding was that -- my understanding

3    when I was told that I was in house counsel for Livewire

4    that I was therefore in house counsel for AF Holdings and

5    the other companies as well, Ingenuity and Guava.

6         And only did I find out later when I was

7    exiting and I was already leaving all these cases

8    essentially, only then, I found out that they had not

9    actually acquired -- Livewire had not acquired AF

10   Holdings according to Mr. Hansmeier.

11   Q    Mr. Gibbs, have you ever authorized anyone else to

12   use your CM/ECF password?

13   A    I don't -- I might have.  I don't know.

14   Q    Who?

15   A    An individual by the name of Carl.  He worked for

16   me, or he worked with me, I guess you would say.  He

17   actually worked for Prenda Law.

18   Q    How about John Steele?

19   A    No.  I don't think so.  Not to my knowledge.  I am

20   not saying -- in terms of authority, I did not, no.

21   Q    How about Paul Hansmeier, did you ever authorize

22   him to use your CM/ECF password?

23   A    I don't believe so.  I mean, I know he had my -- he

24   had access to my passwords at one point, so he might

25   have, yeah.

107

1    Q     What was your business telephone number while you

2    worked for Prenda Law?

3    A     It was (415)325-5900.

4    Q     And what was your business e-mail address when you

5    worked for Prenda Law?

6    A     It was blgibbs@wefightpiracy.com.

7    Q     Have you ever instructed Prenda local counsel to

8    file pleadings using your business e-mail and business

9    telephone number on the pleadings even though it was

10   their name and physical address?

11   A     So, yes, my name is on -- my e-mail address and my

12   number and my phone number is on certain cases in other

13   states.  I was instructed to do so like that by Paul

14   Hansmeier.  And, essentially, the way that was explained

15   to me was that I would essentially forward all of the

16   communications to the outside counsel.  Yeah.  So.

17         MR. PIETZ:  Before we move on any farther, I would

18   ask that Exhibit EE be admitted into evidence as Exhibit

19   13.

20   Q     Mr. Gibbs, I have some copies of a few different

21   complaints, one that was filed by a local counsel in

22   Nebraska and three complaints filed by local counsel in

23   Florida all of which list the name of the local counsel,

24   a mailing address in those respective states and an

25   e-mail address, blgibbs@wefightpiracy.com and your 415

108

1    telephone number, is that consistent with your

2    understanding of what the normal practice was at Prenda

3    that your business e-mail and phone would be on pleadings

4    all around the country?

5         MR. WAXLER:  Objection.  Irrelevant, your Honor.

6         THE COURT:  Overruled.

7         THE WITNESS:  That was what I was instructed to do

8    by Prenda, yeah, was to do that because I was essentially

9    helping those guys out on their cases.  It was their

10   case, but, yes.

11   Q    BY MR. PIETZ:I would ask Mr. Ranallo to pass out

12   No. 2 which is the declaration of Matt Catlett, an

13   attorney in Nebraska, and he is authenticating the

14   service copy of the complaint filed in Nebraska listing

15   Mr. Gibbs.  I would ask that that be admitted into

16   evidence as Exhibit 14.

17        Similarly, Mr. Ranallo, if you would be so

18   kind as to pass out 3, 4 and 5 which are the complaint in

19   Sunlust v. Nguyen, First Time Video.  Here is Sunlust v.

20   Nguyen.  That is Middle District, Florida.  We also have

21   First Time Videos v. Paul Uphold and Openmind Solutions

22   v. Barry Wolfson.

23        MR. WAXLER:  Your Honor, I would object to the

24   introduction of those exhibits.

25        THE COURT:  Right.  We don't need this.  We have

1    basically got his testimony.

2        MR. PIETZ:  Fair enough.

3        THE COURT:  And we have got the testimony on the

4    reason why, but I got to tell you, that doesn't sound

5    reasonable to me that you would be inviting telephone

6    calls, litigation in Florida on a case that you know

7    nothing about.  How do you field these calls?

8        THE WITNESS:  No, sir.  I would pass the messages

9    on to the other attorneys.

10       THE COURT:  Back to Florida?

11       THE WITNESS:  Yes.  I would pass the messages on

12   to them because, essentially, it was just easy for them

13   at that point.  I was like their secretary essentially,

14   and that is the way that Prenda wanted to do it.

15       THE COURT:  Why?

16       THE WITNESS:  I don't know.  I mean, they changed

17   the practice at some point where people were putting

18   their own e-mails, their own numbers, but I don't know

19   why that was the way it was structured originally.

20           And I don't know.  I mean, I don't know who

21   had access to my e-mail either.  So I don't know, like, I

22   have no idea if I was sent something or if someone else

23   read it.

24   Q    BY MR. PIETZ: Did John Steele have access to your

25   e-mail?

1    A      He did.  I don't know if he did throughout, but he

2    did.

3    Q      Would he routinely respond to e-mail inquiries at

4    the blgibbs@wefightpiracy.com e-mail address?

5    A      I never knew it because he didn't CC me on them, or

6    he didn't let me know he was doing them.  But I believe

7    he did.

8    Q      Did Paul Hansmeier have access to that e-mail

9    address?

10   A      I think he had access.  I have no idea whether he

11   used it or not.

12   Q      How about Mr. Duffy, Paul Duffy, did he have access

13   to that e-mail account?

14   A      I don't think so.

15   Q      Mr. Gibbs, earlier, you testified that some things

16   were sent out with your signature stamped on there that

17   didn't have your approval.  I would like to refer now --

18   actually, before I venture any farther afield, I would

19   ask that the court take judicial notice of the complaints

20   I have just identified as Exhibits, I think, 15, 16 and

21   17.

22          In any event, moving on, now, to what has been

23   previously identified in this action as Exhibit X, ask

24   that it be admitted now as Exhibit 18.

25          Essentially, I would just like to ask you a

111

1    question to confirm.

2    A    Sure.

3    Q    Is this the kind of letter you are talking about?

4    This was a demand letter sent in the Guava, St. Clair

5    County, Illinois case.  I note that it is dated -- what

6    is the date on it?  January 30th.  And it is,

7    essentially, a, you know, a demand letter.  And then I

8    will go to the last page there.  It has a pleading in

9    there.  So, in any event, on the last page of the letter

10   itself, there is a stamped signature, what appears to be

11   a stamped signature that says Brett Gibbs.  Is it your

12   testimony that this letter was sent out without your

13   authorization?

14   A    That is my testimony.

15   Q    You had no knowledge whatsoever that this letter

16   was being sent out?

17   A    No.  Not with my name on it.  I don't even

18   remember -- no one ever told me about this before I found

19   out.  I actually found out through an opposing counsel

20   that contacted me and wrote me a letter saying,

21   basically, you know, you have nothing on my client, and

22   you communicate through me.  So I was kind of confused,

23   but I eventually saw the letter, and it had my stamped

24   signature on it.

25   Q    Mr. Gibbs -- I will represent to the court that

1    this letter has been sent to over 300 Internet users

2    across the country.  Have you done anything to correct

3    the fact that this letter went out with your signature on

4    it without your authorization?  I note that it was filed

5    in late January.

6    A      Yeah.  I actually talked with Mark Lutz, and Mark

7    said, I said, Mark, do not send any of these letters out

8    anymore that are, you know, please contact me and let me

9    know what is happening before you send out these letters.

10   And the response from Mr. Lutz was I don't control those

11   types of things, you have to talk with Paul and John.

12   Q      Fair enough.  Mr. Gibbs, have you ever hired local

13   counsel for Prenda Law?

14   A      Actually, the hiring, no, because the hiring

15   process was done by John Steele.

16   Q      Are you familiar with an attorney in Florida named

17   Matthew Wasinger?

18   A      Yes.  Yes.

19   Q      Are you aware of the fact that Mr. Wasinger

20   testified under oath in federal court in Florida at the

21   Sunlust hearing that you hired him and that, as far as he

22   understood, you were a principal of Prenda law?  Are you

23   aware of that, Mr. Gibbs?

