Case 2:12-cv-08333-ODW-JC   Document 218-2   Filed 07/11/13   Page 1 of 100   Page ID
#:4008
Case 2:12-cv-08333-ODW-JC   Document 48   Filed 02/07/13   Page 9 of 11   Page ID #:608

2. *Fraud on the Court*

Upon review of papers filed by attorney Morgan E. Pietz, the Court perceives that Plaintiff may have defrauded the Court. (ECF No. 23.)[4] At the center of this issue is the identity of a person named Alan Cooper and the validity of the underlying copyright assignments.[5] If it is true that Alan Cooper's identity was misappropriated and the underlying copyright assignments were improperly executed using his identity, then Plaintiff faces a few problems.

First, with an invalid assignment, Plaintiff has no standing in these cases. Second, by bringing these cases, Plaintiff's conduct can be considered vexatious, as these cases were filed for a facially improper purpose. And third, the Court will not idle while Plaintiff defrauds this institution.

**D.    Conclusion**

Accordingly, the Court hereby **ORDERS** Brett L. Gibbs, **TO SHOW CAUSE** why he should not be sanctioned for the following:

- In *AF Holdings LLC v. Doe*, No. 2:12-cv-6636-ODW(JCx) (C.D. Cal. filed Aug. 1, 2012), violating the Court's October 19, 2012 Order instructing AF Holdings to cease its discovery efforts based on information obtained through any earlier-issued subpoenas;

- In *AF Holdings LLC v. Doe*, No. 2:12-cv-6669-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), violating the Court's October 19, 2012 Order instructing AF Holdings to cease its discovery efforts based on information obtained through any earlier-issued subpoenas;

/ / /

---

[4] Although the papers revealing this possible fraud were filed in *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-8333-ODW(JCx) (C.D. Cal. filed Sept. 27, 2012), this fraud, if true, was likely committed by Plaintiff in each of its cases before this Court.

[5] For example, in *AF Holdings LLC v. Doe*, No. 2:12-cv-6669-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), Plaintiff filed a copyright assignment signed by Alan Cooper on behalf of Plaintiffs. (ECF No. 16-1.)

Case 2:12-cv-08333-ODW-JC   Document 218-2   Filed 07/11/13   Page 2 of 100   Page ID
#:4009
Case 2:12-cv-08333-ODW-JC   Document 48   Filed 02/07/13   Page 10 of 11   Page ID #:609

- In *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), violating Rule 11(b)(2) by:
  - alleging copyright infringement based on a snapshot of Internet activity, without conducting a reasonable inquiry; or,
  - alleging that Benjamin Wagar is the infringer, without conducting a reasonable inquiry;
- In *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012), violating Rule 11(b)(2) by:
  - alleging copyright infringement based on a snapshot of Internet activity, without conducting a reasonable inquiry; or,
  - alleging that Mayon Denton is the infringer, without conducting a reasonable inquiry;
- In *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-8333-ODW(JCx) (C.D. Cal. filed Sept. 27, 2012), perpetrating fraud on the Court by misappropriating the identity of Alan Cooper and filing lawsuits based on an invalid copyright assignment.

This order to show cause is scheduled for hearing on March 11, 2013, at 1:30 p.m., to provide Mr. Gibbs the opportunity to justify his conduct. Based on the unusual circumstances of this case, the Court invites Morgan E. Pietz to present evidence concerning the conduct outlined in this order. The Court declines to sanction Plaintiffs AF Holdings LLC and Ingenuity 13 LLC at this time for two reasons: (1) Mr. Gibbs appears to be closely related to or have a fiduciary interest in Plaintiffs; and; (2) it is likely Plaintiffs are devoid of assets.

If Mr. Gibbs or Mr. Pietz so desire, they each may file by February 19, 2013, a brief discussing this matter. The Court will also welcome the appearance of Alan Cooper—to either confirm or refute the fraud allegations.

Based on the evidence presented at the March 11, 2013 hearing, the Court will consider whether sanctions are appropriate, and if so, determine the proper

1   punishment.   This may include a monetary fine, incarceration, or other sanctions

2   sufficient to deter future misconduct.   Failure by Mr. Gibbs to appear will result in the

3   automatic imposition of sanctions along with the immediate issuance of a bench

4   warrant for contempt.

5   **IT IS SO ORDERED.**

6   February 7, 2012

7

8   _____

9   **OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit D



JESSE WHITE
SECRETARY OF STATE

## CORPORATION FILE DETAIL REPORT

| Entity Name | PRENDA LAW INC. | File Number | 68212189 |
|---|---|---|---|
| Status | ACTIVE | | |
| Entity Type | CORPORATION | Type of Corp | DOMESTIC BCA |
| Incorporation Date (Domestic) | 11/07/2011 | State | ILLINOIS |
| Agent Name | PAUL DUFFY | Agent Change Date | 11/07/2011 |
| Agent Street Address | 161 N CLARK ST STE 3200 | President Name & Address | PAUL DUFFY |
| Agent City | CHICAGO | Secretary Name & Address | |
| Agent Zip | 60601 | Duration Date | PERPETUAL |
| Annual Report Filing Date | 02/06/2013 | For Year | 2012 |

Return to the Search Screen

Purchase Certificate of Good Standing

(One Certificate per Transaction)

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

# Exhibit E

**STATE OF MINNESOTA**  **DISTRICT COURT**
**COUNTY OF HENNEPIN**  **FOURTH JUDICIAL DISTRICT**

Alan Cooper,  Court File No.: 27-CV-13-3463

      Plaintiff,  Judge: Honorable Ann Leslie Alton

v.

John Lawrence Steele, Prenda Law Inc., AF
Holdings, LLC, Ingenuity13, LLC,

      Defendants.

### AFFIDAVIT OF PAUL DUFFY IN SUPPORT OF DEFENDANT PRENDA LAW, INC.'S RESPONSE TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

I, Paul Duffy, declare as follows:

    1.    I am the sole principal, shareholder, officer, and director of Defendant Prenda Law, Inc. I am also the registered agent for Defendant Prenda Law, Inc.

    2.    Plaintiff's principal place of business is 161 N. Clark St., Suite 3200, Chicago, IL 60601, which is also the address of the registered agent.

    3.    For the entire time up to and including when Plaintiff asserts that he mailed the summons and complaint to Plaintiff's principal place of business, I maintained an office at Plaintiff's principal place of business and regularly worked there on a daily basis from Monday through Friday.

    4.    As such, a reasonably diligent attempt to personally serve me at Defendant's principal place of business would have been successful.

    5.    I am not aware of a single attempt by any person to serve me with any paper at 161 N. Clark Street, Suite 3200, Chicago, Illinois.

*161 ₽₽*

6.      The practice of the receptionist at ~~3200~~ N. Clark Street, Suite 3200 in Chicago, Illinois is to notify me by e-mail whenever a visitor asks for me.   I routinely receive such e-mails for those asking to see me.  I did not receive a message from the receptionist at Suite 3200 that a visitor whom I did not know had asked to see me, from the time Plaintiff filed the Complaint in this action through the time he purports to have sent the Complaint to me by mail.

7.      I am unaware of any attempt by any person to personally serve me with the Complaint or any paper in this actin at any time.

8.      I declare under penalty of perjury that the foregoing is true and correct based on my own personal knowledge, except for those matters stated on information and belief, and those matters I believe to be true.  If called upon to testify, I can and will competently testify as set forth above.


**DATED: May 14, 2013**                              By: _____


"OFFICIAL SEAL"
ANDRIANNA D FLORES
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 06/14/2016

*Andrianna D Flores*

Cook County          5/14/2013.
State: Illinois

# Exhibit F

1

```
 1              UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3              HONORABLE OTIS D. WRIGHT

 4          UNITED STATES DISTRICT JUDGE PRESIDING

 5                    - - -

 6
     Ingenuity 13 LLC,                )
 7                    PLAINTIFF,      )
                                      )
 8   VS.                              )  NO. CV 12-8333 ODW
                                      )
 9   John Doe, et al.,                )
                      DEFENDANT,      )
10   _____)

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              LOS ANGELES, CALIFORNIA

15              MONDAY, MARCH 11, 2013

16

17

18   _____

19          KATIE E. THIBODEAUX, CSR 9858
            U.S. Official Court Reporter
20          312 North Spring Street, #436
            Los Angeles, California 90012
21

22

23

24

25
```

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR RESPONDENT GIBBS:

 4         WAXLER CARNER BRODSKY LLP
           BY:  ANDREW J. WAXLER
 5         -and- BARRY BRODSKY
           1960 E. Grand Avenue
 6         Suite 1210
           El Segundo, CA  90245
 7

 8

 9    FOR DEFENDANT:

10         THE PIETZ LAW FIRM
           BY:  MORGAN E. PIETZ
11         3770 Highland Avenue
           Suite 206
12         Manhattan Beach, CA  90266

13         -and-

14         NICHOLAS RANALLO LAW OFFICES
           BY:  NICHOLAS R. RANALLO
15         371 Dogwood Way
           Boulder Creek, CA  95006
16

17

18    SPECIALLY APPEARING:

19         KLINEDINST LAW OFFICES
           BY:  HEATHER ROSING
20         501 W. Broadway
           Suite 600
21         San Diego, CA  92101

22

23

24

25
```

3

```
 1                      I N D E X

 2

 3   WITNESS NAME                          PAGE

 4   Alan Cooper
          Direct Examination by the Court    21
 5        Direct Examination by Mr. Pietz     26
          Cross-Examination by Mr. Brodsky    34
 6
     Bart Huffman
 7        Direct Examination by Mr. Pietz     39

 8   Benjamin Fox
          Direct Examination by Mr. Pietz     45
 9
     Jessie Nason
10        Direct Examination by Mr. Pietz     52

11   Brad Gibbs
          Direct Examination by Mr. Waxler    73
12        Cross-Examination by Mr. Pietz     105

13

14   EXHIBIT                  I.D.      IN EVID.

15   1                         36          37
     2                         36          37
16   3,4,5                     36
     6,7                       43          44
17   8                         50          50
     9                         56
18   10                        67          67
     11                        68          68
19   12                        73          73
     13                       107         107
20   14                       108         108
     15,16,17,18              110         110
21

22

23

24

25
```

4

```
1          LOS ANGELES, CALIFORNIA; MONDAY, MARCH 11, 2013

2                         1:38 P.M.

3                       - - - - -

4

5

6          THE CLERK:  Calling Item No. 4, CV 12-8333-ODW,

7    CV 12-6662, ODW, CV 12-6668, Ingenuity 13 LLC versus John

8    Doe, additionally, CV 12-6636 ODW, CV 12-6669, AF

9    Holdings LLC versus John Doe.

10          Counsel, please state your appearances.

11          MR. WAXLER:  Andrew Waxler, your Honor, and Barry

12   Brodsky for Mr. Gibbs who is present in the courtroom.

13   Thank you.

14          THE COURT:  Good afternoon, counsel.

15          MR. PIETZ:  Good afternoon, your Honor.  Morgan

16   Pietz, P-I-E-T-Z, for the putative John Doe defendant in

17   12-CV-8333.

18          MR. RANALLO:  Nicholas Ranallo, co-counsel for the

19   same Doe.

