1     if you don't accept this offer, then, you know, we are

2     going to part ways.  So the offer was to be in house

3     counsel for Livewire, and so I was hired W2 employee for

4     this company which is a holding company of copyrights.

5     Q     And you understood that one of the subsidiaries of

6     that company included AF Holdings; correct?

7     A     That was my understanding, yeah.

8     Q     When did you come to a different understanding?

9     A     Oh.  Well, during the deposition, I came to a

10    different understanding because obviously the deposition

11    was said what was said, and I asked Paul Hansmeier about

12    that.

13    Q     And what we are talking about here is

14    Mr. Hansmeier's testimony that there was a trust that

15    owned AF --

16    A     That is correct.

17    Q     And before that testimony, you heard that

18    testimony, you understood as of January 1, that Livewire

19    would own --

20    A     Yes.

21    Q     Livewire would own AF Holdings?

22    A     That is correct.

23    Q     And that is why in at least one of the pleadings

24    you put that you are in house counsel for AF Holdings

25    because that was a company that was owned by Livewire;

90

1    correct?

2    A      I was specifically told to sign as in house counsel

3    for AF Holdings by Paul Hansmeier in that case.  I was

4    actually because of Mark Lutz' position as CEO, I was

5    trying to get his signature for that document, but Paul

6    Hansmeier said, no, you are in house counsel for Livewire

7    thereby in house counsel for AF Holdings, you sign it on

8    behalf of the client.

9    Q      Is one of the other reasons you decided to leave

10   Livewire is because you learned that the stamp was being

11   used for your signature?

12   A      Yes.  Certain letters were sent out without my

13   knowledge.  I never authorized them, never approved them.

14   When I questioned John about them, he was, like,

15   basically said, this is your role.  This is what you have

16   to do.  You have to send these letters out, and I said I

17   don't feel comfortable, these aren't even my cases,

18   essentially.  And, you know, I actually e-mailed Mark

19   Lutz about that, and he said you got to talk with John

20   and Paul about this.

21          THE COURT:  I'm sorry.  What kind of letters are

22   we talking about?  Is that the settlement letters?

23          THE WITNESS:  Settlement letters.  They had been

24   using -- they originally said they were going to do a

25   stamp for me for certain things, but I thought they were

1    only for my cases.  And, you know, later, I found out

2    that stamp might have been used for cases that I never

3    even participated in or seen the letters before they went

4    out.

5         THE COURT:  Let me make sure I understand now.

6    Livewire eventually became the parent of AF Holings and

7    Ingenuity 13 LLC?

8         THE WITNESS:  That was my understanding.  I was

9    told that, yeah.  And that is why I was hired and a lot

10   of people were hired in terms of working as W2 employees

11   for Livewire.  So it was the company that was a holdings

12   company that would do litigation as well as distribution.

13   That is what they told me.

14        THE COURT:  And you were a W2 employee?

15        THE WITNESS:  That's correct.  And I still have

16   not been paid for that position.

17   Q    BY MR. WAXLER:  That was for a period of two months;

18   correct?

19   A    That's correct.  And I gave him my notice early

20   February essentially.

21        THE COURT:  Where was Livewire's offices?

22        THE WITNESS:  Livewire has an address of

23   Washington DC address, but, obviously, I don't know if it

24   has an office to be honest with you.  It is just a matter

25   of, kind of a cloud type office.  It might be a situation

92

1    where -- I am just speculating right now.

2         THE COURT:  You have never visited Washington DC

3    offices?

4         THE WITNESS:  No.  I believe it is just a PO box

5    over there.  That is just a mailing address for them.

6         THE COURT:  Did that form letter requesting

7    payment of the settlement sums, did that letter change to

8    reflect that payment now should be sent to Livewire at

9    the Washington DC address?

10        THE WITNESS:  Absolutely.  It wasn't sent to me or

11   anything like that.  It was sent to that mailbox, and

12   then I believe it would be sent back to somebody at some

13   point somewhere.  But that is the kind of issues that I

14   started having, and along with a lot of other different

15   issues.  So I just decided to -- I asked them if I could

16   go ahead and substitute out with Paul Duffy who had a

17   license in California.  I talked to Paul Duffy about

18   that, he said sure, and then I proceeded to do that.

19        THE COURT:  All right.  So you substituted out.

20   Now, how long were you general counsel for Livewire?

21        THE WITNESS:  Two months basically.  I mean, I

22   guess you could say, I think the official documents were

23   signed.  It never actually specified that I was in house

24   counsel, but that is what I was told.  The documents were

25   just general employment documents, but that was from I

93

1   think January 7th on.  That's when I signed the

2   documents.

3   Q    BY MR. WAXLER: You were not general counsel.  You

4   were in house counsel; right?

5   A    In house counsel.  Sorry.

6   Q    You have never held the position of general

7   counsel, have you?

8   A    No.

9        THE COURT:  Did you know about any other employees

10  there?

11       THE WITNESS:  Yes.

12       THE COURT:  Was there a bookkeeper or an

13  accountant?

14       THE WITNESS:  Yes.

15       THE COURT:  Do you know whether -- well, okay.

16       Thank you.

17       MEMBER OF THE AUDIENCE:  Your Honor?

18       THE COURT:  You are?

19       MEMBER OF THE AUDIENCE:  Jason (inaudible).  I

20  represent Godfread and Cooper in some of the defamation

21  cases.

22       THE COURT:  You represent Godfread?

23       MEMBER OF THE AUDIENCE:  Yes.

24       THE COURT:  So back in Minnesota, lawyers have

25  lawyers?

94

1        MEMBER OF THE AUDIENCE:  I am from Massachusetts.

2        THE COURT:  And how can I help you?

3        MEMBER OF THE AUDIENCE:  I had a conversation with

4   Mr. Gibbs probably back in October regarding AF Holdings

5   where he told me that he was national counsel for AF

6   Holdings and that any settlement negotiations were to be

7   made through him.  And the local counsel for that case

8   confirmed that he was the one who told me to contact

9   Mr. Gibbs.

10       THE COURT:  Have you come to understand as have I

11  that every representation made by a lawyer associated

12  with Prenda is not necessarily true?

13       MEMBER OF THE AUDIENCE:  I have known that for

14  three years.

15       THE COURT:  Okay.  Good.  So you aren't shocked,

16  are you?

17       MEMBER OF THE AUDIENCE:  No.

18       THE COURT:  Nor am I, but thank you.

19       MEMBER OF THE AUDIENCE:  You are welcome.

20  Q    BY MR. WAXLER: Mr. Gibbs, you know you are under

21  penalty of perjury testifying here today?

22  A    That is correct.

23  Q    Have you ever made a representation to a court in

24  the Central District of California or any other court

25  that you know is untrue?

1   A     No.

2         THE COURT:  Well, that isn't exactly accurate, is

3   it?  You have caused documents to be filed with, let's

4   just be kind and say falsified signatures.

5         THE WITNESS:  Your Honor, I had no idea that these

6   were allegations --

7         THE COURT:  That is "yes" or "no".

8         THE WITNESS:  Your Honor, I think it is still an

9   open question.

10        THE COURT:  Oh.  No.  It is not an open question.

11  We have had the individual testify under oath.  Those

12  were not his signatures on these documents.

13        THE WITNESS:  And that is the first time I have

14  heard in terms of him saying out loud that he absolutely

15  did not sign those papers, those exact papers.  He said

16  before he was not associated with the companies, but that

17  is the first time I heard him say he did not sign those

18  exact papers.

19        THE COURT:  Are you saying that you have had prior

20  conversations with him where he either admitted or

21  tacitly admitted that he signed?

22        THE WITNESS:  No, your Honor.  I haven't had any

23  conversations with Mr. Cooper.

24        THE COURT:  That was my thought.  I thought that

25  you had never met the man.

96

1  THE WITNESS:  No.  I never met the man.  He never

2 met me, and I have never talked with him.

3  THE COURT:  And you were acting on the

4 representation of John Steele that --

5  THE WITNESS:  And Paul Hansmeier.

6  THE COURT:  -- that they actually had the

7 signatures, the authentic signature of the real Alan

8 Cooper?

9  THE WITNESS:  Yes.  I was told that.  And I

10 investigated that in terms of, you know, what is going on

11 here when the first Alan Cooper issue arose, and I was

12 told that there was no issue, that he -- that he did sign

13 the document.  And so I also did a little bit of research

14 and found out that the assignor, even if the assignor is

15 invalid, it still is a valid document.  So combining

16 those two things, I still believed -- I don't think I

17 filed a case after that.  It was just a matter of kind of

18 addressing with these guys, and they were my sole

19 information for this type of thing.

20  THE COURT:  Okay.  You also indicated that you had

21 on file the original or notarized signature of Alan

22 Cooper, but you really don't, do you?

23  THE WITNESS:  No.  No.  I never said I had on

24 file.  No.  Prenda law or Steele Hansmeier had it on

25 file.  They told me they had it on file, and that is I

97

1   believe what was in the declaration.  So I said, okay,

2   you know, do we have this notarized copy, do you guys

3   have it over there?  I don't think I ever saw it, but

4   they told me, yes, we have copies of this, it is here,

5   and you can go ahead and file that based on our

6   representation to you.