24          MR. WAXLER:  Objection, your Honor.  It is

25   irrelevant.  It is also hearsay.

1          MR. PIETZ:  I am asking Mr. Gibbs if he is aware

2     of it.

3          THE COURT:  Sustained.  I have got the picture.

4     Okay.  And I appreciate it.  Thank you.

5          MR. PIETZ:  I will move along, your Honor.

6          THE COURT:  Okay.  To what?  Give me a blueprint.

7          MR. PIETZ:  Fair enough, your Honor.  I will

8     explain the broad strokes of the categories I have, and

9     whatever the court is interested in, we will move to

10    that.

11          In addition to a few more things about

12    Mr. Gibbs hiring, firing and even threatening local

13    counsel, I have evidence on him being delegated

14    independent authority to settle cases which he actually

15    concluded.  Contrary to Mr. Gibbs' assertion which is a

16    little confusing in light of the fact that he says I

17    spoke to Mark Lutz, in any event, with respect to his

18    assertion that he never had any direct client contact, I

19    have a number of documents which actually show -- some of

20    which are Mr. Gibbs' own prior words showing that, in

21    fact, at least according to him, he was communicating

22    back and forth with the client, whatever that means, and

23    my theory is that that may mean John Steele.

24          But in any event, beyond the direct client

25    interaction, you know, I could ask Mr. Gibbs about his

114

```
 1    investigation in the case, about the petition, but those

 2    are the broad strokes, your Honor.  If the court has got

 3    the picture, I don't need to necessarily get into all the

 4    documents.

 5         THE COURT:  I do have the picture, and I know who

 6    the client is.  We have talked about the client, and the

 7    client has been running everything.  Yeah, I know who the

 8    client is.

 9         MR. PIETZ:  Very good.

10         THE COURT:  Okay.  Thank you.

11              Gentlemen.  Mr. Brodsky, you look bored.

12         MR. BRODSKY:  I am not bored, your Honor.

13         THE COURT:  All right.

14         MR. WAXLER:  We have no further questions, your

15    Honor.

16         THE COURT:  All right.

17              Unless anyone has anything else in terms of

18    evidence to offer, the matter will stand submitted.  All

19    right.

20              Thank you, sir.  You may step down?

21         THE WITNESS:  Thank you, your Honor.

22         THE COURT:  Good luck to you.

23              All right.  How about this, I will leave this

24    up to counsel, if you wish.  If you would like to sum up

25    your position, you may do so at this time.  It is not
```

1    necessary.  I am just making that offer.

2        MR. WAXLER:  Thank you, your Honor for giving us

3    the opportunity to clear Mr. Gibbs' name, and what I

4    would like to add to the declarations that he has

5    submitted and the papers that we have submitted is that

6    Mr. Gibbs did not intend to disrespect this court or

7    disobey any orders of this court.  Mr. Gibbs had no

8    knowledge that perhaps others may have knowingly or

9    unknowingly disregarded some orders of this court in

10   terms of the service of the knowledge of the October 17th

11   order.

12        The order itself, you know, did not require

13   service on the ISP's, but that was what Mr. Gibbs wanted

14   to do.  And that is the undisputed testimony here today

15   that that is what he wanted to do was to have those ISP's

16   notified of that.  And he took no action whatsoever, your

17   Honor, to do discovery, formal discovery of those ISP's

18   or ask the ISP's to follow-up on the information

19   provided.

20        So Mr. Gibbs stands before you, your Honor, he

21   is I think we could say humbled by this experience, and I

22   think he is regretful that he has perhaps been put in a

23   position where the court at least in the original OSC

24   made comments suggesting that he was a culpable party

25   here.  And he is not, your Honor.  And I hope you see it

116

1    that way too.

2              And I thank you very much for your time.

3    Appreciate the opportunity you have given us to clear his

4    name.

5         THE COURT:  Thank you, counsel.

6              Anything from this side?  You don't have to.

7         MR. PIETZ:  I will keep it very brief, your Honor.

8              I can appreciate that there may be more

9    parties, other people who are more culpable than

10   Mr. Gibbs with respect to what has occurred in these

11   cases.  However, I think the assertion that Mr. Gibbs is

12   merely an independent contract attorney is simply not

13   credible.  I would just simply leave it at this, there is

14   ample evidence showing that Mr. Gibbs was been involved

15   since day one or at least very shortly thereafter on a

16   key level exercising operational control over this

17   litigation on a national basis.

18              So while I am sympathetic that perhaps to a

19   certain extent, maybe there are other people more

20   culpable, I will just leave it that certainly there is

21   ample evidence showing that Mr. Gibbs indeed played a key

22   role in all of this.

23              Thank you, your Honor.

24        THE COURT:  Okay.  I just have one question,

25   gentlemen.  As a licensed attorney in this state,

1    particularly when it is only your name on the pleadings,

2    don't you think you have some responsibility to assure

3    the accuracy of those pleadings?  Or is it permissible

4    simply to go they told me to do so or the senior partner

5    said it is okay, it may not have sounded right to me, but

6    they said it was okay.  Could you do that really?

7         MR. WAXLER:  Your Honor, I am going to suggest

8    that that is not what happened on a key issue.

9         THE COURT:  Okay.

10        MR. WAXLER:  On a key issue, the issue involving

11   Alan Cooper, there was not one shred of information that

12   Alan Cooper wasn't Alan Cooper until Mr. Gottfried's

13   letter in November of 2012 at which point Mr. Gibbs

14   immediately questioned whether this was accurate or not.

15   And the most important thing is that Mr. Gibbs filed no

16   further pleadings after that time which purported to rely

17   on Mr. Cooper being the assignee of AF Holdings.  And so

18   Mr. Gibbs reacted to the notion.

19             He investigated and he did nothing further on

20   it.  He was assured that Alan Cooper was Alan Cooper, but

21   so he -- he did something other than said somebody told

22   me.  And on the other issues, your Honor, these were not

23   examples of him relying on anybody else to do things that

24   were improper.  He was doing discovery.  He was doing

25   investigations.  They were supervising him, but he was

118

1    acting like a California lawyer doing what he thought in

2    his best judgment should be done as a California lawyer

3    in these cases.

4           THE COURT:  All right.

5           MR. WAXLER:  Thank you.

6           THE COURT:  Thank you, counsel.

7               All right.  Again, the matter stands

8    submitted.  We are adjourned.

9           MR. WAXLER:  Thank you, your Honor.

10          MR. PIETZ:  Thank you, your Honor.

11          (Proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATE

 2

 3

 4    I hereby certify that pursuant to Section 753, Title 28,

 5    United States Code, the foregoing is a true and correct

 6    transcript of the stenographically reported proceedings held

 7    in the above-entitled matter and that the transcript page

 8    format is in conformance with the regulations of the

 9    Judicial Conference of the United States.

10    Date:  March 17, 2013

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit I

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

INGENUITY 13 LLC,

               Plaintiff,

     v.

JOHN DOE,

               Defendant.

Case Nos. 2:12-cv-8333-ODW(JCx)

**ORDER**

    The Court has received the Ex Parte Application filed on behalf of John Steele, Paul Hansmeier, Paul Duffy, and Angela Van Den Hemel, requesting the Court to withdraw its March 5, 2013 Order requiring their attendance on March 11, 2013.

    Based on the papers filed and the evidence presented during the March 11, 2013 hearing, the Court concludes there is at least specific jurisdiction over these persons because of their pecuniary interest and active, albeit clandestine participation in these cases. Not only does the Ex Parte Application lack merit, its eleventh-hour filing exemplifies gamesmanship. Accordingly, the Ex Parte Application is **DENIED**.