20          THE COURT:  All right.  Gentlemen, thank you.

21          All right.  We are here in response to an OSC

22   set by this court as to why sanctions should not be

23   imposed for various violations including Rule 11 and

24   Local Rule 83-3.

25          I have received from Mr. Waxler on behalf of
```

5

1    Mr. Gibbs his response, supplemental response, a number

2    of documents.  Spent the weekend reading a depo which was

3    perhaps the most informative thing I have read in this

4    litigation so far primarily because of what you didn't

5    want revealed.  So, in any event, I have extended an

6    offer to all of the principles concerned to offer them an

7    opportunity to explain.

8              It is my understanding that they have declined

9    that invitation.  Therefore --

10        MS. ROSING:  Your Honor?

11        THE COURT:  And you are?

12        MS. ROSING:  If I may approach.

13        THE COURT:  Please.

14        MS. ROSING:  My name is Heather Rosing, and I

15   filed an ex parte application with this court.

16        THE COURT:  When?

17        MS. ROSING:  Friday?

18        THE COURT:  When?

19        MS. ROSING:  It was filed I believe at 3:54 p.m.?

20        THE COURT:  Guaranteed for the court to actually

21   see it; right?  Was it electronically filed?

22        MS. ROSING:  The local rule says we're not

23   allowed --

24        THE COURT:  Answer my question.  Was it

25   electronically filed?

6

1          MS. ROSING:  No.  Because we are not allowed to,

2     your Honor.

3          THE COURT:  Okay.  So what you did is you took it

4     downstairs to the intake window?

5          MS. ROSING:  Yes, your Honor?

6          THE COURT:  Late Friday afternoon addressing a

7     matter that is set for hearing on Monday morning?

8          MS. ROSING:  My clients received notice of this on

9     Thursday, your Honor.  We received notice on Thursday?

10         THE COURT:  I am just asking you a question.  You

11     can answer it "yes" or "no".

12         MS. ROSING:  I'm sorry.  Could you repeat the

13     question.

14         THE COURT:  What is -- why are you here?

15         MS. ROSING:  Again, my name is Heather Rosing with

16     the Klinedinst PC law firm.  I am specially appearing for

17     four of those people that received this notice on

18     Thursday, Angela Van Den Hemel, a paralegal at Prenda

19     law --

20         THE COURT:  Is this the long way of saying they

21     are not going to be here?

22         MS. ROSING:  I'm sorry.  I was just telling you

23     who I represent, your Honor?

24         THE COURT:  Are they here?

25         MS. ROSING:  No, your Honor.

1          THE COURT:  Have a seat.

2          MS. ROSING:  May I just finish?

3          THE COURT:  Have a seat.

4               Bottom line is the court is going to end up

5     drawing its own inferences from the information it

6     actually has.  An opportunity to be heard is all that is

7     required.  If you don't wish to exercise that, fine.

8               There was so much obstruction during the

9     course of this deposition that it is obvious that someone

10    has an awful lot to hide.  This has actually raised far

11    more questions of fraud than the court originally had,

12    but we will get to that later.

13              Initially, I have got a number of questions

14    regarding some of the filings that have been made with

15    the court.

16              I guess, Mr. Waxler, I guess you will be the

17    one that is addressing some of these things.  One of my

18    questions is this.  Why is it that in every single one of

19    these cases there is a form attached to the complaint

20    that asks for whether or not there are any related cases.

21    I have got a partial list of all of these cases that have

22    been filed in the Central District.  None of them have

23    indicated that there are any related cases.

24              Could you tell me why?

25          MR. WAXLER:  Well, your Honor, the downloads are

8

1    done by separate infringers, and the plaintiffs, yes,

2    obviously, were a lot the same, and I believe that the

3    decision had been made that it didn't require the related

4    case filings to be made.

5          THE COURT:  Okay.

6          MR. WAXLER:  Perhaps that was in error, your

7    Honor, as we sit here today.

8          THE COURT:  Let me ask a question then.  Let's

9    just say on one date, that date being July 2nd of 2012,

10   four lawsuits were filed by AF Holdings LLC versus John

11   Doe all seeking a remedy for the infringement of the same

12   movie Popular Demand.

13          Now, can you tell me how on earth these aren't

14   related?

15          MR. WAXLER:  Well, they are obviously related in

16   the sense that --

17          THE COURT:  That is what I thought, too.  And that

18   is what this entire list is.  Okay.  They are all

19   related, but that box was always checked no.  And then we

20   are going to get to something separate in a minute, and

21   that is the issue of who has an interest, a financial

22   interest in the outcome of these cases.  We will look at

23   this shortly.

24          There is the issue of the court having vacated

25   and quashed the subpoenas that were served on various

9

1    ISP's, and, then, of course, I have gotten other

2    responses to the OSC saying, well, we didn't know that

3    that meant we couldn't do other forms of discovery.  And,

4    by the way, we sent out a copy of the court's order to

5    the various ISP's letting them know that the court had

6    withdrawn those orders and surely that is not the conduct

7    of someone who was trying to disobey the court's order.

8    And I had to agree.  Sounded reasonable.

9         Have you all seen the declaration of Sean

10   Moriarty from Verizon?

11        MR. WAXLER:  Your Honor, we saw it this morning,

12   yes.

13        THE COURT:  Okay.  Good.

14        And what say you because he responds directly

15   to Mr. Gibbs' assertion that the ISP's were given notice

16   not to respond to the subpoenas.  He says this didn't

17   happen, that they didn't receive notice.

18        MR. WAXLER:  May I respond to that, your Honor?

19        THE COURT:  Sure.

20        MR. WAXLER:  Mr. Gibbs -- Prenda Law is one of

21   the, is one of the e-mail addresses that received a copy

22   of your October 19th, 2012 order.  As does Mr. Gibbs.

23   Mr. Gibbs had a conversation with Mr. Hansmeier and told

24   him that he thought that this order should be served on

25   the ISP's.  Mr. Hansmeier advised Mr. Gibbs that that

10

1   would be done.  Mr. Hansmeier later advised Mr. Gibbs

2   that his request had been taken care of.

3          Now, if you read page, Paragraph 4 at Line 18

4   and 19 of the declaration, all it says is based on the

5   Verizon records, it does not appear that Verizon received

6   from AF Holdings or its counsel a copy of the order.  It

7   does not say they did not.  And Verizon, like these other

8   ISP's, has a history of, as I understand it, eliminating

9   its records from their systems soon after, like within 30

10  days.  CT Corporation receives the subpoenas.  That was

11  who was supposed to be served, and they have a history of

12  not keeping them in their records for very long.

13      THE COURT:  So they eliminate their documents

14  pretty much the way Mr. Gibbs eliminates the original

15  signed application from Alan Cooper?

16      MR. WAXLER:  Mr. Gibbs never had the original

17  signed verification from Mr. Cooper.  Mr. Gibbs was told

18  by Prenda Law that they had it.  So Mr. Gibbs was never

19  in possession of that document, and Mr. Gibbs did not

20  lose that document, your Honor.

21      THE COURT:  One other thing you didn't really make

22  clear, was it only that document or was the entire file

23  lost?

24      MR. WAXLER:  I don't know the answer to that.

25      THE COURT:  Okay.  So here is the deal.  So what

11

1   we have got, we have got CT Systems destroying the order

2   and the cover letter or transmittal of that order to

3   Verizon; right?  But they have got everything else.  They

4   have got all the other letters and the subpoena and all

5   that sort of thing.  So the only thing they have gotten

6   rid of it just the order quashing the subpoena; right?

7           MR. WAXLER:  No, your Honor.  CT Corporation is

8   the agent for service of process.

9           THE COURT:  I know who they are.

10          MR. WAXLER:  CT Corporation may have received

11  that, and I am just saying their history is they don't

12  keep records for very long of having received subpoenas

13  or service of those.  The other documents which are

14  attached to this declaration -- I believe since it was

15  given to me about an hour, actually 15 minutes ago out

16  there; I saw part of it online -- are documents that were

17  exchanged between Verizon directly and others.  So they

18  weren't going through CT Corporation.  So that is the

19  difference, your Honor.

20          THE COURT:  You are saying, then, that the notice

21  to Verizon that that subpoena had been quashed by the

22  court went to CT and not to Verizon?

23          MR. WAXLER:  That is their agent for service of

24  process.  That is who they served.  That is who

25  Mr. Gibbs, when he talked to Mr. Hansmeier, said please

1   serve this order on them, and that is what Mr. Gibbs

2   understands was done.

3        THE COURT:  Okay.  Was the order served in the

4   same way that the subpoena was served?

5        MR. WAXLER:  That would be our understanding.  I

6   mean, it was served on CT Corporation.  That is how the

7   subpoena was served on CT Corporation.

8        THE COURT:  So the subpoena and all the various

9   letters, et cetera, that emanated from Prenda Law to

10  Verizon were served on CT Systems; right?

11       MR. WAXLER:  No.  As I understand it, your Honor,

12  the e-mails that may appear here were exchanged between

13  Verizon directly, once they got the subpoena, and members

14  of Prenda Law.  The only thing that would have gone

15  through CT Corporation was the service of the original

16  subpoena and a copy of the order.

17       THE COURT:  All right.  I am only going by the

18  declaration of Mr. Moriarty.  This is under tab, Exhibit

19  A.  The letter, Prenda Law, see that, September 5th?  It

20  says via hand delivery.

21       MR. WAXLER:  I see that.

22       THE COURT:  All right.  Enclosed please find a

23  subpoena and attachment.  So I am assuming that the

24  subpoena was also hand delivered.  It doesn't say to

25  whom.  Is this to CT?

13

1        MR. WAXLER:  That is our understanding, your

2   Honor.

3        THE COURT:  So what we have is a situation or at

4   least you are guessing, you are guessing that everything

5   seeking information from Verizon arrived intact, but the

6   order withdrawing or quashing that subpoena somehow got

7   misplaced.

8        MR. WAXLER:  There is no evidence before this

9   court that Verizon did not receive that subpoena, that

10  order from this court.  I can tell you that Mr. Gibbs'

11  intent was that that order be served so that they did

12  receive it.  And it was always his understanding until he

13  saw the declarations in the filings by Mr. Pietz that

14  some of the ISP's did not receive a copy of that order.

15       THE COURT:  It is also my understanding that I

16  guess a paralegal in the employ of one of these law firms

17  began following up with these Internet service providers

18  inquiring as to why certain information had not been

19  provided pursuant to those subpoenas.

20       MR. WAXLER:  And Mr. Gibbs read that for the first

21  time when the declarations were submitted in connection

22  with this OSC and was very surprised by it because he

23  understood, as he does today, that the order by this

24  court was served on CT Corporation and then would have

25  been transmitted to Verizon.

14

```
 1          THE COURT:  Okay.  All right.  There is a number

 2   of things, Mr. Waxler, which you state in your papers

 3   that I wanted to ask you about.  In more than one place,

 4   you indicate that Ingenuity 13 LLC and AF Holdings, et

 5   cetera, have assets which consist of without limitation

 6   their intellectual property rights in some of these

 7   films.  What other assets?

 8          MR. WAXLER:  AF Holdings and Ingenuity -- AF

 9   Holdings, at least, received the assignment.  So they

10   have those property rights, and the companies would have

11   obviously the right to, or rather the settlement funds

12   that were paid on some of these matters would have been

13   property of those companies.

14              But as I understand it from Mr. Hansmeier's

15   deposition which I, too, read over the weekend, that the

16   trust accounts of some of the lawyers were holding those

17   settlement funds.  Whether those settlement funds ever

18   made it to AF Holdings or Ingenuity 13, all I can do,

19   your Honor, is rely on what Mr. Hansmeier says because we

20   have no independent knowledge of it and nor does

21   Mr. Gibbs.  Mr. Gibbs did not receive those funds.  Those

22   funds were sent to Prenda Law.

23          THE COURT:  So you are telling me what you know is

24   what you gleaned from this this weekend pretty much as

25   the court did; right?
```

1          MR. WAXLER:  Well, I mean, Mr. Gibbs may have more

2     knowledge than specifically what Mr. Hansmeier said.

3          THE COURT:  Oh.  Mr. Hansmeier has no knowledge of

4     anything.  So I just want to know if you got what the

5     court got which is the only entities which apparently

6     make any claim whatsoever to these settlement funds are

7     the law firms.  There appears to be no effort whatsoever

8     of transmitting any of these funds to the so-called

9     clients, Ingenuity 13 and AF Holdings, who don't file

10    income taxes anywhere because as Mr. Hansmeier says they

11    have no income.

12              Is that what you got?  That is what I got.

13         MR. WAXLER:  I thought that Mr. Hansmeier said

14    they didn't file income taxes because they were not

15    required in where they were domiciled, but you may be

16    right and I may be wrong.

17         THE COURT:  No.  He quite clearly said they have

18    not filed income taxes anywhere.

19         MR. WAXLER:  I understand that.  I just thought it

20    was a different reason for not filing them.

21         THE COURT:  Well, probably because they don't do

22    anything, do they?

23         MR. WAXLER:  Well, they in hearing from Mr -- in

24    reading from what Mr. Hansmeier says, they obviously own

25    valid copyrights, and those entities retain law firms

1    like Prenda Law, apparently, to file actions such as the

2    ones that are at issue today.

3         THE COURT:  They retain firms?  Seriously?

4              You can hardly keep a straight face, can you?

5         MR. WAXLER:  No, your Honor.

6         THE COURT:  These entities were basically created

7    by these lawyers; right?  They have no business.  They

8    have no employees.  They have no function really.  They

9    are not even really a shell, are they?

10         MR. WAXLER:  I don't know, your Honor.

11         THE COURT:  The law firms are basically

12    prosecuting these actions on their own behalf, aren't

13    they?

14         MR. WAXLER:  Mr. Gibbs never had any client

15    contact with those clients.  Mr. Gibbs received

16    information from Mr. Hansmeier and Mr. Steele, and those

17    individuals advised Mr. Gibbs that they had talked to the

18    clients.

19         THE COURT:  Hansmeier and Steele, are those the

20    individuals to whom you refer in your papers to as the

21    senior partners in the law firm.

22         MR. WAXLER:  Yes, they are.

23         THE COURT:  I have another question.  Does

24    Mr. Gibbs have an indemnity or hold harmless agreement

25    from these senior partners?  Or is he out there on his

17

```
 1    own?
 2         MR. WAXLER:  He has no hold harmless agreement
 3    from these partners that I am aware of.
 4         THE COURT:  Okay.  All right.
 5         MR. WAXLER:  He was an of counsel, W -- 1099,
 6    independent contractor for Prenda Law.
 7         THE COURT:  All right.  Now, the court is coming
 8    to the conclusion, and this is why it has been wonderful
 9    to have someone here to disabuse me of the notion that
10    all of these lawsuits are being prosecuted on behalf of
11    the lawyers, that all of the settlement funds inure
12    solely to the benefit of the lawyers because not dime
13    one has been transmitted to AF Holdings or to Ingenuity
14    13.
15              Now, if there is information to rebut that, I
16    would love to hear it.  But, otherwise, that is what I am
17    stuck with.  So now I am wondering why is it that no
18    disclosure has been made in this court and probably in
19    none of the federal courts that the lawyers have a
20    pecuniary interest in the outcome of these cases?
21         MR. WAXLER:  I don't believe that that is what
22    Mr. Gibbs understands the case to be.  The fact that the
23    settlement funds were not transmitted as of yet to those
24    entities doesn't mean those settlement funds aren't being
25    held in trust for those entities.  Mr. Gibbs has no
```

18

```
 1    information whatsoever, your Honor, to understand

 2    anything different than what I just described.