7         THE COURT:  Do you feel like you have been duped

8   by Hansmeier and Steele?

9         THE WITNESS:  In a way, yes.

10        THE COURT:  Okay.  This has been very

11   enlightening.

12   Q    BY MR. WAXLER:  Mr. Gibbs -- I just have a few more

13   your Honor.  Mr. Gibbs, have you ever been a 30(b)(6)

14   witness for AF Holdings?

15   A    No.

16   Q    Have you ever been a 30(b)(6) witness for Ingenuity

17   13?

18   A    No.

19   Q    Have you ever received client funds in any of your

20   capacities as counsel affiliated with Steele Hansmeier or

21   Prenda Law?

22   A    No.

23   Q    The court expressed some disappointment in the

24   manner in which you described how you determined the

25   location of the houses that sat on the lots, and the

98

1   router, the ability for the router to pick up people who

2   were not authorized to pick up that signal.  And let me

3   ask you some questions about that.

4   A       Sure.

5   Q       It is your understanding that when wireless routers

6   are used and they determine what the distance is where

7   they would be able to pick up a signal, that those

8   determinations are made where there is an open field and

9   not placed in the middle of a structure?

10  A       Yeah.  I have read some reports on that and that

11  the projections are basically favorable to them because

12  there is no obstacles in the middle, there is nothing

13  like walls or fences or bushes or trees which have a

14  great effect on wireless signals.

15  Q       Tell me how you described the Denton residence and

16  what facts you had to support your description of the

17  Denton residence?

18          THE COURT:  Which city?  Is this Santa Maria or

19  West Covina?

20          THE WITNESS:  I believe it is the second one.

21          MR. WAXLER:  I will find it, your Honor.

22          MR. PIETZ:  Your Honor, I might suggest we look at

23  Exhibit II which is the picture, the geographical Google

24  maps picture of the two residences.

25          THE COURT:  That is why I wanted to know.  I mean,

1   I went to Google Earth as well, and I just want to know

2   which one we are talking about because in West Covina,

3   you made some representations of fact that you cannot

4   possibly know to be true.

5        THE WITNESS:  Well, your Honor, based on my

6   personal knowledge of wireless networks, I believed they

7   were true.

8        THE COURT:  I am talking about of the residence

9   itself.  It is a gated community.

10           I'm sorry.  I didn't mean to interrupt you.

11      MR. WAXLER:  I am happy to address that, your

12  Honor.

13  Q    Mr. Gibbs, the map that you have seen that was

14  offered by Mr. Gibbs and Mr. Pietz -- and I apologize if

15  I am butchering your name, by the way --

16      MR. PIETZ:  Pietz.

17      MR. WAXLER:  Pietz.

18  Q    That is not the type of map that you saw; correct?

19  A    No, that is not.

20  Q    Please describe the map that you looked at when you

21  made the representations in the filings that we have done

22  in this courthouse.

23  A    It was a map that you could go down the street, it

24  is actually focused on the house, not on an overview like

25  that, but it is on, basically, there is like a street

1    view on Google that allows you to, like, look around the

2    house essentially.  Kind of.  It is limited to a certain

3    extent though.

4    Q      What did you see when you looked at that map?

5    A      I saw a house that I believed it was likely not

6    something that wifi could have broadcasted out to

7    neighbors.

8    Q      Did you see a gate?

9    A      I did see a gate.

10   Q      Did you see several structures?

11   A      I did.

12   Q      Did you see bushes and shrubs and trees around,

13   between the house structure and the street where someone

14   might be driving by?

15   A      I did.  Actually, the aerial view, I think, is even

16   covering the house if I remember correctly.  So, yeah, it

17   is -- I mean, in terms of trees, there is a lot of trees

18   there.

19   Q      And it is your understanding that the wireless

20   signal doesn't just fly over these trees, does it?

21   A      No.  Actually, I mean, there is just certain things

22   that -- I mean, I think everyone kind of knows when they

23   go into certain people's houses and say, hey, I want to

24   use the wifi connection, there are certain rooms in the

25   house that don't get, even in the same house that don't

101

1   get the wifi connection.  So, yes, walls, trees, these

2   things definitely have a dramatic effect.  Sometimes,

3   concrete wall, for instance, sometimes it just altogether

4   stops something.  That is my understanding of it.

5   Q      Was your description of the residence in West

6   Covina when you signed your declaration and submitted

7   these papers and we submitted these papers on your behalf

8   accurate to the best of your knowledge.

9   A      Yes, it was.  It was based on my personal

10  knowledge.  Yes.

11  Q      And do you still believe it is accurate despite the

12  very different map that was submitted to the court?

13  A      That is correct.  I believe that map might be -- I

14  don't even know where the yards come, or I don't know how

15  that works.

16  Q      Would the same be true for the residence in Santa

17  Maria?

18  A      It was the same analysis essentially.  It was just

19  part of the full analysis, but yeah.

20  Q      In other words, there were walls, there were

21  buildings, there were shrubs, all of which would block

22  the signal and reduce by a great extent the range of the

23  wireless network?

24  A      Yes.  That was my impression from them, the street

25  maps from Google.

102

1          MR. WAXLER:  May I have one moment, your Honor?

2          THE COURT:  Certainly.

3    Q    BY MR. WAXLER: Mr. Gibbs, did you knowingly violate

4    the discovery orders from this court?

5    A    No.

6    Q    Did you cause to be served on the ISP providers the

7    October 19, 2012 discovery order by this court?

8    A    Yes.  I mean, at least, I thought I did.  I had

9    requested it.

10   Q    And it was your understanding that that was done?

11   A    It was my understanding.  I confirmed it

12   afterwards, and they said it was taken care of.

13   Q    And the first time you learned that an ISP may not

14   have received a copy of that order was when?

15   A    I believe it was in the response by the ISP, AT&T

16   possibly.

17          MR. WAXLER:  I have nothing further, your Honor.

18   Thank you.

19          THE COURT:  Okay.  Thank you.  But you started

20   getting responses from some of the Internet service

21   providers, didn't you?

22          THE WITNESS:  I didn't get the responses.

23          THE COURT:  All right.  You filed a status report

24   with the court?

25          THE WITNESS:  Yes.

1          THE COURT:  Right?

2          THE WITNESS:  Yes.

3          THE COURT:  And at the time you filed that status

4    report, there had been no returns on those subpoenas;

5    right?

6          THE WITNESS:  Yes.

7          THE COURT:  Then about a week later --

8          THE WITNESS:  Well, sorry, let me qualify my

9    answer.  There were -- at that point, there was nothing

10   in the computers that showed there was any returns on the

11   subpoenas.

12         THE COURT:  Okay.  That changed a few days later.

13         THE WITNESS:  It changed, I think, on the 7th.

14   Yes.

15         THE COURT:  And, of course, you updated that

16   status report, you advised the court, then -- right --

17   that suddenly, for whatever reason, people are now

18   starting to send you information on your subscribers;

19   right?  You updated your filing, didn't you?

20              Actually, no, you didn't.

21         THE WITNESS:  I didn't, your Honor, but if I can

22   explain why.

23         THE COURT:  Yes.

24         THE WITNESS:  Okay.  So I did some investigation

25   on that, and what I was told, and, again, I don't handle

104

1    the subpoenas.  These are handled out of the Chicago and

2    Minnesota offices.  I was told that these things are

3    usually delivered and that either hand-delivered or I

4    believe mailed but most likely they are just a few blocks

5    away.  Like CT Corporation is just a few blocks away,

6    that CT Corporation would send, mail back the

7    information.

8             I didn't realize that that information was

9    faxed back by Verizon.  I never knew that.  And I did

10   some investigation on it.  And I, also, I talked to Paul

11   Duffy, and the exact date of the court's order in that

12   case, there had been -- he had had some eye surgery and

13   he also had some trauma related to it.

14            So what he said was he wasn't picking up his

15   mail as frequently during that time period.  So I thought

16   that the information had been received essentially by,

17   through his mailbox at that point but hadn't been input

18   in the computer until later.  So that was my

19   understanding.  That was my understanding of what had

20   happened.

21   Q    BY MR. WAXLER: Do you now regret not advising the

22   court when you learned on November 7th that Prenda Law

23   had received information in response to those subpoenas

24   and that there was information in the status report that

25   was not correct?

105

1    A      Absolutely.  Absolutely.

2           MR. WAXLER:  Thank you, your Honor.

3           THE COURT:  Mr. Pietz.

4

5                     CROSS-EXAMINATION

6    BY MR. PIETZ:

7    Q      Mr. Gibbs, I would ask you to refer to the binder

8    that is there with you to Exhibit EE which is the

9    substitution of counsel that was filed apparently with

10   your CM/ECF account listing you as in house counsel for

11   AF Holdings.

12   A      Yes, I am familiar with that document.

13   Q      So Mr. Gibbs, just to clarify, then, your testimony

14   is that when you filed that document, that was an

15   accurate representation -- correct -- that you were at

16   that moment in house counsel for AF Holding?