    The March 11, 2013 hearing raised questions concerning acts performed by other persons related to Prenda Law, Inc., Steele Hansmeier PLLC, Livewire Holdings LLC, AF Holdings LLC, Ingenuity 13 LLC, and 6881 Forensics, LLC. The evidence presented suggests these persons may be culpable for the sanctionable conduct explained in the Court's February 7, 2013 Order to Show Cause, which the Court previously attributed to Brett Gibbs only. Further, it appears that these persons, and

1   their related entities, may have defrauded the Court through their acts and
2   representations in these cases.

3       Thus, the Court amends its February 7, 2013 Order to Show Cause (ECF
4   No. 48) to include sanctions against the persons and entities in subparagraphs a–m
5   below:

6       a)   John Steele, of Steele Hansmeier PLLC, Prenda Law, Inc., and/or
7            Livewire Holdings LLC;
8       b)   Paul Hansmeier, of Steele Hansmeier PLLC and/or Livewire Holdings
9            LLC;
10      c)   Paul Duffy, of Prenda Law, Inc.;
11      d)   Angela Van Den Hemel, of Prenda Law, Inc.;
12      e)   Mark Lutz, of Prenda Law, Inc., AF Holdings LLC and/or Ingenuity
13           13 LLC;
14      f)   Alan Cooper, of AF Holdings LLC;
15      g)   Peter Hansemeier, of 6881 Forensics, LLC;
16      h)   Prenda Law, Inc.;
17      i)   Livewire Holdings LLC;
18      j)   Steele Hansmeier PLLC;
19      k)   AF Holdings LLC;
20      l)   Ingenuity 13 LLC; and
21      m)   6881 Forensics, LLC.

22      These persons and entities are **ORDERED** to appear on March 29, 2013, at
23   10:30 a.m., **TO SHOW CAUSE** for the following:

24      1)   Why they should not be sanctioned for their participation, direction,
25           and execution of the acts described in the Court's February 7, 2013
26           Order to Show Cause;
27      2)   Why they should not be sanctioned for failing to notify the Court of
28           all parties that have a financial interest in the outcome of litigation;

3)     Why they should not be sanctioned for defrauding the Court by misrepresenting the nature and relationship of the individuals and entities in subparagraphs a–m above;

4)     Why John Steele and Paul Hansmeier should not be sanctioned for failing to make a *pro hac vice* appearance before the Court, given their involvement as "senior attorneys" in the cases; and

5)     Why the individuals in subparagraphs a–g above should not be sanctioned for contravening the Court's March 5, 2013 Order (ECF No. 66) and failing to appear on March 11, 2013.

Gibbs is **ORDERED** to serve a copy of this order on the persons and entities in subparagraphs a–m above by March 15, 2013, and must file proofs of service with the Court by March 18, 2013. Gibbs is further **ORDERED** to appear on March 29, 2013, at 10:30 a.m.

No other parties are required to appear on March 29, 2013. If so desired, Morgan E. Pietz and Nicholas R. Ranallo may appear on behalf of Defendant Doe.

Should the persons and entities in subparagraphs a–m above not appear on March 29, 2013, the Court is prepared to draw reasonable inferences concerning their conduct in the cases before the Court, including any inferences derived from their failure to appear. Failure to comply with this order will result in the imposition of sanctions.

**IT IS SO ORDERED.**

March 14, 2013

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

# Exhibit J

1           UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3             HONORABLE OTIS D. WRIGHT

4          UNITED STATES DISTRICT JUDGE PRESIDING

5                    - - -

6
Ingenuity 13 LLC,                    )
7                   PLAINTIFF,        )
                                      )
8      VS.                            )   NO. CV 12-8333 ODW
                                      )
9      John Doe, et al.,              )
                   DEFENDANT,         )
10     _____)

11

12

13           REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              LOS ANGELES, CALIFORNIA

15              TUESDAY, APRIL 2, 2013

16

17

18     _____

19          KATIE E. THIBODEAUX, CSR 9858
            U.S. Official Court Reporter
20          312 North Spring Street, #436
            Los Angeles, California 90012
21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2


 3   FOR RESPONDENT GIBBS:

 4        WAXLER CARNER BRODSKY LLP
          BY:  ANDREW J. WAXLER
 5        -and- BARRY BRODSKY
          1960 E. Grand Avenue
 6        Suite 1210
          El Segundo, CA  90245
 7

 8

 9   FOR DEFENDANT:

10        THE PIETZ LAW FIRM
          BY:  MORGAN E. PIETZ
11        3770 Highland Avenue
          Suite 206
12        Manhattan Beach, CA  90266

13        -and-

14        NICHOLAS RANALLO LAW OFFICES
          BY:  NICHOLAS R. RANALLO
15        371 Dogwood Way
          Boulder Creek, CA  95006
16

17

18   FOR RESPONDENTS DUFFY, VAN DEN HEMEL & PRENDA LAW:

19        KLINEDINST LAW OFFICES
          BY:  HEATHER ROSING
20        -and- PHILIP W. VINEYARD III
          -and- DAVID M. MAJCHRZAK
21        501 W. Broadway
          Suite 600
22        San Diego, CA  92101

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    APPEARANCES:   (Cont'd)

2

3    FOR RESPONDENT HANSMEIER:

4         BAKER, KEENER & NAHRA LLP
          BY:  PHILLIP A. BAKER
5         -and- DANIEL PATRICK LEONARD
          633 West Fifth Street
6         Fifty-fourth Floor
          Los Angeles,  CA  90071

7

8    FOR RESPONDENT STEELE:

9         MURPHY, PEARSON, BRADLEY & FEENEY
          BY:  THOMAS P. MAZZUCCO
10        -and- TIMOTHY J. HALLORAN
          88 Kearny Street
11        Tenth Floor
          San Francisco, CA  94108

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1           LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 2, 2013

 2                        10:00 A.M.

 3                      - - - - -

 4

 5

 6           THE CLERK:  Calling Item No. 1,  CR 12-8333, ODW,

 7   Ingenuity 13, LLC, versus John Doe, et al.

 8               Counsel, please state your appearances.

 9           MR. PIETZ:  Morgan Pietz, P-I-E-T-Z, for the

10   putative John Doe defendant in 12-CV-8333.

11           MR. RANALLO:  And Nicholas Ranallo for the same

12   Doe.

13           THE COURT:  Morning, counsel.

14           MR. WAXLER:  Andrew Waxler and Barry Brodsky, both

15   for Brett Gibbs who is here today.

16           THE COURT:  By the way, thank you for your

17   submittal with respect to your efforts to effect service.

18   Thank you.

19           MR. BAKER:  Phil Baker and Dan Leonard specially

20   appearing for Paul Hansmeier.

21           MR. LEONARD:  Morning, your Honor.

22           MR. BAKER:  And he is present today.

23           THE COURT:  Where?

24           MR. BAKER:  Mr. Hansmeier, will you stand up.

25           THE COURT:  Front row.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. HALLORAN:  Morning your Honor.  My name is Tim

 2   Halloran, Thomas Mazzacco on behalf of John Steele who is

 3   also present.

 4          THE COURT:  Mr. Steele.

 5          MR. STEELE:  Yes.

 6          MS. ROSING:  Morning, your Honor.  Heather Rosing

 7   with Klinedinst PC with my colleagues Phil Vineyard and

 8   Dave Majchrzak appearing on behalf of Paul Duffy, Angela

 9   Van Den Hemel and Prenda Law, and Mr. Duffy and

10   Ms. Van Den Hemel are in the audience today.

11          THE COURT:  Thank you.

12             Is that it?

13          MR. BAKER:  Your Honor?

14          THE COURT:  Yes.

15          MR. BAKER:  There are other individuals pursuant

16   to your order here.  They are not represented.

17          THE COURT:  Mark Lutz?

18          MR. BAKER:  Yes, he is present.

19          MR. LUTZ:  Yes.

20          THE COURT:  Mr. Lutz, welcome, sir.  Did Alan --

21   well, do we have an Alan Cooper?  Any Alan Cooper?

22      (No response.)