 3         MR. BRODSKY:  Your Honor, may I interject one

 4    point?

 5         THE COURT:  Sure.  Your name again?

 6         MR. BRODSKY:  Barry Brodsky.

 7         THE COURT:  All right.  Go ahead, sir.

 8         MR. BRODSKY:  My understanding and it is only from

 9    reading the same deposition transcript was that those

10    funds remained in the trust accounts of the various law

11    firms that were representing the companies to defray

12    future expenses.

13         THE COURT:  And what were those expenses other

14    than filing fees?

15         MR. BRODSKY:  I would assume they would be filing

16    fees, investigative fees, you know, basically that.

17         THE COURT:  To -- okay.

18         MR. BRODSKY:  But that is just my reading of the

19    deposition.

20         THE COURT:  Okay.  And after that is done, then

21    what?

22         MR. BRODSKY:  Apparently -- well, we don't know

23    where that trail ends, whether that trail has ended.  But

24    we do know this.  We know that none of those funds

25    reached Mr. Gibbs.
```

1        THE COURT:  And we also know none of those funds

2    reached Ingenuity 13 and AF Holdings.

3        MR. BRODSKY:  Apparently, from Mr. Hansmeier's

4    testimony, that is correct.

5        THE COURT:  Who was the corporate designee, the

6    30(b)(6) designee for AF Holdings; right?

7        MR. BRODSKY:  Yes.

8        THE COURT:  And none of those funds ever reached

9    AF Holdings.

10       MR. BRODSKY:  According to him, that's correct.

11       THE COURT:  All these lawsuits settled on behalf

12   of AF Holdings; right?  But they reside in the law firm's

13   trust account.

14       MR. BRODSKY:  Some obviously were settled, yes.

15       THE COURT:  You know what was really interesting,

16   a lawsuit handled by law firm A, the settlement funds

17   then are transmitted to law firm B's trust account, law

18   firm B being controlled by Mr. Steele.  I don't know.  I

19   just find these things curious.

20           All right.  Any other light to be shed on some

21   of the court's concerns with respect to this foolishness

22   here because -- by the way, is there a Mr. Cooper here?

23       MR. PIETZ:  Your Honor, Mr. Cooper is in

24   attendance today, and I believe prepared to confirm that

25   these documents are founded on forgeries.

20

1        THE COURT:  Is there an Alan Cooper in the

2   courtroom?  Don't be shy.  Come forward, sir.

3        (The witness was sworn.)

4        THE CLERK:  Thank you.  Have a seat.

5        THE COURT:  By the way, while we are on the

6   subject, is there a Mark Lutz in the courtroom as well?

7             Is either Hansmeier in the courtroom?

8        MS. ROSING:  Your Honor, I am the attorney

9   specially appearing for them and if I could finish my

10  request?

11       THE COURT:  I just want to know if they are here.

12       MS. ROSING:  They are not physically here, your

13  Honor?

14       THE COURT:  Thank you.  Good.

15       MR. PIETZ:  Your Honor, my understanding was that

16  Ms. Rosing was representing one of the Hansmeiers.  Is

17  that different, or are you also representing Peter

18  Hansmeier?

19       MS. ROSING:  I did not have an opportunity to say,

20  but I do not represent Peter Hansmeier.

21       THE COURT:  I didn't think you would be.  The

22  technician?  I didn't think you would be.

23       MR. WAXLER:  Your Honor, while those individuals

24  are not present, my understanding is they are available

25  by phone.

```
 1              THE COURT:  Is that right.  Okay.  I may take them

 2   up on that.  Maybe.  Anyway.

 3

 4                      DIRECT EXAMINATION

 5   BY THE COURT:

 6   Q      Mr. Cooper, your name is Alan Cooper?

 7   A      Yes, sir.

 8   Q      And where do you reside, sir?

 9   A      Isle, Minnesota.

10   Q      Isle, Minnesota.  Do you have any connection -- let

11   me just ask you specifically, do you have any connection

12   with Mr. Gibbs?

13   A      No, sir.

14   Q      Ever met Mr. Gibbs before?

15   A      No.

16   Q      What about Paul Hansmeier, any connection with him?

17   A      No.

18   Q      Ever meet him before?

19   A      No.

20   Q      What about John Steele?

21   A      Yes.

22   Q      What was your connection with Mr. Steele?

23   A      I was a caretaker for a piece of property that he

24   had in Northern Minnesota.

25   Q      And when was this?
```

22

1    A     I think from 2006 till last August.

2    Q     You worked for him from 2006 until August of 2012?

3    A     No, I did not work for him.  I was a caretaker for

4    his piece of property.  He had two houses.  I lived in

5    one and then took care of everything else there.

6    Q     Okay.  And he paid you?

7    A     No.

8    Q     Who paid you?

9    A     There was no pay.  It was I lived in the one house,

10   and I took care of everything on the property for free.

11   Q     Or in exchange for a place to live?

12   A     Yes.

13   Q     All right.  So you didn't have to pay for your

14   housing; correct?

15   A     Correct.

16   Q     So in exchange for housing on the property, you

17   took care of his property?

18   A     Yes.

19   Q     And this was a deal you negotiated with Mr. Steele?

20   A     Yes.

21   Q     All right.

22   A     It is in a lease agreement that we have.

23   Q     All right.  I guess you have been advised.  Matter

24   of fact, I have seen a letter written by an attorney who

25   apparently is acting on your behalf where you have become

23

1    concerned that your name is being used as a corporate

2    representative of some West Indian entities that you know

3    nothing about; is that true?

4    A     Yes.  That's correct.

5    Q     I want you to explain.  I want you to elaborate.

6    What is it that you have heard?

7    A     That my name is being signed and forged and used

8    for whatever these offices or myself personally scams

9    that they have going on.

10   Q     Did you ever have a discussion with Mr. Steele

11   about these concerns of yours?

12   A     He had, on one of his trips up to the cabin, all he

13   had said was if anybody contacts you about any of my law

14   firm or anything that has to do with me, don't answer and

15   call me.

16   Q     Had he ever given you any advance notice that he

17   was contemplating embarking on -- let me back up.  Do you

18   know what his legal specialty was, say, back in 2006?

19   What kind of law was he practicing?

20   A     When I had first met him, he was still in law

21   school.

22   Q     In law school.  All right.  And, then, what area of

23   practice did he go into if you know?

24   A     He had originally said divorce, family law.

25   Q     Family law.  All right.  Did he ever indicate to

24

1    you that he was contemplating embarking on a different

2    specialty in the law?

3    A     Yes.

4    Q     And best as you can recall, what was this new

5    specialty?

6    A     Internet porn buyers.  I don't know exactly how to

7    word it for you.

8    Q     Oh.  Internet porn piracy sounds pretty good.  All

9    right.

10          Do you recall anything he said about that?

11    A     As far as?

12    Q     Anything about this new venture, this new method of

13    practicing law.

14    A     I tried not to talk to him very much, but what he

15    had -- what he had said on one of his trips was his goal

16    was $10,000 a day, to have a mailing of these letters.

17    Q     What letters?

18    A     To people that illegally downloaded on the

19    Internet.

20    Q     Did he explain what these letters would say and who

21    these letters would be sent to?

22    A     I am not very Internet savvy myself, so it would be

23    whoever downloaded something that they weren't paying for

24    or illegal.  I don't know exactly how this works.  That

25    he would just send out a letter stating that if they

1    didn't send a check for a certain amount, that he would

2    make it public to these people's family and friends what

3    they were looking at.

4    Q    I see.  Okay.  Is that all you can remember him

5    saying about this new venture?

6    A    At this time.  Yes.

7    Q    All right.  Now, let's put this in context.  He

8    basically told you that if you started getting any

9    inquiry, that you were to, what, call him or direct the

10   callers to him?

11   A    To contact personally, personally contact him.

12   Q    Okay.  Now, back up.  If you received any calls or

13   inquiries regarding what?

14   A    He said anything that seemed out of place.

15   Q    And you took that to mean what?

16   A    I took that to mean the very next day I went and

17   talked to my father-in-law which is a retired sheriff and

18   talked to him, and he said until anybody contacts you, he

19   goes we have nothing to go to the court system with.

20   Q    And did that change?

21   A    I never heard anything from anybody.

22   Q    All right.  So no one ever contacted you?

23   A    No.

24   Q    And so what is it that made you go off and hire

25   Mr. Paul Godfread?

1  A    I had received a text asking if this was my

2  signature on a particular document, and I said no.  And

3  that is when I was given a number to call an attorney to

4  make sure that this didn't come back towards me.

5  Q    All right.  I am going to assume that that copy of

6  that document is probably in court; right?

7      MR. PIETZ:  Referring now to the copyright

8  assignment agreement, your Honor?

9      THE COURT:  Right.

10      MR. PIETZ:  Correct, your Honor.

11      THE COURT:  Okay.  Let me turn this over to you,

12  sir.  Go ahead.

13      MR. PIETZ:  Okay.  Thank you, your Honor.

14        If it please the court, I have some documents

15  which I can show on the monitor including to Mr. Cooper.

16  I just want to make sure we have both the copyright

17  assignments.

18      MR. PIETZ:  Are the monitors arrayed so that the

19  court can see them?

20      THE COURT:  Yes.  The court has its own.  We got

21  that before the sequester.

22      MR. PIETZ:  All right.

23               DIRECT EXAMINATION

24  BY MR. PIETZ:

25  Q    Mr. Cooper, my name is attorney Morgan Pietz.

27

1    Thank you for coming here today.

2           Did anyone ever ask you to become a corporate

3    representative of AF Holdings LLC?

4    A    No.

5    Q    Did anybody ever ask you to become a corporate

6    representative of Ingenuity 13 LLC?

7    A    No.

8    Q    Mr. Cooper, now, I would like to show you some

9    documents, and Mr. Ranallo I believe just passed out

10   copies of the first.  So what we have here is a

11   complaint.

12          It is one of the consolidated cases presently

13   before the court.  For the record, it is Civil Action No.

14   212 CV 6636, an action filed here in the Central District

15   of California.

16          Mr. Cooper, have you ever seen this complaint

17   before?

18   A    No.

19   Q    I am going to skip now to the last page of this

20   complaint or actually it is not quite the last page.  It

21   is the last page of the main document, or, sorry, it is

22   actually Exhibit B to the complaint.  Here is the first

23   page of Exhibit B, now, Mr. Cooper.

24          It says copyright assignment agreement on the

25   top, and then I will note for the record that the

28

1    copyright at issue is Popular Demand which it states in

2    the first paragraph.  Moving down to the second page of

3    the agreement, Mr. Cooper, you will note that there is a

4    signature on the right where it says Alan Cooper.

5                Is that your signature, sir?

6    A    No.  That is not.

7    Q    You are quite sure about that?

8    A    Yes.  I use a middle initial.

9    Q    Mr. Cooper, I would like to show you a similar

10   document which has appeared in a different case.  What we

11   have here is a copyright assignment agreement.  This is

12   for a different AF Holdings copyright styled Sexual

13   Obsession which it lists in the first paragraph.  For the

14   record, this is Northern District of California No. 12 CV

15   2048.

16               Mr. Cooper, I am going to turn now to the

17   second page of this copyright assignment agreement, or I

18   guess it would be the third page.  There is a signature

19   there on the right that says Alan Cooper.

20               Is that your signature, sir?

21   A    No, it is not.

22   Q    Did anybody ever ask you to become a corporate

23   representative or otherwise involved with a company

24   called AF Films LLC?

25   A    No.

1    Q      And you are quite sure that is not your signature?

2    A      Very sure it is not mine.

3    Q      Mr. Cooper, I would like to show you now another

4    document, and I will note for the record that this is a

5    verified petition to perpetuate testimony filed in the

6    Eastern District of California, 12 CV 8333, have you ever

7    seen this document before, Mr. Cooper, prior to within

8    the last couple of days?

9    A      No.

10          MR. WAXLER:  Your Honor, I would like to object to

11   that question.

12          THE COURT:  Object to the question as to whether

13   or not he has seen the document?

14          MR. WAXLER:  Well, this inquiry is beyond the

15   scope of the OSC.  The OSC is about four cases that was

16   filed in the Central District of California.  Now, we

17   have heard about a Northern District case and Eastern

18   District case that he is being questioned about which we

19   did not address in our papers, and it is not what this

20   OSC is about.

21          THE COURT:  Well, it has become about it.  It has

22   become about fraudulent filings in federal court.

23          MR. PIETZ:  I would add, your Honor, that it all

24   goes to a pattern and practice.

25   Q      Mr. Cooper, looking now at the verified petition, I

30

1    am going to skip to the last page.  You will note that it

2    is signed by Mr. Gibbs.  On this page which reads at the

3    top notarized verification, there is a slash S,

4    type-printed signature that says Alan Cooper, and it says

5    Alan Cooper, Manager of Ingenuity 13 LLC.

6            Did you ever sign a notarized verification for

7    this document?

8    A    No, I did not.

9    Q    Did you ever give anyone permission to sign your

10   name for you on this document?

11   A    No.

12        MR. PIETZ:  Mr. Ran, would you pass out Exhibit

13   53.  I will note for the record that I am moving now to

14   what has been previously filed with this court as Exhibit

15   S which is the declaration of Nicholas Ranallo in

16   opposition to a motion to shorten time filed in the

17   Northern District of California.  And I am going to move

18   now to an exhibit to this motion.

19            It is actually the second to last page in that

20   filing, Exhibit S, and what we are looking at is a

21   business entity detail for an entity called VPR, Inc.

22   from the Minnesota Secretary of State website.

23   Q    Mr. Cooper, you will note there that under

24   officers, it says Alan Cooper and it lists an address of

25   4532 East Villa Teresa Drive, Phoenix, Arizona, 85032.

31

```
 1              Mr. Cooper, have you ever been to Arizona?