17   A      When I filed that document, I believed I was.  What

18   I was told afterwards and after the deposition was that

19   that merger or that acquisition hadn't happened therefore

20   it was still owned by the trust.  So I, essentially, I

21   had been told to go ahead and file as in house counsel,

22   but, for some reason, Livewire didn't own AF Holdings at

23   that time.

24   Q      So can you just pin down for me exactly when it was

25   that your capacity as in house counsel for AF Holdings

106

1    begun and exactly when it terminated?

2    A    Well, my understanding was that -- my understanding

3    when I was told that I was in house counsel for Livewire

4    that I was therefore in house counsel for AF Holdings and

5    the other companies as well, Ingenuity and Guava.

6         And only did I find out later when I was

7    exiting and I was already leaving all these cases

8    essentially, only then, I found out that they had not

9    actually acquired -- Livewire had not acquired AF

10   Holdings according to Mr. Hansmeier.

11   Q    Mr. Gibbs, have you ever authorized anyone else to

12   use your CM/ECF password?

13   A    I don't -- I might have.  I don't know.

14   Q    Who?

15   A    An individual by the name of Carl.  He worked for

16   me, or he worked with me, I guess you would say.  He

17   actually worked for Prenda Law.

18   Q    How about John Steele?

19   A    No.  I don't think so.  Not to my knowledge.  I am

20   not saying -- in terms of authority, I did not, no.

21   Q    How about Paul Hansmeier, did you ever authorize

22   him to use your CM/ECF password?

23   A    I don't believe so.  I mean, I know he had my -- he

24   had access to my passwords at one point, so he might

25   have, yeah.

107

```
 1    Q      What was your business telephone number while you

 2    worked for Prenda Law?

 3    A      It was (415)325-5900.

 4    Q      And what was your business e-mail address when you

 5    worked for Prenda Law?

 6    A      It was blgibbs@wefightpiracy.com.

 7    Q      Have you ever instructed Prenda local counsel to

 8    file pleadings using your business e-mail and business

 9    telephone number on the pleadings even though it was

10    their name and physical address?

11    A      So, yes, my name is on -- my e-mail address and my

12    number and my phone number is on certain cases in other

13    states.  I was instructed to do so like that by Paul

14    Hansmeier.  And, essentially, the way that was explained

15    to me was that I would essentially forward all of the

16    communications to the outside counsel.  Yeah.  So.

17          MR. PIETZ:  Before we move on any farther, I would

18    ask that Exhibit EE be admitted into evidence as Exhibit

19    13.

20    Q      Mr. Gibbs, I have some copies of a few different

21    complaints, one that was filed by a local counsel in

22    Nebraska and three complaints filed by local counsel in

23    Florida all of which list the name of the local counsel,

24    a mailing address in those respective states and an

25    e-mail address, blgibbs@wefightpiracy.com and your 415
```

108

1   telephone number, is that consistent with your

2   understanding of what the normal practice was at Prenda

3   that your business e-mail and phone would be on pleadings

4   all around the country?

5        MR. WAXLER:  Objection.  Irrelevant, your Honor.

6        THE COURT:  Overruled.

7        THE WITNESS:  That was what I was instructed to do

8   by Prenda, yeah, was to do that because I was essentially

9   helping those guys out on their cases.  It was their

10  case, but, yes.

11  Q    BY MR. PIETZ:I would ask Mr. Ranallo to pass out

12  No. 2 which is the declaration of Matt Catlett, an

13  attorney in Nebraska, and he is authenticating the

14  service copy of the complaint filed in Nebraska listing

15  Mr. Gibbs.  I would ask that that be admitted into

16  evidence as Exhibit 14.

17            Similarly, Mr. Ranallo, if you would be so

18  kind as to pass out 3, 4 and 5 which are the complaint in

19  Sunlust v. Nguyen, First Time Video.  Here is Sunlust v.

20  Nguyen.  That is Middle District, Florida.  We also have

21  First Time Videos v. Paul Uphold and Openmind Solutions

22  v. Barry Wolfson.

23       MR. WAXLER:  Your Honor, I would object to the

24  introduction of those exhibits.

25            THE COURT:  Right.  We don't need this.  We have

109

1    basically got his testimony.

2         MR. PIETZ:  Fair enough.

3         THE COURT:  And we have got the testimony on the

4    reason why, but I got to tell you, that doesn't sound

5    reasonable to me that you would be inviting telephone

6    calls, litigation in Florida on a case that you know

7    nothing about.  How do you field these calls?

8         THE WITNESS:  No, sir.  I would pass the messages

9    on to the other attorneys.

10        THE COURT:  Back to Florida?

11        THE WITNESS:  Yes.  I would pass the messages on

12   to them because, essentially, it was just easy for them

13   at that point.  I was like their secretary essentially,

14   and that is the way that Prenda wanted to do it.

15        THE COURT:  Why?

16        THE WITNESS:  I don't know.  I mean, they changed

17   the practice at some point where people were putting

18   their own e-mails, their own numbers, but I don't know

19   why that was the way it was structured originally.

20             And I don't know.  I mean, I don't know who

21   had access to my e-mail either.  So I don't know, like, I

22   have no idea if I was sent something or if someone else

23   read it.

24   Q    BY MR. PIETZ: Did John Steele have access to your

25   e-mail?

110

1    A    He did.  I don't know if he did throughout, but he

2    did.

3    Q    Would he routinely respond to e-mail inquiries at

4    the blgibbs@wefightpiracy.com e-mail address?

5    A    I never knew it because he didn't CC me on them, or

6    he didn't let me know he was doing them.  But I believe

7    he did.

8    Q    Did Paul Hansmeier have access to that e-mail

9    address?

10   A    I think he had access.  I have no idea whether he

11   used it or not.

12   Q    How about Mr. Duffy, Paul Duffy, did he have access

13   to that e-mail account?

14   A    I don't think so.

15   Q    Mr. Gibbs, earlier, you testified that some things

16   were sent out with your signature stamped on there that

17   didn't have your approval.  I would like to refer now --

18   actually, before I venture any farther afield, I would

19   ask that the court take judicial notice of the complaints

20   I have just identified as Exhibits, I think, 15, 16 and

21   17.

22        In any event, moving on, now, to what has been

23   previously identified in this action as Exhibit X, ask

24   that it be admitted now as Exhibit 18.

25        Essentially, I would just like to ask you a

111

1   question to confirm.

2   A      Sure.

3   Q      Is this the kind of letter you are talking about?

4   This was a demand letter sent in the Guava, St. Clair

5   County, Illinois case.  I note that it is dated -- what

6   is the date on it?  January 30th.  And it is,

7   essentially, a, you know, a demand letter.  And then I

8   will go to the last page there.  It has a pleading in

9   there.  So, in any event, on the last page of the letter

10  itself, there is a stamped signature, what appears to be

11  a stamped signature that says Brett Gibbs.  Is it your

12  testimony that this letter was sent out without your

13  authorization?

14  A      That is my testimony.

15  Q      You had no knowledge whatsoever that this letter

16  was being sent out?

17  A      No.  Not with my name on it.  I don't even

18  remember -- no one ever told me about this before I found

19  out.  I actually found out through an opposing counsel

20  that contacted me and wrote me a letter saying,

21  basically, you know, you have nothing on my client, and

22  you communicate through me.  So I was kind of confused,

23  but I eventually saw the letter, and it had my stamped

24  signature on it.

25  Q      Mr. Gibbs -- I will represent to the court that

1    this letter has been sent to over 300 Internet users

2    across the country.  Have you done anything to correct

3    the fact that this letter went out with your signature on

4    it without your authorization?  I note that it was filed

5    in late January.

6    A     Yeah.  I actually talked with Mark Lutz, and Mark

7    said, I said, Mark, do not send any of these letters out

8    anymore that are, you know, please contact me and let me

9    know what is happening before you send out these letters.

10   And the response from Mr. Lutz was I don't control those

11   types of things, you have to talk with Paul and John.

12   Q     Fair enough.  Mr. Gibbs, have you ever hired local

13   counsel for Prenda Law?

14   A     Actually, the hiring, no, because the hiring

15   process was done by John Steele.

16   Q     Are you familiar with an attorney in Florida named

17   Matthew Wasinger?

18   A     Yes.  Yes.

19   Q     Are you aware of the fact that Mr. Wasinger

20   testified under oath in federal court in Florida at the

21   Sunlust hearing that you hired him and that, as far as he

22   understood, you were a principal of Prenda law?  Are you

23   aware of that, Mr. Gibbs?

24         MR. WAXLER:  Objection, your Honor.  It is

25   irrelevant.  It is also hearsay.

113

1          MR. PIETZ:  I am asking Mr. Gibbs if he is aware

2     of it.

3          THE COURT:  Sustained.  I have got the picture.

4     Okay.  And I appreciate it.  Thank you.

5          MR. PIETZ:  I will move along, your Honor.

6          THE COURT:  Okay.  To what?  Give me a blueprint.

7          MR. PIETZ:  Fair enough, your Honor.  I will

8     explain the broad strokes of the categories I have, and

9     whatever the court is interested in, we will move to

10    that.