23          THE COURT:  All right.  Peter Hansmeier?

24          MR. HANSMEIER:  Yes, your Honor.

25          THE COURT:  Good morning, sir.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        MR. HANSMEIER:  Morning.

2        THE COURT:  Any representatives of any other

3    representatives of Prenda Law, Livewire Holdings, AF

4    Holdings other than Mr. Lutz, Ingenuity 13 other than

5    Mr. Lutz and 6881 Forensics, LLC.

6        MS. ROSING:  Mr. Duffy is appearing on behalf of

7    Prenda Law, your Honor.

8        THE COURT:  All right.  Here is my interest, and

9    we can proceed in any way that seems to make sense.  I am

10   pleasantly surprised that we have everyone here.

11   Otherwise, I was going to be forced to draw reasonable

12   inferences from the facts as I know them.

13        It should be clear by now that this court's

14   focus has now shifted dramatically from the area of

15   protecting intellectual property rights to attorney

16   misconduct such misconduct which I think brings discredit

17   to the profession.  That is much more of a concern now to

18   this court than what this litigation initially was about.

19        Mr. Steele -- well, let me do it this way.  I

20   have questions of Mr. Steele.  Mr. Steele can choose to

21   answer those questions or not.  The same applies for

22   Mr. Duffy and Mr. Hansmeier.

23        Now, as the attorneys, how do you all propose

24   we proceed?

25        MR. BAKER:  May I take the podium, your Honor?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1      THE COURT:  Well, actually, we don't have one, but

2  we do have a lecturn and you are free to use it.

3      MR. MAZZUCCO:  Thomas Mazzucco on behalf of

4  Mr. Steele.

5      Your Honor, in light of some of the

6  information that was in the transcript of March 11th,

7  2013 in this courtroom and some of the concerns that this

8  court has mentioned, at this point in time, if Mr. Steele

9  is called to testify, he is going to exercise his Fifth

10  Amendment privilege against forced testimony.

11      And we state for two reasons, one, there were

12  serious allegations made by the court and others of not

13  just attorney misconduct but the word fraud was used

14  several times in the transcript.

15      THE COURT:  Should have been.

16      MR. MAZZUCCO:  The next step is there is also an

17  issue involving attorney-client privilege.  If Mr. Steele

18  was to testify, that privilege belongs to the client.

19      THE COURT:  Which client might that be?

20      MR. MAZZUCCO:  That would be several of his

21  clients.  Mr. Halloran is going to handle that part of

22  the argument, but that is a two pronged argument, your

23  Honor.

24      THE COURT:  Are you talking about AF Holdings,

25  Ingenuity 13, those clients?

1          MR. MAZZUCCO:  Yes.

2          THE COURT:  And you think there is a difference

3    between those clients and Mr. Steele?

4          MR. MAZZUCCO:  I think there is, your Honor, yes.

5          THE COURT:  From what I know about this case,

6    there is no difference at all, but that is why I am glad

7    Mr. Steele is here.  Maybe he can clarify some of those

8    things, but if you say answering those kinds of questions

9    would incriminate him, I'll take you at your word.

10          MR. MAZZUCCO:  No, your Honor.  I'm not saying

11    they are going to incriminate him.  I said it is his

12    Fifth Amendment privilege against forced testimony.

13    There was language on the record from March 11th where

14    this court made some accusatory statements about fraud

15    upon the court, things that were in the transcript.

16          THE COURT:  Yes.

17          MR. MAZZUCCO:  You leave my client with no

18    alternative but.

19          THE COURT:  To rebut those statements.

20          MR. MAZZUCCO:  He can rebut those statements in

21    the proper venue, your Honor.  This is an order to show

22    cause in front of this court.

23          THE COURT:  Let's cut to the chase.  I am really

24    not interested in -- I want to know if some of my

25    conjecture is accurate.  The only way I can find out is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  to have the principles here and answer those questions.

2  Now, if you say he will not answer those

3  questions, then I will draw whatever inferences I think

4  are reasonable from the facts as I know them.  This is an

5  opportunity for him to protect himself, to defend and

6  protect himself.  It is up to him.  So you are saying he

7  doesn't want to answer any questions, fine.  I am not

8  going to go through the charade of asking the questions

9  and have him assert the Fifth.

10  MR. MAZZUCCO:  Your Honor, he is not going to

11  respond to your questions.

12  THE COURT:  All right.  Fine.

13  What about Mr. Hansmeier?  What is his

14  position, the same?

15  MR. BAKER:  The exact same, your Honor.

16  THE COURT:  All right.  You may be seated.

17  Mr. Duffy.

18  MS. ROSING:  Your Honor, Mr. Duffy and

19  Ms. Van Den Hemel will also be taking the fifth

20  amendment.  Though, in response to your desire for

21  additional information, I do have approximately 25

22  minutes of argument, and I do have some exhibits that are

23  judicially noticeable.

24  THE COURT:  On what?  Relevant to what?

25  MS. ROSING:  To the seven issues pending before

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    this court.
2         THE COURT:  Give me the Cliff Note version.  Just
3    give me a summary, what it is that you would like to --
4         MS. ROSING:  Well, your Honor, what I would like
5    to argue because my clients are entitled to a reasonable
6    opportunity to be heard, we weren't allowed --
7         THE COURT:  Excuse me.  They are giving up that
8    right to be heard.  Now, what have you got to say that is
9    under oath?
10        MS. ROSING:  Well, your Honor, my arguments are
11   legal arguments.
12        THE COURT:  I know.  I am looking for facts.  I
13   really am.  I am not a looking for legal arguments.
14        MS. ROSING:  Well, your Honor --
15        THE COURT:  Can you tell me, for example, who
16   directs the litigation here in California?  Who makes the
17   decision as to whether or not cases are dismissed or
18   settled for how much money?  Can you tell me that?
19        MS. ROSING:  Your Honor, I can't testify.
20        THE COURT:  "Yes" or "no", please.  Because we
21   need to move through this.  Can you tell me that?
22        MS. ROSING:  I personally cannot tell you that,
23   your Honor.
24        THE COURT:  All right.  Do you know whether or not
25   there is another Alan Cooper other than the one that was
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1   here at the last hearing?

 2        MS. ROSING:  I am not aware of another Alan

 3   Cooper, your Honor.

 4        THE COURT:  All right.  Good.

 5        What happens to the settlement money?

 6        MS. ROSING:  Your Honor, obviously, I represent

 7   Mr. Duffy and Ms. Van Den Hemel.  I don't have personal

 8   knowledge of any of this.

 9        THE COURT:  Why weren't notices of related cases

10   filed?  Who made the decision to hide from the court the

11   fact that all of these cases were related.

12        MS. ROSING:  I do have a judicially noticeable

13   document on that, your Honor, where the Northern District

14   declined to relate the cases.

15        THE COURT:  That is a different thing.  That is

16   consolidating them.

17        MS. ROSING:  It is actually an order declining to

18   relate them.

19        THE COURT:  Same plaintiff, same film, same causes

20   of action, and they are not related?  Excuse me?

21        Okay.  Tell me this.  Who made the decision

22   not to disclose to the court the fact that the law firms

23   have a financial interest in the outcome of this

24   litigation?

25        MS. ROSING:  Your Honor, there is no evidence
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   before this court at all that the law firm or any, well,

2   certainly, my clients, Paul Duffy or Angela Van Den

3   Hemel, have any financial interest in the outcome of this

4   litigation.

5        THE COURT:  Excuse me.  Did you read Hansmeier's

6   deposition?

7        MS. ROSING:  Yes, I did, your Honor.

8        THE COURT:  And then you make the statement you

9   just made?

10       MS. ROSING:  Your Honor, there is no evidence that

11  Mr. Duffy or Ms. Van Den Hemel who is a W2 paralegal at

12  Prenda Law --

13       THE COURT:  I understand that.

14       MS. ROSING:  And I would be happy --

15       THE COURT:  Wait a minute.  The money goes to

16  Prenda Law's trust account; right?

17       MS. ROSING:  Your Honor, I have no personal

18  knowledge, and I can't testify.  But I do have an

19  argument I would like to present to your Honor.