 2    A    No, I haven't.

 3    Q    So that is not your residence, is it?

 4    A    No.

 5    Q    Do you have any knowledge of that address

 6    whatsoever?

 7    A    No, I do not.

 8    Q    Did anybody ever ask you to be the president of

 9    VPR, Inc.?

10    A    No.

11    Q    Did anybody ask you to be any other role in

12    connection with that company?

13    A    No.

14    Q    Mr. Cooper, I am going to move now to what has been

15    previously identified in the record as Exhibit T.  What

16    we have here is a notissues.com registration.

17              Mr. Cooper, did you ever register an Internet

18    domain name called notissues.com or perhaps it is

19    pronounced notissues.com?

20    A    No, I did not.

21    Q    I am going to zoom in now.  Mr. Cooper, I will note

22    that on the second page it says registrant Alan Cooper,

23    and it lists that same Phoenix address that we mentioned

24    a moment ago.  Am I correct in presuming that there where

25    it says administrative contact, and it lists the e-mail
```

32

1    address, johnsteele@gmail.com.  Am I correct in assuming

2    that johnsteele@gmail.com is not your e-mail address,

3    Mr. Cooper?

4    A    No, it is not.

5    Q    Mr. Cooper, after you hired attorney Paul Godfread,

6    and he let the other side know that he was going to be

7    representing you in actions in Minnesota, did you hear

8    from John Steele?

9    A    Yes.  He called me twice and left two voicemails

10    and sent me two texts.

11    Q    So this was after Mr. Godfread let Prenda know that

12    he was your attorney; isn't that correct?

13    A    Yes.

14    Q    How many times in a row did Mr. Steele call you

15    when that happened?

16    A    I think five or six times right in a row.

17    Q    And that was, more or less, to your understanding,

18    was that more or less immediately after your attorney

19    Paul Godfread let the other side know that he was going

20    to be representing you?

21    A    Yes.  It was right after Paul let him know.

22    Q    Within a matter of minutes, would you say, sir?

23    A    Yes.

24    Q    Have you heard from Mr. Steele recently,

25    Mr. Cooper?

33

1   A      He had left two other voicemails on my phone and

2   two other texts within the last couple of weeks, I think

3   it was.

4   Q      And, more recently than that, have you heard from

5   him again?

6   A      Yes.  Yeah.  There was a two week spell between

7   them that he had called me twice.

8   Q      And, Mr. Cooper -- pardon me, I didn't mean to

9   interrupt you.  Go ahead, sir.

10   A      He left four voicemails altogether and four text

11   messages.

12   Q      And, Mr. Cooper, my understanding is that you

13   brought copies of these voicemails to potentially play

14   for the court; is that correct, sir?

15   A      Yes.

16   Q      If the court will indulge me a moment, I will play

17   those into the microphone for the record.

18        THE COURT:  Okay.

19        MR. PIETZ:  If it is okay with the court, I would

20   like to ask Mr. Stoltz to assist me with this.  He is the

21   brains of the operation on the technology here.

22            Apologize, your Honor.  We are starting from

23   the beginning.

24        (Audio recording played.)

25   Q    BY MR. PIETZ: Mr. Cooper, have you spoken with John

34

1    Steele enough times to recognize his voice?

2    A    Oh, yeah.  That is his voice.  That is him.

3    Q    So that was Mr. Steele on those recordings that we

4    just heard a moment ago?

5    A    Yes.

6    Q    The three lawsuits that Mr. Steele was referring

7    to, do you think he means the three defamation cases

8    recently filed against you and your attorney, Paul

9    Godfread by John Steele, Paul Duffy and Prenda Law in

10   Florida, the Northern District of Illinois and the

11   Central District of Illinois?  Do you think that is what

12   he was talking about?

13   A    Yes.

14   Q    Mr. Cooper, I, for my part, don't have anything

15   further.  Perhaps the court does, but, before I step

16   down, I would like to thank you for coming here today?

17        THE COURT:  Thank you, counsel.

18        MR. BRODSKY:  Very briefly, your Honor.  Thank

19   you.

20

21                  CROSS-EXAMINATION

22   BY MR. BRODSKY:

23   Q    Mr. Cooper, you have never met Mr. Gibbs; is that

24   correct?

25   A    Yes.

35

1   Q      And you have never spoken to him as well; is that

2   correct?

3   A      No, I have not.

4   Q      And you have exchanged no correspondence with him

5   whatsoever; is that correct?

6   A      That is correct.

7   Q      Do you know a gentleman by the name of Grant Berry,

8   B-E-R-R-Y?

9   A      Yes, I do.

10  Q      Who is Mr. Berry?

11  A      He is the one that introduced me to John when I was

12  selling my house.

13  Q      And what type of relationship if any do you have

14  with Mr. Berry?

15  A      He was the realtor for -- he was a realtor that I

16  had for selling my house.

17  Q      And did you ever tell or ask Mr. Steele in

18  Mr. Berry's presence how is my porn company doing?

19  A      No, I have not.

20  Q      You sure about that?

21  A      Yes.

22        MR. BRODSKY:  Thank you, your Honor.  Nothing

23  further.

24        THE COURT:  All right.  Same questions that he

25  asked with respect to -- what about Mr. Paul Duffy, do

1   you know him?

2           THE WITNESS:  No, I do not.

3           THE COURT:  Ever heard of him?

4           THE WITNESS:  Through these things that are going

5   on, yes.

6           THE COURT:  All right.

7           THE WITNESS:  That way only.

8           THE COURT:  All right.  Anyone else?

9           MR. PIETZ:  Your Honor, just very briefly, as a

10  technical matter, I would like to ask that the documents

11  I went through with Mr. Cooper be admitted into evidence.

12           That was the copyright assignment with Popular

13  Demand.  I would ask that that be admitted into evidence

14  as Exhibit 1.  The copyright assignment agreement for

15  sexual obsession, I would ask that that be admitted as

16  Exhibit 2.  The verified petition in the Eastern District

17  of California matter previously identified in this action

18  as Exhibit L, I would ask that it be admitted now as

19  trial Exhibit 3.  The declaration from Mr. Ranallo which

20  has the printout for VPR, Inc. previously filed here as

21  Exhibit S, I would ask that be admitted as trial Exhibit

22  4.  And the notissues.com registration previously

23  identified here as Exhibit T, I would ask be admitted as

24  trial Exhibit 5.

25           THE COURT:  Any objection?

1        MR. BRODSKY:  Yes, your Honor.  As to Exhibits 3,

2   4 and 5, we would object on the ground of relevance.

3        THE COURT:  Sustained.  All right.  Everything

4   else comes in.  What about the audio?  Is there a

5   transcript of the audio?

6        MR. PIETZ:  Your Honor, we can prepare it.

7        THE COURT:  Would you.  Thank you.

8        MR. PIETZ:  We would be happy to, and we will

9   lodge it with the court, your Honor.

10        THE COURT:  Thank you.  Okay.  That will be

11   received as well.

12            All right.

13            Anything, gentlemen?  Nothing.

14            You may step down, sir.  Appreciate you

15   coming.

16        MR. PIETZ:  Your Honor, at this time, I think it

17   might be helpful for me to suggest a few other things

18   that I am prepared to discuss today for the court.  We

19   have heard from Mr. Cooper.

20            What I might propose now is turning to

21   Mr. Gibbs.  Mr. Gibbs has noted in his declaration or

22   attempted to characterize himself as merely a, quote,

23   independent contract attorney for Prenda Law.  I am

24   prepared to present evidence today showing that, in fact,

25   Mr. Gibbs is really what amounts to a de facto chief

38

```
 1   operating officer of Prenda Law.  And I have a number of

 2   documents and exhibits I am prepared to go through with

 3   Mr. Gibbs on that account.

 4           In addition, I am prepared to show through

 5   cross-examination of Mr. Gibbs that his investigation in

 6   these cases was objectively unreasonable.  Although I was

 7   not able to contact Mr. Larguire(phonetic) or Mr. Denton,

 8   a former client of mine in a previous case who was

 9   previously named by Mr. Gibbs as a result of what I view

10   as a shoddy online investigation is here to testify that

11   the main fact that Mr. Gibbs relied upon in that case

12   turned out to be completely incorrect.

13           Fourth, your Honor or I should said say third,

14   there are representatives here today from both AT&T and

15   Verizon who can conform that the court's discovery orders

16   were unambiguously violated in this case.

17           Fifth, and, finally, your Honor, if the court

18   is inclined to hear it, I am prepared to explain my

19   understanding of how Prenda is organized and present

20   evidence showing that the court does indeed have personal

21   jurisdiction over Mr. Steele, Mr. Duffy, Mr. Paul

22   Hansmeier and Ms. Angela Van Den Hemel.

23       THE COURT:  Let's begin with the ISP's.

24       MR. PIETZ:  Very well, I would ask now that

25   Mr. Huffman come forward.  Is he here?
```

39

```
 1          (The witness was sworn.)

 2          THE CLERK:  Please have a seat.

 3             Please state your full and true name for the

 4     record, and spell your last name?

 5          THE WITNESS:  My name is Bart Huffman,

 6     H-U-F-F-M-A-N.

 7          THE COURT:  One second.

 8          THE CLERK:  Counsel, I think we are going to first

 9     have our 2:30 matter.  I think it will be a little

10     shorter.  So I am going to call the next matter and then

11     we will have you guys come back.

12          (Recess from 2:30 to 2:31 p.m.)

13          THE COURT:  Okay.  Sorry for the interruption.

14     Let's go back on the record in the AF Holdings, Ingenuity

15     13 LLC.