11         In addition to a few more things about

12    Mr. Gibbs hiring, firing and even threatening local

13    counsel, I have evidence on him being delegated

14    independent authority to settle cases which he actually

15    concluded.  Contrary to Mr. Gibbs' assertion which is a

16    little confusing in light of the fact that he says I

17    spoke to Mark Lutz, in any event, with respect to his

18    assertion that he never had any direct client contact, I

19    have a number of documents which actually show -- some of

20    which are Mr. Gibbs' own prior words showing that, in

21    fact, at least according to him, he was communicating

22    back and forth with the client, whatever that means, and

23    my theory is that that may mean John Steele.

24         But in any event, beyond the direct client

25    interaction, you know, I could ask Mr. Gibbs about his

114

1     investigation in the case, about the petition, but those

2     are the broad strokes, your Honor.  If the court has got

3     the picture, I don't need to necessarily get into all the

4     documents.

5          THE COURT:  I do have the picture, and I know who

6     the client is.  We have talked about the client, and the

7     client has been running everything.  Yeah, I know who the

8     client is.

9          MR. PIETZ:  Very good.

10         THE COURT:  Okay.  Thank you.

11              Gentlemen.  Mr. Brodsky, you look bored.

12         MR. BRODSKY:  I am not bored, your Honor.

13         THE COURT:  All right.

14         MR. WAXLER:  We have no further questions, your

15    Honor.

16         THE COURT:  All right.

17              Unless anyone has anything else in terms of

18    evidence to offer, the matter will stand submitted.  All

19    right.

20              Thank you, sir.  You may step down?

21         THE WITNESS:  Thank you, your Honor.

22         THE COURT:  Good luck to you.

23              All right.  How about this, I will leave this

24    up to counsel, if you wish.  If you would like to sum up

25    your position, you may do so at this time.  It is not

1   necessary.  I am just making that offer.

2        MR. WAXLER:  Thank you, your Honor for giving us

3   the opportunity to clear Mr. Gibbs' name, and what I

4   would like to add to the declarations that he has

5   submitted and the papers that we have submitted is that

6   Mr. Gibbs did not intend to disrespect this court or

7   disobey any orders of this court.  Mr. Gibbs had no

8   knowledge that perhaps others may have knowingly or

9   unknowingly disregarded some orders of this court in

10  terms of the service of the knowledge of the October 17th

11  order.

12          The order itself, you know, did not require

13  service on the ISP's, but that was what Mr. Gibbs wanted

14  to do.  And that is the undisputed testimony here today

15  that that is what he wanted to do was to have those ISP's

16  notified of that.  And he took no action whatsoever, your

17  Honor, to do discovery, formal discovery of those ISP's

18  or ask the ISP's to follow-up on the information

19  provided.

20          So Mr. Gibbs stands before you, your Honor, he

21  is I think we could say humbled by this experience, and I

22  think he is regretful that he has perhaps been put in a

23  position where the court at least in the original OSC

24  made comments suggesting that he was a culpable party

25  here.  And he is not, your Honor.  And I hope you see it

116

1    that way too.

2            And I thank you very much for your time.

3    Appreciate the opportunity you have given us to clear his

4    name.

5            THE COURT:  Thank you, counsel.

6            Anything from this side?  You don't have to.

7            MR. PIETZ:  I will keep it very brief, your Honor.

8            I can appreciate that there may be more

9    parties, other people who are more culpable than

10   Mr. Gibbs with respect to what has occurred in these

11   cases.  However, I think the assertion that Mr. Gibbs is

12   merely an independent contract attorney is simply not

13   credible.  I would just simply leave it at this, there is

14   ample evidence showing that Mr. Gibbs was been involved

15   since day one or at least very shortly thereafter on a

16   key level exercising operational control over this

17   litigation on a national basis.

18           So while I am sympathetic that perhaps to a

19   certain extent, maybe there are other people more

20   culpable, I will just leave it that certainly there is

21   ample evidence showing that Mr. Gibbs indeed played a key

22   role in all of this.

23           Thank you, your Honor.

24           THE COURT:  Okay.  I just have one question,

25   gentlemen.  As a licensed attorney in this state,

117

1   particularly when it is only your name on the pleadings,

2   don't you think you have some responsibility to assure

3   the accuracy of those pleadings?  Or is it permissible

4   simply to go they told me to do so or the senior partner

5   said it is okay, it may not have sounded right to me, but

6   they said it was okay.  Could you do that really?

7        MR. WAXLER:  Your Honor, I am going to suggest

8   that that is not what happened on a key issue.

9        THE COURT:  Okay.

10        MR. WAXLER:  On a key issue, the issue involving

11   Alan Cooper, there was not one shred of information that

12   Alan Cooper wasn't Alan Cooper until Mr. Gottfried's

13   letter in November of 2012 at which point Mr. Gibbs

14   immediately questioned whether this was accurate or not.

15   And the most important thing is that Mr. Gibbs filed no

16   further pleadings after that time which purported to rely

17   on Mr. Cooper being the assignee of AF Holdings.  And so

18   Mr. Gibbs reacted to the notion.

19        He investigated and he did nothing further on

20   it.  He was assured that Alan Cooper was Alan Cooper, but

21   so he -- he did something other than said somebody told

22   me.  And on the other issues, your Honor, these were not

23   examples of him relying on anybody else to do things that

24   were improper.  He was doing discovery.  He was doing

25   investigations.  They were supervising him, but he was

118

1    acting like a California lawyer doing what he thought in

2    his best judgment should be done as a California lawyer

3    in these cases.

4            THE COURT:  All right.

5            MR. WAXLER:  Thank you.

6            THE COURT:  Thank you, counsel.

7                All right.  Again, the matter stands

8    submitted.  We are adjourned.

9            MR. WAXLER:  Thank you, your Honor.

10           MR. PIETZ:  Thank you, your Honor.

11           (Proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2

3

4    I hereby certify that pursuant to Section 753, Title 28,

5    United States Code, the foregoing is a true and correct

6    transcript of the stenographically reported proceedings held

7    in the above-entitled matter and that the transcript page

8    format is in conformance with the regulations of the

9    Judicial Conference of the United States.

10   Date:  March 17, 2013

11

12    /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit G

Paul D:

Attached are .pdf documents for a new case to file in Illinois, Western
District.  I also put this in ███████████ ████████████████████████
████████████████

All you will need to do is draft the civil cover sheet, and file these
(they are already in .pdf form).

Please email or call me with any questions.

--
Brett L. Gibbs, Esq. (SBN 251000)
Of Counsel to Prenda Law Inc.
38 Miller Avenue, #263
Mill Valley, CA 94941
415-341-5318
blgibbs@wefightpiracy.com

NOTICE: THIS EMAIL IS INTENDED TO BE PART OF A SETTLEMENT NEGOTIATION AND
IS NOT ADMISSIBLE UNDER FRE RULE 408.

NOTICE:
This communication is covered by the Electronic Communications Privacy Act,
found at 18 U.S.C. 2510 et. seq. and is intended to remain confidential and
is subject to applicable attorney/client and/or work product privileges.
 If you are not the intended recipient of this message, or if this message
has been addressed to you in error, please immediately alert the sender by
reply e-mail and then delete this message and all attachments.  Do not
deliver, distribute or copy this message and/or any attachments and if you
are not the intended recipient, do not disclose the contents or take any
action in reliance upon the information contained in this communication or
any attachments.

Circular 230 Disclosure: Pursuant to recently-enacted U.S. Treasury
Department regulations, we are now required to advise you that, unless
otherwise expressly indicated, any federal tax advice contained in this
communication, including attachments and enclosures, is not intended or
written to be used, and may not be used, for the purpose of (i) avoiding
tax-related penalties under the Internal Revenue Code or (ii) promoting,
marketing or recommending to another party any tax-related matters
addressed herein.

**Attachments**

| | | | | |
|---|---|---|---|---|
| Download | View | untitled-[1.2] | text/html | 2.1 kB |
| Download | View | 1 COMPLAINT ███████████████████ | application/pdf | 137 kB |
| Download | View | 1-1 EXHIBIT A - ███████████ | application/pdf | 152 kB |
| Download | View | 2 CORPORATE DISCLOSURE STATEMENT ██████ | application/pdf | 89 kB |

███████

I am giving you your first (and likely not last) Hacker Case for Minnesota. Because of the unique non-filing process (i.e. pocket service) in Minnesota, you (with the help of █████ will be able to initiate this suit on Monday. All of the necessary documents are attached.

In light of Minnesota's Rules on "Pocket Service," this Complaint *won't*be filed initially. Instead,
*copies *(not the original) of the executed Summons and Complaint will be personally served on* ████████ (via a process server -- I assume ████████ will help you coordinate that), and after the process is completed, the server will need to fill out the Affidavit of Service (attached), and return this to you. A copy of the Summons, Complaint, and Affidavit of Service should be scanned and put up on ████████ ████████ Also, any further documents you receive in this case (such as the Answer), or future cases, should all be docketed ████████.