20       THE COURT:  Relative to what?  To anything I just

21  asked?

22       MS. ROSING:  Well, your Honor, it is a legal

23  argument with some objections and some judicially

24  noticeable documents.

25       THE COURT:  Relative to what?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          MS. ROSING:  Well, the seven issues before the

2     court, the Alan Cooper issue, the discovery order issue,

3     the Wagar investigation, the Denton investigation, Form

4     CV30, the relationships, and March 11, the things that

5     are noticed in this court's OSC.

6          But, your Honor, we would be happy to submit

7     this in a brief if that would be more --

8          THE COURT:  Good.  Do that.  Thank you.

9          We are done.

10         (Proceedings concluded.)

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3

 4   I hereby certify that pursuant to Section 753, Title 28,

 5   United States Code, the foregoing is a true and correct

 6   transcript of the stenographically reported proceedings held

 7   in the above-entitled matter and that the transcript page

 8   format is in conformance with the regulations of the

 9   Judicial Conference of the United States.

10   Date:  April 5, 2013

11

12    /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

# Exhibit B

## 2:12-cv-8333-ODW (JCx)

Office of the Chief Trial Counsel/Intake
The State Bar of California
1149 South Hill Street
Los Angeles, California 90015

Dear Sirs,

My name is John Steele and I am filing this bar complaint against a California attorney named Brett Gibbs ("Attorney Gibbs"). I understand his bar number to be 251000. I am an attorney myself and am licensed solely in the state of Illinois. This is the first bar complaint I have ever filed, and I do not take this action lightly.

## Background

Attorney Gibbs was a senior attorney at a law firm named Prenda Law, Inc. ("Prenda") until sometime earlier this year. Attorney Gibbs represented a number of Prenda's clients, including AF Holdings LLC ("AFH") and Ingenuity 13 LLC ("I13"). I have attached an affidavit from the manager of those two entities, Mark Lutz, who was the person in charge of both AFH and I13 (Exhibit A). That affidavit makes clear that Attorney Gibbs was the only attorney for AFH and I13 throughout the entire state of California during the relevant time period. It is my understanding that Attorney Gibbs directly handled hundreds of cases in California and supervised hundreds of cases outside of California that were handled by local counsels. I have attached an email AFH sent to me showing Attorney Gibbs directing local counsel in Georgia. (Exhibit B).

Apparently, in several cases, Attorney Gibbs filed pleadings that were patently hostile to the sitting judge in the matter, most notably Judge Otis T. Wright, II of the U.S. District Court for the Central District of California (case 2:12-cv-8333-SVW(PJWx). On February 7, 2013, Judge Wright issued an Order to Show Cause against Attorney Gibbs for his conduct in that matter (Exhibit C).

## Relevant facts regarding my involvement

- I have never represented any individual or company in any case in the State of California in my entire life. I have never filed a single pleading, memorandum, or other document with any court in the State of California prior to March 2013 (a search on ECF will confirm this). I have never appeared in any court in California prior to April 2013. To the best of my recollection, I have not even stepped foot in the state of California as an adult, except for two days in 2012 (vacation) and two days in April 2013 (discussed below).

- I have never filed a *pro hac vice* application to appear in a California case. In my entire legal career, I have appeared a total of two times outside the state of Illinois. Once in Minnesota, Case 27-CV-12-17079, and once in Washington DC, Case 12-0048 (BAH).

- I have never had an ownership interest in Prenda Law Inc. I have attached a screenshot from the Illinois Secretary of State (Exhibit D) and an affidavit from the actual owner of Prenda (Exhibit E). I do not have an ownership interest in any other law firm. I live in Florida, where I am not licensed to practice law and do not practice law. I do not have any law clients, a law firm website, a law firm phone number, a trust account, or any other indices of practicing law.

- I have never had an ownership interest in AF Holdings LLC or Ingenuity 13, and have attached an affidavit from the actual person who controls both entities attesting to that fact (Exhibit A).

- I want to make it clear that I never read, prepared, reviewed, modified, discussed, or was in any way involved with the pleadings filed by Attorney Gibbs in the Judge Wright matter. My first knowledge of the case was when a third party told me sometime in February 2013 that Attorney Gibbs was in trouble for insulting a judge in California.

### March 11, 2013, Hearing

I was stunned upon reading the transcript of the March OSC hearing ("Exhibit F"). Attorney Gibbs told Judge Wright that me and a Minnesota attorney named Paul Hansmeier supervised him in all of his cases and that he was essentially a "secretary" for Mr. Hansmeier and myself. This is a complete and unequivocal lie. There is no other way to describe it. At the time Attorney Gibbs lied to Judge Wright, I had absolutely no relationship to that case. Also, the court docket is clear that Attorney Gibbs was the only counsel for AFH and I13 in the case before Judge Wright. Attorney Gibbs was the only person to sign pleadings in the case or appear at hearings in front of Judge Wright regarding AFH from the beginning of the case until it was dismissed. Furthermore, AF Holdings, through its manager, makes it clear that it only had one attorney and that his name was Brett Gibbs. But the most damning evidence as to Attorney Gibbs' true role is his own words. I have attached a few emails that Attorney Gibbs sent to various attorneys he supervised:

- "Please note that my information is everywhere that it can legally be. This is because we are trying to drive all of the phone calls to me, so we don't have to burden local counsel with settlement discussions" (May 19, 2012 email to Minnesota counsel)

- "Attached are .pdf documents for a new case to file in Illinois, Western District. . . All you will need to do is draft the civil cover sheet, and file these. . . (Email to Paul Duffy instructing him to file a complaint, corporate disclosure documents and other papers Attorney Gibbs had prepared.)

- "I talked with the Unauthorized Practice of Law Department in Florida. . . I can still participate in these cases if I have reasonable expectation of being allowed to be admitted in pro-hac if I were to apply . . . feel

free to tell Syfert to contact me for settlement negotiations on the [redacted] and [redacted] clients. (Email to a Florida local counsel on August 28, 2012)

- "While we are drafting the Responses, we need to make sure you are available tomorrow to file them." (Email to Florida local counsel).

- "Good sign . . . educating the judicial system, one judge at a time. Though, how arrogant is this judge? "No, your honor, we are not the idiots here . . . it is clearly you and your staff without with [sic] requisite mental facilities" (October 25, 2012 email). (Exhibit G)

I would submit that when I actually did practice law, none of my secretaries made comments like those of Attorney Gibbs.

In addition, the attached affidavit from Jacques Nazaire makes clear that Attorney Gibbs was his supervising attorney. Attorney Nazaire stated, "On the occasion when I needed to speak with a representative for AF Holdings, LLC, my point of contact was Brett Gibbs, who I understood to be the lead counsel for all the AF Holdings cases nationwide." He further stated, "I have spoken infrequently to Mr. John Steele over the past years."

As of the filing of this complaint, I have been able to reach out to three other attorneys who were also counsels of record for AF Holdings and Ingenuity 13 in various states. Based on their statements to me, I believe they would corroborate Attorney Nazaire's affidavit. I would certainly provide additional information on this issue if your office desires.

### April 2, 2013 Hearing

Based on Attorney Gibbs' perjury to Judge Wright, the court issued an OSC against me and other people that also had nothing to do with this case. I was ordered to appear in front of Judge Wright on April 2, 2013. Obviously, as an officer of the court, I complied with the Judge's order and flew to L.A at great personal expense. Since I had absolutely no idea what the case was about, and based on advice of counsel, I invoked my 5th Amendment right not to testify. Although this may seem strange, I simply had no idea of what was going on in the case. As I stated earlier, prior to preparing for my April 2, 2013 appearance in front of Judge Wright, I had not read a single document in the case.