16             All right.  Go ahead, counsel.

17          MR. PIETZ:  Thank you, your Honor.

18

19                     DIRECT EXAMINATION

20     BY MR. PIETZ:

21     Q     Mr. Huffman, what is your job, sir?

22     A     I am an attorney.

23     Q     With what firm?

24     A     Lock Lorde.

25     Q     And do you represent AT&T in that capacity, sir?
```

40

1    A      Yes, I do.

2    Q      And how long have you been -- how long have you

3    been representing AT&T, sir?

4    A      I have been representing AT&T for about six or

5    seven years, I suppose.

6    Q      And do you have personal familiarity with matters

7    before AT&T that involve the Prenda law firm?

8    A      I do.

9    Q      So on a day-to-day basis over the past few years,

10   have you handled Prenda matters for AT&T?

11   A      A number of them.

12   Q      Very well.  You prepared a declaration which I

13   submitted with the court in this matter; isn't that

14   correct, sir?

15   A      That is correct.

16   Q      And that declaration was based on an investigation

17   performed by your client, AT&T; is that correct?

18   A      Well, that declaration recounts a series of events

19   where Angela Van Den Hemel who has contacted us on a

20   regular basis to follow-up on subpoenas contacted us with

21   respect to the subpoenas in the case that was

22   consolidated with others in this proceeding.  And as we

23   looked into it, we discovered that the case had been

24   stayed as far as discovery goes.

25   Q      So you are familiar, then, with this court's

1    October 19th, 2013 discovery order vacating the subpoenas

2    in the AF Holdings cases now before this court?

3    A    Yes.

4    Q    And as far as AT&T is aware, did Prenda in fact

5    stop seeking subpoena returns on the cases consolidated

6    before this court after October 19th, 2013?

7         MR. WAXLER:  Calls for speculation.

8         THE WITNESS:  I am not aware that they did.  AT&T

9    did not, to my knowledge, receive any notice of the order

10   and furthermore Ms. Van Den Hemel, I think I am saying

11   her name right, contacted us seeking to follow-up and

12   obtain information presumably with respect to the

13   subpoenas in that case.  And we received, I should add,

14   we received, I and my firm receive the information pretty

15   much directly as it comes in from CT Corporation so with

16   respect to these type of subpoenas.

17   Q    BY MR. PIETZ: So with respect to these type of

18   subpoenas, then, the receipt or non receipt by AT&T would

19   come into your office; is that correct?

20   A    Typically, it would.

21        MR. WAXLER:  Calls for speculation.

22        THE COURT:  Hang on.  What is your objection?

23        MR. WAXLER:  Calls for speculation, your Honor.

24             This witness is being asked to say whether

25   AT&T received something, and I think that is speculative

42

1   for him to be able to testify as to whether AT&T might

2   have received it or not.

3        THE COURT:  I understood it to be how mail is

4   handled in his office, but let's walk through it again.

5        MR. PIETZ:  Very well.

6   Q    So did your office receive a copy of the

7   October 19th, 2013 order vacating the subpoenas in this

8   case?

9   A    Not independently.  When we looked on Pacer as

10  we -- we routinely do with respect to production requests

11  and the like, we found the order.

12  Q    So your office was not served by Prenda or anybody

13  affiliated with Prenda with this court's October 19th

14  discovery order?

15  A    That is correct.

16  Q    And did you investigate with your client, AT&T, as

17  to whether or not AT&T received a copy of the court's

18  October 19th order?

19  A    I did not specifically ask them that, no.

20  Q    And were you contacted only the once by Angela

21  Van Den Hemel regarding the court's October 19th order in

22  this action?

23  A    No.  She contacted my paralegal twice and my

24  paralegal would routinely refer those type of inquiries

25  to me.

43

1   Q      So she actually asked twice for subpoena returns to

2   be made after the October 19th discovery order?

3   A      That's correct.  And when I looked at the Pacer

4   records and saw the order, I then responded to

5   Ms. Van Den Hemel saying that the discovery had been

6   stayed and we of course would not be producing discovery

7   in the case at that time.

8          MR. PIETZ:  I would ask that the declaration of

9   Bart Huffman be admitted as evidence in this hearing.  I

10  think we are on Exhibit 6.

11         THE COURT:  Okay.

12         THE WITNESS:  And would you also want to have the

13  declaration of my paralegal admitted as well?

14         MR. PIETZ:  Yes.  I would ask as well that that be

15  admitted as Exhibit 7.  It is the next filing on the

16  docket.

17         THE WITNESS:  Camille Kerr.

18  Q   BY MR. PIETZ:Could you spell her name for the

19  record.

20  A      Certainly.  C-A-M-I-L-L-E, K-E-R-R.

21         THE COURT:  All right.  Any objection, gentlemen?

22         MR. BRODSKY:  Is she going to be testifying, your

23  Honor?

24         THE COURT:  I have no idea.

25         MR. BRODSKY:  Object on the ground of hearsay.

44

1            THE COURT:  Is she here?

2     Q     BY MR. PIETZ:  Mr. Huffman, is Ms. Kerr here today?

3     A     Ms. Kerr is not here today.  I can testify though

4     that I oversaw and reviewed all of the items stated in

5     her declaration, and they are part of our regularly kept

6     records and they are consistent with our files, were

7     overseen by me at every single step and reviewed and they

8     are, in fact, true and correct.

9     Q     So you are personally familiar with the facts in

10    Ms. Kerr's declaration?

11    A     I am, and I reviewed it in detail.

12            THE COURT:  What is the substance or the subject

13    matter?

14            THE WITNESS:  Ms. Kerr submitted a separate

15    declaration simply because she was the addressee on the

16    e-mails from Ms. Van Den Hemel.

17            THE COURT:  All right.  And her declaration

18    attests to?

19            THE WITNESS:  Her declaration attests to the truth

20    and authenticity of the e-mails that I attached thereto.

21            THE COURT:  That is all?

22            THE WITNESS:  That is all.

23            THE COURT:  All right.  I will permit it.  Okay.

24            Gentlemen?

25            MR. BRODSKY:  No questions, your Honor.

45

1          THE COURT:  All right.  Sir, you may step down.

2    Thank you.

3          THE WITNESS:  Thank you, your Honor.

4          THE COURT:  I do have one question.

5    Ms. Van Den Hemel, when you advised her that you had

6    learned from Pacer of the court's order quashing those

7    subpoenas, did she sound surprised?

8          THE WITNESS:  She never responded at all.

9          THE COURT:  All right.  Thank you.

10         MR. PIETZ:  Your Honor, also in attendance today

11   is an attorney for Verizon, Mr. Benjamin Fox.  If it

12   please the court, I would suggest we offer him.

13         THE COURT:  Yes.  Please.

14         (The witness was sworn.)

15         THE CLERK:  Please have a seat.  And please state

16   your full and true name for the record and spell your

17   last name.

18         THE WITNESS:  Benjamin Fox, F-O-X.

19

20                    DIRECT EXAMINATION

21   BY MR. PIETZ:

22   Q     Mr. Fox, what is your occupation, sir?

23   A     I am a partner at Morrison and Foerster here in Los

24   Angeles.  I am a lawyer.

25   Q     And do you represent Verizon in that capacity?

46

1    A    I do.

2    Q    And how long have you represented Verizon in that

3    capacity?

4    A    I can't tell you the date.  I know that the first

5    matter was the Eastern District of California Rule 27

6    proceeding filed by Ingenuity 13, and that is the case

7    that you had a copyright assignment for that you showed

8    earlier this afternoon.

9    Q    So you appeared on behalf of Verizon in that Rule

10   27 petition action in the Eastern District of California;

11   is that correct?

12   A    Correct.

13   Q    And I believe that was in 2011.  Since then, have

14   you had occasion to deal with litigation matters

15   involving the Prenda law firm?

16   A    Yes.

17   Q    So you have handled those issues for Verizon on a

18   day-to-day basis in the past two years?

19   A    Yes.  Many of them.

20   Q    Very well.  You prepared and submitted, filed, I

21   should say, a declaration with the court earlier today;

22   isn't that correct, sir?

23   A    I prepared for Verizon and obtained a signature

24   from Mr. Sean Moriarty who is a Verizon representative in

25   Arlington, Virginia.  Yes.

47

1    Q       So you are familiar with the facts that were

2    averred in the declaration filed with the court today?

3    A       Yes, I am.

4    Q       And did you investigate whether the facts are

5    correct prior to filing the document here today?

6    A       I did.

7    Q       And can you explain to me the substance of the

8    declaration with respect to whether or not Verizon

9    received a copy of the court's October 19th discovery

10   order?

11   A       Sure.  Verizon has been the recipient of I think

12   literally hundreds of subpoenas from the Prenda firm, and

13   Verizon is a party in a DC Circuit appeal where AF

14   Holdings was the plaintiff based on one of the copyright

15   assignments that bears the name of Mr. Cooper.  Verizon

16   is very focused on what has been happening in these cases

17   and has been paying close attention to it.

18           So if Verizon had received the October 19

19   order from this court, Verizon would have known that, and

20   I would have received it as well.  My e-mail doesn't have

21   any record of it.  I have searched.  I know that Verizon

22   has now searched.  Is there some theoretical possibility

23   that maybe it was sent to someone at Verizon and not

24   forwarded to the correct people?  Possible.  But having

25   not seen anything from Mr. Gibbs that suggests it was

48

1    sent, you know, my conclusion is that it was not sent to

2    Verizon.

3    Q    So, then, in terms of the usual channels, the

4    custom and practice, the way subpoenas would normally

5    come in from Verizon, did you check all of these means of

6    receiving subpoena information?

7    A    I checked.

8         MR. WAXLER:  Calls for speculation, your Honor.

9         MR. PIETZ:  Let me rephrase.

10        THE COURT:  What is your objection?

11        MR. WAXLER:  Calls for speculation.  He is asking

12   this witness to speculate about what Verizon's policies

13   are in receiving subpoenas.

14        THE COURT:  I thought you were talking about

15   Morrison and Foerster's policy.

16        MR. PIETZ:  That's right.  I will rephrase and

17   make it more clear, your Honor.  Let me rephrase.

18   Q    So did you personally check Morrison and

19   Foerster's, the way that Morrison and Foerster would

20   normally receive information about a subpoena?  Did you

21   check and make sure that no notice was received of the

22   October 19th discovery order?

23   A    Yes.  I made a reasonable search, and I looked

24   wherever that I thought was appropriate to look.

25   Q    And you communicated with your client that you --

49

1    well, let me back up.

2            The gentleman who executed the declaration

3    that was filed with the court today, what was his name,

4    again, sir?

5    A    Sean Moriarty.

6    Q    And is that somebody you normally communicate with

7    these type of matters.

8    A    Yes.

9    Q    And you spoke with Mr. Moriarty, and can you

10   explain, did you have him investigate, from Verizon's

11   end, whether notice was received?

12   A    The Verizon team investigated.   Yes.

13   Q    Including Mr. Moriarty?

14   A    Yes.

15   Q    Very well.  And so, then, to the best of your

16   knowledge, based on both his investigation and a review

17   of Morrison and Foerster's own records, Verizon did not

18   receive a copy of the October 19th discovery order; isn't

19   that correct?

20        MR. WAXLER:  Your Honor, it is basically taking

21   hearsay.  Calls for speculation.  He is asking the

22   witness what Verizon did.  Verizon has given a

23   declaration that says it does not appear.

24        THE COURT:  Overruled.

25        THE WITNESS:  Correct.

50

1    Q    BY MR. PIETZ: I would ask, then, that the

2    declaration submitted by Mr. Moriarty with the court

3    earlier today be admitted into evidence as Exhibit 7.

4    Sorry.  Pardon.  Exhibit 8.

5          THE COURT:  It will be admitted.

6             All right.  Mr. Brodsky, do you wish to

7    inquire?

8          MR. BRODSKY:  I do not, your Honor.  I have no

9    questions.

10         THE COURT:  Sir, you may step down.

11         THE WITNESS:  Thank you.

12         THE COURT:  All right.  Now, I would also like to

13   hear from your former client?

14         MR. PIETZ:  Very well.  Mr. Nason, are you in

15   attendance today?

16         (The witness was sworn.)

17         MR. WAXLER:  Your Honor, I would object to this

18   line of questioning please.

19         THE COURT:  He hasn't asked any questions yet.

20         MR. WAXLER:  I know that, but this witness has no

21   relevant testimony to this subject matter.  He is not a

22   party to any of the four cases at issue in this OSC.  It

23   is not even a federal court case that he was a defendant

24   in, your Honor.  He has no relevant testimony that he

25   could state in connection with this OSC.

51

```
 1          THE COURT:  Maybe yes.  Maybe no.  If we are

 2   talking about a pattern and practice, and from what I

 3   have seen, this is a cookie-cutter litigation.  Sometimes

 4   the only thing that I see changed on the complaints are

 5   the ISP's addresses and the name of the film, but, in all

 6   other respects, they seem to be all the same even the

 7   declaration from the technical expert as to what he did

 8   in order to identify the infringer.  It is the same

 9   document.  So I hear your point.  If I don't find it to

10   be relevant, I will discard it.

11          MR. WAXLER:  Your Honor, just for the record,

12   Mr. Gibbs' declaration does go through exactly the

13   different things that he did in order to determine

14   whether in the two cases that you cited in the OSC

15   whether he was able to locate the infringer and who that

16   was.  And there is nothing cookie cutter about that

17   effort that he put in his declaration.

18          THE COURT:  All right.  Thank you.

19              Go ahead.

20          THE CLERK:  Please state your full and true name

21   for the record and spell your last name.

22          THE WITNESS:  Jessie Nason.  That is N like Nancy,

23   A-S-O-N.

24          THE COURT:  Go ahead, counsel.

25              Is that one S or two?
```

52

```
 1              THE WITNESS:  One S.

 2              THE COURT:  All right.

 3              THE WITNESS:  Well, two in Jessie.   Sorry.

 4

 5                        DIRECT EXAMINATION

 6   BY MR. PIETZ:

 7   Q       Mr. Nason, have you heard the name Brent Gibbs

 8   before?

 9   A       Yes.

10   Q       And in what context, sir?

11   A       He was the lawyer who brought the case against me,

12   Lightspeed Media versus my name.

13   Q       And where was that -- and I represented you in that

14   case, did I not, sir?

15   A       Correct.

16   Q       And was that in the Los Angeles Superior Court

17   filed in 2012?

18   A       Yes.

19   Q       I will note for the record that the case is

20   Lightspeed Media Corporation versus Jessie Nason, Los

21   Angeles Superior Court No. NC057950.

22              MR. WAXLER:  Your Honor, I would like to object

23   again.  This case is not even a copyright case.  It was a

24   case where the individual here was alleged to --

25              THE COURT:  Where are you from?
```

53

```
 1          MR. WAXLER:  I am from Los Angeles, your Honor.