Please note that my information is everywhere that it can legally be. This is because we are trying to drive all of the phone calls to me, so we don't have to burden local counsel with settlement discussions. If, for instance, ██████ would like to serve you personally, and contacts me to initiate that process, I will be in touch with you.

Please contact me if you have any questions. Remember, while this is going to be your case, you can still talk to me about it (and future ones) at any time. Understandably, considering this is the first time in Minnesota (for both of us), having a quick pre-service conversation to iron out any concerns or questions might be helpful. Please feel free to call me: 415-341-5318 or 415-381-3104.

Thanks, ███████

--
Brett L. Gibbs, Esq. (SBN 251000)
Of Counsel to Prenda Law Inc.
38 Miller Avenue, #263
Mill Valley, CA 94941
415-341-5318
blgibbs@wefightpiracy.com

Matt:

I talked with the Unauthorized Practice of Law Department in Florida, and got an explanation from an attorney over there about my ability to participate in this case. Rule 4-5.5 Unlicensed Practice of Law; Multi-Jurisdictional Practice of Law is the key.

At this point, applying to the Court for pro-hac vice counsel, at this point, is not the move. According to the attorney, and the Rule, I can still participate in these cases if I have reasonable expectation of being allowed to be admitted in pro-hac vice if I were to apply. The limit is 3 pro-hac vice's per 365-day calendar year, and as long as I qualify for that I am good with the California bar, I am fine negotiating with ███████████ because I have can reasonably expect to be admitted pro hac if need be.

That said, it seems that I can only enter on ███████████████ and ███████████████████████████ as these are the clients whom are in the same state as I am licensed, thus the ones that I can reasonably expect to enter as pro hac counsel. (Rule 4-5.5(c)(3)(A)).

That said, feel free to tell ████████ to contact me for settlement negotiations on the ██████████████ clients. From there, he might get a good idea of where we stand on ████████

Thanks,

Brett Gibbs
(415) 325-5900

Matt:

We have noticed that there are two motions to dismiss in the cases involving █████ (i.e. ███). The responses to those motions are due *Tomorrow*.

While we are drafting the Responses, we need to make sure that you are available tomorrow to file them.

I called you earlier today, and left you a message, but couldn't get in touch with you. Please give me a call tomorrow (around 9:00 am (PST)), or simply email back saying that you will be around tomorrow, and will be able to file the responses that we are currently drafting.

Thanks,

--

Brett L. Gibbs, Esq. (SBN 251000)
Of Counsel to Prenda Law Inc.
38 Miller Avenue, #263
Mill Valley, CA 94941
415-341-5318
blgibbs@wefightpiracy.com

Good sign... educating the judicial system, one judge at a time.

Though, how arrogant is this judge? "No, your honor, we are not the idiots here... it is clearly you and your staff without with requisite mental facilities"

Of well, a win is a win.

# Exhibit H

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE OTIS D. WRIGHT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

Ingenuity 13 LLC,                       )
                    PLAINTIFF,           )
                                         )
VS.                                      )    NO. CV 12-8333 ODW
                                         )
John Doe, et al.,                        )
                    DEFENDANT,           )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

TUESDAY, APRIL 2, 2013

_____

KATIE E. THIBODEAUX, CSR 9858
U.S. Official Court Reporter
312 North Spring Street, #436
Los Angeles, California 90012

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  APPEARANCES OF COUNSEL:

2

3  FOR RESPONDENT GIBBS:

4      WAXLER CARNER BRODSKY LLP
       BY:  ANDREW J. WAXLER
5      -and- BARRY BRODSKY
       1960 E. Grand Avenue
6      Suite 1210
       El Segundo, CA  90245
7

8

9  FOR DEFENDANT:

10     THE PIETZ LAW FIRM
       BY:  MORGAN E. PIETZ
11     3770 Highland Avenue
       Suite 206
12     Manhattan Beach, CA  90266

13     -and-

14     NICHOLAS RANALLO LAW OFFICES
       BY:  NICHOLAS R. RANALLO
15     371 Dogwood Way
       Boulder Creek, CA  95006

16

17

18  FOR RESPONDENTS DUFFY, VAN DEN HEMEL & PRENDA LAW:

19     KLINEDINST LAW OFFICES
       BY:  HEATHER ROSING
20     -and- PHILIP W. VINEYARD III
       -and- DAVID M. MAJCHRZAK
21     501 W. Broadway
       Suite 600
22     San Diego, CA  92101

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    APPEARANCES:   (Cont'd)

2


3    FOR RESPONDENT HANSMEIER:

4         BAKER, KEENER & NAHRA LLP
          BY:  PHILLIP A. BAKER
5         -and- DANIEL PATRICK LEONARD
          633 West Fifth Street
6         Fifty-fourth Floor
          Los Angeles,  CA  90071

7


8    FOR RESPONDENT STEELE:

9         MURPHY, PEARSON, BRADLEY & FEENEY
          BY:   THOMAS P. MAZZUCCO
10        -and- TIMOTHY J. HALLORAN
          88 Kearny Street
11        Tenth Floor
          San Francisco, CA  94108

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1          LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 2, 2013

 2                      10:00 A.M.

 3                      - - - - -

 4

 5

 6          THE CLERK:  Calling Item No. 1,  CR 12-8333, ODW,

 7   Ingenuity 13, LLC, versus John Doe, et al.

 8              Counsel, please state your appearances.

 9          MR. PIETZ:  Morgan Pietz, P-I-E-T-Z, for the

10   putative John Doe defendant in 12-CV-8333.

11          MR. RANALLO:  And Nicholas Ranallo for the same

12   Doe.

13          THE COURT:  Morning, counsel.

14          MR. WAXLER:  Andrew Waxler and Barry Brodsky, both

15   for Brett Gibbs who is here today.

16          THE COURT:  By the way, thank you for your

17   submittal with respect to your efforts to effect service.

18   Thank you.

19          MR. BAKER:  Phil Baker and Dan Leonard specially

20   appearing for Paul Hansmeier.

21          MR. LEONARD:  Morning, your Honor.

22          MR. BAKER:  And he is present today.

23          THE COURT:  Where?

24          MR. BAKER:  Mr. Hansmeier, will you stand up.

25          THE COURT:  Front row.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. HALLORAN:  Morning your Honor.  My name is Tim

 2     Halloran, Thomas Mazzacco on behalf of John Steele who is

 3     also present.

 4          THE COURT:  Mr. Steele.

 5          MR. STEELE:  Yes.

 6          MS. ROSING:  Morning, your Honor.  Heather Rosing

 7     with Klinedinst PC with my colleagues Phil Vineyard and

 8     Dave Majchrzak appearing on behalf of Paul Duffy, Angela

 9     Van Den Hemel and Prenda Law, and Mr. Duffy and

10     Ms. Van Den Hemel are in the audience today.

11          THE COURT:  Thank you.

12             Is that it?

13          MR. BAKER:  Your Honor?

14          THE COURT:  Yes.

15          MR. BAKER:  There are other individuals pursuant

16     to your order here.  They are not represented.

17          THE COURT:  Mark Lutz?

18          MR. BAKER:  Yes, he is present.

19          MR. LUTZ:  Yes.

20          THE COURT:  Mr. Lutz, welcome, sir.  Did Alan --

21     well, do we have an Alan Cooper?  Any Alan Cooper?

22          (No response.)

23          THE COURT:  All right.  Peter Hansmeier?

24          MR. HANSMEIER:  Yes, your Honor.

25          THE COURT:  Good morning, sir.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1       MR. HANSMEIER:  Morning.

2       THE COURT:  Any representatives of any other

3   representatives of Prenda Law, Livewire Holdings, AF

4   Holdings other than Mr. Lutz, Ingenuity 13 other than

5   Mr. Lutz and 6881 Forensics, LLC.

6       MS. ROSING:  Mr. Duffy is appearing on behalf of

7   Prenda Law, your Honor.

8       THE COURT:  All right.  Here is my interest, and

9   we can proceed in any way that seems to make sense.  I am

10   pleasantly surprised that we have everyone here.

11   Otherwise, I was going to be forced to draw reasonable

12   inferences from the facts as I know them.

13       It should be clear by now that this court's

14   focus has now shifted dramatically from the area of

15   protecting intellectual property rights to attorney

16   misconduct such misconduct which I think brings discredit

17   to the profession.  That is much more of a concern now to

18   this court than what this litigation initially was about.

19       Mr. Steele -- well, let me do it this way.  I

20   have questions of Mr. Steele.  Mr. Steele can choose to

21   answer those questions or not.  The same applies for

22   Mr. Duffy and Mr. Hansmeier.

23       Now, as the attorneys, how do you all propose

24   we proceed?

25       MR. BAKER:  May I take the podium, your Honor?

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1      THE COURT:  Well, actually, we don't have one, but

2   we do have a lecturn and you are free to use it.