The OSC hearing involving me, Paul Hansmeier, AFH, I13, Prenda Law, Paul Duffy, and two paralegals lasted a total of <u>12 minutes</u> and no evidence whatsoever was submitted. No testimony was taken, and no witnesses were sworn in. I have attached the transcript (Exhibit H). On May 6, 2013 Judge Wright issued an order based solely on Attorney Gibbs perjurous statements made at the March hearing that I did not attend (Exhibit I). I appealed the sanctions order to the Ninth Circuit for the reasons stated above (Exhibit J).

To the best of my knowledge, there has never been any evidence introduced in any court in this country to show I had any ownership interest in Prenda, AFH, or I13. That is because I do not have, and have never had, any ownership interest in any of those entities. Attorney Gibbs knows I have no involvement in his case in front of Judge Wright. He is simply trying to escape responsibility for his own inappropriate behavior in cases throughout the state of California.

## Further misconduct by Attorney Gibbs

To add insult to injury, Attorney Gibbs, failed to timely send me the pleadings he filed in the Judge Wright case after April 2, 2013, as required by local rules. Attorney Gibbs is licensed in the U.S. District for the Central District of California. According to L.R. 5-3.1.1:

> *Documents presented to the Clerk for filing or lodging in paper format pursuant to L.R. 5-4.2 must be served in accordance with F.R.Civ.P. 5. All documents served under this L.R. 5-3.1.1 **must be accompanied by a proof of service** in the form required. L.R. 5-3.1.2. (Emphasis added).*

F.R.Civ.P 5 makes it clear that Attorney Gibbs was required to serve me with the pleadings he filed with the court According to the U.S. District for the Central District of California's application for admission, prior to being admitted:

> *"Applicants **must** certify that they are familiar with this Court's Local Civil and Criminal Rules, and with the Federal Rules of Civil Procedure, Criminal Procedure, and Evidence. (Emphasis added)* (Exhibit I).

I am appearing *pro se* in the Judge Wright matter and do not have an ECF account. Further, I have not consented to any alternative forms of service.

Attorney Gibbs failure to serve me (and other pro se parties in the Judge Wright case) was not an accident or a one time mistake. He <u>never</u> timely served me with <u>any</u> of his filings. And there is a very good reason for why he purposely violated L.R. 5-3.1.1 and F.R.Civ.P 5: He knew if I had an opportunity to object to his pleadings, he would have had a more difficult time lying to Judge Wright. Attorney Gibbs, who now works <u>with</u> the opposing counsel in the case against his own client AFH, obtained leave from an <u>*ex parte*</u> order from Judge Wright ordering me (and others) to pay an additional $135,000 bond if I want to continue appealing the April order. (Exhibit J). I would note that I finally received all the pleadings in the case in a package postmarked July 2, 2013, 9 days ago. I still have the physical package with the postmark on it.

## Conclusion

Attorney Gibbs acted inappropriately in a case in front of Judge Wright and filed pleadings that insulted the court. When he was forced to answer for his misconduct, he lied and blamed others who had no relation to the case. Then to avoid having to pay the sanctions award in that case, he teamed up with the opposing counsels (Mr. Pietz and Mr. Ranallo) to file joint pleadings with them against his own client and others such as myself who have nothing to do with Mr. Gibbs' conduct in California.

I am fully prepared to submit an affidavit regarding the above claims, or provide any additional information your office requests of me regarding this matter. I have already expended countless hours defending myself from the repercussions of Attorney Gibbs outrageous lies. As your office can see from Judge Wright's order of May 6, 2013, the court referred me to the IRS CID, the US Attorney's office, the Illinois State Bar, and the Central District of California for investigation. I am not worried about these investigations, as I did nothing wrong. But the very fact that I face disbarment from the Central District of California when I have never even applied for admission is surreal. Attorney Gibbs' false statements, which he cannot substantiate with any evidence whatsoever, have ruined my reputation and caused me a great deal of harm. I was forced to contribute to a $100,000 bond in order to appeal the sanctions order entered by Judge Wright.

I believe that once your office begins an investigation into the allegations raised in this complaint, it will be very disturbed by what Attorney Gibbs has done not only to me and other attorneys, but to his own current (and former) clients. What really frustrates me about Attorney Gibbs behavior was that he hurt more than just the attorneys like myself who had nothing to do with his case. He also inflicted large financial burdens and difficulties on low-level paralegals and administrative staff when he lied to Judge Wright and claimed that they were also responsible for his own unethical behavior.

Finally, I would ask the attorney reviewing this matter to imagine yourself sitting in your home, three time zones away from a case you had never heard of in front of a judge you had never heard of in a state where you had never practiced law. All of a sudden, you are ordered to appear to discuss a case you have no relation to. Then you have to post a combined $235,000 bond to appeal the resulting sanctions order. And there is no actual evidence against you. Nothing but self-serving testimony from an ethically challenged California attorney looking to escape his conduct.

John Steele
1111 Lincoln Road Suite 400
Miami Beach, FL 33139
(708) 689-8131

# Exhibit A

## AFFIDAVIT OF MARK LUTZ

I, Mark Lutz, declare under penalty of perjury as true and correct:

1. I am over eighteen years of age and am competent to testify as to the matters set forth herein.

2. I am the manager of both AF Holdings LLC ("AF") and Ingenuity13 LLC ("Ingenuity").

3. I have never met or heard of anyone named Salt Marsh. No individual by that name has ever been involved with AF or Ingenuity.

4. Neither John Steele, Paul Hansmeier, or Paul Duffy, has ever had any ownership interest in, or control whatsoever of AF or Ingenuity.

5. I filed a bar complaint against Brett Gibbs on July 10, 2013 due to his misconduct regarding his representation of AF Holdings LLC in hundreds of cases across the country, including case number 2:12-cv-08333-ODW-JC in front of Judge Wright.

6. Brett Gibbs is the only attorney that AF or Ingenuity ever retained to perform legal work related to case 2:12-cv-08333-ODW-JC in front of Judge Wright. Mr. Gibbs was the only attorney that discussed that case with me. John Steele has never represented Ingenuity or AF in any case in any case in the state of California.

7. I have read the bar complaint being filed by John Steele against Mr. Gibbs and have no objections to the information about me, AF, or Ingenuity 13 that is being used in that complaint. In fact, most of the facts in his complaint I am personally aware of and believe happened as described in Mr. Steele's complaint against Mr. Gibbs.

_____     7/10/13
Mark Lutz                                              Date

State of Florida
County of Miami Dade
The foregoing instrument was acknowledged before me this 10ᵗʰ day of July, 2013 by Mark Lutz who has produced a Florida Driver License as identification.

_____
Notary Signature

IRMA  CALDERON
Name



# Exhibit B

> From: Jacques Nazaire <nazaire.jacques@gmail.com>
> Date: Fri, Jan 18, 2013 at 12:43 PM
> Subject: Re: Letters to Send Out ASAP
> To: Brett Gibbs <blgibbs@wefightpiracy.com>
>
>
> Here it is. Let me know if you need anything else. Thanks.
>
>
> -Jacques
>
> On Fri, Jan 18, 2013 at 1:24 PM, Brett Gibbs <blgibbs@wefightpiracy.com>wrote:
>
> > Jacques:
> >
> > Yes, we can email you a copy of each letter that we plan to send out prior
> > to sending.  We will send you a copy of all of the letters we intend to
> > send out (in bulk) and then check to see if you have any issue in sending
> > those out.  If you do not respond that you have any issues, we will send
> > those out the next day.
> >
> > ALSO -- we have a hacker version of the letter (attached) that we would
> > like to send out.  Please review/edit and send back your approved version
> > of that as well.
> >
> > Thanks,
> >
> > Brett
> >
> >
> > On Fri, Jan 18, 2013 at 9:53 AM, Jacques Nazaire <
> > nazaire.jacques@gmail.com> wrote:
> >
> >> Good Afternoon Brett:
> >>
> >> Attached please find the generic letter. I toned it down a bit. I don't
> >> want the Bar to accuse me of taking unfair advantage of potential
> >> litigants. If your staff has the time, please have someone email me a copy
> >> of each letter before sending them out. Thank you.
> >>
> >> -Jacques