 2          THE COURT:  There are no speaking objections in

 3     Los Angeles.

 4          MR. WAXLER:  I'm sorry, your Honor.

 5          THE COURT:  Okay.  What is this case about?

 6          MR. PIETZ:  Your Honor, if I might speak to that

 7     very briefly.  What we have seen from Prenda Law is a

 8     slightly different twist in some of their cases on

 9     copyright litigation, and what it is is essentially an

10     attempt to address a copyright infringement case in state

11     law clothing, well, state law and the Computer Fraud and

12     Abuse Act.

13          So the causes of action at issue in the

14     Lightspeed case was a computer fraud and abuse act claim

15     which essentially alleges that downloading and

16     distributing content, and the content is nebulously

17     specified in the complaint amounts to Computer Fraud and

18     Abuse Act violations.  And then there were a variety of

19     related claims all of which were preempted by the

20     Copyright Act for conversion, unjust enrichment and the

21     like.  But, really, what it was, and, in fact, and I can

22     speak to this longer although perhaps it is getting off

23     on a tangent, in reality what happened, was at some point

24     somebody probably hacked into a password protected

25     website, but, then, Prenda started logging IP addresses
```

54

1    and suing people in CFAA claims even though really the

2    gravamen of the case was the use of BitTorrent.  So it is

3    similar, but, in any event, the issue in Mr. Nason's case

4    that I think is relevant here is the same, and that

5    specifically what was the investigation that was

6    performed prior to naming Mr. Nason as the defendant in

7    the case, and it is fairly bread and butter.

8         THE COURT:  Okay.  Go ahead.

9    Q    Mr. Nason, are you familiar with the reason that

10   Mr. Gibbs stated that he had named you as a defendant?

11   A    Yes.

12        MR. WAXLER:  Calls for speculation.

13        THE COURT:  He said stated.  You did say stated;

14   right?

15        MR. PIETZ:  Yes, your Honor.

16        THE COURT:  All right.  Overruled.

17   Q    BY MR. PIETZ: So, in any event, what was that

18   reason, Mr. Nason.

19   A    I believed it to be that he supposed I lived by

20   myself in my apartment, and so he considered me a single

21   male.

22   Q    And, Mr. Nason, is that correct?  Do you live

23   alone?

24   A    No, I do not.

25   Q    And who do you live with, Mr. Nason?

55

1    A    My wife of nine years.

2    Q    And have you lived with her for the past

3    nine years?

4    A    Correct.

5    Q    So, at any point, you know, save perhaps for a

6    vacation, consistently for the past nine years, you have

7    always lived with your wife; is that correct?

8    A    That's correct.

9         MR. PIETZ:  That is essentially all I need from

10   Mr. Nason, your Honor.  I might have some questions about

11   Mr. Gibbs, or perhaps now I could show the court the

12   section of the transcript from the hearing in the Nason

13   matter where Mr. Gibbs, when pressed by the court as to

14   how it is and why it is he justified having named

15   Mr. Nason as a defendant, Mr. Gibbs specifically stated,

16   well, because we determined that he lived alone.  It is

17   just incorrect.  And, indeed, the court denied my motion

18   on that basis even though it turned out to be incorrect.

19        MR. BRODSKY:  Your Honor, for the record, may we

20   move to strike the testimony on the ground that it is

21   irrelevant and beyond the scope of the court's OSC.

22        THE COURT:  You may step down, sir.  Thank you.

23        THE WITNESS:  Thank you.

24        MR. PIETZ:  I am looking now for the specific

25   section of the transcript.

56

1          THE COURT:  Don't worry about it.

2          MR. PIETZ:  All right.  I can find it afterwards.

3    Thank you, your Honor.

4          THE COURT:  All right.  Let's now switch to the

5    jurisdictional issue.

6          MR. PIETZ:  Oh, you know what, your Honor, I have

7    here the actual original copy of the transcript which

8    perhaps I will lodge with the court and move to mark as

9    Exhibit 9, I believe we are on.

10         THE COURT:  Okay.

11         MR. PIETZ:  And, Mr. Ranallo, if you can find the

12   pin cite, we will go ahead and add it.

13             May I approach to give this to the clerk, your

14   Honor?

15         MR. WAXLER:  We would object to the inclusion of

16   that transcript as an exhibit.

17         THE COURT:  I will take a look at it.  We will

18   see.

19             Where was this?  Was this in Torrance?

20         MR. PIETZ:  Yes, it was, your Honor.  Judge

21   Vicencia.

22         THE COURT:  Small world.  My old court reporter.

23   Okay.

24         MR. PIETZ:  I am just looking now for the diagram

25   which I think will assist in explaining all of this.

57

1              We seem to be a bit off kilter there, don't

2    we.  Interesting.  Well, in any event --

3         MR. WAXLER:  What exhibit is this?

4         MR. PIETZ:  Yes.  Marked as -- I will tell you in

5    just a moment.  Double H, previously on the record.

6              In any event, perhaps less useful than I hoped

7    it would be, but I can at least talk the court through

8    it.

9         THE COURT:  What is your source?  I mean,

10   electronic source?

11        MR. PIETZ:  This is a demonstrative exhibit, your

12   Honor.

13        THE COURT:  I know that.  What are you using,

14   laptop?

15        MR. PIETZ:  It is Trial Pad on my iPad, your

16   Honor.

17        THE COURT:  It is on your iPad?

18        MR. PIETZ:  Yes, sir.

19        THE COURT:  And you can't do anything to adjust

20   it?

21        MR. PIETZ:  We do have a color paper copy of the

22   document.  It will take just a moment to pull it.

23        THE COURT:  Okay.  Go ahead.

24        MR. PIETZ:  In any event, Mr. Ranallo, perhaps you

25   can look for that.

58

1        MR. BRODSKY:  Your Honor, may I inquire of the

2  court for a moment?

3        THE COURT:  Sure.

4        MR. BRODSKY:  I am not quite sure what the

5  relevance of this is, the foundation for it or exactly

6  what counsel is doing.  It just seems to be his own

7  statement of his investigation.

8        THE COURT:  Do you know the general subject that

9  we are going to discuss now?

10        MR. BRODSKY:  I believe so, your Honor.

11        THE COURT:  Okay.  That is what I think it is, and

12  hopefully it will help him.  Now, when it gets down to

13  the source of this material and the accuracy of this

14  material, I hope I will be hearing from you gentlemen.  I

15  don't have the independent knowledge of this one way or

16  the other.  Thank God for the adversarial process.

17        MR. WAXLER:  Your Honor, so, then, should

18  Mr. Pietz be on the stand if he is going to give

19  essentially testimony about this exhibit?

20        THE COURT:  I don't make a habit of placing

21  lawyers under oath, but this case may change that.  I

22  figure officers of the court will not knowingly make

23  misrepresentations to the court, will they.

24        MR. WAXLER:  No, they won't.

25        THE COURT:  Until this case.

1          MR. WAXLER:  My client hasn't in this case.

2          MR. PIETZ:  Your Honor, to explain what it is,

3     what I thought I might do is to give a very brief

4     overview of the organization, and, then, I thought I

5     would go through some specific documents about Mr. Steele

6     and a couple of arguments.  So this is really argument,

7     essentially, a couple of exhibits that go to Mr. Steele's

8     connection to the California as well as a couple of

9     points about Mr. Paul Hansmeier and Mr. Duffy.

10         THE COURT:  Okay.

11         MR. PIETZ:  So, in any event, this is a chart that

12    was essentially prepared.  This was prepared by my office

13    essentially as a tool to aid in the understanding of how

14    Prenda Law appears to have evolved over the past few

15    years.

16             Essentially, it started out here with Steele

17    Hansmeier, and John Steele -- I know that is a little

18    hard to see -- John Steele, Paul Hansmeier and Brett

19    Gibbs.  Mr. Steele and Mr. Hansmeier were the named

20    partners in the firm, and Mr. Gibbs was the of counsel

21    originally.  When they first started out, circa 2011 --

22         THE COURT:  I am going to have to stop you.  How

23    do you know that Mr. Gibbs was of counsel with Steele and

24    Hansmeier?

25         MR. PIETZ:  Your Honor, I can point to the

60

1    specific exhibit, but there are pleadings of which the

2    court can take judicial notice where he is listed on the

3    pleadings as of counsel to Steele Hansmeier.

4         THE COURT:  You are aware of the fact that

5    Mr. Hansmeier doesn't know what capacity Mr. Gibbs was

6    working at his law firm?

7         MR. PIETZ:  Correct, your Honor.  So, in any

8    event, let me put it this way.  Mr. Gibbs filed documents

9    in federal court indicating on the caption that he was of

10   counsel to Steele Hansmeier.

11        THE COURT:  Okay.

12        MR. PIETZ:  Now, I believe I can also speak to

13   this if the court is so inclined that Mr. Lutz was

14   holding himself out to the world as a paralegal at that

15   time, working, according to Mr. Paul Hansmeier, solely

16   for Mr. Steele.  At this time, most of the lawsuits with

17   a few exceptions filed by Prenda around 2011 were on

18   behalf of a porno production, pardon me, adult

19   entertainment production company that actually people

20   have heard of before.  And that is this list of clients

21   here.

22           What happened is that sometime in 2012, the

23   Steele Hansmeier firm was disbanded or become Prenda,

24   sold its client book to Prenda Law.  We are not entirely

25   sure exactly the nature of the transaction, but, in any

61

 1   event, at that point, Paul Duffy became involved as the

 2   nominal figurehead of the Prenda Law enterprise.

 3   However, there are indications that Mr. Steele and

 4   Mr. Hansmeier remain involved and Mr. Gibbs has declared

 5   that he essentially continued on as of counsel handling

 6   the same cases only now on behalf of Prenda Law, Inc.

 7   rather than Steele Hansmeier LLC.

 8           At the same time that Steele Hansmeier became

 9   Prenda, sometime around, then, in 2012, I am not exactly

10   sure, Mr. Hansmeier started up his own shingle in

11   Minnesota, the virtual office called the Alpha Law Firm

12   LLC.  So, essentially, Mr. Hansmeier sometimes files

13   pleadings in federal court that list his affiliation as

14   Alpha Law Firm LLC, but, by the same token, Mr. Gibbs has

15   identified Mr. Paul Hansmeier as being the person from

16   whom he took direction at Prenda.

17           And, indeed, the court may recall from the

18   deposition transcript read over the weekend that

19   Mr. Hansmeier testified that, indeed, his clients

20   deposited their trust account funds into the Prenda Law

21   Firm account rather than to the Alpha Law Firm account.

22       THE COURT:  Stop.  I hate to interrupt you.

23           But she means more to me than this argument,

24   and we have had her going at light speed for an

25   hour-and-a-half.  Right.  So I am going to take a break,

62

1    and we can all take a break.  How about 10 minutes.

2    Okay.

3          MR. PIETZ:  Very good.  Thank you, your Honor.

4          (Recess from 2:58 to 3:09.)

5          THE COURT:  All right.  Mr. Pietz.

6          MR. PIETZ:  Thank you.  I will attempt to keep

7    this section very brief, and then we will move on to some

8    documentary evidence.  This is just a summary.

9          So, as I was saying, sometime around 2012,

10   there was a bit of a shift in the Prenda business

11   strategy.  Mr. Hansmeier -- so what happened is these

12   companies, AF Holdings, LLC, Ingenuity 13 LLC and then

13   there is a couple of other companies which are the ones

14   in the CFAA cases.  That is Arte de Oaxaca LLC and Guava

15   LLC.  And the CFAA cases have primarily been filed in

16   state court and have indeed tried to use -- certain

17   states have presuit discovery procedures that are more

18   lenient than Federal Rule of Civil Procedure 27.  So it

19   is sort of a newer twist is these state court CFAA cases

20   and Arte de Oaxaca.

21         But, in any event, according to Mr. Hansmeier

22   in his deposition, these essentially shell company

23   plaintiffs are owned by a mystery trust.  Mr. Hansmeier,

24   as 30(b)(6) deponent -- well, anyway, I won't go into

25   that.  The court read it.  According to Mr. Gibbs'

1    special counsel, though, on the same day, February 19th,

2    there is conflicting testimony essentially saying that

3    Livewire Holdings LLC is actually the current holder of

4    AF Holdings and Ingenuity 13.

5          So, in any event, these are the parent

6    companies, some mystery trust and Livewire Holdings LLC.

7    There is documents, you know, I had this sort of set

8    aside to potentially go through with Mr. Gibbs, but I can

9    also just show the documents, show what I have.  In any

10   event, there is documents showing Mr. Gibbs as in-house

11   counsel for Livewire Holdings.

12         There are various other connections between

13   Livewire Holdings and the attorneys we see over here.

14   Mr. Dugas is a local counsel who has worked at both

15   Prenda and Alpha Law which I can show through his

16   LinkedIn profiles, obviously, not central to the case.

17   Mr. Dugas' wife has been identified on LinkedIn as

18   in-house counsel for Livewire Holdings.

19         In addition, what I will talk about now is the

20   way that we see the lawyers.  Mr. Hansmeier has been both

21   30BC deponent for AF and as its counsel.  In any event,

22   what seemed to happen is that at some point these cases

23   filed on behalf of Ingenuity, AF Holdings, Arte de Oaxaca

24   and Guava LLC are cases where what appears to have

25   happened is the lawyers essentially took assignment of

64

1    the underlying intellectual property rights in these

2    mysterious shell companies.  One recurring theme here is

3    the way that when we are seeing the straw men, there is

4    always a connection to John Steele.  So, for example, in

5    the VPR International, we see John Steele is the

6    attorney.  We see Alan Cooper listed on the corporate

7    registration.  The address listed for VPR International,

8    the 4532 East Villa Teresa Drive.  My understanding based

9    on documents that have been submitted with the court is

10   that is an address that comes up for John Steele's sister

11   and a gentleman named Anthony Saltmarsh, in addition, of

12   course, to being the address listed for Mr. Cooper.

13        So on various federal court filings in the

14   Northern District of California, all of which are

15   attached as exhibits to the deposition that was lodged

16   with the court which the court read over the weekend,

17   when pressed to identify the person at AF Holdings who

18   would be made available for an early neutral settlement

19   evaluation conference, there are various court filings

20   listing the owner of AF Holdings as somebody named Salt

21   Marsh, two words.

22        So, in any event, what seems to perhaps be the

23   case is that this Anthony Saltmarsh lived at this address

24   with John Steele's sister which was essentially used as a

25   front for various entities involved in Prenda activities.

65

1           I don't want to spend too much time on just

2    the overview.  What I thought I might do is shift instead

3    to taking the nonappearing folks individually.  And I

4    thought I might start with Mr. Steele.  So I have some

5    documents which go to that, and I will switch back now

6    to -- okay.  There we go.  So I will note that in the

7    declaration submitted to the court by Mr. Steele on

8    Friday, he claims that he resides in the State of

9    Florida.

10          I will point out that when Mr. Steele was

11   under threat of sanction in the state of Florida, he

12   declared to the court there that he resided in the State

13   of Nevada and only visited the State of Florida.  So I

14   have here the affidavit of John Steele that he filed, and

15   you can see the file stamp on the top.  It is Middle

16   District of Florida, Case No. 812 CV 1685 that was filed

17   on December 20th, 2012.  And, in Paragraph 2, Mr. Steele

18   swore to the court that my legal residence is Las Vegas,

19   Nevada, and I also spend one to two weeks a month in

20   Miami, Florida.  So my understanding must be then that

21   sometime between last December and now Mr. Steele has

22   decided that his residence is not Nevada but rather

23   Florida.

24          In any event, and before moving on, I would

25   ask the court to take judicial notice of the fact that in

66