3      MR. MAZZUCCO:  Thomas Mazzucco on behalf of

4   Mr. Steele.

5      Your Honor, in light of some of the

6   information that was in the transcript of March 11th,

7   2013 in this courtroom and some of the concerns that this

8   court has mentioned, at this point in time, if Mr. Steele

9   is called to testify, he is going to exercise his Fifth

10  Amendment privilege against forced testimony.

11      And we state for two reasons, one, there were

12  serious allegations made by the court and others of not

13  just attorney misconduct but the word fraud was used

14  several times in the transcript.

15      THE COURT:  Should have been.

16      MR. MAZZUCCO:  The next step is there is also an

17  issue involving attorney-client privilege.  If Mr. Steele

18  was to testify, that privilege belongs to the client.

19      THE COURT:  Which client might that be?

20      MR. MAZZUCCO:  That would be several of his

21  clients.  Mr. Halloran is going to handle that part of

22  the argument, but that is a two pronged argument, your

23  Honor.

24      THE COURT:  Are you talking about AF Holdings,

25  Ingenuity 13, those clients?

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1          MR. MAZZUCCO:  Yes.

2          THE COURT:  And you think there is a difference

3     between those clients and Mr. Steele?

4          MR. MAZZUCCO:  I think there is, your Honor, yes.

5          THE COURT:  From what I know about this case,

6     there is no difference at all, but that is why I am glad

7     Mr. Steele is here.  Maybe he can clarify some of those

8     things, but if you say answering those kinds of questions

9     would incriminate him, I'll take you at your word.

10          MR. MAZZUCCO:  No, your Honor.  I'm not saying

11     they are going to incriminate him.  I said it is his

12     Fifth Amendment privilege against forced testimony.

13     There was language on the record from March 11th where

14     this court made some accusatory statements about fraud

15     upon the court, things that were in the transcript.

16          THE COURT:  Yes.

17          MR. MAZZUCCO:  You leave my client with no

18     alternative but.

19          THE COURT:  To rebut those statements.

20          MR. MAZZUCCO:  He can rebut those statements in

21     the proper venue, your Honor.  This is an order to show

22     cause in front of this court.

23          THE COURT:  Let's cut to the chase.  I am really

24     not interested in -- I want to know if some of my

25     conjecture is accurate.  The only way I can find out is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to have the principles here and answer those questions.

2            Now, if you say he will not answer those

3    questions, then I will draw whatever inferences I think

4    are reasonable from the facts as I know them.  This is an

5    opportunity for him to protect himself, to defend and

6    protect himself.  It is up to him.  So you are saying he

7    doesn't want to answer any questions, fine.  I am not

8    going to go through the charade of asking the questions

9    and have him assert the Fifth.

10       MR. MAZZUCCO:  Your Honor, he is not going to

11   respond to your questions.

12       THE COURT:  All right.  Fine.

13            What about Mr. Hansmeier?  What is his

14   position, the same?

15       MR. BAKER:  The exact same, your Honor.

16       THE COURT:  All right.  You may be seated.

17            Mr. Duffy.

18       MS. ROSING:  Your Honor, Mr. Duffy and

19   Ms. Van Den Hemel will also be taking the fifth

20   amendment.  Though, in response to your desire for

21   additional information, I do have approximately 25

22   minutes of argument, and I do have some exhibits that are

23   judicially noticeable.

24       THE COURT:  On what?  Relevant to what?

25       MS. ROSING:  To the seven issues pending before

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    this court.

2         THE COURT:  Give me the Cliff Note version.  Just

3    give me a summary, what it is that you would like to --

4         MS. ROSING:  Well, your Honor, what I would like

5    to argue because my clients are entitled to a reasonable

6    opportunity to be heard, we weren't allowed --

7         THE COURT:  Excuse me.  They are giving up that

8    right to be heard.  Now, what have you got to say that is

9    under oath?

10        MS. ROSING:  Well, your Honor, my arguments are

11   legal arguments.

12        THE COURT:  I know.  I am looking for facts.  I

13   really am.  I am not a looking for legal arguments.

14        MS. ROSING:  Well, your Honor --

15        THE COURT:  Can you tell me, for example, who

16   directs the litigation here in California?  Who makes the

17   decision as to whether or not cases are dismissed or

18   settled for how much money?  Can you tell me that?

19        MS. ROSING:  Your Honor, I can't testify.

20        THE COURT:  "Yes" or "no", please.  Because we

21   need to move through this.  Can you tell me that?

22        MS. ROSING:  I personally cannot tell you that,

23   your Honor.

24        THE COURT:  All right.  Do you know whether or not

25   there is another Alan Cooper other than the one that was

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    here at the last hearing?

2        MS. ROSING:  I am not aware of another Alan

3    Cooper, your Honor.

4        THE COURT:  All right.  Good.

5            What happens to the settlement money?

6        MS. ROSING:  Your Honor, obviously, I represent

7    Mr. Duffy and Ms. Van Den Hemel.  I don't have personal

8    knowledge of any of this.

9        THE COURT:  Why weren't notices of related cases

10   filed?  Who made the decision to hide from the court the

11   fact that all of these cases were related.

12       MS. ROSING:  I do have a judicially noticeable

13   document on that, your Honor, where the Northern District

14   declined to relate the cases.

15       THE COURT:  That is a different thing.  That is

16   consolidating them.

17       MS. ROSING:  It is actually an order declining to

18   relate them.

19       THE COURT:  Same plaintiff, same film, same causes

20   of action, and they are not related?  Excuse me?

21           Okay.  Tell me this.  Who made the decision

22   not to disclose to the court the fact that the law firms

23   have a financial interest in the outcome of this

24   litigation?

25       MS. ROSING:  Your Honor, there is no evidence

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  before this court at all that the law firm or any, well,

2  certainly, my clients, Paul Duffy or Angela Van Den

3  Hemel, have any financial interest in the outcome of this

4  litigation.

5       THE COURT:  Excuse me.  Did you read Hansmeier's

6  deposition?

7       MS. ROSING:  Yes, I did, your Honor.

8       THE COURT:  And then you make the statement you

9  just made?

10      MS. ROSING:  Your Honor, there is no evidence that

11  Mr. Duffy or Ms. Van Den Hemel who is a W2 paralegal at

12  Prenda Law --

13      THE COURT:  I understand that.

14      MS. ROSING:  And I would be happy --

15      THE COURT:  Wait a minute.  The money goes to

16  Prenda Law's trust account; right?

17      MS. ROSING:  Your Honor, I have no personal

18  knowledge, and I can't testify.  But I do have an

19  argument I would like to present to your Honor.

20      THE COURT:  Relative to what?  To anything I just

21  asked?

22      MS. ROSING:  Well, your Honor, it is a legal

23  argument with some objections and some judicially

24  noticeable documents.

25      THE COURT:  Relative to what?

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1          MS. ROSING:  Well, the seven issues before the

2    court, the Alan Cooper issue, the discovery order issue,

3    the Wagar investigation, the Denton investigation, Form

4    CV30, the relationships, and March 11, the things that

5    are noticed in this court's OSC.

6          But, your Honor, we would be happy to submit

7    this in a brief if that would be more --

8          THE COURT:  Good.  Do that.  Thank you.

9          We are done.

10    (Proceedings concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3

 4    I hereby certify that pursuant to Section 753, Title 28,

 5    United States Code, the foregoing is a true and correct

 6    transcript of the stenographically reported proceedings held

 7    in the above-entitled matter and that the transcript page

 8    format is in conformance with the regulations of the

 9    Judicial Conference of the United States.

10    Date:  April 5, 2013

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

# Exhibit I

Case 2:12-cv-08333-ODW-JC   Document 218-3   Filed 07/11/13   Page 57 of 71   Page ID
#:4164
Case 2:12-cv-08333-ODW-JC   Document 130   Filed 05/06/13   Page 1 of 11   Page ID #:2889

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INGENUITY 13 LLC, | Case No. 2:12-cv-8333-ODW(JCx) |
| Plaintiff, | **ORDER ISSUING SANCTIONS** |
| v. | |
| JOHN DOE, | |
| Defendant. | |

> "The needs of the many outweigh the needs of the few."
> —Spock, *Star Trek II: The Wrath of Khan* (1982).

## I.   INTRODUCTION

Plaintiffs[1] have outmaneuvered the legal system.[2]   They've discovered the nexus of antiquated copyright laws, paralyzing social stigma, and unaffordable defense costs.   And they exploit this anomaly by accusing individuals of illegally downloading a single pornographic video.   Then they offer to settle—for a sum

---

[1] The term "Plaintiffs" used in this order refers to AF Holdings LLC, Ingenuity 13 LLC, as well as related entities, individuals, and attorneys that collaborated in the underlying scheme fronted by AF Holdings and Ingenuity 13.

[2] This order concerns conduct committed in the following related cases: *AF Holdings LLC v. Doe*, No. 2:12-cv-6636-ODW(JCx) (C.D. Cal. filed Aug. 1, 2012); *AF Holdings LLC v. Doe*, No. 2:12-cv-6669-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-8333-ODW(JCx) (C.D. Cal. filed Sept. 27, 2012).