# Exhibit C

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INGENUITY 13 LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>JOHN DOE,<br><br>                    Defendant. | Case Nos. 2:12-cv-8333-ODW(JCx)<br><br>**ORDER TO SHOW CAUSE RE SANCTIONS FOR RULE 11 AND LOCAL RULE 83-3 VIOLATIONS** |

The Court hereby orders Brett L. Gibbs, attorney of record for AF Holdings LLC and Ingenuity 13 LLC, to appear on March 11, 2013, at 1:30 p.m., to justify his violations of Federal Rule of Civil Procedure 11 and Local Rule 83-3 discussed herein.[1]

## A.    Legal Standard

The Court has a duty to supervise the conduct of attorneys appearing before it. *Erickson v. Newmar Corp.*, 87 F.3d 298, 301 (9th Cir. 1996). The power to punish contempt and to coerce compliance with issued orders is based on statutes and the Court's inherent authority. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512

---

[1] The violations discussed herein were committed in the following related cases: *AF Holdings LLC v. Doe*, No. 2:12-cv-6636-ODW(JCx) (C.D. Cal. filed Aug. 1, 2012); *AF Holdings LLC v. Doe*, No. 2:12-cv-6669-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-8333-ODW(JCx) (C.D. Cal. filed Sept. 27, 2012). To facilitate this matter, Mr. Gibbs will be given the opportunity to address these violations together in one hearing rather than in several separate hearings.

1 U.S. 821, 831 (1994). And though this power must be exercised with restraint, the
2 Court has wide latitude in fashioning appropriate sanctions to fit the conduct. *See*
3 *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–65 (1980).

**B.   Rule 11(b)(3) Violations**

5     By presenting a pleading to the Court, an attorney certifies that—after
6 conducting a reasonable inquiry—the factual contentions in the pleading have
7 evidentiary support or, if specifically so identified, will likely have evidentiary
8 support after a reasonable opportunity for further investigation or discovery. Fed. R.
9 Civ. P. 11(b)(3). This precomplaint duty to find supporting facts is "not satisfied by
10 rumor or hunch." *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th
11 Cir. 1992). The reasonableness of this inquiry is based on an objective standard, and
12 subjective good faith provides no safe harbor. *Golden Eagle Distrib. Corp. v.*
13 *Burroughs Corp.*, 801 F.2d 1531, 1538 (9th Cir. 1986); *F.D.I.C. v. Calhoun*, 34 F.3d
14 1291, 1296 (5th Cir. 1994); *Knipe v. Skinner*, 19 F.3d 72, 75 (2d Cir. 1994). The
15 Court wields the discretion to impose sanctions designed to "deter repetition of the
16 conduct or comparable conduct by others similarly situated." Fed R. Civ. P 11(c)(4).

17     In *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed
18 Aug. 2, 2012), the Court ordered Plaintiff on December 20, 2012, to show cause why
19 it failed to timely serve the Defendant or, if the Defendant has already been served, to
20 submit the proof of service. (ECF No. 12.) In response, Plaintiff noted that the delay
21 was because it waited to receive a response from the subscriber of the IP address
22 associated with the alleged act of infringement. (ECF No. 14.) Plaintiff further noted:
23 "Though the subscriber, David Wagar, remained silent, Plaintiff's investigation of his
24 household established that Benjamin Wagar was the likely infringer of Plaintiff's
25 copyright." (ECF No. 14, at 2.) Based on this investigation, Plaintiff filed an
26 Amended Complaint, substituting Benjamin Wagar for John Doe. (ECF No. 13.)

27     Plaintiff's Amended Complaint alleges the following in connection with
28 Benjamin Wagar:

1      • "Defendant Benjamin Wagar ('Defendant') knowingly and illegally
2          reproduced and distributed Plaintiff's copyrighted Video by acting in
3          concert with others via the BitTorrent file sharing protocol and, upon
4          information and belief, continues to do the same." (AC ¶ 1);

5      • "Defendant is an individual who, upon information and belief, is over the
6          age of eighteen and resides in this District." (AC ¶ 4);

7      • "Defendant was assigned the Internet Protocol ('IP') address of
8          96.248.225.171 on 2012-06-28 at 07:19:47 (UTC)." (AC ¶ 4);

9      • "Defendant, using IP address 96.248.225.171, without Plaintiff's
10         authorization or license, intentionally downloaded a torrent file particular
11         to Plaintiff's Video, purposefully loaded that torrent file into his
12         BitTorrent client—in this case, Azureus 4.7.0.2—entered a BitTorrent
13         swarm particular to Plaintiff's Video, and reproduced and distributed the
14         Video to numerous third parties." (AC ¶ 22);

15      • "Plaintiff's investigators detected Defendant's illegal download on 2012-
16         06-28 at 07:19:47 (UTC). However, this is a [*sic*] simply a snapshot
17         observation of when the IP address was *observed* in the BitTorrent
18         swarm; the conduct took itself [*sic*] place before and after this date and
19         time." (AC ¶ 23);

20      • "The unique hash value in this case is identified as
21         F016490BD8E60E184EC5B7052CEB1FA570A4AF11." (AC ¶ 24.)

22      In a different case, *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx)
23 (C.D. Cal. filed Aug. 2, 2012), Plaintiff essentially makes the same response to the
24 Court's December 20, 2012 Order To Show Cause (ECF No. 12): "Though the
25 subscriber, Marvin Denton, remained silent, Plaintiff's investigation of his household
26 established that Mayon Denton was the likely infringer of Plaintiff's copyright."
27 (ECF No. 13, at 2.) And based on this information, Plaintiff filed an Amended
28 Complaint (ECF No. 16), similar in all respects to the one filed against Benjamin

1   Wagar in *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed

2   Aug. 2, 2012), with the following technical exceptions:

3   • "Defendant was assigned the Internet Protocol ('IP') address of 75.128.55.44

4   on 2012-07-04 at 07:51:30 (UTC)."  (AC ¶ 4);

5   • "Defendant . . . purposefully loaded that torrent file into his BitTorrent

6   client—in this case, μTorrent 3.1.3 . . . ."  (AC ¶ 22);

7   • "The   unique   hash   value   in   this   case   is   identified   as

8   0D47A7A035591B0BA4FA5CB86AFE986885F5E18E."  (AC ¶ 24.)

9       Upon review of these allegations, the Court finds two glaring problems that

10  Plaintiff's technical cloak fails to mask.  Both of these are obvious to an objective

11  observer having a working understanding of the underlying technology.

12      *1.    Lack of reasonable investigation of copyright infringement activity*

13      The first problem is how Plaintiff concluded that the Defendants actually

14  downloaded the entire copyrighted video, when all Plaintiff has as evidence is a

15  "snapshot observation."   (AC ¶ 23.)   This snapshot allegedly shows that the

16  Defendants were downloading the copyrighted work—at least at that moment in time.

17  But downloading a large file like a video takes time; and depending on a user's

18  Internet-connection speed, it may take a long time.  In fact, it may take so long that the

19  user may have terminated the download.   The user may have also terminated the

20  download for other reasons.   To allege copyright infringement based on an IP

21  snapshot is akin to alleging theft based on a single surveillance camera shot: a photo

22  of a child reaching for candy from a display does not automatically mean he stole it.

23  No Court would allow a lawsuit to be filed based on that amount of evidence.

24      What is more, downloading data via the Bittorrent protocol is not like stealing

25  candy.  Stealing a piece of a chocolate bar, however small, is still theft; but copying an

26  encrypted, unusable piece of a video file via the Bittorrent protocol may not be

27  copyright infringement.  In the former case, some chocolate was taken; in the latter

28  case, an encrypted, unusable chunk of zeroes and ones.  And as part of its prima facie

1  copyright claim, Plaintiff must show that Defendants copied the copyrighted work.