```
 1    the -- that this affidavit which was filed in the public
 2    record in the Middle District of Florida that Mr. Steele
 3    states that he spends one to two weeks a month in Miami,
 4    Florida.  Mr. Ranallo can pass out copies of the
 5    affidavit to everybody.
 6           So, in any event, let's look at some other
 7    documents about Mr. Steele.  And what I would start with,
 8    I believe, is a declaration here, and I will ask
 9    Mr. Ranallo again to pass this out for the court, the
10    declaration of Michael B. Stone, and what this
11    declaration is, the declaration itself is essentially
12    just authenticating the document, but the document at
13    issue is a collection of pleadings in a Northern District
14    of California action in which it was a case filed on
15    behalf of a Prenda client.
16           Well, this I think was an actual company that
17    people have heard of in an earlier case, but in any
18    event, here, we see the pleading.  So the declaration
19    authenticates it, and then Exhibit 1 is a copy of the
20    complaint which as we can see was filed in the United
21    States District Court for the Northern District of
22    California, and it is Civil Action No. 511 CV 3648.
23           Well, in any event, the interesting thing
24    about this complaint is who signed the subpoena that was
25    directed in this case at a John Doe defendant who resided
```

67

1    in California.  And the answer, and here we see a copy of

2    the subpoena, pardon me, authenticated by Mr. Stone.

3    This is the letter that the ISP normally sends out, and,

4    here, we see a copy of the subpoena itself.  And this is

5    in the same action.

6            Then, we see, there, that this subpoena which

7    again was signed by John Steele in a California action

8    requesting information of a John Doe defendant in the

9    State of California.  So, essentially, I would ask that

10   this declaration of Michael Stone be admitted into

11   evidence as Exhibit, I believe, we are on 9.

12           Is that correct, Madam Clerk?

13           THE CLERK:  10.

14           MR. PIETZ:  Pardon me.  10.  I am one behind.

15           THE COURT:  All right.  Any objection?

16           MR. WAXLER:  Your Honor, I just question the

17   relevancy of it as to Mr. Gibbs.  Again, it is not one of

18   the cases that you put in your OSC.

19           THE COURT:  It will be admitted.

20           MR. PIETZ:  Similar document that I will move onto

21   next.  What we have here is a declaration which was filed

22   on the docket in a case in the Northern District of

23   California by a man named Samuel Teitelbaum.  It is

24   Northern District of California No. 311 CV 5628.  And we

25   can see here that it is pending in the Northern District

68

1     of California.

2              In this declaration, Mr. Teitelbaum explains

3     that he received a letter directed to him in California

4     from Prenda Law and that the letter which was mailed to

5     him in California which is there is a copy of it right

6     here.  It is on Steele Hansmeier letterhead, and if we go

7     to the last page, we see that the letter, mailed into the

8     State of California in a case pending in the Northern

9     District of California, is signed by John Steele,

10    attorney and counselor at law.

11             So, in any event, I would ask that this be

12    admitted into evidence as Exhibit 11, and these both go

13    to showing that Mr. Steele has indeed reached into the

14    State of California in terms of his actions in BitTorrent

15    copyright litigation cases.

16             THE COURT:  All right.  Will be received.

17             MR. PIETZ:  So what I will do now, I think that

18    the other facts that I had already pointed out about the

19    other gentlemen who are not here today, so I mean Paul

20    Hansmeier and Paul Duffy, I pointed out in my opposition

21    to the objections which was filed on Friday, but, in

22    general, I would argue the jurisdictional issue as

23    follows.

24             What we have from Mr. Gibbs is a declaration

25    saying that anything that was potentially improper in

69

1    these cases was done at the direction of his superiors at

2    the Prenda law firm.   He identifies those people as John

3    Steele and Paul Hansmeier.   Interestingly enough,

4    Mr. Duffy isn't on the list or perhaps maybe not as much.

5         Mr. Duffy has his California bar license in

6    the state of California and has substituted in in

7    Mr. Gibbs' place in a variety of actions in the Northern

8    District of California.   Mr. Hansmeier, in addition to

9    being identified by Mr. Gibbs as essentially running a

10   law firm doing business in California, flew to California

11   apparently of his own free will to appear as the

12   corporate 30(b)(6) deponent of AF Holdings LLC.   So we

13   have Mr. Hansmeier reaching into the state of California,

14   attending a deposition in California in a Northern

15   District of California case, representing essentially

16   that the same plaintiff that is at issue here, AF

17   Holdings LLC.

18        So at least with respect to Mr. Duffy who has

19   his bar license here and Mr. Hansmeier who flew here as a

20   30(b)(6) deponent and has been identified, I think it is

21   fairly clear that probably both general and specific

22   jurisdiction exists.

23        Mr. Steele has perhaps been a little more

24   careful about trying to keep his fingerprints off here,

25   but I would remind the court that Mr. Gibbs has

70