Case 2:12-cv-08333-ODW-JC   Document 218-3   Filed 07/11/13   Page 58 of 71   Page ID
#:4165
Case 2:12-cv-08333-ODW-JC   Document 130   Filed 05/06/13   Page 2 of 11   Page ID #:2890

1  calculated to be just below the cost of a bare-bones defense. For these individuals,
2  resistance is futile; most reluctantly pay rather than have their names associated with
3  illegally downloading porn. So now, copyright laws originally designed to
4  compensate starving artists allow, starving attorneys in this electronic-media era to
5  plunder the citizenry.

6  Plaintiffs do have a right to assert their intellectual-property rights, so long as
7  they do it right. But Plaintiffs' filing of cases using the same boilerplate complaint
8  against dozens of defendants raised the Court's alert. It was when the Court realized
9  Plaintiffs engaged their cloak of shell companies and fraud that the Court went to
10  battlestations.

## II.   PROCEDURAL HISTORY

12  The Court issued its February 7, 2013 Order to Show Cause re Sanctions to
13  allow counsel, Brett Gibbs, to explain why he ignored the Court's discovery-stay
14  Order, filed complaints without reasonable investigation, and defrauded the Court by
15  asserting a copyright assignment secured with a stolen identity. (ECF No. 48.) As
16  evidence materialized, it turned out that Gibbs was just a redshirt.

17  Gibbs's behavior in the porno-trolling collective was controlled by several
18  attorneys, under whom other individuals also took their orders. Because it was
19  conceivable that these attorneys (and others) were culpable for Gibbs's conduct, the
20  Court ordered these parties to appear.

21  The following additional parties were ordered to appear: (a) John Steele, of
22  Steele Hansmeier PLLC, Prenda Law, Inc., and/or Livewire Holdings LLC; (b) Paul
23  Hansmeier, of Steele Hansmeier PLLC and/or Livewire Holdings LLC; (c) Paul
24  Duffy, of Prenda Law, Inc.; (d) Angela Van Den Hemel, of Prenda Law, Inc.;
25  (e) Mark Lutz, of Prenda Law, Inc., AF Holdings LLC, and/or Ingenuity 13 LLC;
26  (f) Alan Cooper, of AF Holdings LLC; (g) Peter Hansemeier, of 6881 Forensics, LLC;
27  (h) Prenda Law, Inc.; (i) Livewire Holdings LLC; (j) Steele Hansmeier PLLC; (k) AF
28  Holdings LLC; (l) Ingenuity 13 LLC; (m) 6881 Forensics, LLC; and (n) Alan Cooper,

of 2170 Highway 47 North, Isle, MN 56342. (ECF Nos. 66, 86.) These parties were ordered to show cause why they should not be sanctioned for their behind-the-scenes role in the conduct facially perpetrated by Gibbs. These parties were also ordered to explain the nature of their operations, relationships, and financial interests.

### III.    LEGAL STANDARD

The Court has a duty to supervise the conduct of attorneys appearing before it. *Erickson v. Newmar Corp.*, 87 F.3d 298, 301 (9th Cir. 1996). The power to punish contempt and to coerce compliance with issued orders is based on statutes and the Court's inherent authority. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994). Though this power must be exercised with restraint, the Court has wide latitude in fashioning appropriate sanctions to fit the conduct. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–65 (1980).

Under the Court's inherent authority, parties and their lawyers may be sanctioned for improper conduct. *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001). This inherent power extends to a full range of litigation abuses, the litigant must have engaged in bad faith or willful disobedience of a court's order. *Id.* at 992. Sanctions under the Court's inherent authority are particularly appropriate for fraud perpetrated on the court. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 54 (1991).

### IV.    DISCUSSION

**A.    Findings of fact**

Based on the evidence presented on the papers and through sworn testimony, the Court finds the following facts, including those based on adverse inferences drawn from Steele, Hansmeier, Duffy, and Van Den Hemel's blanket refusal to testify.[3]

1.    Steele, Hansmeier, and Duffy ("Principals") are attorneys with shattered law practices. Seeking easy money, they conspired to operate this enterprise and

---

[3] Even if their refusal was based on the Fifth Amendment privilege against self-incrimination, the Court still may draw adverse inferences against them in this civil proceeding. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

3

Case 2:12-cv-08333-ODW-JC   Document 130   Filed 05/06/13   Page 4 of 11   Page ID #:2892

1    formed the AF Holdings and Ingenuity 13 entities (among other fungible entities) for

2    the sole purpose of litigating copyright-infringement lawsuits.   They created these

3    entities to shield the Principals from potential liability and to give an appearance of

4    legitimacy.

5           2.     AF Holdings and Ingenuity 13 have no assets other than several

6    copyrights to pornographic movies.   There are no official owners or officers for these

7    two offshore entities, but the Principals are the de facto owners and officers.

8           3.     The Principals started their copyright-enforcement crusade in about 2010,

9    through Prenda Law, which was also owned and controlled by the Principals.   Their

10   litigation strategy consisted of monitoring BitTorrent download activity of their

11   copyrighted pornographic movies, recording IP addresses of the computers

12   downloading the movies, filing suit in federal court to subpoena Internet Service

13   Providers ("ISPs") for the identity of the subscribers to these IP addresses, and

14   sending cease-and-desist letters to the subscribers, offering to settle each copyright-

15   infringement claim for about $4,000.

16          4.     This nationwide strategy was highly successful because of statutory-

17   copyright damages, the pornographic subject matter, and the high cost of litigation.

18   Most defendants settled with the Principals, resulting in proceeds of millions of

19   dollars due to the numerosity of defendants.   These settlement funds resided in the

20   Principals' accounts and not in accounts belonging to AF Holdings or Ingenuity 13.

21   No taxes have been paid on this income.

22          5.     For defendants that refused to settle, the Principals engaged in vexatious

23   litigation designed to coerce settlement.   These lawsuits were filed using boilerplate

24   complaints based on a modicum of evidence, calculated to maximize settlement

25   profits by minimizing costs and effort.

26          6.     The Principals have shown little desire to proceed in these lawsuits when

27   faced with a determined defendant.   Instead of litigating, they dismiss the case.   When

28   pressed for discovery, the Principals offer only disinformation—even to the Court.

7. The Principals have hired willing attorneys, like Gibbs, to prosecute these cases. Though Gibbs is culpable for his own conduct before the Court, the Principals directed his actions. In some instances, Gibbs operated within narrow parameters given to him by the Principals, whom he called "senior attorneys."

8. The Principals maintained full control over the entire copyright-litigation operation. The Principals dictated the strategy to employ in each case, ordered their hired lawyers and witnesses to provide disinformation about the cases and the nature of their operation, and possessed all financial interests in the outcome of each case.

9. The Principals stole the identity of Alan Cooper (of 2170 Highway 47 North, Isle, MN 56342). The Principals fraudulently signed the copyright assignment for "Popular Demand" using Alan Cooper's signature without his authorization, holding him out to be an officer of AF Holdings. Alan Cooper is not an officer of AF Holdings and has no affiliation with Plaintiffs other than his employment as a groundskeeper for Steele. There is no other person named Alan Cooper related to AF Holdings or Ingenuity 13.

10. The Principals ordered Gibbs to commit the following acts before this Court: file copyright-infringement complaints based on a single snapshot of Internet activity; name individuals as defendants based on a statistical guess; and assert a copyright assignment with a fraudulent signature. The Principals also instructed Gibbs to prosecute these lawsuits only if they remained profitable; and to dismiss them otherwise.

11. Plaintiffs have demonstrated their willingness to deceive not just this Court, but other courts where they have appeared. Plaintiffs' representations about their operations, relationships, and financial interests have varied from feigned ignorance to misstatements to outright lies. But this deception was calculated so that the Court would grant Plaintiffs' early-discovery requests, thereby allowing Plaintiffs to identify defendants and exact settlement proceeds from them. With these granted requests, Plaintiffs borrow the authority of the Court to pressure settlement.

**B.    Sanctions**

Although the Court originally notified the parties that sanctions would be imposed under Federal Rule of Civil Procedure 11(b)(3) and Local Rule 83-3, the Court finds it more appropriate to sanction the parties under its inherent authority. *See In re DeVille*, 361 F.3d 539, 550 (9th Cir. 2004) ("[T]he bankruptcy court's failure to specify, in advance of the disciplinary proceedings, that its inherent power was a basis for those proceedings, did not serve to undercut its sanctioning authority."). The sanctions for Plaintiffs' misconduct are as follows.

*1.    Rule 11 sanctions*

The Court maintains that its prior analysis of Plaintiffs' Rule 11 violations is accurate. (ECF No. 48.) Plaintiffs can only show that someone, using an IP address belonging to the subscriber, was seen online in a torrent swarm. But Plaintiffs did not conduct a sufficient investigation to determine whether that person actually downloaded enough data (or even anything at all) to produce a viewable video. Further, Plaintiffs cannot conclude whether that person spoofed the IP address, is the subscriber of that IP address, or is someone else using that subscriber's Internet access. Without better technology, prosecuting illegal BitTorrent activity requires substantial effort in order to make a case. It is simply not economically viable to *properly* prosecute the illegal download of a single copyrighted video.