2  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). If a download

3  was not completed, Plaintiff's lawsuit may be deemed frivolous.

4    In this case, Plaintiff's reliance on snapshot evidence to establish its copyright

5  infringement claims is misplaced. A reasonable investigation should include evidence

6  showing that Defendants downloaded the entire copyrighted work—or at least a

7  usable portion of a copyrighted work. Plaintiff has none of this—no evidence that

8  Defendants completed their download, and no evidence that what they downloaded is

9  a substantially similar copy of the copyrighted work. Thus, Plaintiff's attorney

10  violated Rule 11(b)(3) for filing a pleading that lacks factual foundation.

11    *2. Lack of reasonable investigation of actual infringer's identity*

12    The second problem is more troublesome. Here, Plaintiff concluded that

13  Benjamin Wagar is the person who illegally downloaded the copyrighted video. But

14  Plaintiff fails to allege facts in the Amended Complaint to show how Benjamin Wagar

15  is the infringer, other than noting his IP address, the name of his Bittorrent client, and

16  the alleged time of download.[2] Plaintiff's December 27, 2012 Response to the Court's

17  Order to Show Cause re Lack of Service sheds some light:

18    Though the subscriber, David Wagar, remained silent, Plaintiff's
19    investigation of his household established that Benjamin Wagar was the
     likely infringer of Plaintiff's copyright. As such, Plaintiff mailed its
20    Amended Complaint to the Court naming Benjamin Wagar as the
21    Defendant in this action. (ECF No. 14, at 2.)

22  The disconnect is how Plaintiff arrived at this conclusion—that the actual infringer is

23  a member of the subscriber's household (and not the subscriber himself or anyone

24  else)—when all it had was an IP address, the name of the Bittorrent client used, the

25  alleged time of download, and an unresponsive subscriber.

26  

27   [2] This analysis similarly applies in *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx) (C.D.
   Cal. filed Aug. 2, 2012), where Plaintiff fails to allege sufficient facts to show how Mayon Denton is
28  the infringer.

Case 2:12-cv-08333-ODW-JC   Document 218-1   Filed 07/11/13   Page 98 of 100   Page ID
#:4005
Case 2:12-cv-08333-ODW-JC   Document 48   Filed 02/07/13   Page 6 of 11   Page ID #:605

Plaintiff's December 27, 2012 Discovery Status Report gives additional insight into Plaintiff's deductive process:

> In cases where the subscriber remains silent, Plaintiff conducts investigations to determine the likelihood that the subscriber, or someone in his or her household, was the actual infringer. . . . For example, if the subscriber is 75 years old, or the subscriber is female, it is statistically quite unlikely that the subscriber was the infringer.  In such cases, Plaintiff performs an investigation into the subscriber's household to determine if there is a likely infringer of Plaintiff's copyright. . . . Plaintiff bases its choices regarding whom to name as the infringer on factual analysis. (ECF No. 15, at 24.)

The Court interprets this to mean: if the subscriber is 75 years old or female, then Plaintiff looks to see if there is a pubescent male in the house; and if so, he is named as the defendant.  Plaintiff's "factual analysis" cannot be characterized as anything more than a hunch.

Other than invoking undocumented statistics, Plaintiff provides nothing to indicate that Benjamin Wagar is the infringer.  While it is plausible that Benjamin Wagar is the infringer, Plaintiff's deduction falls short of the reasonableness standard required by Rule 11.

For instance, Plaintiff cannot show that Benjamin is the infringer instead of someone else, such as: David Wagar; other members of the household; family guests; or, the next door neighbor who may be leeching from the Wagars' Internet access. Thus, Plaintiff acted recklessly by naming Benjamin Wagar as the infringer based on its haphazard and incomplete investigation.

Further, the Court is not convinced that there is no solution to the problem of identifying the actual infringer.  Here, since Plaintiff has the identity of the subscriber, Plaintiff can find the subscriber's home address and determine (by driving up and scanning the airwaves) whether the subscriber, (1) has Wi-Fi, and (2) has password-protected his Wi-Fi access, thereby reducing the likelihood that an unauthorized user outside the subscriber's home is the infringer.  In addition, since Plaintiff is tracking a

1  number of related copyrighted videos, Plaintiff can compile its tracking data to

2  determine whether other copyrighted videos were downloaded under the same IP

3  address.  This may suggest that the infringer is likely a resident of the subscriber's

4  home and not a guest.  And an old-fashioned stakeout may be in order: the presence of

5  persons within the subscriber's home may be correlated with tracking data—the

6  determination of who would have been in the subscriber's home when the download

7  was initiated may assist in discovering the actual infringer.

8      Such an investigation may not be perfect, but it narrows down the possible

9  infringers and is better than the Plaintiff's current investigation, which the Court finds

10  involves nothing more than blindly picking a male resident from a subscriber's home.

11  But this type of investigation requires time and effort, something that would destroy

12  Plaintiff's business model.

13      The Court has previously expressed concern that in pornographic copyright

14  infringement lawsuits like these, the economics of the situation makes it highly likely

15  for the accused to immediately pay a settlement demand.  Even for the innocent, a

16  four-digit settlement makes economic sense over fighting the lawsuit in court—not to

17  mention the benefits of preventing public disclosure (by being named in a lawsuit) of

18  allegedly downloading pornographic videos.

19      And copyright lawsuits brought by private parties for damages are different

20  than criminal investigations of cybercrimes, which sometimes require identification of

21  an individual through an IP address.  In these criminal investigations, a court has some

22  guarantee from law enforcement that they will bring a case only when they actually

23  have a case and have confidently identified a suspect.  In civil lawsuits, no such

24  guarantees are given.  So, when viewed with a court's duty to serve the public interest,

25  a plaintiff cannot be given free rein to sue anyone they wish—the plaintiff has to

26  actually show facts supporting its allegations.

27  / / /

28  / / /

## C.   Local Rule 83-3 Violations

Under Local Rule 83-3, the Court possesses the power to sanction attorney misconduct, including: disposing of the matter; referring the matter to the Standing Committee on Discipline; or taking "any action the Court deems appropriate." L.R. 83-3.1. This includes the power to fine and imprison for contempt of the Court's authority, for: (1) misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) misbehavior of any of its officers in their official transactions; or, (3) disobedience or resistance to its lawful writ, process, order, rule, decree, or command. 18 U.S.C. § 401.

The Court is concerned with three instances of attorney misconduct. The first and second instances are related and concern violating the Court's discovery order. The third instance concerns possible fraud upon the Court.

### 1.   Failure to comply with the Court's discovery order

In *AF Holdings LLC v. Doe*, No. 2:12-cv-6636-ODW(JCx) (C.D. Cal. filed Aug. 1, 2012) and *AF Holdings LLC v. Doe*, No. 2:12-cv-6669-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), the Court ordered Plaintiff to "cease its discovery efforts relating to or based on information obtained through any abovementioned Rule 45 subpoenas." (ECF No. 13, at 1; ECF No. 10, at 1.) Further, Plaintiff was required to name all persons that were identified through any Rule 45 subpoenas. (*Id.*)

Plaintiff responded on November 1, 2012, and indicated that it did not obtain any information about the subscribers in both of these cases. (ECF No. 10, at 6–7, 10.)[3] But in response to the Court's subsequent Orders to Show Cause, Plaintiff not only named the subscribers, but recounted its efforts to contact the subscriber and find additional information. (ECF No. 15; ECF No. 18.)

This conduct contravenes the Court's order to cease discovery. Plaintiff has provided no justification why it ignored the Court's order.

---

[3] This response was filed in *AF Holdings LLC v. Doe*, No. 2:12-cv-5709-ODW(JCx) (C.D. Cal. filed July 2, 2012).