```
1    identified him as essentially running a law firm in
2    California which by the way is not qualified to do
3    business in California, and I checked with the state bar
4    and it is not registered as a law firm here.
5                But in any event --
6          THE COURT:  You talking about Prenda now?
7          MR. PIETZ:  Talking about Prenda.  Yes, sir.
8                In any event, I apologize.  I don't have
9    documents to back that up, but I can provide them.  But,
10   in any event, I think that with respect to Mr. Steele
11   when you take Mr. Gibbs' declaration and add it together
12   with a subpoena signed by Mr. Steele.  And, pardon me, I
13   will note one other thing about the declaration of
14   Michael Stone.  In addition to authenticating the
15   documents, he also included some back and forth, some
16   meet and confer correspondence he had with Mr. Steele.
17               So, essentially, Mr. Stone noticed the fact
18   that Mr. Steele was not licensed in California and that
19   he had signed the subpoena and wrote to Mr. Gibbs saying
20   this subpoena is invalid.  And what happened is that
21   Mr. Steele wrote back directly without cc'ing Mr. Gibbs
22   and essentially shrugged off the concerns about the
23   subpoena being signed by an attorney who doesn't have a
24   license in California.
25               So, in any event, I think that with respect to
```

71

1    Mr. Steele, when you add together the subpoena issued

2    into the state of California, a demand letter issued

3    under the state of California as well as Mr. Gibbs'

4    testimony, it is pretty clear that the court has personal

5    jurisdiction.

6           I don't have a tremendous number of additional

7    exhibits on this topic.  However, I do have quite a few

8    with respect to what I view as Mr. Gibbs' central role in

9    the Prenda law organization.

10    MR. BRODSKY:  Your Honor, may I make one comment?

11    THE COURT:  You can make more than that.  Thank

12    you.

13           Yes.  Go ahead.

14    MR. BRODSKY:  We are not taking a position at the

15    present time on the jurisdictional issues that the court

16    is deciding, but there were statements made about my

17    client that I believe mischaracterize the evidence that

18    has been put forward.

19    THE COURT:  Okay.  Listen, let me just sort of

20    tell you the way we are going to proceed here.  At this

21    point, you will have the floor.  All right.  I can't

22    imagine you are going to raise too much in opposition to

23    the jurisdictional issue.  Otherwise, he is in.  So you

24    go right ahead.

25           Now, a number of things -- I am just going to

1    give you some of my thinking.  A number of things were

2    stated in your papers.  Some of them caused me some

3    concern because they were inaccurate.  For example, you

4    make the argument that certain people were identified as

5    infringers because there was no way, for example, that

6    someone else could have been piggy-backing off of their

7    modem because of the size of the lot, where the house is

8    situated on the lot, the proximity or lack of proximity

9    of other residences around, et cetera.

10          Your representation of these homes and the

11   neighborhoods and juxtaposition of other houses around

12   them was simply not accurate.  Not in the least bit.  And

13   I found that troublesome when you are asking me, then, to

14   accept all of your our arguments.

15          So I just want to throw that out there to let

16   you know some of my thinking.

17          MR. WAXLER:  Our turn, your Honor?

18          THE COURT:  I don't care who.  It is this side.

19          MR. WAXLER:  We will call Mr. Gibbs to the stand,

20   your Honor.

21          THE COURT:  All right.

22          (The witness was sworn.)

23          MR. PIETZ:  Your Honor, before we move onto

24   Mr. Gibbs, may I request that we admit into evidence the

25   affidavit of John Steele as Exhibit 12, the Michael Stone

73

1    declaration as Exhibit 13 -- oh.  Pardon me.  Stone and

2    Teitelbaum have already been admitted so just the

3    affidavit of John Steele.  I would ask that that be

4    admitted as Exhibit 12.

5         THE COURT:  I think that's right.  Are we up to

6    12?  Okay.  All right.

7         THE CLERK:  If you could state your full and true

8    name for the record and spell your last name.

9         THE WITNESS:  Sure.  Brad Gibbs, G-I-B-B-S.

10

11                    DIRECT EXAMINATION

12   BY MR. WAXLER:

13   Q    Mr. Gibbs, who is your present employer?

14   A    I am not currently employed.

15   Q    You became employed -- I'm sorry.  You became an of

16   counsel, 1099 independent contractor for Steele

17   Hansmeier; correct?

18   A    Yes.

19   Q    Was Steele Hansmeier an existing law firm at the

20   time that occurred?

21   A    I believe they had been existing for a number of

22   months at that point.

23   Q    What were you told your role would be at Steele

24   Hansmeier?

25   A    Basically, California counsel for Steele Hansmeier

74

1    in bringing lawsuits on behalf of their clients.

2    Q     Were you paid as an employee?

3    A     No.

4    Q     Did you share in Steele Hansmeier profits?

5    A     No.

6    Q     Were you on the management of Steele Hansmeier?

7    A     No.

8    Q     And who did you understand were the decision makers

9    of Steele Hansmeier?

10   A     John Steele and Paul Hansmeier.

11   Q     When you were an of counsel to Steele Hansmeier,

12   who supervised you?

13   A     John Steele and Paul Hansmeier.

14   Q     Did you have periodic meetings while at Steele

15   Hansmeier to discuss cases?

16   A     Yes, we did.

17   Q     And were those weekly meetings?

18   A     Yes.  Sometimes they would be sending the schedule,

19   but, yes, mostly weekly meetings.

20   Q     Who participated in those meetings?

21   A     John and Paul would call me, and they would hold a

22   weekly meeting.

23   Q     And were these by phone or in person?

24   A     These were by phone.

25         THE COURT:  Were they ever in person.

1        THE WITNESS:  I went sometimes and met them, and

2   then we had meetings, yes, in person at that point, but

3   this was only a couple of times.

4        THE COURT:  This is out of California?

5        THE WITNESS:  Yes.  Well, I have met with Paul

6   Hansmeier in California prior to this deposition, but the

7   other, everything was out of California.

8   Q    BY MR. WAXLER: When -- were any cases that you filed

9   while at -- while of counsel to Steele Hansmeier, were

10  any of those cases settled?

11  A    Yes.

12  Q    And did the checks, the settlement checks come to

13  you?

14  A    No.

15  Q    Did you have a client trust account in any account

16  in which you had an interest at all as a signatory?

17  A    No.  Actually, I don't even have a client trust

18  account.

19  Q    So the checks were sent to Steele Hansmeier's trust

20  account?

21  A    I don't know.  I would assume they were.  They

22  weren't sent to me.  They were sent to Steele Hansmeier.

23  Q    And how did you learn that Prenda law was going to

24  substitute in or take over the cases from Steele

25  Hansmeier?

1    A    Basically, I heard of the name Prenda Law.  They

2    told me that Prenda Law was now taking over the business.

3    Steele Hansmeier was no longer going to exist at that

4    point.

5    Q    And who is they in that answer?

6    A    That would be John Steele and Paul Hansmeier.

7    Q    Were you on the management committee at all of

8    Prenda Law?

9    A    No.

10   Q    Were you partner at Prenda Law?

11   A    No.

12   Q    What was your affiliation with Prenda Law?

13   A    The same as it was for Steele Hansmeier which would

14   be of counsel, California counsel essentially for Prenda

15   Law.

16   Q    So you were compensated with a 1099?

17   A    Yes.  That is correct.

18   Q    And did that ever change over the course of the

19   time which you were counsel to Prenda Law?

20   A    In terms of what?

21   Q    In terms of your relationship with that firm?

22   A    No.  I would only say that they, John and Paul, had

23   asked me to help the other counsel in different states,

24   basically, like, give them advice in doing their own

25   cases in different states.  That was the only change

77

1    really.  Other than that, I was just California counsel.

2    Q    While of counsel to Prenda Law, did you ever

3    receive any settlement checks?

4    A    Myself personally, no.

5    Q    Did you have a client trust account at Prenda Law

6    that you somehow administered or controlled?

7    A    No.

8    Q    And were you supervised at Prenda Law?

9    A    Yes, I was.

10   Q    Who were you supervised by?

11   A    Paul Hansmeier and John Steele.

12   Q    Were you supervised by Paul Duffy?

13   A    No.

14   Q    And when you say supervised, could you just

15   describe what you mean by that?  How did they supervise

16   you?

17   A    Sure.  You know, they essentially were the ones

18   that would initiate cases.  By that, I mean, they would

19   tell me they wanted to file certain cases in California,

20   for instance, and they would instruct me to go ahead and

21   file those.  And they would give me the authority to do

22   so.  I would be told what cases we are looking at and how

23   many cases we are talking about, and then I would file

24   the cases.

25        And they would give me general guidelines on

78

1    what to do and sometimes the cases would be settled by

2    John as was pointed out earlier, and sometimes they gave

3    me certain parameters which I could settle the case

4    myself.

5    Q     Did you ever talk to anybody that you understood to

6    be the client, AF Holdings?

7    A     No.  The communications were solely through Paul

8    Hansmeier and John Steele.

9    Q     Did you ever talk to anybody who said they were

10   affiliated with Ingenuity 13?

11   A     Well, I mean, aside from Mark Lutz who is the CEO

12   of Ingenuity 13, but aside from that, no.  All my

13   communications were straight through Paul Hansmeier and

14   John Steele.

15   Q     Did Mr. Lutz ever give you direction on the

16   handling of any of these cases directly?

17   A     No.  Actually, I only found out about that

18   connection, I would say, after the cases in the Central

19   District were filed, about him being the CEO.  I didn't

20   know that before.

21   Q     And the cases that were filed in the Central

22   District were dismissed; correct?

23   A     That is correct.

24   Q     And whose decision was it to dismiss those cases?

25   A     Ultimately, it was John Steele and Paul Hansmeier's

1   decisions.  We had talked about it.  As counsel of record

2   here, I just kind of broke down like a cost benefit

3   analysis of those cases.  And they said, basically, go

4   ahead and dismiss them because -- they said go ahead and

5   dismiss them.

6   Q     When the cases were filed, did you have a

7   discussion with anybody about whether notice of

8   interested parties should be filed?

9   A     I did.  Yeah.

10   Q     And who did you have discussions with?

11   A     Mostly Paul Hansmeier.  Yes.  Mostly Paul Hansmeier

12   but sometimes John Steele, I guess.  I don't know.  It

13   was a while ago I guess.

14   Q     Did you file those notices of interested parties?

15   A     Yes.

16   Q     What did they say in connection with AF Holdings.

17   A     They said there was no other interested parties.

18   Q     Do you have any personal knowledge of that

19   statement as untrue?

20   A     No, I did not.  No.  I still don't.  I mean, in

21   terms of I know there is other things involved in terms

22   of the trust and stuff like that, but in terms of other

23   people involved, I was only taking direction from these

24   guys in terms of these types of filings.

25   Q     And these guys are?

80

1    A      These guys are Paul Hansmeier and John Steele.

2    Q      In connection with Ingenuity 13 cases did you file

3    notices of interested parties?

4    A      That is correct.  Yes.

5    Q      And were you ever advised that the information --

6    how did you obtain the information for those notices?

7    A      Well, I just, I would ask them, you know, are there

8    any other people that I should be noticing on this

9    document that I am filing with the court.

10   Q      Who is them in your response?

11   A      That would be Paul Hansmeier and John Steele.

12   Q      Were you told not to do that again.  Instead of

13   saying them, were you told by Paul Hansmeier, John Steel

14   that the information you included in those notice of

15   interested parties was correct?

16   A      So they actually told me, I was instructed to fill

17   those documents out like I did.

18   Q      There was a question raised by the court this

19   morning about the failure to have filed notices of

20   related cases.  My question is did you consider filing

21   notices of related cases when you filed the actions in

22   the Central District of California?

23   A      Yes, we did.

24   Q      And could you please describe for the court what

25   your thought process was as a result of, in not filing

81

1    these notices?

2    A      So we had filed -- well, I filed on behalf of

3    Steele Hansmeier, then Prenda Law, a number of cases in

4    the Northern District of California, and those were cases

5    with multiple people in them.

6              And what the court in the Northern District of

7    California concluded, almost every court, at that point,

8    after filing multiple cases was that joinder was not

9    valid and that they basically told us in no uncertain

10   terms that these cases weren't related.  Therefore, that

11   informed my belief in terms of whether we wanted to

12   relate these cases or not.  They said these cases,

13   essentially, through their orders and through live

14   hearings, that these cases aren't related, they should be

15   brought as individual actions.  So it was just a decision

16   to bring those individual actions and not relate the

17   cases based on that.

18   Q      And your experience in Northern California, that

19   predated the filings of the Central District actions that

20   we are here to discuss today?

21   A      Yes.  I don't even know if I was admitted into the

22   Central District at that point.

23       THE COURT:  Let me jump in a second.  You were

24   told in the Northern District of California that when you

25   filed a lawsuit on behalf of either AF Holdings or

82

1    Ingenuity 13 versus Does 1 through many, that that

2    joinder was improper; correct?

3         THE WITNESS:  Some cases.  Some cases it was not

4    improper.  Some judges felt differently.

5         THE COURT:  All right.  But if it involved

6    different movies, downloads, different times, different

7    people, different places, different ISP addresses, they

8    said you need to file separate lawsuits; right?

9         THE WITNESS:  Some of them were the same clients,

10   same videos.

11        THE COURT:  Okay.  But even then?

12        THE WITNESS:  Yes.

13        THE COURT:  Even then, you had to file separate

14   lawsuits?

15        THE WITNESS:  Yes.  We were pointing that

16   direction even there was a footnote in one of the courts'

17   opinions saying basically that we were trying to get

18   around the filing fee, and that is what they thought so

19   we should file individual cases from there on out.

20        THE COURT:  Of course, you were, but that is not

21   where we are going here.  Now, that deals with joinder in

22   one lawsuit and consolidating really separate and

23   complete causes of action, different parties in a single

24   lawsuit.

25             Now, what we are talking about here is with

83

1    respect to your notice of related case.

2         THE WITNESS:  I understand.

3         THE COURT:  You do because I can hear it now.  I

4    can hear you going it is compound, all the stuff that you

5    do.

6              Do you realize -- no.  Did you equate the

7    instructions you got from the court regarding improper

8    consolidation of a lot of cases, a lot of claims into a

9    single complaint, did you somehow conflate that with the

10   issue of related cases, notices of related cases?  And

11   you know what that is for, here; right?

12        THE WITNESS:  I understand.

13        THE COURT:  You understand why we are looking for

14   that.

15        THE WITNESS:  I understand.

16        THE COURT:  Tell me what your understanding is as

17   to why the court is interested in knowing whether or not

18   there are related cases.

19        THE WITNESS:  Because if they are similar cases,

20   my belief is the court wants to know about those so the

21   court can handle it so that there are uniform decisions

22   essentially that are held from the same court.

23        THE COURT:  Excellent.  A completely different

24   objective -- right -- than consolidating a lot of

25   different lawsuits in one complaint; right?  Completely

84

1    different.  This is judicial economy.

2         THE WITNESS:  I understand.  Yes.  I understand

3    what you are saying.  In terms of that it was just the

4    decision that was made, and perhaps it was the wrong

5    decision, but, you know, the decision was made.

6         THE COURT:  Okay.  Don't do that.  Decision that

7    was made.  Who made that decision?

8         THE WITNESS:  It was a discussion amongst myself,

9    Paul Hansmeier and John Steele and, probably, mostly,

10   Paul Hansmeier.  I don't even know if Steele was involved

11   in that discussion or not, and that is just what we

12   decided to do.

13        THE COURT:  All right.  The law firm that you were

14   working for -- and I guess initially we are talking

15   Steele Hansmeier or the other way around.

16        THE WITNESS:  It was Steele Hansmeier.

17        THE COURT:  Okay.  Did that firm have, in its

18   California office, did it have a client trust account?

19        THE WITNESS:  In California.

20        THE COURT:  Yes.

21        THE WITNESS:  Well, I was working of counsel to

22   them.  So, no, I never had my own client trust account.

23   The funds were always going through the law firm.

24        THE COURT:  Were you operating out of your home?

25        THE WITNESS:  Yes, I was originally.

1       THE COURT:  Did at any time you ever have a

2   business office even if it was a suite any place?

3       THE WITNESS:  Not for Steele Hansmeier.

4       THE COURT:  What about Prenda?

5       THE WITNESS:  Prenda Law, yes.  They wanted me to

6   get an office.  So I got an office, and I actually moved

7   twice.

8       THE COURT:  At that time, did you have a client

9   trust account?

10      THE WITNESS:  No, your Honor.

11      THE COURT:  Was it your understanding that in

12  California that you were required to have a client trust

13  account?

14      THE WITNESS:  My belief was that considering I was

15  working as of counsel to the Prenda Law, and Prenda Law

16  had the trust account, that was my understanding of how

17  the money was dealt with.  I didn't ever -- they never

18  saw my bank account.  I was paid like by Prenda Law as an

19  attorney, of counsel attorney, 1099.  And so my

20  understanding was that they had a trust account.  And,

21  therefore, you know, the people that were working with

22  them did not need trust accounts themselves.

23      THE COURT:  Okay.  All right.  And you only handle

24  one kind of business; right?

25      THE WITNESS:  What do you mean by that, your

86

1    Honor?  I only handle one kind of business?

2           THE COURT:  Yes.

3           THE WITNESS:  Can you explain your question?  You

4    mean in terms of just being plaintiff's lawyer?

5           THE COURT:  Plaintiff's lawyer for copyright

6    infringement for the adult film industry.

7           THE WITNESS:  Well, no, actually.  So originally

8    when I was working for Steele Hansmeier, I was also

9    working for an arbitrator.  So I had other business, but

10   it was just a 1099 worker at the same time.  I was

11   helping him out with his cases, and so when Prenda law

12   came around, we basically, I said, look, you guys are

13   trying to put a lot of work on my plate essentially, and

14   I am kind of split here.  And they said, well, we would

15   like to basically have you work solely for Prenda Law,

16   this is being Paul Hansmeier and John Steele.  And so I

17   wrapped up my arrangement with the arbitrator, and I

18   became exclusive doing stuff for Prenda Law at that

19   point.

20          THE COURT:  Listen, last January, this past

21   January, a few weeks ago, I guess you started withdrawing

22   as counsel of record.

23          THE WITNESS:  That is correct, yes.

24          THE COURT:  All right.  And you just testified

25   that you are no longer employed by Prenda?

1          THE WITNESS:  That is correct.  I am no longer

2     employed by Prenda or any other corporation or LLC that

3     is involved in these cases.  I have moved on.  I am going

4     to work again for the arbitrator and find some other work

5     essentially.  You know, so that is where I am right now.

6     Actually, I was working for Livewire for two months, but

7     there was actually a couple of things that happened in

8     terms of I never even got paid for my two months there.

9          THE COURT:  Two months where?

10         THE WITNESS:  Two months at Livewire.

11         THE COURT:  You did get paid by Prenda though;

12    right?

13         THE WITNESS:  Before that, yes.  During 2012, yes.

14         THE COURT:  So why did you leave?

15         THE WITNESS:  Well, there is multiple reasons for

16    it.  Personal reasons, I am getting married soon.  So I

17    wanted to focus on that, but, you know, to be honest with

18    you --

19         THE COURT:  That would be good.

20         THE WITNESS:  Yeah.  No.  I am looking forward to

21    it.  And to be honest with you, these types of things

22    raising up themselves, I just didn't want to be

23    affiliated with it anymore.  It wasn't worth it.  I was

24    getting a lot of harassment.  My family was receiving

25    e-mails and correspondence from people, my fiance, my

88

1   parents.  I just didn't see, and I was getting a lot of

2   negative exposure that, you know, I just didn't want

3   anymore ultimately.

4           And, then, also, I didn't really get along

5   with one of the people that managed me.  So I, you know,

6   I decided to go ahead and exit and told them about that,

7   and, yeah, and that is the situation essentially.

8           THE COURT:  Okay.

9   Q    BY MR. WAXLER: Just to complete your employment

10  picture because there was perhaps some gaps.  You learned

11  sometime in late 2012 that Prenda Law was no longer going

12  to be your, I will just say the word employer but you

13  weren't going to be of counsel to Prenda Law anymore;

14  correct?

15  A    That is correct.

16  Q    And how were you informed of that?

17  A    I was told I would say middle December or so.

18  There was a brainstorming issue about -- they were, John

19  Steele and Paul Hansmeier were brainstorming about

20  whether they wanted basically to start their own company,

21  I guess.  And the company was Livewire, turned out to be

22  Livewire.  And that Livewire would essentially buy AF

23  Holdings and Ingenuity 13 and Guava.

24          And so I was informed that as of January 1,

25  you know, Livewire extends you this offer, and basically