Enter Plaintiffs and their cottage-industry lawsuits. Even so, the Court is not as troubled by their lack of reasonable investigation as by their cover-up. Gibbs argued that a deep inquiry was performed *prior* to filing. Yet these arguments are not credible and do not support Gibbs's conclusions. Instead, Gibbs's arguments suggest a hasty after-the-fact investigation, and a shoddy one at that.

For instance, Gibbs characterized Marvin Denton's property as "a very large estate consisting of a gate for entry and multiple separate houses/structures on the property." (ECF No. 49, at 19.) He stated this to demonstrate the improbability that Denton's Wi-Fi signal could be received by someone outside the residence. But

1   Denton's property is not a large estate; it is a small house in a closely packed

2   residential neighborhood.  There are also no gates visible.



20   Gibbs's statement is a blatant lie.  His statement resembles other statements

21   given by Plaintiffs in this and their other cases: statements that sound reasonable but

22   lack truth.  Thus, the Court concludes that Gibbs, even in the face of sanctions,

23   continued to make factual misrepresentations to the Court.

24   Nevertheless, Rule 11 sanctions are inappropriate here because it is the wrong

25   sanctions vehicle at this stage of litigation.  The cases have already been dismissed

26   and monetary sanctions are not available.  Fed. R. Civ. P 11(c)(5)(B) (a court cannot

27   impose a monetary sanction on its own unless it issued the show-cause order before

28   voluntary dismissal).  The more appropriate sanction for these Rule 11 violations is

1   what the Court had already imposed: denial of requests for early discovery. (ECF
2   No. 28.)

3         2.     *Sanctions under the Court's inherent authority*

4         In addition to Gibbs's misrepresentations, there is the matter of the ignored
5   Court Order vacating early discovery. (ECF No. 28.) The evidence does not show
6   that the Order was ignored because of miscommunication among Plaintiffs. The
7   Order was purposely ignored—hoping that the ISPs were unaware of the vacatur and
8   would turn over the requested subscriber information.

9         Then there is the Alan Cooper forgery. Although a recipient of a copyright
10  assignment need not sign the document, a forgery is still a forgery. And trying to pass
11  that forged document by the Court smacks of fraud. Unfortunately, other than these
12  specific instances of fraud, the Court cannot make more detailed findings of fraud.

13        Nevertheless, it is clear that the Principals' enterprise relies on deception. Part
14  of that ploy requires cooperation from the courts, which could only be achieved
15  through deception. In other words, if the Principals assigned the copyright to
16  themselves, brought suit in their own names, and disclosed that they had the sole
17  financial interest in the suit, a court would scrutinize their conduct from the outset.
18  But by being less than forthcoming, they defrauded the Court. They anticipated that
19  the Court would blindly approve their early-discovery requests, thereby opening the
20  door to more settlement proceeds.

21        The Principals also obfuscate other facts, especially those concerning their
22  operations, relationships, and financial interests. The Principals' web of
23  disinformation is so vast that the Principals cannot keep track—their explanations of
24  their operations, relationships, and financial interests constantly vary. This makes it
25  difficult for the Court to make a concrete determination.

26        Still, the Court adopts as its finding the following chart detailing Plaintiffs'
27  relationships. Though incomplete, this chart is about as accurate as possible given
28  Plaintiffs' obfuscation.



As for Van Den Hemel, Lutz, and Hansemeier, they are not without fault even though they acted under orders from the Principals. They were not merely assimilated; they knowingly participated in this scheme, reaping the benefits when the going was good. Even so, their status as non-attorneys *and* non-parties severely limits the sanctions that could be levied against them.

Despite these findings, the Court deems these findings insufficient to support a large monetary sanction—a seven-digit sanction adequate to deter Plaintiffs from continuing their profitable enterprise. Even if the Court enters such a sanction, it is certain that Plaintiffs will transfer out their settlement proceeds and plead paucity. Yet Plaintiffs' bad-faith conduct supports other more fitting sanctions.

/ / /

1    First, an award of attorney's fees to Defendants is appropriate. This award
2 compensates them for expenses incurred in this vexatious lawsuit, especially for their
3 efforts in countering and revealing the fraud perpetrated by Plaintiffs.

4    So far, only Morgan Pietz and Nicholas Ranallo have appeared.[4] Upon review,
5 the Court finds Pietz's expenditure of 120.5 hours at an hourly rate of $300 reasonable
6 based on his experience, work quality, and quantity of necessary papers filed with the
7 Court. (ECF No. 102.) Although many of these hours were spent after the case was
8 dismissed, these hours were spent in connection with the sanction hearings—time well
9 spent. Similarly, the attorney's fees and costs incurred by Ranallo also appear
10 reasonable.

11    Therefore, the Court awards attorney's fees and costs in the sum of $40,659.86
12 to Doe: $36,150.00 for Pietz's attorney's fees; $1,950.00 for Ranallo's attorney's fees;
13 $2,226.26 for Pietz's costs; and $333.60 for Ranallo's costs. As a punitive measure,
14 the Court doubles this award, yielding $81,319.72.[5] This punitive multiplier is
15 justified by Plaintiffs' brazen misconduct and relentless fraud. The Principals, AF
16 Holdings, Ingenuity 13, Prenda Law, and Gibbs are liable for this sum jointly and
17 severally, and shall pay this sum within 14 days of this order.

18    Second, there is little doubt that that Steele, Hansmeier, Duffy, Gibbs suffer
19 from a form of moral turpitude unbecoming of an officer of the court. To this end, the
20 Court will refer them to their respective state and federal bars.

21    Third, though Plaintiffs boldly probe the outskirts of law, the only enterprise
22 they resemble is RICO. The federal agency eleven decks up is familiar with their
23 prime directive and will gladly refit them for their next voyage. The Court will refer
24 this matter to the United States Attorney for the Central District of California. The
25 will also refer this matter to the Criminal Investigation Division of the Internal

26

27    [4] They appeared on behalf of the Doe Defendant in the case *Ingenuity 13 LLC v. Doe*, No. 2:12-cv-8333-ODW(JCx) (C.D. Cal. filed Sept. 27, 2012).
28    [5] This punitive portion is calculated to be just below the cost of an effective appeal.

Case 2:12-cv-08333-ODW-JC  Document 218-3  Filed 07/11/13  Page 67 of 71  Page ID
#:4174
Case 2:12-cv-08333-ODW-JC  Document 130  Filed 05/06/13  Page 11 of 11  Page ID #:2899

1  Revenue Service and will notify all judges before whom these attorneys have pending
2  cases.  For the sake of completeness, the Court requests Pietz to assist by filing a
3  report, within 14 days, containing contact information for: (1) every bar (state and
4  federal) where these attorneys are admitted to practice; and (2) every judge before
5  whom these attorneys have pending cases.

6      4.    *Local Rule 83-3 sanctions*

7      For the same reasons stated above, the Court will refer Duffy and Gibbs to the
8  Standing Committee on Discipline (for this District) under Local Rule 83-3.

9                          **V.    CONCLUSION**

10      Steele, Hansmeier, Duffy, Gibbs, Prenda Law, AF Holdings, and Ingenuity 13
11  shall pay, within 14 days of this order, attorney's fees and costs totaling $81,319.72 to
12  Doe.  The Court enters additional nonmonetary sanctions in accordance with the
13  discussion above.

14      **IT IS SO ORDERED.**

15      May 6, 2013

16
17
18                          OTIS D. WRIGHT, II
                            UNITED STATES DISTRICT JUDGE
19
20
21
22
23
24
25
26
27
28

11

# Exhibit J

ORIGINAL

Fee paid

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 7 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

John Steele
1111 Lincoln Rd Ste. 400
Miami Beach, FL 33139
Telephone: (708) 689-8131
johnlsteele@gmail.com

*In Propria Persona*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INGENUITY 13 LLC, | CASE NO. 2:12-CV-8333-ODW (JCx) |
| *Plaintiff,* | |
| v. | Judge:  Hon. Otis D. Wright, II |
| JOHN DOE, | Magistrate Judge:  Hon. Jacqueline Chooljian |
| *Defendant.* | **JOHN STEELE'S NOTICE OF APPEAL AND REPRESENTATION STATEMENT** |

1

1

## NOTICE OF APPEAL

2       NOTICE IS HEREBY GIVEN that John Steele hereby appeals to the United States

3  Court of Appeals for the Ninth Circuit from: (1) the Court's May 6, 2013 Order Issuing Sanctions

4  (ECF No. 130), attached as Exhibit A; (2) the Court's Order Granting Request for Leave to File a

5  Reply (ECF No. 116) attached as Exhibit B; (3) the Court's March 14, 2013 Order to show cause

6  (ECF No. 86) (amending and incorporating ECF No. 48) attached as Exhibit C; and (4) the Court's

7  Order to appear (ECF No. 66) attached as Exhibit D.

8

9                                          Respectfully submitted,

10  DATED: May 17, 2013

11

12                                      John Steele
                                       1111 Lincoln Rd Ste. 400

13                                       Miami Beach, FL 33139
                                       Telephone: (708) 689-8131

14                                        johnlsteele@gmail.com
                                       *In Propria Persona*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2